FILED
IN CLERKS OFFICE
2006 MAY 19 P 2:29
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JAMES TAMBONE and
ROBERT HUSSEY,

Defendants.

CIVIL ACTION NO. 06-10885 NMG

MAGISTRATE JUDGE Cohen

TRIAL BY JURY DEMANDED

RECEIPT #
AMOUNT $ N/A
SUMMONS ISSUED 4
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 5/19/06

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

## SUMMARY

1. From as early as 1998 and continuing through September 2003, the Defendants, senior executives of Columbia Funds Distributor, Inc. and its predecessor entity ("Columbia Distributor"), participated in a fraudulent scheme with Columbia Distributor, which had responsibility for selling and marketing over 140 of the mutual funds in the Columbia mutual fund complex (the "Columbia Funds"), and with Columbia Management Advisors, Inc. and predecessor companies ("Columbia Advisors"), the investment adviser to the funds.

2. In connection with the scheme, the Defendants – James Tambone ("Tambone"), Columbia Distributor's Co-President, and Robert Hussey ("Hussey"), its Managing Director for National Accounts – reaped financial benefits by allowing certain preferred customers to engage in short-term or excessive trading to the potential detriment of other investors in the funds. The Defendants allowed these preferred customers to do so even after they knew or were reckless in

not knowing that Columbia Advisors had determined and publicly stated to investors that "[e]xcessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses." In certain cases, the Defendants also blocked attempts by the funds' transfer agent to stop these customers from engaging in such trading.

3. Although the Defendants, by virtue of their positions within Columbia Distributor, were responsible for and directed the firm's efforts to sell the Columbia Funds to investors, they did not disclose to these investors the existence of these arrangements. Indeed, quite the contrary, in connection with selling the funds, the Defendants knowingly allowed Columbia Distributor to disseminate prospectuses that falsely represented that the funds did not permit or were otherwise hostile to market timing or other short-term or excessive trading because of its harmful effect on the funds. Further, Tambone, who as Columbia Distributor's Co-President was ultimately responsible for the distribution of the prospectuses, signed hundreds of agreements with fund purchasers in which he expressly represented and warranted that the prospectuses were not misleading. The Defendants engaged in this conduct even though even though they knew, or were reckless in not knowing, that the representations in the prospectuses were false.

4. In total, the Defendants negotiated, approved or knowingly permitted arrangements with at least eight investors allowing them to engage in frequent short-term trading in at least six different funds. After entering into these arrangements, the eight investors engaged in frequent short-term or excessive trading in at least sixteen different Columbia Funds, thereby threatening the interests of the other shareholders in those funds. Columbia Advisors was aware of all but one of the arrangements.

5. In connection with certain of the arrangements, the Defendants insisted that traders provide so-called "sticky assets" – long-term investments that were to remain in place in return for allowing the investors to actively trade in the funds. In some cases, the Defendants required investors who wanted to engage in frequent short-term trading in certain Columbia Funds to place long-term assets in other Columbia Funds.

6. The Defendants entered into, approved and/or knowingly allowed these arrangements despite the fact that they knew or suspected that these investors were engaged in "market timing," which can harm other mutual fund shareholders by diluting the value of their shares or causing them to incur additional costs.

7. Although such arrangements threatened the interests of investors in the funds in which short-term trading was allowed, the arrangements benefited Tambone and Hussey, whose compensation depended significantly upon the level of sales by Columbia Distributor, and benefited Columbia Distributor, which earned revenue based on the total amount of assets it caused to be invested in the funds. The arrangements also benefited Columbia Advisors, the investment adviser to the Funds, because it received advisory fees based on total assets under management.

8. Throughout the relevant period, neither the Defendants nor Columbia Advisors or Columbia Distributor (collectively, the "Columbia Entities") ever disclosed to the long-term or prospective shareholders of the Columbia Funds or to the independent trustees of the Columbia Funds the special arrangements they made with these short-term or excessive traders and the harm these arrangements posed to the relevant Columbia Funds. The Defendants and the Columbia Entities also did not disclose the resulting conflicts of interest these arrangements

created between Columbia Advisors and its clients. Nor did the Defendants or the Columbia Entities disclose the conflicts of interest created by the disparate treatment of investors in the same fund, which was a result of these arrangements (*i.e.*, while investors with special arrangements were allowed to engage in frequent trading, those without such arrangements were not). These non-disclosures constituted material omissions of fact.

9. Further, many of these arrangements and the trades made pursuant to them were directly contrary to certain representations contained in fund prospectuses that Columbia Advisors prepared, that Columbia Advisors and Columbia Distributor issued, and that Defendants used in their sales efforts by allowing them to be disseminated and by referring clients and potential clients to them for information on the funds. These fund prospectuses represented to investors that the funds did not permit market timing or other short-term or excessive trading because of its harmful effect on the funds. In other cases, these arrangements and trades were contrary to prospectus representations that the funds involved would allow no more than three or four exchanges per fund per year.

10. Hussey helped lead a working group that proposed processes and procedures designed to detect and deter market timing in the Columbia Funds and, on information and belief, he and Tambone reviewed and provided input into the market timing language that was incorporated into certain of the prospectuses. Tambone also falsely represented and warranted to fund purchasers that the prospectuses were not misleading.

11. As the underwriter of the Columbia Funds, Columbia Distributor had a duty to make a reasonable and diligent investigation of the statements contained in the prospectuses for the Columbia Funds to ensure that such statements were true and that there were no omissions of

material fact required to be stated in order to make the statements contained therein not materially misleading. As securities professionals and as executives who directed and had responsibility for Columbia Distributor's efforts to sell the Columbia Funds, the Defendants owed a similar special duty to those to whom they sold the funds. They had an obligation to investigate and analyze the prospectuses to ensure that the key representations in the literature provided to the investors were truthful and complete. Further, the Defendants were not entitled to ignore deliberately representations they knew to be false and they had an affirmative duty to disclose material information they knew about the funds to investors, particularly where that information contradicted information they knew or were reckless in not knowing had been provided to investors. Notwithstanding their duties, the Defendants assisted in the issuance of the misleading prospectuses by allowing them to be disseminated, by referring investors to the prospectuses in connection with their sales efforts, and by failing to correct the statements within the prospectuses that they knew or were reckless in not knowing were misleading. The Defendants engaged in this conduct in order to increase sales of the Columbia Funds and to thereby benefit themselves, Columbia Distributor, and Columbia Advisors.

12. Columbia Advisors had a fiduciary duty to act at all times in the best interests of the Columbia Funds it managed and of the investors in those funds. As a result, it had an affirmative obligation to act in the utmost good faith, and to provide full and fair disclosure of all material facts, including conflicts of interest, to investors and to the independent trustees of the Columbia Funds. It further had an affirmative obligation to act with reasonable care to avoid misleading investors.

13. By placing its own interest in generating fees from short-term or excessive traders

above the interests of long-term shareholders to whom this trading posed a risk of harm, and by allowing and failing to disclose these arrangements and the conflicts of interest they created, Columbia Advisors breached its fiduciary duty to the funds where the short-term or excessive trading took place and to the shareholders in those funds. Defendants aided and abetted Columbia Advisors' conduct insofar as they knew or were reckless in not knowing that the conduct was improper and they each knowingly rendered substantial assistance in this conduct.

14. By engaging in the transactions and practices alleged in this Complaint,

a. Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

b. Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)];

c. Defendants aided and abetted violations by Columbia Advisors and Columbia Distributor of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

d. Defendants aided and abetted Columbia Advisors' violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1) and (2)];

e. Defendants aided and abetted Columbia Distributor's violations of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)].

15. The conduct of Tambone and Hussey involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

16. Unless enjoined, the Defendants will continue to engage in acts, practices, and courses of business as set forth in this Complaint or in acts, practices, and courses of business of similar object and purpose. Accordingly, the Commission seeks the following against each

Defendant: (i) entry of a permanent injunction prohibiting him from further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of all ill-gotten gains, plus prejudgment interest thereon; (iii) imposition of civil monetary penalties; and (iv) such other equitable relief as the Court deems just and appropriate.

## JURISDICTION

17. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Additionally, the acts and practices alleged herein occurred primarily within the District of Massachusetts.

18. The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21 of the Exchange Act [15 U.S.C. § 78u], and Section 209 of the Advisers Act [15 U.S.C. §80b-9].

19. In connection with the conduct alleged herein, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

20. James Tambone, of Wellesley, Massachusetts, was Co-President of Columbia Distributor from November 2001 until April 2004. From 1997 to 2001, he served as Co-President of Liberty Funds Distributor, Inc. ("Liberty Distributor"), a predecessor of Columbia Funds Distributor, Inc. As Co-President of Columbia Distributor, Tambone shared responsibility for managing all of Columbia Distributor's activities, which included selling and marketing the

Columbia Funds and disseminating to investors the prospectuses for the funds. Throughout the relevant period, he was a registered securities principal.

21. Robert Hussey, of Bedford, Massachusetts, was Managing Director, National Accounts of Columbia Distributor from late January 2002 until March 2004. He had held the same position at Liberty Funds Distributor, Inc. from late 2000 to January 2002. Prior to that, from 1998 to late 2000, he had served as Senior Vice President of the Fee-Based Alliance Group at Liberty Distributor. Throughout the relevant period, he reported directly to Tambone and was a registered securities representative, an investment company products principal, and a municipal securities principal.

**RELATED ENTITIES**

22. Columbia Advisors, an Oregon corporation formerly known as Columbia Management Company, is a wholly-owned subsidiary of Columbia Management Group, Inc. ("Columbia Management"), which during the relevant period was a wholly-owned subsidiary of FleetBoston Financial Corporation ("Fleet"). On or about April 1, 2004, Bank of America Corporation became the successor to Fleet. Columbia Advisors, which has offices in Boston, has been an investment adviser registered with the Commission since 1969. In connection with its purchase of Liberty Financial Group ("Liberty") in November 2001, Fleet acquired various Liberty fund groups and investment advisers. The Liberty investment advisers included Liberty Advisory Services Corp., Colonial Management Associates, Inc., Stein Roe and Farnham Inc., Newport Pacific Management, Inc., Newport Fund Management, Inc., and Columbia Funds Management Company. In April 2003, these entities were merged with Fleet Investment Advisors Inc. into Columbia Advisors. (Six of the Columbia Funds, including the Acorn Fund

Group, continue to be advised by a separate entity, Columbia Wanger Asset Management, LP.) Following the merger, Columbia Advisors was the sponsor of approximately 140 Columbia Funds and remained primarily responsible for all representations made in the prospectuses for those funds.

23. Columbia Distributor, a Massachusetts corporation with offices in Boston, is a wholly-owned subsidiary of Columbia Management and during the relevant period was an indirect subsidiary of Fleet. Columbia Distributor has been a broker-dealer registered with the Commission since 1992. Throughout the relevant period, it acted as the principal underwriter and distributor for the Columbia Funds. In this role, it sold the Columbia Funds, and in connection with this activity, disseminated the prospectuses for the funds as well as sales materials that referred investors to the prospectuses for information on the funds. Prior to the Liberty acquisition in November, 2001, it went by the name of Liberty Funds Distributor, Inc. ("Liberty Distributor"). When Fleet acquired the Liberty funds, it kept in place the organization and management of Liberty Distributor and continued using that name on the prospectuses for the Liberty funds. Before and after the acquisition, the prospectuses for the Liberty funds stated that investors could request other information about the funds and discuss questions about the funds by contacting Liberty Distributor. Tambone, who had been Co-President of Liberty Distributor, became Co-President of Columbia Distributor, and Hussey maintained his position reporting to Tambone.

24. Columbia Fund Services, Inc. ("Columbia Services"), a subsidiary of Columbia Management, is the transfer agent for the Columbia Funds, with responsibility for identifying market timing activity in the funds. Prior to the acquisition of Liberty in November 2001, it was

called Liberty Fund Services, Inc.

## FACTS

***Defendants' Sales Mission***

25. As Co-President of Liberty Distributor and later Columbia Distributor during the relevant period, Tambone managed these entities and was responsible for sales and marketing of the Liberty, and later Columbia, funds, both directly and through intermediaries, such as financial advisers. In connection with this role, Tambone shared ultimate responsibility for ensuring that the prospectuses for the Columbia Funds were disseminated to the investors in those funds. As the Co-President of Columbia Distributor, Tambone was also involved in the process of revising the prospectuses for the funds at times when it was decided that the sales organization needed to be aware of or provide input to proposed changes.

26. As Senior Vice President of the Fee-Based Alliance Group of Liberty Distributor from 1998 to late 2000, Hussey was responsible for selling the funds to investment advisers and others to invest in on behalf of their clients. Hussey then assumed additional responsibility for Liberty's National Accounts group, which maintained relationships between Liberty and all broker-dealers through whom Liberty sold its funds. Hussey's title was changed to Managing Director, National Accounts. In this role, Hussey managed and directed the efforts of the groups within Columbia Distributor that made virtually all its sales. In early 2002, Hussey gave up official responsibility for the Fee-Based Alliance Group, but continued as head of the National Accounts group until August 2003. In this capacity, he continued to direct Columbia Distributor's efforts to sell the funds to investment advisers, all broker-dealers, hedge funds, and others.

27. During the entire relevant period, Tambone's and Hussey's compensation depended in significant part on mutual fund sales. Tambone's compensation was comprised of a salary, a bonus based on net sales, and a commission based on gross sales. The commission comprised over half of his compensation. Similarly, over half of Hussey's total annual compensation was comprised of commissions he received on the basis of fund sales.

***Market Timing***

28. Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal *per se*, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

29. Although market timing itself is not illegal, mutual fund advisers have an obligation to ensure that mutual fund shareholders are treated fairly and that one group of shareholders (*i.e.,* market timers) is not favored over another group of investors (*i.e.*, long-term investors). Further, when a fund represents in its prospectus that it will act to discourage market timing, it cannot knowingly permit such activities.

30. As set forth below, Tambone and Hussey were aware that market timing and short-term or excessive trading posed threats to the interests of other shareholders in the funds where such trading took place. Among other things, the Defendants knew or were reckless in not knowing that Columbia Advisors had determined and publicly stated to investors that

"[e]xcessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses."

***The Funds' Disclosures***

31. The Columbia Funds are a group of funds that were owned by Fleet. This group includes several funds (*e.g.*, the Acorn, Newport, and Stein-Roe fund groups) that had belonged to Liberty until late 2001, when Liberty was acquired by Fleet. By September 2003, the names of the various fund groups Fleet owned had been changed so that all were uniformly referred to by the name Columbia.

32. From 1998 through 2000, the prospectuses for various of the Columbia Funds contained disclosures stating that shareholders would be limited in the number of exchanges they could make during a given period. For example, the prospectuses for the Acorn Fund Group represented that investors would generally be permitted to make only up to four round trip exchanges per year, defining a round trip as an exchange out of one fund into another fund and then back again.

33. Further, starting in May 1999, certain of the Columbia Funds belonging to the Acorn Fund Group began representing in their respective prospectuses that "[t]he Acorn funds do not permit market-timing and have adopted policies to discourage this practice."

34. In early 2000, Hussey and Columbia Services' President led a working group formed to create processes and procedures designed to detect and deter market timing in the Columbia Funds. This group recommended formulating a consistent position regarding market timing and communicating that position "via appropriate language in the funds' prospectuses . . . ." As a result of the efforts of the working group, changes were made to the prospectuses for a

number of Columbia Funds.

35. More specifically, in the fall of 2000, a number of the Columbia Funds belonging to Liberty at the time began including in their respective prospectuses the following disclosure, which expressly stated that short-term or excessive trading was prohibited (the "Strict Prohibition"):

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

36. On information and belief, Hussey, by virtue of his role as co-lead of the working group, and Tambone reviewed the market timing representations before they were included in the prospectuses and they communicated their comments on these representations to in-house counsel for Columbia Advisors who were involved in drafting the representations. On or about April 27, 2000, in-house counsel for Columbia Advisors asked Tambone if he had a chance to review a document attached to a prior e-mail which set forth "the approach for policing and eliminating market timers from the [Columbia Funds belonging to Liberty at the time] that we are in the process of implementing internally." The next day, Tambone provided his comments on the document and copying Hussey, asked him to do the same.

37. Thereafter, in early May 2000, Tambone received at least five e-mails from in-house counsel for Columbia Advisors regarding the proposed amendment of the prospectus language addressing market timing. On May 9, 2000, he forwarded to Hussey one of these e-

mails, entitled "Market Timers/Disclosure," and he invited Hussey to respond to the e-mail "if you believe this change is a problem." On May 10, 2000, Tambone sent Hussey another e-mail regarding market timers. The same day, Hussey sent an e-mail to in-house counsel with his comments on the proposed prospectus language. In similar fashion, on May 15, 2000, Tambone sent an e-mail to in-house counsel with his comments on the issue. Tambone and Hussey knew or were reckless in not knowing that the prospectuses for the Columbia Funds were disseminated to the public. The Columbia Entities have, to date, asserted a claim of attorney-client privilege with respect to these communications and numerous other communications that Hussey and Tambone had with in-house counsel for the Columbia Entities regarding prospectus representations during the relevant timeframe.

38. By the spring of 2001, the rest of the Columbia Funds belonging to Liberty began including the Strict Prohibition in their prospectuses. Columbia Advisors retained this disclosure language upon Fleet's acquisition of the funds from Liberty, and in early 2002, adopted the same disclosure for most of the funds that had belonged to Fleet prior to the acquisition. In the Spring of 2003, Columbia Advisors amended the Strict Prohibition language in certain of the prospectuses to make clear that other funds distributed by Columbia Distributor similarly reserved the right to reject trade requests from market timers or investors with a pattern of short-term or excessive trading.

39. Tambone and Hussey knew or were reckless in not knowing that the prospectuses for the Columbia Funds prohibited short-term or excessive trading or otherwise expressed a hostility towards such trading. They also knew or were reckless in not knowing that they had to act consistently with these disclosures.

***Tambone's Misrepresentations in Selling Agreements***

40. Throughout the relevant timeframe, Columbia Distributor made the majority of its sales of shares of the Columbia Funds to other broker-dealers. These broker-dealers, in turn, generally sold the shares to their own customers, but they did so as principals for their own account and not as agents of Columbia Distributor. The sales from Columbia Distributor to the broker-dealers were generally governed by a standard "Selling Agreement" entered into by Columbia Distributor and the broker-dealer (the "Selling Agreement"). Throughout the relevant timeframe, Tambone signed hundreds of these agreements as the Chief Executive Officer of Liberty Distributor.

41. In each Selling Agreement, Tambone stated, "[W]e offer to sell to you shares of each of the open-end investment companies for which we are the principal distributor or underwriter" on the terms set forth in the agreement. Each agreement set forth procedures by which the customer would purchase shares of the Columbia Funds from Columbia Distributor and pay for them. In each agreement, Tambone referred the purchaser to the fund prospectuses for information on the funds and also stated, "We shall furnish Prospectuses and sales literature upon request."

42. In each Selling Agreement, Tambone also expressly represented and warranted that

> (a) the Prospectus of each Fund and all sales literature we issue for distribution to the public will comply with all applicable state and Federal laws, rules and regulations[;and]
>
> (b) each Prospectus and all sales literature we issue will not by statement or omission be misleading . . . .

43. Tambone knew or was reckless in not knowing that the prospectuses for the Columbia Funds were misleading in that the prospectuses stated that short-term or excessive trading was prohibited or otherwise expressed a hostility towards such trading. He also knew or was reckless in not knowing that he had to act consistently with these disclosures.

**Defendants Agreed to Allow Short-Term or Excessive Trading**
**In Columbia Funds, in Contravention of Disclosures**

44. During the period from at least 1998 and continuing through summer 2003, as Columbia Distributor executives, Tambone entered, approved, or knowingly allowed at least six, and Hussey entered into, approved, or knowingly allowed at least seven, arrangements with investment advisers, hedge funds and brokers allowing them to engage in frequent trading in particular mutual funds. The investors with the arrangements made multiple "round trips" (each round trip consisting of a purchase and subsequent sale) per month and some made hundreds of round trips during this approximately five-year period, in amounts totaling approximately $2.5 billion. Further, much of this trading was directly contrary to the prospectus disclosures for the funds in which it occurred. Columbia Advisors knew and approved of all but one of these arrangements.

***A. Ilytat's Arrangement and Trading***

45. From April 2000 through October 2002, Ilytat, L.P., a San Francisco hedge fund, and its affiliates ("Ilytat") made almost 350 round trips in seven international Columbia Funds. A substantial number of these trades were made pursuant to an arrangement approved by Hussey, with Tambone's knowledge, which allowed Ilytat to engage in frequent and short-term trading in the Newport Tiger Fund (the "Newport Tiger Fund"), an Asian equity fund. Columbia Advisors

initially approved the arrangement.

46. Through 2000 and early 2001, the prospectus for the Newport Tiger Fund noted that "[s]hort-term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders." Starting in May 2001, the prospectus included the Strict Prohibition representation.

47. Notwithstanding the language in the prospectus, in or about early 2000, Hussey met with Ilytat's principals, and discussed and approved a "sticky assets" arrangement, under which Ilytat would place $20 million in the Newport Tiger Fund, with two-thirds of that amount to remain static and one-third to be actively traded. Tambone approved or became aware of the arrangement in or before October 2000. According to internal calculations for the Newport Tiger Fund, during 2000, Ilytat made purchases or exchanges totaling over $133 million in the fund and redeemed $104 million. Further, during the first five months of 2001, Ilytat's purchases or exchanges accounted for $72 million out of the $204 million in total purchases made by all investors in the Newport Tiger Fund. During the same five-month period, Ilytat made redemptions totaling $60 million.

48. By June 2000, a senior executive of Columbia Advisors became concerned that Ilytat appeared to be making weekly trades of $7 million in and out of the Newport Tiger Fund. Beginning no later than October 2000, the portfolio manager for the Newport Tiger Fund, who had initially approved the arrangement, repeatedly wrote to Tambone and Hussey expressing concern about Ilytat's trading activity and the harm that this trading activity could have on the fund and its investors.

49. In October 2000, in an e-mail to Tambone, Hussey and others discussing Ilytat, the portfolio manager stated: "[T]heir active trading has increased and it has become unbearable. There will be long term damage to the fund." He further noted, "Let's understand that they [timers] really are not investors. They take advantage of the fund's delayed pricing mechanism which almost guarantees a risk free return . . . I hope wholesalers understand that by accepting a flipper's [*i.e.*, a short-term trader's] investment they do damage to the fund's performance, tax status, and the other shareholders (their clients)." In his response, which was copied to Tambone, Hussey set forth guidelines for such arrangements, which included:

- Identify and close a long-term asset stream as a quid-pro-quo to any short-term movements;
- Dictate that any short-term movements must use a Liberty money market option to ensure gross sales are not artificially inflated and to ensure that Liberty generates constant management fee income;
- Bring the potential relationship to the attention to[sic] the relevant investment management team early; and
- Monitor the relationship to ensure the investment management team's comfort.

Hussey also stated that the Ilytat arrangement followed these guidelines.

50. Tambone and Hussey, however, ignored the portfolio manager's warnings that Ilytat's trading was harming his fund and that allowing it to continue would result in long-term damage to the fund and harm to investors. Although Hussey represented that he would halt Ilytat's trading, in fact neither Hussey nor Tambone took any steps, or caused others to take steps, to restrict or stop Ilytat and Ilytat continued to engage in short-term and frequent trading.

51. In March 2001, in another e-mail sent to Tambone, Hussey and others, the Tiger Fund portfolio manager stated that "Newport . . . and the fund's long-term shareholders are all

negatively impacted by flippers" and he suggested that action be taken. Neither Tambone nor Hussey, however, took any action or caused anyone else to take action to halt Ilytat's trading. On other occasions, the portfolio manager and his superior spoke directly Tambone about market timing issues, including concerns about the negative impact on his funds caused by frequent movements of large amounts of cash in and out of the fund, making it difficult to manage the funds. Notwithstanding these concerns, neither Tambone nor Hussey took any action to halt Ilytat's trading.

52. Hussey instead took affirmative steps to shield Ilytat from any action by the Columbia Service personnel charged with detecting and halting market timing in the funds. By March 2001, with Hussey's approval, Ilytat had been placed on a list of "Authorized Accounts for Frequent Trading," a list of accounts maintained by Columbia Services against which no action was to be taken, however frequent their trading. In addition, Hussey directly intervened to block efforts by surveillance or operations personnel to halt Ilytat's timing activity in the Tiger Fund. In 2002, for example, Hussey reversed a stop placed on Ilytat's trading by Columbia Services market timing surveillance personnel. Ilytat continued trading for almost three more months thereafter.

53. Ilytat was allowed to continue trading in the Newport Tiger Fund until September 2002. During the 30 months from April 2000 to September 2002 during which it actively traded in the Newport Tiger Fund, Ilytat made almost 90 round trips in amounts of up to $13 million apiece. This activity included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Strict Prohibition representation.

54. Ilytat also traded extensively in the Acorn International Fund during the period

from September 1998 through October 2003. From September 1998 through September 2000, the prospectus for the fund stated that investors would be permitted to make only up to four round trips per year. Further, as of May 1999, the prospectus for the fund stated that market timing would not be permitted in the fund. In addition, by the end of September 2000, the Strict Prohibition representation was included in the fund's prospectus.

55. Despite these representations, from September 1998 through October 2003, Ilytat made 73 round trips in the Acorn International Fund, including 27 round trips in 1999 and 18 round trips in 2000. From July 2000 to December 2001, the period during which it most actively traded the fund, Ilytat made at least 40 round trips in the fund in amounts of up to $15 million. This activity included 27 round trips made after the Strict Prohibition representation had been included in the fund's prospectus.

56. In March 2001, Hussey intervened when a portfolio assistant to the Acorn International Fund had telephoned the broker responsible for the Ilytat account and asked him to stop Ilytat from violating the fund's short-term trading policy. Hussey caused the Columbia Services manager responsible for market timing surveillance to telephone the portfolio assistant and tell her that it was "inappropriate" for her to take any direct steps to halt Ilytat's trading. In December 2001, Hussey's subordinate, copying Hussey on his e-mail, intervened when the portfolio manager for Acorn International Fund complained about Ilytat's market timing adversely impacting her fund and tried to halt it. Ilytat was allowed to continue trading.

57. Ilytat also traded extensively in the Acorn International Select Fund during the period from July 2000 through June 2001. Throughout this period, the prospectus for the Acorn International Select Fund included the Strict Prohibition representation. Contrary to this