UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | 06-10885 NMG |
| v. ) | |
| ) | |
| JAMES TAMBONE and ) | |
| ROBERT HUSSEY, ) | **ORAL ARGUMENT** |
| ) | **REQUESTED** |
| Defendants. ) | |

## SEC'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Luke T. Cadigan
Celia Moore
David London
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
33 Arch Street, 23rd Floor
Boston, Massachusetts
(617) 573-8919 (Cadigan)
(617) 573-4590 (Facsimile)

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..................................................................1

ARGUMENT.........................................................................................2

I.      THE STANDARD FOR DECIDING A MOTION TO DISMISS....................2

II.     THE SEC HAS ALLEGED A PRIMARY VIOLATION OF §10(b)
BY EACH OF THE DEFENDANTS................................................3

      A.     Tambone and Hussey Made Material
Misrepresentations in the Prospectuses...............................3

           1.     The Prospectuses Were Misleading....................................3

           2.     Tambone and Hussey Made Material
Misrepresentations.................................................6

                   i.     The Public Attribution Requirement
Does Not Apply to SEC Enforcement Actions..............6

                   ii.    Hussey and Tambone Made Misrepresentations
in and by Means of the Prospectuses........................7

      B.     Tambone Made Misrepresentations in the Selling Agreements.............8

      C.     The Defendants' Material Omissions......................................10

           1.     The Nature of the Material Omissions.................................10

           2.     The Defendants Had a Duty to Disclose..............................14

      D.     The Defendants Engaged in a Fraudulent Scheme..........................13

      E.     The SEC Has Alleged Facts Supporting a
Strong Inference of Scienter............................................18

III.    THE SEC HAS PROPERLY PLED PRIMARY VIOLATIONS
OF SECTION 17(a).......................................................21

IV.    THE SEC HAS PROPERLY PLED ITS AIDING AND
ABETTING CLAIMS.......................................................22

    A.    The SEC Has Alleged Primary Violations by
         Columbia Advisors and/or Columbia Distributor............................23

    B.    The Defendants had the Requisite State of Mind
         for Aiding and Abetting.........................................................24

    C.    The Defendants Provided Substantial Assistance to the Scheme...........26

V.    THE VIOLATIONS PRIOR TO MAY 19, 2001 REMAIN
    ACTIONABLE IN THIS ENFORCEMENT PROCEEDING...................…..27

VI.    HOLDING DEFENDANTS LIABLE WOULD NOT VIOLATE
     DUE PROCESS..............................................................…...............…..29

CONCLUSION..................................................................................30

REQUEST FOR ORAL ARGUMENT.......................................................30

# TABLE OF AUTHORITIES

## CASES

*Aaron v. SEC,*
    446 U.S. 680 (1980)……………………………………………………21,22

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972)………………………………………...…………….15

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002)...…………………………...…..18, 19

*Antinoph v. Laverell Reynolds Secs., Inc.,*
    703 F. Supp. 1185, 1188 (E.D. Penn. 1989) ……………………..………...….13

*Austin v. Bradley, Barry & Tarlow, P.C.,*
    836 F. Supp. 36 (D. Mass. 1993)…………………………………….25

*Barker v. Henderson, Franklin, Starnes & Holt,*
    797 F.2d 490 (7th Cir. 1986)………………...……………..……….25

*Central Bank of Denver v. First Interstate Bank of Denver,*
    511 U.S. 164 (1994)…………….…………...……………………...……….25

*Chiarella v. United States,*
    445 U.S. 222 (1980)……………….…………………….…………...15

*Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,*
    480 F.2d 341 (2d Cir. 1973)………………………………………….14

*Cleary v. Perfectune, Inc.,*
    700 F.2d 774 (1st Cir. 1983)…………………...……………...…………24

*Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.,*
    800 F.2d 177 (7th Cir. 1986) …………………………………….14

*Conway v. Icahn & Co.,*
    16 F.3d 504, 510 (2d Cir.1994) ………………………………...14

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990)……………...………..………..……….25

*Estate of Soler v. Rodriguez,*
    63 F.3d 45 (1st Cir. 1995)…………...……..…..……………………...18

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)…………………………………………………………18

*Feeney v. SEC,*
    564 F.2d 260 (8th Cir. 1977)……………...………………………………13

*Grandon v. Merrill Lynch & Co., Inc.,*
    147 F.3d 184 (2d Cir. 1998) ……………………………………………12

*Greebel v. FTP Software, Inc.,*
    194 F.3d 185 (1st Cir. 1999)…………………...….………………………2, 19

*Hanly v. SEC,*
    415 F.2d 589 (2d Cir. 1969)………………………...…………………..13

*Hiller v. SEC,*
    429 F.2d 856 (2d Cir. 1970)………………………...………………..14

*In re Alstom SA Secs. Litig.,*
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)…………………………...6, 14, 15

*In re Enron Corp. Secs.,*
    235 F. Supp. 2d 549 (S.D. Tex. 2002)………………………...…………14, 16

*In re Fidelity/Micron Secs. Litig,*
    964 F. Supp. 539 (D. Mass. 1997)……………………….……………11

*In re Global Crossing Ltd. Sec. Litig.,*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)…………………….………6, 14, 15

*In re Lernout & Hauspie Sec. Litig.,*
    236 F. Supp. 2d 161 (D. Mass. 2003)…………………………………16

*In re Mutual Funds Inv. Litig.,*
    384 F.Supp.2d 845 (D.Md. 2005)……………………………...16, 17, 21, 25

*In re Scholastic Corp. Sec. Litig,*
    252 F.3d 63 (2d Cir. 2001)……………………………...……………6, 7

*In re Suprema Specialties, Inc. Sec. Litig.,*
    438 F.3d 256, 282 (3d Cir. 2006) …………………….…………….....13

*In re ZZZZ Best Sec. Litig.,*
    864 F. Supp. 960(C.D.Cal.1994) …………………………………15

*Johnson v. SEC,*
   87 F. 3d 484 (D.C. Cir. 1996)...........................................................28

*Keenan v. D.H. Blair & Co., Inc.,*
   838 F. Supp. 82 (S.D.N.Y. 1993)..................................................13

*Luce v. Edelstein,*
   802 F.2d 49 (2d Cir. 1986)..........................................................5, 9, 10

*Mishkin v. Peat Marwick, Mitchell & Co.,*
   658 F. Supp. 271 (S.D.N.Y. 1987)...............................................24

*Moss v. Morgan Stanley Inc.,*
   719 F.2d 5, 15 (2nd Cir.,1983) ...................................................13

*North Bridge Assocs., Inc. v. Boldt,*
   274 F.3d 38 (1st Cir. 2001)..........................................................2

*Press v. Chemical Investment Services Corp.,*
   166 F.3d 529, 536, (2d Cir. 1999)................................................14

*Pross v. Katz,*
   784 F.2d 455 (2d Cir. 1986)..........................................................9

*Roeder v. Alpha Indus., Inc.,*
   814 F.2d 22, 26-27 (1st Cir. 1987) ...............................................12

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*
   570 F.2d 38 (2d Cir. 1978)............................................................13

*Sanders v. John Nuveen & Co.,*
   554 F.2d 790 (7th Cir. 1977).........................................................14

*Shaw v. Digital Equipment Corp.,*
   82 F.3d 1194 (1st Cir.1996) .........................................................12

*SEC v. Calvo,*
   378 F.3d 1211 (11th Cir. 2004).....................................................28

*SEC v. Coven,*
   581 F.2d 1020 (2d Cir. 1978).........................................................24

*SEC v. Credit Bancorp,*
   195 F. Supp. 2d (S.D.N.Y. 2002)....................................................6

*SEC v. Currency Trading Intern., Inc.,*
No. CV 02-05143PA., 2004 WL 2753128 (C.D. Cal. Feb. 02, 2004).....................13

*SEC v. Downe,*
No. 92 Civ. 4092, 1994 WL 67826 (S.D.N.Y. March 3, 1994)..................................28

*SEC v. Druffner,*
353 F. Supp. 2d 141 (D. Mass. 2005).....................................................................*passim*

*SEC v. Dunlap,*
2002 WL 1007626 (S.D. Fla. 2002)...........................................................................6

*SEC v. Fife,*
311 F.3d 1 (1st Cir. 2002)...........................................................6, 18, 21, 22

*SEC v. First Jersey Secs.,*
101 F.3d 1450 (2d Cir. 1996)..................................................................................21

*SEC v. Gann,*
No.Civ.A. 305CV0063L, 2006 WL 616005 (N.D. Tex. Mar. 13, 2006)...........17, 18

*SEC v. GLT Dain Rauscher, Inc.,*
254 F.3d 852 (9th Cir. 2001)...........................................................................13, 22

*SEC v. Hasho,*
784 F. Supp. 1059 (S.D.N.Y. 1992)........................................................................13

*SEC v. JB Oxford Holdings, Inc.,*
No. CV-04-070, slip op. (Nov. 10, 2004).................................................................17

*SEC v. Jones,*
No. 05 Civ. 7044(RCC), 2006 WL 1084276 (Apr. 25, 2006).......................28, 29

*SEC v. KPMG, LLP,*
412 F. Supp. 2d 349 (S.D.N.Y. 2006)..................................................................6, 7

*SEC v. Lybrand,*
200 F. Supp. 2d 384 (S.D.N.Y. 2002),
*aff'd, SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ........................................24

*SEC* v. Meltzer,
No. 03 Civ. 0770(DRH)(ETB), 2006 WL 1896329 (E.D.N.Y., July 10, 2006) ...9

*SEC v. Moran,*
922 F. Supp. 867 (S.D.N.Y. 1996).........................................................................23

*SEC v. Ogle,*
    2000 WL 45260 (N.D. Ill. Jan. 11, 2000)…………………………………….28

*SEC v. PIMCO Advisors Fund Management LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)………………………………………*passim*

*SEC v. Ponce,*
    345 F.3d 722 (9th Cir. 2003)………………………………..…………………24

*SEC v. Rind,*
    991 F.2d 1486 (9th Cir. 1993)…………………………...…………………..……………28

*SEC v. Sargent,*
    229 F.3d 68 (1st Cir. 2000)………………………………………………………8

*SEC v. Saul,*
    133 F.R.D. 115 (N.D. Ill. 1990)……………………………………………….8

*SEC v. Tambone,*
    417 F. Supp. 2d 127 (D. Mass. 2006)………………………..………………*passim*

*SEC v. Treadway,*
    354 F. Supp. 2d 311 (S.D.N.Y. 2005)…………………………...……7, 10, 12

*SEC v. Treadway*
    430 F. Supp. 2d 293 (S.D.N.Y. 2006)……………………………………8, 26, 27

*SEC v. Williams,*
    884 F. Supp. 28 (D. Mass. 1995)…………………………………...………..28

*SEC v. Zandford,*
    535 U.S. 813, 823 (2002) ……………………………………...…..……13, 25

*Superintendent of Ins. of State of New York v. Bankers Life & Casualty Co.,*
    404 U.S. 6 (1971)…………………………………………………...…..…15

*TAG/ICIB Servs., Inc. v. Pan American Grain Co.,*
    215 F.3d 172 (1st Cir. 2000)……………………………..…………………………2

*Threadgill v. Black,*
    730 F.2d 810, 811-12 (D.C. Cir. 1984) ……………………..………………...9

*Torres Ramirez v. Bermudez Garcia,*
    898 F.2d 224 (1st Cir. 1990)……………………………………………...…..28

*United States v. Banks,*
   115 F.3d 916 (11th Cir.1997) ……………………………………...…28

*United States v. Windward Properties, Inc.,*
   821 F. Supp. 690 (N.D.Ga.1993)...…………………………………...…28

*United States v. Telluride Co.,*
   146 F.3d 1241, 1248 (10th Cir. 1998)………………………………...…28

*Upton v. SEC,*
   75 F.3d 92 (2d Cir. 1996)……………………………………….………29

*Walker v. SEC,*
   383 F.2d 344 (2d Cir. 1967)……………………………………….……13

*Walling v. Beverly Enterprises,*
   476 F.2d 393, 396 (9th Cir.1973) …………………………………..……9

*Wright v. Ernst & Young, LLP,*
   152 F.3d 169 (2d Cir. 1998)……………………………………….……..6

## STATUTES & REGULATIONS

Section 17(a) of the Securities Act of 1934…………………………………...*passim*

Section 15(c) of the Securities Exchange Act. Act of 1933……………………2, 14, 22, 24

Section 10(b) of the Securities Exchange Act of 1933…………………………*passim*

Rule 10b-5 under the Securities Exchange Act of 1933……………..………………*passim*

Section 206 of the Investment Advisers Act of 1940 ………..………………......2, 22, 23

Fed. R. Civ. P. 9(b) ………………………………………………………...…2, 5, 10

# PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission (the "SEC") hereby opposes the motions to dismiss filed by Defendants James Tambone ("Tambone") and Robert Hussey ("Hussey"). In its Complaint, the SEC has alleged, with particularity, that the Defendants, the senior executives responsible for selling the Columbia Funds, participated in a fraudulent scheme with Columbia Funds Distributor, Inc. ("Columbia Distributor"), the underwriter to the funds, and Columbia Management Advisors, Inc. ("Columbia Advisors"), the investment adviser to the funds. In connection with the scheme, the Defendants allowed certain preferred customers (the "Preferred Customers") to engage in short-term or excessive trading even though the Defendants knew that such trading posed a threat to other shareholders by diluting the value of their shares or causing them to incur additional costs. The Defendants, whose compensation was largely dependant on sales of the Columbia Funds, engaged in this conduct in order to increase those sales and to thereby benefit themselves, Columbia Distributor, and Columbia Advisors.

Although the Defendants, as securities professionals responsible for selling the funds, had a fiduciary duty to investors, they did not disclose to these investors the existence of these arrangements. Indeed, quite the contrary, they participated in the process of drafting prospectus disclosures that falsely represented that the funds did not permit or were otherwise hostile to market timing or other short-term or excessive trading. Hussey helped lead the market timing working group whose efforts lead to those disclosures. Further, as the SEC has alleged on information and belief, Hussey and Tambone reviewed and commented upon these disclosures before they were included in the prospectuses. The Defendants then used these prospectuses in their sales efforts by allowing them to be disseminated and by referring clients and potential clients to them for information on the funds. In addition, the SEC has alleged Tambone signed

hundreds of agreements with fund purchasers in which he expressly represented and warranted that the prospectuses would not be misleading.

By this conduct, the SEC has alleged that the Defendants engaged in fraud in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder. The SEC has also alleged that the Defendants aided and abetted violations by Columbia Advisors and Columbia Distributor of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; violations by Columbia Advisors of Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"); and violations by Columbia Distributor of Section 15(c) of the Exchange Act.

## ARGUMENT

## I.     THE STANDARD FOR DECIDING A MOTION TO DISMISS

In ruling on the Defendants' motions to dismiss, the Court must accept as true all factual allegations in the Complaint and must "indulge every reasonable inference in favor of allowing the lawsuit to proceed." *See North Bridge Assocs., Inc. v. Boldt,* 274 F.3d 38, 40 (1st Cir. 2001); *TAG/ICIB Servs., Inc. v. Pan American Grain Co.*, 215 F.3d 172, 175 (1st Cir. 2000). Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Estate of Soler v. Rodriguez*, 63 F.3d 45, 53 (1st Cir. 1995). Applying this standard, the Court should deny the Defendants' motions.

Because the SEC's allegations rest primarily on fraud, the Complaint must satisfy the requirements of Rule 9(b). *See SEC v. Druffner*, 353 F. Supp. 2d 141, 148 (D. Mass. 2005) (Gorton, J.). Courts in the First Circuit interpret Rule 9(b) to require that the complaint allege the "time, place, and content of the alleged misrepresentations with specificity." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).

## II.   THE SEC HAS ALLEGED A PRIMARY VIOLATION OF § 10(B) BY EACH OF THE DEFENDANTS

The elements of an action for securities fraud under Section 10(b) of the Exchange Act

(and Rule 10b-5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the

same. *See SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (Gorton, J.). "To

establish that a defendant engaged in 'fraudulent conduct' as defined by the securities laws, the

SEC must show that the defendant: 1) made an untrue statement of material fact, 2) omitted a

fact that rendered a prior statement misleading or 3) committed a manipulative or deceptive act

as part of a scheme to defraud." *See Tambone*, 417 F. Supp. 2d at 131-32.

The SEC has alleged that the Defendants made material misrepresentations to customers

of the Columbia Funds.  More specifically, the SEC has alleged that Tambone made

misrepresentations to customers in the Selling Agreements he signed and that Tambone and

Hussey made misrepresentations to investors by means of the false prospectuses that were

delivered to investors.

### A.   Tambone and Hussey Made Material Misrepresentations in the Prospectuses

#### 1.   The Prospectuses Were Misleading

The SEC has alleged that the prospectuses for the Columbia Funds were misleading in

that falsely represented that the funds did not permit short-term or excessive trading or were

otherwise hostile to such trading. *See, e.g.,* Complaint, at ¶¶ 31-39.[1]  Hussey suggests that

---

[1] In support, the Complaint places particular emphasis on the following prospectus disclosure regarding short-term or excessive trading:

> The Fund does not permit short-term or excessive trading in its shares.  Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses.  In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund.  The funds into which you would like to exchange may also reject your request.

because the disclosure at issue states that the respective fund reserves the right to reject trades, it is not an absolute prohibition against short-term or excessive trading and is therefore not misleading. *See* Defendant Hussey's Memorandum in Support of Motion to Dismiss, at 16.  In its decision on the initial motion to dismiss in *SEC v. PIMCO Advisors Fund Management LLC, ("PIMCO I")*, the court rejected a similar argument with respect to language that was not even as definitive as the language at issue here.[2] 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004).  The court found that the disclosures there were misleading even though they did not formally prohibit market timing under all circumstances, because "they gave the clear impression to investors that the PIMCO Funds were hostile to market timing activities and intended for use by long-term investors at the same time that PIMCO was negotiating and maintaining a market timing relationship with Canary [a customer]." *Id.* at 464.  The court reasoned that "even if the Canary arrangement was not strictly prohibited by the alleged disclosures, the disclosures were clearly misleading *under the circumstances* because they informed investors that the management of the PIMCO Funds would act to protect the interests of long-term investors from market-timers at the same time that the Funds were, under the direction of [defendants], allegedly facilitating an undisclosed market timing arrangement." *Id.* (emphasis added).  The court concluded that "[b]ecause the disclosures here could easily be read by a factfinder to strictly limit market timing, and because the Canary arrangement was so out of keeping with the PIMCO's Funds' policy against market timing, dismissal of the SEC's misrepresentation claim is inappropriate at this stage of the proceedings." *Id.*

---

*Id.*, at ¶ 35.

[2] The *PIMCO* disclosure repeatedly stated that the fund reserved the right to refuse a purchase.  Among other circumstances, it could do so if in the judgment of the fund advisor, the purchase would adversely affect the fund and its shareholders. *Id.* at 459.  Unlike the disclosure in this matter, the *PIMCO* disclosure did not expressly state that the fund "does not permit short-term or excessive trading in its shares."

Here, the SEC alleges that the fund prospectuses contained misrepresentations that, as in *PIMCO I*, gave the clear impression that the Columbia Funds were hostile to market timing activities at the same time that the Defendants were negotiating, approving, or knowingly permitting short-term or excessive trading relationships with the Preferred Customers. In the Complaint, the SEC specifically identifies those fund prospectuses that contained misrepresentations and identifies what those misrepresentations were. *See* Complaint, at ¶¶ 46, 54, 57, 62, 64, 67, 68, 87, 88, 91; *see also Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("Reference to the Offering Memorandum satisfies [Rule] 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations."). The Complaint also alleges that even prior to the adoption of the Strict Prohibition language, certain of the prospectuses (each of which is specifically identified in the Complaint) were affirmatively misleading insofar as they contained other language stating that market timing would not be permitted, or generally limiting investors to three-to-four trades per year. *See* Complaint, at ¶¶ 46, 54, 58, 62, 78, 88. For each of the prospectuses, the Complaint alleges when the misleading language was in effect.[3] In short, the Complaint sets forth the misrepresentations in the prospectuses with particularity.

---

[3] The Complaint also identifies the eight Preferred Customers with market timing arrangements that were negotiated, approved or knowingly permitted by Defendants, the nature of those arrangements, Defendants' respective roles in those arrangements, and the timeframe those arrangements were entered into. *See id.* at ¶¶ 45-93. In addition, to highlight the misleading nature of the disclosures regarding short-term or excessive trading, the SEC has detailed the trading activity of the Preferred Customers in each of the affected funds. *See id.* at ¶¶ 47, 53-55, 57-59, 62, 64, 65, 67, 68, 73-74, 78, 82, 86-88, 90, 91; *see also Druffner*, 353 F. Supp. 2d at 148 (finding requirements of Rule 9(b) met where complaint alleged, *inter alia*, the seven principal clients for whom market timing trades were processed and their trading activity).

### 2.   **Tambone and Hussey Made Material Misrepresentations**

#### i.   **The Public Attribution Requirement Does Not Apply to SEC Enforcement Actions**

In its decision dismissing the initial complaint brought by the SEC against the Defendants (the "Initial Decision"), the Court, citing *Wright v. Ernst & Young, LLP,* 152 F.3d 169, 175 (2d Cir. 1998), suggested that in order to establish primary liability for a material misstatement or omission, the misrepresentation must be attributed to the defendant at the time of the public dissemination. *See Tambone*, 417 F. Supp. 2d at 133-34. Since *Wright*, however, the Second Circuit has arguably relaxed the attribution requirement.[4] Further, *Wright's* attribution requirement followed from that court's concern that plaintiffs be able to demonstrate reliance, an element that the SEC is not required to prove. *See Wright,* 152 F.3d at 174; *Alstom*, 406 F. Supp. 2d at 466 n.29 (citing same); *see also SEC v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002) (the SEC need not prove reliance); *SEC v. Credit Bancorp*, 195 F. Supp. 2d 475, 491 (S.D.N.Y. 2002) (same; collecting cases). "Accordingly, in an SEC enforcement action, there appears to be no reason to impose a requirement that a misstatement have been publicly attributable to a defendant for liability to attach . . . ." *See SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006); *see also SEC v. Dunlap*, No. 01-8437-CIV, 2002 WL 1007626, at *5 n. 7 (S.D. Fla. 2002) (finding that requirement of attribution has little relevance to SEC actions). Accordingly, the fact that the misrepresentations in the prospectuses were not publicly attributable to the Defendants does not shield the Defendants from liability in this matter.

---

[4] *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (holding company's officer could be held primarily liable for misleading statements that were not directly attributed to him); *see also, e.g., In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 331 (S.D.N.Y. 2004) (noting that *Scholastic* suggests a relaxation of *Wright's* attribution requirement); *In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 465-66 (S.D.N.Y. 2005) ("*Scholastic* permits liability despite a lack of specific attribution").

### ii.      Hussey and Tambone Made Misrepresentations in and by Means of the Prospectuses

To establish that a defendant "made" a misstatement, the SEC must still show, in the absence of public attribution, "that the defendant was sufficiently responsible for the statement -- in effect, caused the statement to be made -- and knew or had reason to know that the statement would be disseminated to investors." *KPMG*, 412 F. Supp. 2d at 375.  In *Scholastic Corp.*, the Second Circuit held that a company's officer could be held primarily liable for misleading statements that were not directly attributed to him where the officer was responsible for communications with investors and allegedly involved in "drafting, producing, reviewing and/or disseminating" the statements.  252 F.3d at 75-76.  Similarly, in *SEC v. Treadway* ("*PIMCO II*"), the court found that a mutual fund executive could be held primarily liable for omissions in prospectuses insofar as he was primarily responsible for portions of the prospectuses and failed to use them to disclose a market-timing arrangement and its potential detrimental effect on the funds.  354 F. Supp. 2d 311, 316 (S.D.N.Y. 2005).

Here, Hussey played a pivotal role in the formulation of the language in the prospectuses prohibiting market timing.  In early 2000, he helped lead the working group formed to create processes and procedures designed to detect and deter market timing in the Columbia Funds and whose efforts resulted in the language in the prospectuses suggesting hostility towards market timing.  *See* Complaint, at ¶ 35.  The SEC has also alleged on information and belief that Hussey reviewed and commented upon the market timing representations before they were included in the prospectuses.  *Id.*, at ¶ 36-37.[5]  In addition, Hussey directed the efforts of the groups within

---

[5] The SEC has detailed its bases for its allegation on information and belief, which include communications as to which the Columbia Entities has asserted a privilege.  *See also Scholastic Corp.*, 252 F.3d at 75 (allowing claim made on basis of allegation as to role in misstatement made "on information and belief").  If allowed to proceed, the SEC would, during discovery, inquire further as to the nature of those communications and other

Columbia Distributor that made virtually all its sales. *Id.*, at ¶ 26.  In connection with selling the funds, he knowingly allowed Columbia Distributor to disseminate prospectuses containing market timing representations that he knew to be false. *Id.*, at ¶ 3.

With respect to Tambone, the SEC has alleged on information and belief that he, like Hussey, reviewed and commented upon the market timing representations before they were included in the prospectuses. *Id.*, at ¶ 37.  On other occasions, he was involved in the process of revising the prospectuses for the funds, from which one could infer that he had the opportunity to disclose the market timing arrangements. *Id.*, at ¶ 25.  In addition, as Co-President of Columbia Distributor, Tambone was responsible for sales and marketing of the Columbia Funds and shared ultimate responsibility for ensuring that the prospectuses for the Columbia Funds were disseminated to the investors in those funds. *Id.*  Like Hussey, Tambone knowingly allowed Columbia Distributor, in selling the funds, to disseminate prospectuses containing market timing representations he knew to be false. *Id.*, at ¶ 3.

For these reasons, the SEC has sufficiently alleged that the Defendants made misrepresentations in the prospectuses.

**B.**     **Tambone Made Misrepresentations in the Selling Agreements**

In addition to the misrepresentations in the prospectuses, the SEC has alleged that Tambone made misrepresentations in the standard Selling Agreements he executed and provided to the broker-dealers that purchased virtually all of the funds shares.  Tambone signed hundreds

---

communications the Defendants may have had with counsel drafting the prospectus language. *See SEC v. Treadway*, 430 F. Supp. 2d 293, 327 (S.D.N.Y. 2006) ("*PIMCO III*") (denying motion for summary judgment on basis of evidence presented by SEC, after formal discovery, detailing defendant's role in prospectus changes).  The SEC is not limited by the facts uncovered in its pre-filing investigation, but is entitled to take discovery to further support its claims and if necessary would seek an order compelling any communications that have until now been withheld on the grounds of privilege. *See S.E.C. v. Sargent*, 229 F.3d 68, 79 (1st Cir. 2000) (quoting *SEC v. Saul*, 133 F.R.D. 115, 118 (N.D.Ill.1990)) ("'[T]here is no authority which suggests that it is appropriate to limit the SEC's right to take discovery based upon the extent of its previous investigation into the facts underlying its case.'").

of these agreements in which he vouched for the statements in the prospectuses, expressly representing and warranting to customers of the Columbia Funds that "the Prospectus of each Fund and all sales literature we issue for distribution to the public will comply with all applicable state and Federal laws, rules and regulations" and "each Prospectus and all sales literature we issue will not by statement or omission be misleading." Complaint, at ¶¶ 40-42. These representations were false in that the prospectuses were misleading and therefore violated federal securities laws, rules, and regulations.

Tambone has argued that these statements are not actionable because they relate to future events. *See* Tambone's Memorandum in Support of Motion to Dismiss ("Tambone Mem."), at 12-14. However, promises regarding future events are actionable if they are known by the defendant to be false when made, either because the defendant secretly did not intend to perform or knew that the promises could not be carried out. *See Luce*, 802 F.2d at 57; *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir. 1986); *see also SEC* v. Meltzer, --- F.Supp.2d ---, No. 03 Civ. 0770(DRH)(ETB), 2006 WL 1896329, at *8 (E.D.N.Y., July 10, 2006) (statement as to future event may be fraudulent where actually false and known to be false to the defendant making the promise at the time it was made).[6] Here, the SEC has alleged facts sufficient to show that Tambone made the misstatements in the Selling Agreements and that he knew the statements were false when made. He signed his name to each such agreement issued during the relevant timeframe knowing the agreements would be disseminated to customers of the Columbia Funds -- more specifically the broker-dealers to whom virtually all sales of the funds were made. In *PIMCO I*, the court stated

---

[6] The fact that the misrepresentation was made in a contract does not immunize the Tambone from liability under Section 10(b). *See, e.g., Threadgill v. Black*, 730 F.2d 810, 811-12 (D.C. Cir. 1984) (fraud in the purchase or sale of any security includes "[e]ntering into a contract of sale [of a security] with the secret reservation not to fully perform") (quoting *Walling v. Beverly Enterprises*, 476 F.2d 393, 396 (9th Cir.1973)).

> [T]he PIMCO Entities' relationship with Canary, which Treadway personally
> approved, was inconsistent with the market timing disclosures provided to the
> public. If the inconsistency amounts to a fraud, then Treadway's personal
> signature of the disclosures established by itself that fraud is being alleged with
> particularity against Treadway.

341 F. Supp. 2d at 463. By the same reasoning, the SEC's allegation that Tambone

signed the misleading Selling Agreements provides the requisite particularity.[7]

### C.    Defendants' Material Omissions

#### 1.    The Nature of the Material Omissions

Section 17(a)(2) of the Securities Act and Rule 10b-5(b) under the Exchange Act provide

that, when making statements, a speaker must not omit "to state a material fact necessary in order

to make the statements made, in the light of the circumstances under which they were made, not

misleading."

The failure to disclose a market timing arrangement may be considered a material

omission. *See PIMCO I*, 341 F. Supp. 2d at 464; *see also PIMCO II*, 354 F. Supp. 2d at 317

(finding defendant could be liable for failing to disclose market timing arrangements). As the

court stated in *PIMCO I*, "[d]isclosure of the arrangement, with its potential detrimental impact

on investors in several mutual funds affected by the market timing practices, could easily have

affected a reasonable long-term investor's decision to invest in one of the funds that [was]

aggressively market-timed." *Id. at* 464-65. The duty to disclose such an arrangement is

particularly acute where, as here, the funds have made or are making blanket statements

---

[7] Tambone's suggestion that the Complaint does not sufficiently identify details about the Selling Agreements is without basis. The Complaint concisely sets forth "(1) the allegedly fraudulent statements or omissions; (2) the identity of the speaker; (3) where and when the statements or omissions were made; and (4) why the statements or omissions were fraudulent." *See Druffner,* 353 F. Supp. 2d at 148; *see also Luce,* 802 F.2d at 55 (reference to offering memorandum satisfies Rule 9(b) requirements).

indicating their hostility to market timing practices. *See id.* at 465.[8]

### 2.      The Defendants Had a Duty to Disclose

To make out a cause of action for an omission, or failure to speak, in a securities case, a

plaintiff must plead an affirmative duty of disclosure. *In re Fidelity/Micron Secs. Litig.*, 964 F.

Supp. 539, 544-45 (D. Mass. 1997).  As a primary matter, the Defendants had a duty to disclose

because as set forth above, Tambone made misrepresentations in the Selling Agreements and

Tambone and Hussey made representations in connection with the misleading prospectuses of

the Columbia Funds. *See Druffner,* 353 F. Supp. 2d at 148 (citing Rule 10b-5(b) ("The securities

laws give rise to a duty to disclose any information necessary to make an individual's voluntary

statements not misleading.").

Considering similar circumstances in the context of a summary judgment motion, the

*PIMCO* court found a genuine issue of fact existed with respect to whether a defendant had made

a material omission by failing to disclose market-timing arrangements in those portions of the

prospectuses for which he had primary responsibility. *PIMCO III*, 430 F. Supp. 2d at 327.  The

court reasoned that the SEC had provided evidence sufficient to show that persons in the

defendant's position "occasionally would review and comment upon" sections of the

prospectuses and were "periodically shown the Prospectus to determine whether it was accurate

and whether changes should be made to the language."  In one instance, the court highlighted

testimony about the fact that a portfolio manager was twice the "driver" behind a need for a

---

[8] It is equally clear that even prior to the adoption of the market timing disclosures in the prospectuses and even in the absence of any language prohibiting market timing, Defendants had an obligation to disclose to investors the existence of those arrangements. *See Druffner,* 353 F. Supp. 2d at 148; *PIMCO I*, 341 F. Supp. 2d at 464-65. The fact that the arrangements may not have expressly violated any provisions set forth in the prospectus of any individual fund does not make the omissions any less actionable. *See Druffner*, 353 F. Supp. 2d at 149 ("[T]he securities laws do not require that a violation of Section 10(b) or Rule 10b-5 must involve a violation of the provisions of the prospectus of a particular fund.").

change in the prospectus. *Id.* at 328.   In similar fashion, the SEC in the instant action has

alleged facts sufficient to support the inference that Hussey was the co-lead of the working group

that was the "driver" behind the change in the prospectus language regarding market-timing.

Complaint, at ¶¶ 36-37.   Further, he and Tambone, who was also involved in revising other

prospectus language from time to time, reviewed the proposed market timing language and

provided their comments.   By virtue of their respective roles in the market-timing arrangements,

they were in unique position to disclose these arrangements in the prospectus market-timing

language they reviewed.   *See id.* at 327; *see also PIMCO II*, 354 F. Supp. 2d at 317 (the

defendant, who negotiated the relationship "was in a unique position to disclose the Canary

arrangement, and its effect on PEA-advised funds, in sections of the prospectuses for which he

had primary responsibility.").   Accordingly, given the language in the prospectuses suggesting

hostility to market timing, and the Defendants' involvement in reviewing and commenting upon

that language, the Defendants had a duty to disclose to investors the existence of the trading

arrangements with the Preferred Customers.

In addition, "a duty to disclose arises when one party has information that the other

[party] is entitled to know because of a fiduciary or other similar relation of trust and confidence

between them."   *Chiarella v. United States*, 445 U.S. 222, 228 (1980) (internal quotation and

citation omitted); *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 189 (2d Cir. 1998)

quoting same).[9]   Securities professionals owe just such a duty to the investors to whom they sell

---

[9] "The First Circuit has identified three situations that trigger a duty to disclose: 1) when a corporate insider trades on confidential information, 2) when a corporation has made inaccurate, incomplete or misleading prior disclosures and 3) when a statute or regulation requires disclosure." *Tambone*, 417 F. Supp.2d at 134 (citing *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26-27 (1st Cir. 1987)).   However, the First Circuit has declined to state "whether these three situations are the only ones that could trigger a duty of disclosure, or whether they necessarily would do so in every case." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1201 n.3 (1st Cir.1996) (superseded by statute on other grounds).   In any event, the duty to disclose is triggered here first by the incomplete and misleading disclosures made in the prospectuses and in the case of Tambone, the Selling Agreements.

securities.[10]  As a result, they are obligated to disclose material information to their customers.[11]

Indeed, a securities professional has an obligation to investigate the securities he offers to

customers and must ensure that he has a reasonable basis for believing that the representations in

the statements provided to investors are truthful and complete.  *SEC v. GLT Dain Rauscher, Inc.*,

254 F.3d 852, 857-58 (9th Cir. 2001); *see also In re Suprema Specialties, Inc. Securities

Litigation*, 438 F.3d 256, 282 (3d Cir. 2006) (citing same).  In short, "[s]alesmen or registered

representatives have certain duties that they cannot avoid by reliance on either their employer or

an issuer." *Hasho*, 784 F. Supp. at 1107.[12]

By the same token, as securities professionals and as executives who directed and

had responsibility for virtually all of Columbia Distributor's efforts to sell the Columbia

Funds, Defendants Tambone and Hussey owed a similar special duty of disclosure to

those to whom they sold the funds.[13]  Complaint, at ¶ 11.  They were not entitled to

---

[10] *See, e.g., Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 45 & n.10 (2d Cir. 1978) (holding that broker owed investor a fiduciary duty); *SEC v. Currency Trading Intern., Inc.*, No. CV 02-05143PA., 2004 WL 2753128, at *9 (C.D.Cal. Feb. 02, 2004) ("defendants had an affirmative duty to disclose accurate and complete information, not only because they held themselves out as securities professionals, but, equally important, because they made recommendations to prospective and existing clients."); *Keenan v. D.H. Blair & Co., Inc.*, 838 F. Supp. 82, 89 (S.D.N.Y. 1993) ("[s]ecurities dealers owe special duty of fair dealing to their clients")(internal quotations omitted); *SEC v. Hasho*, 784 F. Supp. 1059, 1107 (S.D.N.Y. 1992) ("Securities dealers owe a special duty of fair dealing to their clients."); *see also SEC v. Zandford*, 535 U.S. 813, 823 (2002) ("any distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to his clients").

[11] *See Hanly v. SEC*, 415 F.2d 589, 597 (2d Cir. 1969) (broker must disclose facts which he knows and those which are reasonably ascertainable); *Antinoph v. Laverell Reynolds Secs., Inc.*, 703 F. Supp. 1185, 1188 (E.D. Penn. 1989) (brokers are under a duty to disclose information and cannot escape liability by claiming they had no such duty); *Feeney v. SEC*, 564 F.2d 260, 262 (8th Cir. 1977) (professional securities salesmen have an obligation to the public to investigate the value of the securities they offer and disclose material facts regarding the value of the securities).

[12] *See also Hanly*, 415 F. 2d at 597 ("A salesman may not rely blindly upon the issuer for information concerning a company . . . ."); *Walker v. SEC*, 383 F. 2d 344, 345 (2d Cir. 1967) ("The Commission is justified in holding a securities salesman chargeable with knowledge of the contents of sales literature.  He cannot avoid his duty to the public by blindly relying on his employer's brochures.").

[13] The cases that Tambone cites to suggest otherwise are distinguishable.  In *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 15 (2nd Cir. 1983), the court noted that while a broker-dealer does not have a duty of disclosure to "complete stranger[s]" in the market, such a duty can arise from a relationship between the parties.  In *Congregation*

deliberately ignore representations in the prospectuses they knew to be false and they had

an affirmative duty to disclose material information they knew about the funds to

investors, particularly where that information contradicted information they knew or were

reckless in not knowing was being disseminated to investors in connection with that sales

effort. *Id.*[14] By failing to disclose the existence of the arrangements with the Preferred

Customers, the Defendants omitted to state material facts necessary to make the

statements in the prospectuses, in the light of the circumstances under which they were

made, not misleading.

### D.    The Defendants Engaged in a Fraudulent Scheme

The SEC has also alleged that the Defendants participated in a scheme to defraud.  To

plead such a scheme, "the SEC must allege that the defendants engaged in a manipulative device

or contrivance." *See Tambone*, 417 F. Supp. 2d at 135.  "[S]ubsections (a) and (c) of Rule 10b-5

encompass a wide range of activities and are not limited to the prohibition of market

manipulation." *Alstom*, 406 F. Supp. 2d at 474 n.37; *see also Global Crossing*, 322 F. Supp. 2d

---

*of the Passion, Holy Cross Province v. Kidder Peabody & Co.*, 800 F.2d 177, 183 (7th Cir. 1986), the court found no fiduciary duty where there were virtually "no contacts of any kind" between the brokers and the customer and where the alleged failure to disclose did not affect an investment decision. Finally, in *Press v. Chemical Investment Services Corp.*, the court recognized that under New York common law, there was precedent supporting the proposition that a broker does indeed owe a fiduciary duty to the purchaser of a security and the court held that the defendant broker-dealers had "'duty to use reasonable efforts to give [the customer] information relevant to the affairs that [had] been entrusted'" to them. 166 F.3d 529, 536, (2d Cir. 1999) (citing *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir.1994)).

[14] Other courts have focused on the similar duty that underwriters owe to investors. *See In re Enron Corp. Secs.*, 235 F. Supp. 2d 549, 612 (S.D. Tex. 2002) (an underwriter has a duty to investigate an issuer and the securities that the underwriter offers to investors); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 792-93 (7th Cir. 1977) (an underwriter has a duty to investigate an issuer and may be liable under Rule 10b-5 for reckless failure to do so). "This investigative duty is placed on the underwriter because . . . its role is critical to the integrity of the market and the confidence of the investing public." *Enron*, 235 F. Supp. 2d at 612; *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir.1973) ("No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter."). Here, Tambone, as the Co-President of the underwriter of the Columbia Funds, had a duty to make sure that the statements contained in the prospectuses for the Columbia Funds were not misleading (as he knew they were). *See* Complaint at ¶ 11; *see also Hiller v. SEC*, 429 F.2d 856, 857-58 (2d Cir. 1970) (upholding a finding of liability under Section 15(c)(1) of the Exchange Act against the president of an underwriter that had disseminated misleading reports about the stock it sold).

at 336 ("subsections (a) and (c) encompass much more than illegal trading activity: they encompass the use of '*any* device, scheme or artifice,' or '*any* act practice, course of business' used to perpetrate a fraud on investors.") (citing 17 C.F.R. § 240.10b-5(a), (c)) (emphasis in original); *In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 971 (C.D.Cal.1994) ("It appears that the scope of deceptive devices or schemes prohibited by subsections (a) and (c) is quite extensive."). Indeed, as the Supreme Court has stated, "Section 10(b) was designed as a catch-all clause to prevent fraudulent practices." *Chiarella*, 445 U.S. at 226.[15]

A plaintiff may not evade the pleading requirements imposed on Rule 10b-5(b) claims simply by recasting claims of misrepresentations as deceptive scheme claims under Rule 10b-5(a) and (c). *See Alstom*, 406 F. Supp. 2d at 475. "Nonetheless, it is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts, where the plaintiff[] allege[s] both that the defendants made misrepresentations in violations of Rule 10b-5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *See id.* "Thus, even if a defendant who did not make any statements in connection with a particular fraud may not be held liable for fraudulent misrepresentations under subsection (b), that defendant may still be held liable under subsections (a) and (c) if is alleged that they participated in a scheme that encompassed conduct beyond misrepresentations." *See id.*[16]

Here, the SEC has alleged a scheme that encompasses conduct beyond the

---

[15] *See also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (Section 10(b) should be construed flexibly to effectuate its remedial purposes); *Superintendent of Ins. of State of New York v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971) ("Since practices constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers in the regulatory agency have been found practically essential.")(internal quotations omitted).

[16] *See also Enron,* 235 F. Supp.2d at 577 (while Rule 10b-5a and (c) allow suits against defendants who participate in a fraudulent scheme even if they did not make misstatement or omission); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp.2d 161, 173 (D. Mass. 2003) (same).

misrepresentations in the prospectuses and Selling Agreements.  Despite being aware of the

prospectus language prohibiting or otherwise expressing hostility towards short-term or

excessive trading, Hussey and Tambone actively negotiated, approved, and/or entered into

arrangements designed to permit Preferred Customers to engage in such trading, benefiting

themselves, the Columbia Entities, and the Preferred Customers to the detriment of other

Columbia Fund shareholders.  *See* Complaint, at ¶¶ 2, 3, 4, 7, 47-49, 51, 63, 65, 67, 70, 71,77,

81, 84, 86, 92.  In connection with certain of the arrangements, the Defendants insisted that

traders provide so-called "sticky assets" (long-term investments) in certain funds in return for the

ability to engage in short-term trading in other funds.  *Id.*, at ¶¶ 5, 47, 63, 64, 77, 85.  Further,

with Tambone's knowledge, Hussey established guidelines pursuant to which certain Preferred

Customers would be allowed to engage in such trading while other shareholders were prohibited

from doing so.  In addition, Hussey and Tambone took active (and passive) steps to prevent

efforts by employees at Columbia Services to stop the trading of these Preferred Customers.  *Id.*,

at ¶¶ 2, 49, 50, 51, 52, 56, 72, 75, 79, 86, 92, 98.  The Defendants engaged in this conduct

despite knowing or suspecting that these investors were engaged in "market timing," which can

harm other mutual fund shareholders by diluting the value of their shares or causing them to

incur additional costs.  Complaint, at ¶ 6; *see also Druffner*, 353 F. Supp. 2d at 145-46

("Although market timing can lead to profits, such profits come at the expense of long-term

investors in the fund.").

In a number of other cases, courts have denied motions to dismiss Rule 10b-5(a) or (c)

claims arising from market-timing schemes.[17]  In *In re Mutual Funds Investment Litigation*, for

---

[17] *See In re Mutual Funds Inv. Litig.,* 384 F.Supp.2d 845, 856-57 (D.Md. 2005); *SEC v. JB Oxford Holdings, Inc.*, No. CV-04-070, slip op. at 2 (Nov. 10, 2004) (attached hereto at Tab A); *SEC v. Gann*, No.Civ.A. 305CV0063L, 2006 WL 616005, at *7 (N.D. Tex. March 13, 2006); *Druffner*, 353 F. Supp. 2d at 146, 150.

example, the court denied motions to dismiss claims against mutual fund investment advisers,

traders, and broker/dealers, where the plaintiffs had alleged a scheme to permit favored investors

to engage in late trades and other market timing activities.  *See* 384 F. Supp. 2d at 856-57.  In

doing so, the court reasoned:

> Although market timing itself may be lawful, it nevertheless is prohibited by Rule
> 10b-5 if it is engaged in by favored market insiders at the expense of long-term
> mutual fund investors from whom it is concealed and who have a right to rely
> upon its prevention by fund advisers' and managers' good faith performance of
> their fiduciary obligations.  Market timing then becomes a "scheme or artifice to
> defraud" or, at least, "a practice . . . or course of business which operates as a
> fraud or deceit" upon those who have been misled or lulled into purchasing
> mutual fund shares in ignorance of its occurrence.

384 F. Supp.2d at 856-57.  Here, as in that matter, the Defendants participated in a scheme to

favor market timers at the expense of long-term investors from whom such conduct was

concealed.

In other cases, courts (including this one) have denied motions to dismiss claims alleging

schemes in which the defendants were engaged in deceitful conduct designed to circumvent

restrictions on market timing.[18]  The conduct of the Defendants in this matter was no less

deceitful.  As in *JB Oxford Holdings, Inc., Gann,* and *Druffner,* the funds at issue had restrictions

designed to prevent market timing, which leads to profits for individual investors at the expense

of long-term investors.  While the Defendants here did not use fictitious names or multiple

accounts, their conduct was no less designed to help certain customers evade the trading

restrictions to all other shareholders were subject, to block efforts to stop their trading, and to

cause the fund companies to process these transactions, which should otherwise have been

---

[18] *See JB Oxford Holdings, Inc.,* No. CV-04-070, slip op. at 2 ("cloning" of account numbers to circumvent the mutual funds' efforts to prevent market timing); *Gann,* 2006 WL 616005, at *7 (use of multiple accounts, multiple registered representative numbers, and smaller trades to avoid trading restrictions); *Druffner,* 353 F. Supp. 2d at 146, 150 (use of numerous broker identification numbers and of fictitious names to evade market timing restrictions).

prohibited.  Further, that conduct, like the conduct in the other market timing schemes, had the

ultimate effect of benefiting the market timers (as well as the Defendants and the Columbia

Entities) at the expense of the long-term shareholders, from whom these arrangements were

concealed.  *See also Gann*, 2006 WL 616006, at *7 (stating that whether market timing *per se* is

illegal is "not germane" because "the relevant inquiry is whether, while practicing market timing,

the Defendants committed fraud by engaging in deceptive practices . . . ").  For these reasons, the

SEC has alleged a deceptive scheme under Rule 10b-5(a) and (c).

### E.    The SEC Has Alleged Facts Supporting a Strong Inference of Scienter

To satisfy establish its claims of primary liability under Securities Act Section 17(a)(1)

and Exchange Act Section 10(b) and Rule 10b-5, the SEC must show that the Defendants acted

with scienter.  *See Fife*, 311 F.3d at 9.[19]  Scienter is "a mental state embracing intent to deceive,

manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12, 9 (1976).

"The plaintiff must demonstrate that the defendants acted with a high degree of

recklessness or consciously intended to defraud." *See Fife*, 311 F.3d at 9 (*citing Aldridge v. A.T.*

*Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)).  "Recklessness is a highly unreasonable omission,

involving not merely simple, or even inexcusable [ ] negligence, but an extreme departure from

the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

either known to the defendant or is so obvious the actor must have been aware of it." *Id.* at 9-10

(citations and internal quotations omitted).  The SEC must allege facts which give rise to an

inference of scienter that is "both reasonable and strong." *Greebel*, 194 F.3d at 195-96 (internal

quotation marks omitted).  "[W]hile mere allegations of motive and opportunity alone may be

insufficient, together with additional factual support, evidence of motive and opportunity may

---

[19] As discussed below, it is not necessary to show scienter to prove violations of Sections 17(a)(2) or 17(a)(3).  *See* Part III, *infra*.

establish a strong inference of scienter." *Aldridge*, 284 F.3d at 82.  In this context, motive refers to the "concrete benefits that could be realized by . . . . the false statements and wrongful nondisclosures" and opportunity refers to "the means and likely prospect of achieving concrete benefits by the means alleged."  *Id.* (internal quotations and citations omitted).

In *PIMCO I*, the court found the requisite scienter where under the circumstances, a reasonable factfinder could conclude that the defendant "had to have been aware of the Funds' stated policies against market timing and orientation towards long-term investors at the time he allegedly personally approved the agreement with Canary authorizing Canary to engage in activities inconsistent with the Fund's disclosed market timing policies."  341 F. Supp. 2d at 465.  In the present case, the Court should find the requisite scienter for the same reasons.

In the Complaint, the SEC alleges numerous facts from which a reasonable factfinder could conclude that the Defendants were aware of the Columbia Funds' policies against short-term or excessive trading and its orientation towards long-term investors.  As set forth above, Hussey helped lead the working group that was supposed focused on detecting and deterring market timing in the Columbia Funds, and the market timing disclosure in the prospectuses resulted from that group's efforts.  The SEC alleges on information and belief that Hussey and Tambone reviewed and commented upon these disclosures before they were included in the prospectuses.  Hussey further served as the designated contact at Columbia Distributor for inquiries about apparent market timers and about the market timing policy at the Columbia Entities.  Complaint, at ¶ 97.

As the SEC alleges, the Defendants made and/or received numerous statements which provide compelling evidence that they knew or recklessly disregarded the short-term or excessive trading engaged in by those with whom they had entered into agreements and the

19

potential or actual harm and disruption it was causing to the respective Columbia Funds. *See Id.*, at ¶¶ 49, 51, 72, 75, 86 95; *see also PIMCO I,* 341 F. Supp. 2d at 465 (finding that defendant's "statements and course of conduct strongly indicate that he was regularly made aware of the harmful nature of Canary's trading activities, but that he nonetheless failed to either disclose the activities or put a stop to them for more than a year after the conduct began").

Notwithstanding the concerns raised about market timing generally and the impact of the trading by the Preferred Customers more specifically, Tambone and Hussey did not take any steps, or cause others to take steps, to restrict or stop the short-term or excessive trading of the Preferred Customers. *See, e.g., id.* at ¶ 7, 50, 51, 72, 75, 86; *see also Druffner,* 353 F. Supp. 2d at 151 (finding scienter where, *inter alia,* defendant failed to stop market timing activity after receiving complaints of such activity). Indeed, in response to concerns raised about the damage done by market timers, Hussey had set forth guidelines for *allowing* such short-term or excessive trading arrangements and copied them to Tambone. *See* Complaint, at ¶ 49. In addition, Hussey was aware the market timing surveillance manager was allowing those with timing arrangements to engage in market timing. *Id.* at ¶ 98. The Defendants also interfered, or knowingly allowed subordinates to interfere, with efforts to halt short-term or excessive trading. *See id.* at ¶¶ 52, 56, 92, 98. Finally, the SEC alleges that the Defendants, whose compensation depended in significant part on mutual fund sales, engaged in this conduct in order to reap financial benefits from these arrangements and that they did, in fact, reap such benefits. *See* Complaint, at ¶¶ 2, 7, 11, 27; *see also Mutual Funds Inv. Litig.*, 384 F.Supp.2d at 865 (finding allegations of scienter sufficient where, *inter alia,* plaintiffs alleged financial incentives providing motivation for market timing conduct including increased commissions and receipt of "sticky assets" upon which further fees could be earned). In sum, the SEC has alleged facts giving rise to a

reasonable and strong inference that the Defendants acted with the intent to mislead investors as to the existence of the arrangements with the Preferred Customers.

At a minimum, the Defendants were reckless in failing to ascertain whether the market-timing disclosures that were the result of the working group Hussey himself lead, that the Defendants reviewed and commented upon, and that related to the funds the Defendants sold, were rendered misleading by the potentially harmful short-term and excessive trading undertaken pursuant to the agreements with the Preferred Customers that the Defendants themselves negotiated and/or approved. *See PIMCO I*, 341 F. Supp. 2d at 468 (finding Cobra was at least reckless in failing to ascertain whether the disclosures were rendered misleading by the market timing activities undertaken pursuant to the agreement he negotiated). Given their respective roles in the market timing relationships, their efforts to prevent Columbia Entities from stopping that trading, their understanding of the market timing policy at Columbia Distributor, and their involvement in the drafting of the prospectus language, the misleading nature of the disclosures was "either known to [the Defendants] or . . . so obvious [the Defendants] must have been aware of it." *See Fife*, 311 F.3d at 9-10.

## III.   THE SEC HAS PROPERLY PLED PRIMARY VIOLATIONS OF SECTION 17(A)

"With respect to [Section] 17(a)(1), essentially the same elements must be established in connection with the offer or sale of a security [as for Section 10(b) and Rule 10b-5 liability]." *SEC v. First Jersey Secs.*, 101 F.3d 1450, 1467 (2d Cir. 1996). However, scienter need not be established to prove violations of Sections 17(a)(2) or (3).[20] *See Aaron v. SEC*, 446 U.S. 680,

---

[20] Section 17(a)(2) and (3) make it unlawful respectively "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," and "to engage in any

686 n.5, 697 (1980); *First Jersey Secs.*, 101 F.3d at 1467; *PIMCO I*, 341 F. Supp. 2d at 469.

Negligence is sufficient. *Fife*, 311 F.3d at 9; *Dain Rauscher*, 254 F.3d at 856.

For all the reasons set forth above with respect to Section 10(b) and Rule 10b-5, the SEC

has made out a claim under Section 17(a)(1). Even if the Court were to find no scienter, the

Defendants would still be liable under Section 17(a)(2) for their roles in the making of the

misrepresentations or omissions of material fact, and under Section 17(a)(3) for their roles in the

scheme. *See PIMCO I*, 341 F. Supp. 2d at 470 (finding Cobra could be held liable under Section

17(a)(3) where his "alleged acts on behalf of the Canary relationship facilitated the success of a

fraud or deceit upon purchasers who were affected by the Canary market timing arrangement and

by its illegal selective disclosure of portfolio holdings.") *Id.*

## IV.    THE SEC HAS PROPERLY PLED ITS AIDING AND ABETTING CLAIMS

The SEC has also alleged that the Defendants aided and abetted violations by the

Columbia Entities of Exchange Act Section 10(b) and Rule 10b-5, by Columbia Advisors of

Sections 206(1) and 206(2) of the Advisers Act, and by Columbia Distributor of Exchange Act

Section 15(c). To establish aiding and abetting liability, a plaintiff must show: 1) a primary

violation was committed, 2) the defendants had a general awareness that their conduct was a part

of an overall activity that was improper and 3) the defendants knowingly and substantially

assisted in the primary violation. *Tambone*, 417 F. Supp. 2d at 136.

### A.    The SEC Has Alleged Primary Violations by Columbia Advisors and/or
### Columbia Distributor

The SEC alleges a primary violation by Columbia Advisors and/or Columbia Distributor

of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and by Columbia Advisors of

---

transportation, practice, or course of business which operates or would operate as a fraud or deceit upon the
purchaser." 15 U.S.C. § 77q(a)(2), (3).

Sections 206(1) and 206(2).[21]  More specifically, the SEC alleges that Columbia Advisors, an

investment adviser registered with the SEC, was the sponsor of the Columbia Funds and that it

prepared and, with Columbia Distributor, issued the misleading prospectuses for the funds in

violation of Section 10(b) and Rule 10b-5 thereunder.  *See, e.g.*, Complaint, at ¶¶ 9, 22, 107, 108.

The SEC further alleges that Columbia Distributor, through the Defendants, negotiated and/or

approved the trading arrangements and that Columbia Advisors, which included the fund

portfolio managers, was aware of and approved all but one of them.  *See id.* at ¶¶ 44, 45, 47, 48,

65, 6768, 70, 77, 81, 85.  To further bolster its allegations of scienter, the SEC details instances

in which individuals at Columbia Advisors and Columbia Distributor expressed concern about

the Preferred Customers' short-term or excessive trading.  *See id.* at ¶¶ 48, 49, 51, 56, 72, 75,

86, 95.  By its conduct, Columbia Advisors also breached its fiduciary duties and violated

Sections 206(1) and 206(2) of the Advisors Act.  *See, e.g., id.* at ¶¶ 8, 9, 12, 13, 113, 114; *see

also PIMCO I*, 341 F. Supp. 2d at 470 (finding that SEC had alleged Section 206 aiding and

abetting claims).

The SEC also alleges a primary violation of Section 15(c) of the Exchange Act by

Columbia Distributor.  More specifically, the SEC alleges that Columbia Distributor, a broker-

dealer registered with the SEC, served as the principal underwriter and distributor of the

Columbia Funds.  In that capacity, it made misrepresentations in the prospectuses that it

disseminated, even though it was aware of and approved the trading arrangements with the

Preferred Customers.  *See id.* at ¶¶ 3, 23, 44, 45, 63, 64, 65, 67, 68, 70, 77, 81, 84, 85, 90.

---

[21] "The provisions of Sections 206(1) and 206(2) have been interpreted as substantively indistinguishable from Section 17(a) of the Securities Act, except that Section 206(1) requires proof of fraudulent intent, while Section 206(2) simply requires proof of negligence by the primary wrongdoer."  *See PIMCO I*, 341 F. Supp. 2d at 470 (citing *SEC v. Moran*, 922 F. Supp. 867, 896-97 (S.D.N.Y. 1996)).

### B.    The Defendants had the Requisite State of Mind for Aiding and Abetting

To establish aiding and abetting liability, the SEC must allege facts sufficient to show

that the Defendants had a general awareness that their conduct was a part of an overall activity

that was improper. *Tambone*, 417 F. Supp. 2d at 136; *Druffner*, 353 F. Supp. 2d at 150.  There is

no scienter requirement with respect to the claims that the Defendants aided and abetted

violations of Section 17(a)(2) or (3) of the Securities Act. *See SEC v. Coven*, 581 F.2d 1020,

1028 (2nd Cir. 1978); *cf. SEC v. Ponce*, 345 F.3d 722, 737 & n.10 (9th Cir. 2003)(holding no

scienter requirement with respect to aiding and abetting §13(a) violation because underlying

violation does not require scienter).  Further, with respect to the claims that a defendants aided

and abetted violations of Sections 10(b) and 17(a)(1), recklessness is sufficient to establish

scienter where the defendant owes a fiduciary duty or duty of disclosure to the defrauded party or

where the reliance on the defendant's fraudulent conduct by the defrauded party was foreseeable.

*SEC v. Lybrand*, 200 F. Supp. 2d 384, 399-400 (S.D.N.Y. 2002), *aff'd on other grounds, SEC v.*

*Kern*, 425 F.3d 143 (2d Cir. 2005); *Mishkin v. Peat Marwick, Mitchell & Co.*, 658 F. Supp. 271,

273 (S.D.N.Y. 1987); *see also Cleary v. Perfectune, Inc.*, 700 F.2d, 774, 777 (1st Cir. 1983)

(noting that courts have found that recklessness satisfies scienter standard where defendant has

duty of disclosure), *overruled on other grounds by Cent. Bank of Denver v. First Interstate Bank*

*of Denver*, 511 U.S. 164 (1994).

The option of applying the recklessness standard is particularly appropriate in this case

where the Defendants made affirmative misrepresentations to investors and therefore had a duty

not to mislead them and further, given the duty that the Defendants had to investors by virtue of

their positions as securities professionals charged with selling the Columbia Funds to those

24

investors. *See* Part I(C)(2), *supra.* As set forth above, however, the Defendants were fully aware that their conduct was part of an overall scheme that was improper.

In its Initial Decision, the Court held that in connection with its aiding and abetting claims, the SEC must allege facts sufficient to suggest that "the defendants consciously threw in their lot with the primary violators." *See Tambone,* 417 F. Supp. 2d at 136-37 (citing *Austin v. Bradley, Barry & Tarlow, P.C.,* 836 F. Supp. 36, 39-40 (D. Mass. 1993)).[22] In determining whether the SEC has made such a showing, the Court must inquire whether the fraud was interests of the Defendants and whether they stood to gain by it. *See Barker,* 797 F.2d at 497("the court should ask whether the fraud (or cover-up) was in the interest of the defendants. Did they gain by bilking the buyers of the securities?"); *DiLeo,* 901 F.2d at 629 ("The complaint does not allege that E&W had anything to gain from any fraud by Continental Bank"). Here, the SEC has alleged that the Defendants, whose compensation depended in significant part on mutual fund sales, engaged in this conduct in order to reap financial benefits from these arrangements and that they did, in fact, reap such benefits.[23] *See* Complaint, at ¶¶ 2, 7, 11, 27. Beyond the Defendant's financial motives, the SEC has also alleged facts sufficient to show that

---

[22] *See also Austin,* 836 F. Supp. at 40 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir. 1990) (quoting *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir. 1986))). The facts in this matter stand in stark contrast to those in *Barker, DiLeo, and Austin,* where the respective courts found the defendants could not be said to have "thrown in [their] lot with the primary violators" *See Barker,* 797 F. 2d at 496-97 (no evidence that the defendants saw any of the allegedly misleading selling documents, knew that they were inaccurate, or gained in any way from the sales); *DiLeo,* 901 F.2d at 629-30 (no allegation that the defendant had anything to gain from the scheme and no specific allegation to show that the defendant knew that statements were misleading); *Austin,* 836 F. Supp. at 40 (no allegation that defendant benefited from its silence).

[23] These allegations further distinguish this matter from *Austin,* where the court found that the presumptive economic motivation -- specific to that matter -- was too remote and minimal, in and of itself, to demonstrate conscious intent. *See Austin,* 836 F. Supp. at 40 ("While presumably BB&T received a fee for its legal services, this economic motivation alone is too remote and minimal to demonstrate that BB&T's silence was designed intentionally to aid the primary fraud.") (emphasis added; internal quotation marks and citation omitted); *see also Mutual Funds Inv. Litig.,* 384 F.Supp.2d at 865 (considering financial incentives to engage in market timing scheme relevant to scienter).

they knew that the Columbia Entities were improperly making misrepresentations and omissions in their fund prospectuses while at the same time allowing Preferred Customers to engage in short-term trading to the detriment of other shareholders. The Defendants were also aware that such trading posed threats to the interests of other shareholders. *See* Complaint, at ¶¶ 1, 10, 30, 34, 36, 37, 48, 49, 51, 62, 72, 75, 86, 95. Finally, the SEC has alleged facts from which it can be inferred that the Defendants knew their role in this scheme, which involved making or helping to make the misrepresentations, allowing the misrepresentations to be disseminated as part of their sales efforts, and negotiating and facilitating the trading arrangements despite the supposed restrictions in place. *See* Part I(D), *supra*.

**C.    The Defendants Provided Substantial Assistance to the Scheme**

In *PIMCO I*, the court denied defendant Cobra's motion to dismiss the aiding and abetting claims against him. *See* 341 F. Supp.2d at 466. In doing so, the court reasoned that "Cobra's alleged facilitation of the undisclosed Canary arrangement and the market timing activities conducted thereunder, in combination with his failure to correct his own funds' market timing disclosures when they were rendered materially misleading, indicate that Cobra provided substantial assistance in the primary violation." *Id.* at 468; *see also id.* at 467 (finding Cobra to have substantially assisted "in the issuance of misleading disclosures by failing to correct statements he knew or should have known were misleading."); *PIMCO III*, 430 F. Supp.2d at 340 (denying summary judgment as to Cobra on substantial assistance issue). Similarly, in *PIMCO III*, the Court denied defendant Treadway' motion for summary judgment on the issue of substantial assistance where the SEC had presented evidence that he had approved the market-timing arrangement, was aware of frequent trading by the customer, oversaw the market timing

monitoring, and failed to disclose the arrangement to the board of trustees. *See PIMCO III*, 430
F. Supp.2d at 340.

Like the *PIMCO* defendants, the Defendants in this matter provided substantial assistance
to the scheme. Simply put, without their assistance, the scheme could not have been executed.
The Defendants played central roles in the negotiating, approving, and/or entering into the
arrangements with the Preferred Customers. *See* Part I(D), *supra*. Although there were systems
in place to prevent market timing, the Defendants also helped the Preferred Customers evade
these systems and continue their trading. *See* Part I(D), *supra*. As set forth above, Tambone and
Hussey also provided substantial assistance to the scheme by helping to make the material
misrepresentations and omissions. *See* Part I(B), (C), *supra*. Accordingly, the Court should find
that the SEC has sufficiently alleged that the Defendants provided substantial assistance to the
primary violations and it should deny the Defendants' Motions to dismiss the aiding and abetting
claims.

## V.   THE VIOLATIONS PRIOR TO MAY 19, 2001, REMAIN ACTIONABLE IN THIS ENFORCEMENT PROCEEDING

In his motion, Hussey also seeks to dismiss so much of the Complaint as alleges
violations prior to May 19, 2001. The Court should reject this request for several reasons. First,
the vast majority of the Complaint relates to misrepresentations, omissions, and other conduct
that occurred after May 19, 2001. For example, even though the Columbia Funds included the
disclosures in many of the prospectuses issued prior to May 19, 2001, they also included these
misrepresentations in prospectuses issued thereafter.

In addition, the SEC seeks disgorgement and injunctive relief for the charged violations.
Because there is no statute of limitations governing the SEC's claims to such equitable relief,

these claims must stand. *See SEC v. Williams*, 884 F. Supp. 28, 30-31 (D. Mass. 1995); *see also SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, at *3 (N.D. Ill. Jan. 11, 2000) (where SEC seeks equitable relief and penalties, only penalties are subject to limitations period).[24]

Further, even with respect to the SEC's claims for penalties, the statute of limitations was tolled until September 2003 under the fraudulent concealment doctrine. To establish fraudulent concealment, a plaintiff must show that "[t]he defendant . . . engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff . . . failed to discover these facts within the normal limitations period despite his exercise of due diligence." *Torres Ramirez v. Bermudez Garcia*, 898 F.2d 224, 229 (1st Cir. 1990); *see also SEC v. Jones*, No. 05 Civ. 7044(RCC), 2006 WL 1084276, at *6 (Apr. 25, 2006) (noting that fraudulent concealment doctrine applies to toll statute of limitations in SEC enforcement action where defendants took steps to conceal fraud or where fraud was self-concealing). Here, the SEC has alleged that the Defendants and the Columbia Entities concealed from the investors and the independent trustees of the Columbia Funds the facts regarding the fraud and that the fraud was concealed from the SEC until September 2003. Complaint, ¶ 100. The SEC has also alleged prior to September 2003, when the SEC initiated an inquiry regarding possible market-timing activity in the Columbia Funds, the SEC received no information that would have alerted it to the fraud or that would have triggered a duty to inquire into the possibility that the Defendants and the Columbia

---

[24] In support of its argument that even the SEC's claims for equitable relief are barred by the statute of limitations, Tambone cites *United States v. Windward Properties, Inc.*, 821 F.Supp. 690, 693 (N.D.Ga.1993). *See* Tambone Mem., at 7. However, that decision was expressly abrogated by the Eleventh Circuit in *United States v. Banks*, 115 F.3d 916, 919 (11th Cir.1997), which rejected the application of the concurrent remedy rule to the Government. *See also U.S. v. Telluride Co.*, 146 F.3d 1241, 1248 (10th Cir. 1998) (recognizing abrogation and holding that the concurrent remedy rule does not bar the Government's claims for equitable relief). This result is not surprising. Indeed, some courts have held more broadly that no statute of limitations applies to SEC enforcement actions at all. *See, e.g., SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004); *SEC v. Rind*, 991 F.2d 1486, 1491-92 (9th Cir. 1993); *SEC v. Downe*, No. 92 Civ. 4092, 1994 WL 67826, at *1 (S.D.N.Y. March 3, 1994); *but see Johnson v. SEC*, 87 F. 3d 484, 492 (D.C. Cir. 1996).

Entities were engaged in a fraud. *Id.*, at ¶¶ 100-101.  As a result, as the SEC has alleged, its lack

of information about the fraud, which was self-concealing, prior to its inquiry in September 2003

was not due to a lack of diligence on its part. *Id.*, at ¶ 101.  Accordingly, the statute of

limitations should be tolled as to the SEC's claims for penalties as to conduct that occurred prior

to May 19, 2001. *See Jones*, 2006 WL 1084276, at *6 (applying fraudulent concealment

doctrine to toll statute of limitations in SEC enforcement action).

## VI.    **HOLDING DEFENDANTS LIABLE WOULD NOT VIOLATE DUE PROCESS**

Relying upon *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996), Defendant Hussey also argues

that it would violate due process to hold him liable for the alleged conduct.   As securities

professionals, however, the Defendants cannot claim that they had no notice of the illegality of

defrauding investors by making material misstatements or omissions or otherwise engaging in

fraudulent conduct. *Druffner,* 353 F. Supp. 2d at 151 (distinguishing *Upton*).   Accordingly, the

Court should also reject Hussey's attempt to dismiss the Complaint on this ground.

## CONCLUSION

For the reasons set forth above, the Defendants' motions to dismiss the Complaint should be denied.

## REQUEST FOR ORAL ARGUMENT

Believing that it may assist the Court, the SEC requests oral argument on this matter.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**

By its attorneys,

Luke T. Cadigan
   Senior Trial Counsel (BBO# 561117)
Celia Moore
   Dep. Asst. Dist. Administrator (BBO# 542136)
David London
   Senior Counsel (BBO# 638289)
33 Arch Street, 23rd Floor
Boston, Massachusetts
(617) 573-8919 (Cadigan)
(617) 573-4590 (Facsimile)

Dated:   August 25, 2006

## CERTIFICATE OF SERVICE

I certify that this document filed through the Court's Electronic Case Filing (ECF) system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent by first-class mail to those indicated as non-registered participants on August 25, 2006:

**Counsel for Robert Hussey**
Warren L. Feldman, Esq.
Christopher M. Joralemon, Esq.
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019-6131
212-878-8136

Frank A. Libby, Jr., Esq.
John J. Commisso, Esq.
175 Federal Street
Boston, MA 02110
617-338-9300

**Counsel for James Tambone**
A. John Pappalardo, Esq.
John A. Sten, Esq.
David G. Thomas, Esq.
Greenberg Traurig
1 International Place
Boston, MA 02110
617-310-6000

Luke T. Cadigan

31