UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>v.<br><br>JAMES TAMBONE and ROBERT HUSSEY,<br><br>       Defendants. | Civil Action No.: 06-10885-NMG |

### JAMES TAMBONE'S REPLY MEMORANDUM
### IN SUPPORT OF MOTION TO DISMISS

#### INTRODUCTION

After three bites at the apple, the SEC still fails to state viable claims against James Tambone. Remarkably, the SEC's New Complaint is the same pleading dismissed by this Court earlier this year with only slight embellishment. It is a hastily *reconstructed* document that fails to follow this Court's previous guidance. In its Opposition, the SEC runs roughshod over the facts and the law – ignoring First Circuit precedent and this Court's January 27, 2006 Memorandum and Order. Compounding the flaws in its pleading, the SEC also violates the applicable statute of limitations. This Court should end this case once and for all and dismiss the New Complaint *with prejudice*. It is now time to allow Mr. Tambone to live unburdened by the SEC's failure to plead its fraud claims against him. The SEC has tarnished Mr. Tambone's reputation enough.

**DISCUSSION**

**A.     THE SEC HAS NOT PLEAD SUFFICIENT FACTS FOR PRIMARY LIABILITY**

   1.     <u>The Prospectuses and the "Strict Prohibition Language"</u>

In its Opposition, as with the Original Complaint, the SEC relies on the Strict Prohibition Language to anchor Mr. Tambone's alleged fraud. <u>See</u> SEC Mem., p. 3, n. 1. The fundamental problem, however, remains as Mr. Tambone's allegedly conflicting actions occurred *before* that language appeared in the prospectuses (and before the outside date for the statute of limitations – May 19, 2001). Hence, there can be no conflict even if any of Mr. Tambone's alleged actions were wrongful (which they were not). According to the New Complaint:

| **Conduct** | **Date Alleged** | **Inclusion of Strict Prohibition Language** |
|---|---|---|
| Approval or awareness of Illytat "arrangement" (New Compl. ¶¶45, 47, 48) | **October 2000 or before** | May 2001 |
| Receipt of an e-mail re: Illytat (New Compl. ¶49) | **October 2000** | May 2001 |
| Receipt of an e-mail re: Illytat (New Compl. ¶51) | **March 2001** | May 2001 |
| Receipt of an e-mail re: Calugar (New Compl. ¶72, 95(a)) | **Beginning of 2000; spring of 2000** | "early 2001" |
| Approval of Giacalone arrangement (New Compl. ¶77) | **Late 2000** | May 2001 |
| Receipt of an e-mail re: Loeser (New Compl. ¶82) | **February 2000** | "early 2001" |
| Review and comment on an "approach for policing and eliminating market timers" and receipt of e-mails regarding market timing language in prospectuses (New Compl. ¶¶36-37) | **April and May 2000** | 2001 |

Even if the Strict Prohibition Language[1] was misleading, the SEC *still* has not attributed a *single* misstatement to Mr. Tambone. <u>See</u> <u>infra</u> pp. 5-6. Rather, the SEC essentially argues that Mr.

---

[1] In some instances, the Commission bases Mr. Tambone's alleged fraud on prospectus language indicating that short-term trading *could* cause harm to a fund or create additional costs borne by all shareholders. That disclosure cannot support a fraud claim because it actually warns investors of the risks of purchasing shares of the fund. In addition, the SEC vaguely relies on some language in the Acorn Fund Group prospectuses. New Compl. ¶33. At all relevant times, however, Liberty Wanger was the investment advisor to those funds. New Compl. ¶¶22-24. *Mr. Tambone was not affiliated with or Co-President of Liberty Wanger and Columbia Distributor did not act as broker-dealer for the Acorn Fund Group during the time periods stated in the New Complaint.*

Tambone is primarily liable merely based on his *status* as co-president of Columbia Distributor (although the other co-president was not sued). This has always been the core of the SEC's allegations and it is unsupported by law or fact.

Furthermore, despite *extensive* discovery and the opportunity given by this Court to "file a new lawsuit against defendants after a period of further investigation to bolster its allegations[,]"[2] the New Complaint contains only the same *two* vague allegations that Mr. Tambone did *anything after* the Strict Prohibition Language appeared, *i.e.*, he allegedly approved trading by Ritchie Capital and Stern in early 2003. New Compl. ¶¶65, 67. Neither of those claims are true or supported by *specific* factual allegations. Indeed, they are not supported by *any* facts (new or old) and cannot carry the SEC's fraud claims.[3]

    2.    <u>The Pro Forma Selling Agreements</u>

Mr. Tambone's signature on unspecified, pro-forma Selling Agreements cannot satisfy Rule 9(b) as set forth in Mr. Tambone's Memorandum. The SEC does not provide any substantive argument rebutting that conclusion. <u>See</u> SEC Mem., p. 10, n.7. Nor does the SEC elaborate how Mr. Tambone personally "used" or "disseminated" the Selling Agreements to commit fraud apart from stating that they were used by Columbia Distributor in contacting with broker dealers to sell funds. <u>See</u> New Compl. ¶¶ 40-42. This Court deemed those allegations insufficient to establish Mr. Tambone's personal liability as a primary actor for "use" or "dissemination" of the prospectuses. <u>See</u> <u>SEC v. Tambone</u>, 417 F. Supp. 2d 127, 133-34 (D. Mass. 2006). So too are those allegations insufficient for the Selling Agreements, which even are one step removed from the prospectuses.

---

[2] <u>See</u> Memorandum & Order, May 5, 2006, at p. 7.

[3] Federal pleading rules require a party to support affirmatively each general allegation and legal theory with specific facts. <u>See</u> <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 628 (1st Cir. 1996). Omitted facts that would "clearly dominate" the case are deemed not to exist. <u>See</u> <u>O'Brien v. DiGrazia</u>, 544 F.2d 543, 546 n.3 (1st Cir. 1976).

The SEC's reliance on Threadgill v. Black and Walling v. Beverly Enterprises misses the point. Those cases deal with breaches of contract accompanied by facts showing that the party, *at the time of contracting*, harbored a secret reservation not to fully perform the contract.[4] *There are no such accompanying facts in the New Complaint. Mr. Tambone was not even a party to those agreements.* One cannot reasonably infer that Mr. Tambone harbored some secret reservation not to perform or to direct Columbia Distributor not to perform those agreements based on any facts alleged in the New Complaint. See New Compl. ¶¶40-43.

Similarly, while trying to side-step the broad language in the Selling Agreements dealing with future events, the SEC cites cases where the defendants, *at the time the defendants made certain statements*, knew the statements were false and secretly intended not to not carry out the promises.[5] There are no facts in the New Complaint supporting any reasonable inference that Mr. Tambone had such knowledge and intent when he signed the Selling Agreements. Rather, the SEC generally alleges that Mr. Tambone knew or was reckless in not knowing the prospectuses were misleading. See New Compl. ¶¶40-43. That is not enough for primary liability or sufficient for Rule 9(b).

---

[4] In Threadgill, plaintiff transferred stock to defendants for $70,000; however, defendants had no intent to pay the plaintiff and their agreement was part of a larger scheme to defraud plaintiff out of his stock whereby they misrepresented the corporation's financial accounts, looted the corporation, and purposefully allowed the corporation to dissolve for non-payment of taxes. Threadgill v Black, 730 F.2d 810, 811-12 & n.1 (D.C.Cir. 1984). In Walling, plaintiffs sold stock to defendant; however, defendant raised fictitious excuses and had no intent to perform unless defendant later determined it was in defendant's best interests to do so and if plaintiffs provided additional concessions to which defendant was not legally entitled. Walling v. Beverly Enter., 476 F.2d 393, 395-96 (9th Cir. 1973).

[5] In Luce, plaintiff alleged that defendants made knowingly false statements and secretly intended not to carry out their promises. Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986). In Pross, although plaintiff alleged that defendant had from the outset a secret plan to divest plaintiff of his ownership interests, securities fraud was *lacking* because the contemplated scheme related to defendant's future acts as a fiduciary and promises were not part of the consideration. Pross v. Katz, 784 F.2d 455, 457-58 (2d Cir. 1986). In Meltzer, defendant admitted that fraudulent disclaimers were in his sole control and that he referred recipients to nonexistent entities to deceive recipients. SEC v. Meltzer, 2006 WL 1896329, at *8 (E.D.N.Y. July 10, 2006).

3. The SEC Has Filed to Attribute a Misrepresentation to Mr. Tambone or Allege Facts With Particularly Showing He Was *Primarily Responsible* for a Misrepresentation of Another

The SEC cannot foist primarily liability on Mr. Tambone merely because he allegedly commented on or reviewed prospectus language addressing market timing or had the opportunity to disclose the market timing. See New Compl. ¶¶25, 36-37; SEC Mem., p. 8. A defendant may be primarily liable under Section 10(b) by *personally* making a misrepresentation (or omission) or if a misrepresentation by another is attributed to a defendant at the time of dissemination. See Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (citing Central Bank of Denver v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994)). Absent *personal* attribution, primarily liability does not attach unless a defendant, at the very least, was "primarily responsible" for a misrepresentation by another. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001) (cited by the SEC). That standard is high and even *substantial participation or assistance* in drafting and communicating the misleading statements by others *cannot* constitute primary responsibility. See Wright, 152 F.3d at 175-76; see also In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161, 171-73 (D. Mass. 2003) (cited by SEC).

Wright's "bright-line" test is well settled law and, despite the SEC's attempt to muddy the waters, there is no question that a person's review, comment, or even approval of a misleading statement by another does not amount to primary liability for securities fraud. See In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 333 (S.D.N.Y. 2004) (defendant not liable for misleading public statements of another despite allegation that defendant "reviewed and approved" and helped create the statements) (cited by SEC). All the SEC alleges, however, is that Mr. Tambone reviewed and commented on the market timing disclosures in the prospectuses (which the SEC merely alleges based upon information and belief) and that is

insufficient for primarily liability based on Wright and even the cases the SEC asserts narrowed Wright.

The SEC's reliance on S.E.C. v. PIMCO Advisors Fund Mgt. LLC, 341 F. Supp. 2d 454 (S.D.N.Y. 2004) ("PIMCO I") does not aide its case.  In PIMCO I, a federal District Court concluded that the SEC properly stated fraud claims against Stephen Treadway because he *personally* negotiated and approved the arrangements, *personally* signed the misleading statements, and affirmatively withheld information from management.  See id. at 459-63.  The District Court concluded, however, that Kenneth Corba was *not* subject to primary liability because the SEC failed to allege he *personally* made any misrepresentations, *personally* drafted any misleading statements, or had "primary responsibility for development or communication of any misleading statements." Id. at 466-67.  In doing so, the District Court cited Wright and reaffirmed that substantial participation or assistance is insufficient for primary liability.  Id. at 467 (actor must *personally* draft or communicate misrepresentations).

The SEC only was able to avoid dismissal against Mr. Corba by later amending its complaint and alleging Mr. Corba *personally* made knowingly misleading statements and was *personally* responsible for the relevant portions of the prospectuses while being primarily responsible for managing the relevant funds.  See S.E.C. v. Treadway, 354 F. Supp. 2d 311, 317 (S.D.N.Y. 2005) ("PIMCO II").  Unlike PIMCO II, the SEC has not alleged that Mr. Tambone *personally* made any misrepresentations or was *personally* responsible for drafting the allegedly misleading prospectus disclosures.  See New Compl. ¶¶36-37.  The SEC's "facts" do not support its primary liability claims and neither does the law.[6]

---

[6] See In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 162 ("courts in this district have uniformly rejected efforts to impose liability" on persons for "merely reviewing and approving financial statements where there was no evidence that the accountant played a significant role in drafting the statement, and there are no attributions in the statement to the accountant . . . most courts have construed *Central Bank* as requiring a secondary actor's actual drafting and preparation of actionable material as opposed to mere review and approval."); SEC v. KPMG LLP, 412

6

B.   **THE SEC FAILS TO IDENTIFY A SCHEME TO DEFRAUD**

The SEC does not allege anything more about Mr. Tambone's alleged scheme to defraud. SEC Mem., pp. 1, 16. Inexplicably, however, the SEC again argues it has properly plead such a scheme. Nonsense. The cases the SEC cites involved *some* other device that was clearly illegal or fraudulent.[7] The Court highlighted that gaping flaw in the Original Complaint. See Tambone, 417 F. Supp. 2d at 135-36. The SEC ignored it.

C.   **THE SEC DOES NOT ALLEGE FACTS THAT CREATE A DUTY TO DISCLOSE**

The SEC's reliance on S.E.C. v. Treadway, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) ("PIMCO III") to create a duty to disclose is misplaced. In PIMCO III, the New York District Court found that Mr. Corba had a duty to disclose certain arrangements with Canary Capital Partners LLC ("Canary") because Mr. Corba was in a *unique position* to disclose those arrangements. 430 F. Supp. 2d at 327. That unique position arose because Mr. Corba, among other things, (1) *actually negotiated* the Canary relationship, (2) had "extensive dealings" with Canary as CEO of the funds' sub-investment advisor, (3) was portfolio manager of the funds affected by the Canary relationship, (4) received numerous e-mails from a broker regarding the arrangement and transactions, and (5) had "primary responsibility" for drafting the prospectus sections in which the information could have been disclosed. Id. at 327-29. Mr. Corba also

---

F. Supp. 2d 349, 375 (S.D.N.Y. 2006) (any narrow exception to Wright must fit within "a discrete set of circumstances . . . where it can be shown that the officer was sufficiently responsible for making the false statements . . . [and] was sufficiently responsible for the entity's speech such that he could properly be said to have made the false statement.") (cited by the SEC).

[7] See S.E.C. v. JB Oxford Holdings, Inc., No. CV-04-070, slip op. (C.D. Cal. Nov. 10, 2004) (device was the "cloning" of account numbers to circumvent efforts to prevent market timing); S.E.C. v. Gann, 2006 WL 616005, *5 (N.D. Tex. Mar. 13, 2006) (device was "masking" market-timing activities through the use of multiple accounts, multiple registered representative numbers and by dividing trades into smaller dollar amounts); S.E.C. v. Druffner, 353 F. Supp. 2d 141, 148 (D. Mass. 2005) (device was use of multiple FA numbers and account numbers to conceal market-timing activities). In re Mutual Funds Inv. Litig. is not analogous or controlling as it dealt with broker-dealers that were "architects" or "key conduits" of the alleged fraud. See 384 F. Supp. 2d 845, 858-59 (D. Md. 2005). There are no such allegations against Mr. Tambone in the New Complaint.

owed a fiduciary duty to the funds as the CEO of the funds' advisor and as portfolio manager. Id. at 328-39.

Unlike Mr. Corba in PIMCO III and despite extensive discovery canvassing Mr. Tambone's conduct from 1998 through September 2003, the SEC does not allege facts to support any reasonable inference that Mr. Tambone was in a similar unique position to have a duty to disclose anything to anyone in the prospectuses.[8] Rather, the SEC parsimoniously states that Mr. Tambone may have reviewed and commented on an "approach for policing and eliminating market timers" and received some e-mails regarding prospectus language regarding market timing in or around April and May of 2000. New Compl. ¶¶36-37. *Those e-mails were received one year before any prospectus contained the Strict Prohibition Language and do not even fall within the five year statute of limitations period applicable to the SEC's claims.* Because Mr. Tambone was not responsible for the prospectus disclosures and did not make any misleading statements, he was under no duty to correct the alleged misstatements. See Tambone, 417 F. Supp. 2d at 135.[9]

Mr. Tambone was not a fiduciary merely because he was a "securities professional" as the SEC contends. *All* securities professionals do not owe a fiduciary duty to investors.[10] The

---

[8] The SEC's reliance on Druffner also is misplaced. In Druffner, this Court concluded that defendant brokers owed a duty to disclose as they had used numerous broker identification numbers and intentionally opened approximately 200 fictitious accounts to conceal their identities. See Druffner, 353 F. Supp. 2d at 148-49.

[9] The SEC's new allegations against Mr. Tambone contradict the SEC's statement in the Original Complaint that Columbia Advisors was responsible for the disclosures in the funds. See Original Comp. ¶16.

[10] See Patsos v. First Albany Corp., 433 Mass. 323, 330 (2001) ("under Massachusetts law, a 'simple' broker-customer relationship is not fiduciary in nature."); see also Vogelaar v. H.L. Robbins & Co., 348 Mass. 787, 788 (1965) (no fiduciary duty even though broker was aware investor knew little about securities, had received psychiatric treatment and relied completely on advice of brokers); Lefkowitz v. Smith Barney, Harris Upham & Co., 804 F.2d 154, 155 (1st Cir. 1986) ("simple stockbroker-customer relationship does not constitute fiduciary relationship in Massachusetts"); Tambone, 417 F. Supp. 2d at 134 (duty to disclose does not arise from mere possession of non-public information). The SEC's claims that Mr. Tambone must have known of the alleged fraud also are insufficient. See Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998) ("general inferences that [defendants] 'must have known' about [alleged fraud] . . . are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate.").

cases cited by the SEC do not even support that broad proposition; but rather, they address duties arising when a securities professional "recommends" a security while secretly knowing and withholding facts making the "recommendation" false or misleading. See SEC v. GLT Dain Rauscher, Inc., 254 F. 3d 852, 857-58 (9th Cir. 2001) (lead investment banker recommended security based on misleading statements he prepared and failed to inform investors about investment strategy risks); SEC v. Hasho, 784 F. Supp. 1059, 1107 (S.D.N.Y 1992) (brokers cold-called and misled investors by providing unjustified predictions that their recommendations would produce future profits, uttered false statements regarding their possession of inside information, omitted risk factors associated with speculate nature of investments, and made price predictions and profit guarantees without a reasonable basis).[11]

The SEC does not and cannot allege that Mr. Tambone knowingly and falsely recommended any securities to anyone. Tambone, 417 F. Supp. 2d at 135 (recognizing that the SEC did not allege facts with particularity to conclude that Mr. Tambone *personally* made any

---

[11] See In re Suprema Specialties Inc. Sec. Litig., 438 F.3d 256, 282 (3d Cir. 2006) (court dismissed complaint because plaintiff failed to allege facts supporting anything more than negligence); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 42-45 & n.10 (2d Cir. 1978) (broker supervised plaintiff's accounts, recommended highly speculative securities, and "undertook a hand-holding operation" to assure Plaintiff his investments were safe when defendant had no reasonable basis for such assurances); SEC v. Currency Trading Intern, Inc., 2004 WL 2753128, *9-10 (C.D.Cal., Feb. 2, 2004) (brokers failed to disclose that most clients lost money and that withdrawing money was difficult, engaged in unauthorized trading, and recommended speculative investments without explaining risks); Keenan v. D.H. Blair & Co., 838 F. Supp. 82, 85 (S.D.N.Y 1993) (broker made actual recommendations during telephone conversations that particular stock was suitable while broker knew stock was artificially inflated); SEC v. Zanford, 535 U.S. 813, 824 (2002) (broker failed to disclose intent to steal securities); Hanly v. SEC, 415 F.2d 589, 597 (2d Cir. 1969) (salesman provided unfounded recommendations without conducting reasonable investigation into facts); Antinoph v. Laverell Reynolds Sec., Inc., 703 F. Supp. 1185, 1186 (E.D. Penn. 1989) (broker did not explain risks involved in recommended trading); Feeney v. SEC, 564 F.2d 260, 262 (8th Cir. 1977) (salesman encouraged public to purchase worthless, unregistered securities that salesman represented were sound without a reasonable basis for doing so); Walker v. SEC, 383 F.2d 344, 345 (2d Cir. 1967) (broker, as part of a boiler room operation, urged investor by telephone to purchase particular stock by statements he failed to verify); In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 637-56 (S.D. Tex. 2002) (underwriters liable for issuing investment analyses and opinions about company and promises of extraordinary returns with knowledge that company and others artificially inflated value of company); Sanders v. John Nuveen & Co., 554 F.2d 790, 792-93 (7th Cir. 1977) (court reversed and remanded finding against underwriter because trial court found underwriter merely was negligent in its actions); Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 371 (2d Cir. 1973) (underwriter found liable for misleading exchange offer); Hiller v. SEC, 429 F.2d 856, 858 (2d Cir. 1970) (president of underwriter *actively* instructed salespersons to recommend a security even though president believed the extravagant reports about security were unreliable).

statements to investors, misleading or otherwise). Rather, the SEC flaccidly alleges that Mr. Tambone "had responsibility for Columbia Distributor's efforts to sell the" funds and signed the pro forma Selling Agreements between broker dealers and Columbia Distributor (without specifying what broker-dealers, the dates of the agreements or any other facts with particularity). See New Compl. ¶¶11, 40-42.[12] That conduct is remarkably different than personally recommending that someone purchase securities while knowing, or failing to investigate whether, such recommendation is false or misleading. The conduct alleged by the SEC cannot make Mr. Tambone a fiduciary.

**D.   THE SEC DOES NOT ALLEGE FACTS SUPPORTING AIDING AND ABETTING LIABILITY**

As this Court made clear, for aiding and abetting liability, the SEC must allege facts showing that Mr. Tambone's provided "substantial assistance to" a primary violator and that his silence was consciously intended to further a primary violation. See Tambone, 417 F. Supp. 2d at 136-37. Economic motivation alone, however, is an insufficient fact to support secondary liability. Id. at 137. Despite this Court's guidance, the New Complaint only contains the same vague and conclusory allegations against Mr. Tambone, which the SEC blindly reiterates in its Opposition. See New Compl. ¶¶2, 7, 11, and 27; SEC Mem., pp. 25-26. Nothing has changed. The Court already has rejected those claims and should do so again here.

---

[12] The Selling Agreements cannot reasonably be viewed as "recommendations" to purchase any securities – they merely are pro forma contracts between the fund distribution company and broker dealers. Mr. Tambone is not even a party to those agreements.

### E. THE STATUTE OF LIMITATIONS BARS THE SEC'S CLAIMS

The SEC seemingly concedes that 28 U.S.C. § 2462 bars any monetary penalty claim absent equitable tolling by fraudulent concealment. See SEC Mem., pp. 27-28.[13] The SEC's fraudulent concealment allegations, however, cannot prevail because the SEC has not plead with particularity any facts supporting any inference that Mr. Tambone engaged in an affirmative act of concealment. See Berkson v. Del Monte Corp., 743 F.2d 53, 56 (1st Cir. 1984) (silence or passive conduct not sufficient unless there exists a duty to disclose); Oechsner v. Connell Ltd. P'ship, 283 F. Supp. 2d 926, 933 (S.D.N.Y. 2003). Consequently, all claims based on conduct occurring five years before the filing of the New Complaint (May 19, 2001) are time barred.

### CONCLUSION

For the foregoing reasons and for the reasons set forth in Mr. Tambone's Memorandum in Support of Motion to Dismiss, this Court should dismiss the SEC's Complaint with prejudice.[14]

                                                 JAMES TAMBONE,

                                                 By his attorneys,

                                               /s/ David G. Thomas
                                               A. John Pappalardo (BBO #388760)
                                               John A. Sten (BBO #629577)
                                               David G. Thomas (BBO# 640854)
                                               Jennifer Martin Foster (BBO# 644796)
                                               GREENBERG TAURIG, LLP
                                               One International Place
                                               Boston, MA  02110
                                               (617) 310-6000

Dated:  September 15, 2006

---

[13] As the SEC chose to combine its claims for monetary penalties and injunctive relief, all claims are barred. See Federal Election Com'n v. Williams, 104 F. 3d 237, 240 (9th Cir. 1996) (any argument that the statute of limitations found in § 2462 does not apply to actions for injunctive relief when connected to actions for legal relief "runs directly contrary" to the Supreme Court's holding in Cope v. Anderson, 331 U.S. 461, 464 (1947)).

[14] To the extent it is consistent, Mr. Tambone incorporates herein by reference defendant Robert Hussey's Reply Memorandum in Support of Motion to Dismiss, dated September 15, 2006.

## CERTIFICATE OF SERVICE

      I, David G. Thomas, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent, via First-Class Mail, to those indicated as non-registered participants on this 15th day of September, 2006.

                                                   /s/ David G. Thomas  
                                                   David G. Thomas