06-10885

# United States Court of Appeals
## For the First Circuit

No. 07-1384

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellant,

v.

JAMES TAMBONE; ROBERT HUSSEY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,
and Delgado-Colón,* District Judge.

John W. Avery, Senior Litigation Counsel, Securities and
Exchange Commission, with whom Andrew N. Vollmer, Deputy General
Counsel, and Jacob H. Stillman, Solicitor, were on brief, for
appellant.
Elliot H. Scherker, with whom Greenberg Traurig, P.A., A. John
Pappalardo, John A. Sten, David G. Thomas, D. Greg Blankinship, and
Greenberg Traurig, LLP, were on brief, for appellee Tambone.
Christopher M. Joralemon, with whom Warren L. Feldman,
Clifford Chance US LLP, Frank A. Libby, Jr., John J. Commisso, and
Kelly, Libby & Hoopes, P.C., were on brief, for appellee Hussey.

December 3, 2008

*Of the District of Puerto Rico, sitting by designation.

**LIPEZ, Circuit Judge.** In this enforcement action brought by the Securities and Exchange Commission ("SEC" or "the Commission"), the Commission seeks to hold defendants James R. Tambone and Robert Hussey, executives of Columbia Funds Distributor, Inc., the primary underwriter for the Columbia family of mutual funds, responsible both as primary violators of the federal securities laws and as aiders and abettors of uncharged primary violations of Columbia Advisors and/or Columbia Distributor.[1] After carefully reviewing the relevant statutes and precedents, we conclude that Tambone and Hussey may be held primarily liable for using false or misleading fund prospectuses to sell mutual fund shares under Section 17(a)(2) of the Securities Act of 1933 ("section 17(a)(2)") and Section 10(b) of the Exchange Act of 1934 ("section 10(b)"), and its implementing regulation, Rule 10b-5. Additionally, we conclude that the scope of conduct encompassed by section 17(a)(2)'s prohibition on obtaining money or property "by means of" any untrue statement of material fact may, in certain circumstances, be broader than Rule 10b-5(b)'s prohibition against "making" an untrue statement. Here, however,

---

[1] The provisions at issue in this case are Sections 10(b) and 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78o(c), respectively, along with Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under section 10(b); Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and Sections 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(1), (2).

-2-

we conclude that the SEC's second complaint[2] alleges with sufficient particularity violations of both prohibitions by Tambone and Hussey, as well as aiding and abetting violations. We therefore reverse the district court's judgment dismissing the SEC's complaint against Tambone and Hussey.

I.

## A. The Roles of the Defendants

The following description of the alleged conduct, drawn primarily from the SEC's second complaint, is presented in the light most favorable to the plaintiff. Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).

During the relevant time period, defendants Tambone and Hussey were senior executives of Columbia Funds Distributor, Inc. ("Columbia Distributor"), a broker-dealer registered with the SEC since 1992. Between 1998 and 2003, the company was the principal underwriter and distributor for a group of approximately 140 mutual funds ("the Columbia Funds") and, in that capacity, was primarily responsible for selling those securities and disseminating informational materials on the funds, including prospectuses, to investors and potential investors.[3]  See 15 U.S.C. § 80a-

---

[2] We review the district court's dismissal of the SEC's second complaint. The SEC's first complaint against defendants was dismissed without prejudice before the Commission had an opportunity to amend it with additional related allegations.

[3] Although a mutual fund may sell shares directly to broker-dealers, it typically employs a principal underwriter to distribute

2(a)(40) (describing the duties of an underwriter to include purchasing securities from an issuer for resale, or selling securities for an issuer). Columbia Distributor was also responsible for answering inquiries from the investing public and other entities seeking additional information about any of the Columbia Funds. Columbia Distributor and the issuer of the funds, Columbia Advisors, a registered investment adviser, were both wholly-owned subsidiaries of Columbia Management Group, Inc. and indirect subsidiaries of FleetBoston Financial Corporation.[4]

As issuer and sponsor, Columbia Advisors was primarily responsible for creating the content of the prospectuses for the Columbia Funds.  See 15 U.S.C. § 80b-2(a)(11) (defining an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling

---

and market the fund to broker-dealers and to the investing public.

[4] Columbia Distributor previously went by the name Liberty Funds Distributor, Inc.  In November 2001, FleetBoston Financial Corporation purchased Liberty Financial Group and acquired various Liberty fund groups and investment advisers, including Liberty Advisory Services Corp., Colonial Management Associates, Inc., Stein Roe and Farnham Inc., Newport Pacific Management, Inc., Newport Fund Management, Inc. and Columbia Funds Management Company.  Fleet retained the organization and management of Liberty Distributor and continued using the Liberty name on the prospectuses for the Liberty Funds.  These entities merged in April 2003 with Fleet Investment Advisors, Inc. into Columbia Advisors. In April 2004, Bank of America Corporation became the successor to Fleet.

-4-

securities"). Columbia Fund Services, Inc. ("Columbia Services"), also a subsidiary of Columbia Management Group, was responsible for determining whether "market timing" activities were occurring in the Columbia funds and responding to such activity. Market timing refers to the practice of buying and selling mutual funds in rapid succession to exploit short-term inefficiencies in the pricing of the funds.[5] Among the specific Columbia Funds pertinent to this case were the Acorn Fund Group, the Newport Tiger Fund, the Columbia Growth Stock Fund, and several others.

Beginning in 1997, Tambone, a registered securities principal,[6] was employed as Co-President of Liberty Distributor, and later Columbia Distributor, where he was one of the executives responsible for managing all of Columbia Distributor's activities, including the fulfillment of its obligations as underwriter of the Columbia Funds. These duties included the sale and marketing of

---

[5] Market timing is "a mutual fund trading strategy that 'exploit[s] brief discrepancies between the stock prices used to calculate the shares' value once a day, and the prices at which those stocks are actually trading in the interim." SEC v. Ficken, 2008 WL 4615797, at *1 (1st Cir. Oct. 20, 2008) (quoting Kircher v. Putnam Funds Trust, 547 U.S. 633, 637 n.4 (2006)). "The discrepancy occurs because the value of the fund is calculated only once each day." SEC v. Druffner, 517 F. Supp. 2d 502, 506 (D. Mass. 2007).

[6] A registered securities principal is one who has been certified by the Financial Industry Regulatory Authority ("FINRA") to "manage or supervise [a member entity's] investment banking or securities business for corporate securities, direct participation programs, and investment company products/variable contracts." See FINRA Registration and Examination Requirements, http://www.finra.org/RegistrationQualifications/BrokerGuidanceRes ponsibility/Qualifications/p011051 (last visited Dec. 3, 2008).

-5-

the Columbia Funds and the dissemination to investors of the fund prospectuses and other materials. As Co-President, Tambone was at times involved in the process of revising the prospectuses, although the SEC does not allege that he was responsible for drafting them.

Hussey served as Senior Vice President of the Alliance Group at Liberty Distributor from 1998 until 2000, where he was responsible for selling funds to investment advisers and others for the benefit of their clients.    In 2000, he became Liberty Distributor's Managing Director for National Accounts.   In that capacity, he managed the sale of the funds to broker-dealers and other entities.  Hussey held the same position, with substantially similar responsibilities, at Columbia Distributor from January 2002 until March 2004.  Throughout this period, Hussey reported directly to Tambone.   Both Tambone and Hussey thus played substantial and direct roles in the sale and distribution of securities, and, according to the complaint, more than half of the total compensation that defendants received each year consisted of commissions from fund sales.

## B. The Nature of the Alleged Wrongdoing

Between 1998 and 2003, various Columbia Funds adopted disclosure statements in their mutual fund prospectuses addressing market timing practices engaged in by fund investors.   The market timing practice of rapidly shuffling an investment into and out of

-6-

certain targeted funds is known as engaging in "round-trips." Although potentially beneficial to an individual investor, and not per se illegal, round-trips and other market timing practices can adversely affect mutual fund shareholders because the profits obtained from market timing practices dilute the value of shares in the fund held by long-term shareholders. Further, round-trips increase a fund's trading costs (which are borne by all shareholders), and may cause the mutual fund to realize capital gains at inopportune times. To prevent such practices, language was inserted into many of the Columbia Fund prospectuses limiting the number of round-trips -- specifically, an exchange from one fund to another and then back again -- a shareholder could engage in during a given period.[7] As market timing practices became more prevalent, Columbia took additional steps to prevent such behavior. In May 1999, certain of the prospectuses for the funds belonging to the Acorn Fund Group began representing that "[t]he Acorn funds do not permit market timing and have adopted policies to discourage this practice."

Consistent with the goal of limiting market timing behavior, Hussey, in 2000, co-led a working group that recommended that all of the Columbia Funds adopt a consistent position against such practices in their prospectuses. The complaint states, based

---

[7] For example, from 1998 through 2000, the prospectuses for the funds within the Acorn Fund Group stated that investors would generally be permitted to make up to four round-trips per year.

-7-

on information and belief, that in April and May 2000, Hussey and
Tambone each reviewed drafts of the market timing representations
to be included in the prospectuses and offered comments via e-mail
to the in-house counsel for Columbia Advisors. Months later, a
number of the Columbia Funds revised their prospectuses to include
a statement prohibiting market timing (the "Strict Prohibition").[8]
By the spring of 2001, the remaining Columbia Funds belonging to
Liberty had also adopted the Strict Prohibition language in their
prospectuses. That language remained in these funds' prospectuses
until at least 2003, and was later added to prospectuses for funds
previously owned by Fleet before the acquisition.

The SEC alleges that, concurrent with these amendments,
defendants affirmatively approved or knowingly allowed frequent
trading in particular mutual funds in violation of the Strict
Prohibition disclosures contained in their prospectuses.    The
Commission's second complaint details six arrangements that Tambone
approved or knowingly allowed and seven arrangements that Hussey

---

[8] The Strict Prohibition read:

The fund does not permit short-term or excessive trading
in its shares.   Excessive purchases, redemptions or
exchanges of Fund shares disrupt portfolio management and
increase Fund expenses.  In order to promote the best
interests of the Fund, the Fund reserves the right to
reject  any  purchase  order  or  exchange  request
particularly from market timers or investors who, in the
advisor's opinion, have a pattern of short-term excessive
trading or whose trading has been or may be disruptive to
the Fund.   The funds into which you would like to
exchange may also reject your request.

approved or knowingly allowed, most, but not all of which, overlapped. We describe the alleged arrangements, none of which were disclosed to the investors or the independent trustees of the Columbia Funds.

(1) Hussey and Tambone approved an arrangement allowing Ilytat, L.P. to engage in frequent and short-term trading in Newport Tiger Fund, a Columbia mutual fund. According to the arrangement, Ilytat would place $20 million in the Newport Tiger Fund, with two-thirds remaining static and one-third being actively traded. Tambone approved or became aware of the arrangement by October 2000, when the portfolio manager for the Newport Tiger Fund, who had initially approved the arrangement, communicated to both Tambone and Hussey his concern about Ilytat's market timing practices and the potential harm it could have on the fund and its investors.[9] With Hussey's approval, Ilytat was added to Columbia

_____

[9] In response to an email from the Newport Tiger Fund's portfolio manager in October 2000 discussing Ilytat, in which the manager states that "their active trading has increased and it has become unbearable. There will be long term damage to the fund," Hussey set forth guidelines for such market timing arrangements, including:

- Identify and close a long-term asset stream as a quid-pro-quo to any short-term movements;
- Dictate that any short-term movements must use a Liberty money market option to ensure gross sales are not artificially inflated and to ensure that Liberty generates constant management fee income;
- Bring the potential relationship to the attention to [sic] the relevant investment management team early; and
- Monitor the relationship to ensure the investment management team's comfort.

Services' list of "Authorized Accounts for Frequent Trading,"[10] and Hussey, in 2002, reversed a stop placed on Ilytat's trading by Columbia Services market timing surveillance personnel.

In total, between April 2000 and October 2002, Ilytat made 350 round-trips in seven international Columbia Funds, including the Newport Tiger Fund and the Acorn International Fund. At least 30 of the round-trips in the Newport Tiger Fund were made during the period from May 2001 through September 2002 when the fund prospectus contained the Strict Prohibition representation.[11] Moreover, despite language in the prospectus for the Acorn International Fund between September 1998 and September 2000 preventing investors from engaging in more than four round-trips per year, Ilytat engaged in 27 such round-trips in 1999 and 18 in 2000. Ilytat also engaged in at least 20 round-trips in the fund between July 2000 and June 2001, when the fund prospectus included the Strict Prohibition language.

---

Hussey's response, which was copied to Tambone, stated that the Ilytat arrangement followed these guidelines.

[10] The list was designed to protect certain entities from any internal actions taken to prevent market timing practices.

[11] In 2000 and early 2001, before it was amended to include the Strict Prohibition, the prospectus for the Newport Tiger Fund stated that "[s]hort term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders."

(2) From January 2000 through September 2003, Ritchie Capital Management, Inc. traded frequently in a number of Columbia Funds, including the Newport Tiger Fund and the Columbia Growth Stock Fund. In late 2001, Hussey became aware of Ritchie's short-term trading activities in the two Columbia Funds. In early 2003, Ritchie Capital Management, Inc. entered into an arrangement with Columbia Distributor, approved by Tambone and Hussey, designating certain of Ritchie's investments as "sticky assets,"[12] or long-term assets, and others as available for short-term trading.

(3) In late 2002 or early 2003, Edward Stern entered into two separate agreements with Columbia Distributor through intermediaries.   One arrangement, secured by Epic Advisors on behalf of Stern's Canary Investment Management firm, and approved by Tambone, allowed Stern entities to make three round-trips per month in each of three Columbia funds.   Each fund's prospectus contained the Strict Prohibition language.   The second agreement involved the placement of $5 million in the Columbia High Yield Fund, whose prospectus also contained the Strict Prohibition disclosure.   That arrangement, approved by the fund's portfolio manager, permitted Stern to make one round-trip each month.

---

[12] "Sticky assets" are investment assets that remain in place within a given fund for an extended period of time.   A "sticky asset" arrangement typically involves keeping these "sticky assets" in place for a given period of time in return for permission to actively trade another amount of assets more frequently.

-11-

(4)   In 1999, Daniel Calugar was allowed to place up to
$50 million in the Columbia Young Investor Fund and the Columbia
Growth Stock Fund, with permission to make one round-trip per month
with the entire amount.  In 2000, knowing that Calugar was trading
at levels exceeding their arrangement, Hussey expressed concern
that Calugar's activities were harming the funds, but took no
action to limit the trading activities.  Tambone was apprised by
Hussey of Calugar's activities, but also took no action.  Calugar
continued the short-term trading activities until at least August
2001, several months after the funds at issue adopted the Strict
Prohibition language in their prospectuses.

(5)   Tambone approved a "sticky asset" arrangement
between Columbia Distributor and broker Sal Giacalone in late 2000.
Per the terms of the arrangement, Giacalone was allowed to make
four round-trips per month of up to $15 million in the Newport
Tiger Fund so long as he also placed $5 million in the long-term
assets of the Acorn Fund.  Between November 2000 and April 2001,
Giacalone made a total of 43 round-trips in the Newport Tiger Fund
pursuant to the arrangement.

(6)   Hussey approved an arrangement with D.R. Loeser in
late 1998 allowing Loeser to make five round-trips per month of up
to $8 million in the Columbia Growth Stock Fund.  In the first five
months of 2000, Loeser made approximately 20 round-trips in the
Growth Stock Fund and another 20 round-trips in the Young Investor

-12-

Fund. Despite knowledge by Tambone and Hussey of Loeser's trading practices, neither took action to halt the trading activities.

(7) Signalert entered into an arrangement with Columbia Distributor in 1999, approved by Hussey, in which it agreed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund in exchange for permission to engage in 10 round-trips annually in each of the funds. Pursuant to the arrangement, Signalert was also required to place $5 million in each of six other funds, which could be traded just once each quarter. During 2000-2001, Signalert made over 50 round-trips in the Growth Stock Fund and approximately 50 round-trips in the Young Investor Fund. These included 20 round-trips in the Young Investor Fund between February and August 2001, after the fund's prospectus had been amended to include the Strict Prohibition language.

(8) In early 2000, Columbia Distributor agreed to allow Tandem Financial to make an unlimited number of trades in one or more of the Columbia Funds. During the period from April 2001 through September 2003, Tandem made 106 round-trips in the Columbia Tax Exempt Fund, despite the Strict Prohibition disclosure in the fund prospectus. Hussey and one of Tambone's subordinates became aware of Tandem's activities in early 2003.

The complaint alleged that Columbia Advisors, itself or through portfolio managers for the separate funds, knew or approved of all of the market timing arrangements, except the arrangement

-13-

with Tandem. In total, during the approximately five-year period from 1998 to 2003, hundreds of round-trips were executed in the Columbia Funds in amounts approaching \$2.5 billion.

Meanwhile, in his position as Managing Director for National Accounts, Hussey also helped lead a task force established to develop procedures for detecting and preventing market timing activities in the Columbia Funds. Hussey was the designated contact for inquiries about market timing, including what actions, if any, should be taken if such activity was detected. In this capacity, he participated in the creation of a list of "Accounts Approved for Frequent Trading."[13] According to the second complaint, both Hussey and Tambone, on multiple occasions, blocked or allowed their subordinates to block efforts to halt the trading activity of preferred customers.

In addition to overseeing the distribution of prospectuses, Tambone, on behalf of Columbia Distributor, signed hundreds of selling agreements for Columbia Funds during this

---

[13] The complaint describes an email forwarded to Hussey by the market timing surveillance manager describing the differential treatment given to favored investors:

> I review 3 different reports each day that reflect accounts fitting this criteria [the definition of market timers]. After these accounts are located, I take action against some of them. The accounts that are recognized as timers (that do not have some kind of existing relationship with us) merit trade cancellations and placement of account stops. The accounts that are allowed to trade (due to a sales relationship) are ignored.

-14-

period. Each selling agreement stated the procedures by which the customer would purchase shares of the Columbia Funds from Columbia Distributor and contained express representations and warranties related to the content of the prospectuses. Tambone referred the purchaser to the fund prospectuses for information on the fund and specifically stated in each agreement that "[w]e shall furnish prospectuses and sales literature upon request."

The SEC learned of the alleged conduct of defendants and the various Columbia entities during the course of its investigation of market timing practices of many fund companies. See Gretchen Morgenson & Landon Thomas, Jr., S.E.C. Finding Fund Abuses, Official Says, N.Y. Times, Oct. 25, 2003, at C1 ("[A]fter sending out 88 letters to mutual fund companies and brokerage firms, [the SEC] found that half . . . had arrangements with one or more investors allowing them to trade in and out of shares. These arrangements occurred even though about half of the fund companies have policies specifically barring market timing, the official said."). Prior to filing its initial complaint in this case, the Commission obtained extensive discovery from Columbia, reviewing hundreds of thousands of pages in documents and taking the sworn testimony of Mr. Hussey and over 20 other witnesses.[14]

_____

[14] Section 21 (a)(1) of the Securities Exchange Act of 1934 gives the SEC broad authority to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of [the Exchange Act and] the rules or regulations thereunder . . . ." 15 U.S.C. § 78u(a)(1).

-15-

## C. **Procedural History**

The SEC filed a complaint against defendants Tambone and Hussey in February 2005 alleging securities fraud based on the above allegations.[15]   The complaint alleged that defendants committed primary acts of fraud in violation of section 10(b) of the Securities Exchange Act, Rule 10b-5, and section 17(a)(2) of the Securities Act.   It also alleged that defendants aided and abetted primary violations committed by Columbia Advisors and Columbia Distributor in violation of section 206 of the Advisers Act, and primary violations committed by Columbia Distributor in violation of section 15(c)(1) of the Exchange Act.   The complaint sought three remedies: (1) a permanent injunction to restrain Tambone and Hussey from further violating, either directly or indirectly, the statutory provisions implicated in this case; (2)

---

[15] In February 2005, the SEC settled an enforcement action against Columbia Advisors, Columbia Distributor, and three former Columbia executives related to undisclosed market timing arrangements in the Columbia Funds.   Without admitting or denying the SEC's findings, Columbia Advisor and Columbia Distributor agreed to pay $70 million in disgorgement and a civil penalty of $70 million to the SEC, to be distributed to investors harmed by the conduct.   Press Release, U.S. Securities and Exchange Commission, Fleet's Columbia Mutual Fund Adviser and Distributor to Pay $140 Million to Settle SEC Fraud Charges for Undisclosed Market Timing, 2005-15 (Feb. 9, 2005) (available at http://www.sec.gov/news/press/2005-15.htm).   As a result, the SEC's claims in this case are targeted at Tambone and Hussey only, although to establish aiding and abetting liability against these defendants, the SEC is also required to allege claims against Columbia Advisors and/or Columbia Distributor for primary violations of the securities laws.

disgorgement and pre-judgment interest; and (3) unspecified civil penalties. See 15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(e).

The defendants moved to dismiss the complaint for failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and for failure to state a claim upon which relief could be granted under Rule 12(b)(6). The district court granted the motions without prejudice on January 27, 2006.

On March 16, 2006, the SEC moved for leave to amend the original complaint. Before that motion was resolved, the SEC moved for relief from judgment pursuant to Fed. R. Civ. P. 60(b), having realized that a motion for leave to amend cannot be considered after a case has been dismissed. The district court denied both motions on May 5, 2006.

On May 19, 2006, the SEC filed a second complaint which sought the same remedies but raised an additional aiding and abetting offense and offered supplemental factual allegations to support all of the claimed violations. As characterized by the district court, the Commission's second complaint contained 110 paragraphs nearly identical to those in the initial complaint, and twelve additional paragraphs alleging new facts. The additional paragraphs state generally that both defendants participated in the review and oversight processes related to market timing issues for the Columbia Funds, and specifically allege that defendants were responsible for misrepresentations on market timing in the fund

-17-

prospectuses.[16]  Despite these additions, the district court again dismissed the Commission's claims on December 29, 2006, this time with prejudice.

Addressing the question of primary liability, the court applied an attribution test.  That is, the court stated that to be liable under "Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, a defendant must have personally made either an allegedly untrue statement or a material omission."  Despite the SEC's allegations that defendants had participated in working groups and task forces that led to the revision of the market timing statements in the false and misleading prospectuses, and then used those prospectuses to sell the mutual funds, the court concluded that "[t]he major flaw with the SEC's complaint was then, and continues to be, a failure to attribute misleading statements to either Tambone or Hussey."  According to the district court, neither the defendants' roles in disseminating the allegedly misleading prospectuses nor their participation in the process of revising the disclosures was sufficient to satisfy the provisions' attribution requirement.

The court also found other deficiencies in the SEC's complaint.  First, the court ruled that the SEC had failed to satisfy the pleading particularity requirements imposed by Fed. R. Civ. P. 9(b), noting that "[t]he new paragraphs fail [] to identify

[16] From this point forward in the opinion, we shall refer to the second complaint as "the complaint."

-18-

the substance of the comments made by either Tambone or Hussey . .
. and . . . fail to allege that any of the language reviewed or
proposed by either defendant was ever actually incorporated into
the fall 2001 prospectus."   Second, the court rejected the
Commission's allegation that Tambone and Hussey owed a duty to the
investors to whom they sold the funds.  It wrote: "[A]n individual
owes a duty to clarify a misleading statement only if that
statement is attributable to the individual."   Without any
statement attributable to them, the defendants could not be held
liable for misleading statements or omissions in the prospectuses,
nor for failing to correct the false prospectuses.

        Finally, the court dismissed the SEC's aiding and
abetting allegations, finding that the "SEC had not sufficiently
alleged that the defendants consciously threw in their lot with the
primary violators."

        The SEC challenges these conclusions of the district
court on appeal.

**II.**

        We review the district court's grant of a motion to
dismiss de novo.  Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d
92, 95 (1st Cir. 2007).  Although Fed. R. Civ. P. 8(a)(2) requires
only "a short and plain statement of the claim" sufficient to give
the defendant fair notice of the claim and its factual basis, see
Conley v. Gibson, 355 U.S. 41, 47 (1957), the "plain statement"

must "possess enough heft to 'sho[w] that the pleader is entitled
to relief.'" Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1966
(2007) (quoting Fed. R. Civ. P. 8(a)(2)). A plaintiff's task
"requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action." Id. at 1965; see
also Rodríguez-Ortiz, 490 F.3d at 95.

When reviewing a ruling on a motion to dismiss under Rule
12(b)(6), we accept all well-pleaded facts as true and draw all
reasonable inferences in favor of the plaintiff. ACA Fin. Guar.
Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008). We are not
limited to the district court's reasoning, but "may affirm an order
of dismissal on any basis made apparent by the record." Ramos-
Pinero v. Puerto Rico, 453 F.3d 48, 51 (1st Cir. 2006).

The SEC must also satisfy the heightened pleading
standard set by Fed. R. Civ. P. 9(b) for allegations of fraud. The
heightened standard applies both where fraud is an essential
element of the claim, as in the Commission's claims under section
10(b), and where the plaintiff alleges fraud even though it is not
a statutory element of the offense, as in the SEC's claims under
section 17(a)(2). Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223
(1st Cir. 1996) ("It is the allegation of fraud, not the 'title' of
the claim that brings the policy concerns [underlying Rule 9(b)] .
. . to the forefront." (quoting Haft v. Eastland Fin. Corp., 755 F.
Supp. 1123, 1133 (D.R.I. 1991))); see also ACA Fin., 512 F.3d at

-20-

68.   Rule 9(b) mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[17]   Fed. R. Civ. P. 9(b).   "Malice, intent, knowledge, and other condition of mind of a person may be averred generally."   Id.   To satisfy the particularity element, we require that the Commission's complaint include the "time, place, and content of the alleged misrepresentation with specificity." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999). Further, "[w]here allegations of fraud are explicitly or . . . implicitly[] based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief."   Romani v. Shearson, Lehman, Hutton, 929 F.2d 875, 878 (1st Cir. 1991).

To establish scienter, we ordinarily require that a plaintiff allege sufficient facts to give rise to a "strong inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2); see also ACA Fin., 512 F.3d at 58-59.   We developed this heightened standard in the context of private securities actions "to minimize the chance 'that a plaintiff with a largely groundless claim will bring a suit and

---

[17] Since the SEC filed its complaint, Rule 9(b) "has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules."   We recite the text of the old version of the rule.   The changes were "intended to be stylistic only."   Fed. R. Civ. P. 9 advisory committee's notes (2007 amendment).

conduct extensive discovery in the hopes of obtaining an increased
settlement, rather than in the hopes that the process will reveal
relevant evidence,'" Shaw, 82 F.3d at 1223 (quoting Romani, 929
F.2d at 878), and it was largely codified by Congress in the
Private Securities Law Reform Act of 1995 ("PSLRA"). See ACA Fin.,
512 F.3d at 58 n.7 (noting that our prior application of Fed. R.
Civ. P. 9(b) to allegations of scienter in private securities fraud
actions is consistent with the standard imposed by the PSLRA);
Greebel, 194 F.3d at 193 ("The PSLRA's pleading standard is
congruent and consistent with the pre-existing standards of this
circuit.").

        Here, however, we are evaluating a securities complaint
filed by the SEC, not a private actor.  Therefore, on its face,
the requirements of the PSLRA do not apply.  Additionally, the
rationales we set forth for a more demanding standard in private
securities actions do not apply to this SEC enforcement action.
Whereas private parties have a financial incentive to initiate
"strike" suits and drag deep-pocketed defendants into court on
allegations of fraud in hopes of obtaining a lucrative settlement,
the SEC's statutory task is to protect the investing public by
policing the securities markets and preventing fraud.  Moreover,
as noted above, the SEC possesses the authority to investigate
conduct prior to filing a complaint, thereby minimizing the
concerns that may result from a lengthy and intense discovery

-22-

process. See 15 U.S.C. § 78u(a)(1); cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 80-81 (2006) (noting that the standard for establishing a claim under section 10(b) is higher in the context of a private suit than in an SEC enforcement action because courts are rightly concerned with limiting the "vexatiousness" associated with private Rule 10b-5 suits). Therefore, the additional scrutiny applied to allegations of scienter in private securities fraud complaints is unwarranted in this case. See, e.g., SEC v. Lucent Techs., Inc., 363 F. Supp. 2d 708, 717 (D.N.J. 2005) ("[T]he heightened requirements for pleading scienter under the PSLRA do not apply to actions brought by the SEC."); SEC v. ICN Pharm., Inc., 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) ("[T]he 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case . . . brought by the SEC."). Of course, the ordinary scienter requirements of Rule 9(b) apply. The SEC need only allege scienter generally. Fed. R. Civ. P. 9(b).

Although we decline to apply the "strong inference" requirement of the PSLRA, we rely on the method elucidated recently by the Supreme Court to assess whether scienter has been adequately alleged. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007).[18] Accordingly, we evaluate "the

_____

[18] In Tellabs, the Supreme Court was faced with the question of how to assess whether a private securities complaint alleged

-23-

complaint in its entirety" to determine "whether all of the facts alleged, taken collectively" meet the scienter standard. Id. Further, we conduct a fact-specific inquiry that considers the circumstances and allegations of the particular case, rather than relying on a generalized pattern of facts as evidence of motive and opportunity. Greebel, 194 F.3d at 196 ("The categorization of patterns of facts as acceptable or unacceptable to prove scienter or to prove fraud has never been the approach this circuit has taken to securities fraud."); In re Cabletron Sys., Inc., 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").

## III.

### A. Statutory Background

We begin our analysis of the SEC's claims with the text, history, and purpose of the provisions at issue. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976) ("[t]he starting point in every case involving construction of a statute is the language itself." (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) (Powell, J., concurring))). The Securities Act of 1933 and the Exchange Act of 1934 were enacted to "set the economy on the road to recovery" after the 1929 stock

_____

sufficient facts to establish a "strong inference" of scienter against the defendant, as required by the PSLRA.

-24-

market crash and reports of widespread fraud and abuse in the securities industry. United States v. Naftalin, 441 U.S. 768, 775 (1979); see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 170-71 (1994). Together, the acts promote this goal by prohibiting fraud through a scheme of civil and criminal[19] liability and "substitut[ing] a philosophy of full disclosure for the philosophy of caveat emptor." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186 (1963). Although the Securities Act was primarily concerned with the regulation of new offerings and the Exchange Act with post-distribution trading, section 17(a) of the Securities Act "was meant as a major departure" from the scope of the rest of that statute, and was "intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." Naftalin, 441 U.S. at 777-78; see also Central Bank, 511 U.S. at 171.

The text of the statutes confirms their common purpose to prohibit a wide swath of fraudulent behavior that Congress believed impeded the smooth and honest functioning of the securities markets. See Naftalin, 441 U.S. at 775-78; Ernst & Ernst, 425 U.S. at 194. Section 17(a) was designed to address the most egregious abuses of securities sellers by authorizing the SEC

---

[19] Criminal penalties may be imposed if an individual or entity is found to have willfully violated section 17(a) of the Securities Act. 15 U.S.C. § 77x; see Naftalin, 441 U.S. at 778 (criminal prosecution under section 17(a)).