# United States Court of Appeals
## For the First Circuit

No. 07-1384

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellant,

v.

JAMES TAMBONE AND ROBERT HUSSEY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Selya, Boudin, Lipez and Howard,
Circuit Judges.

John W. Avery, Senior Litigation Counsel, with whom David M. Becker, General Counsel, Mark D. Cahn, Deputy General Counsel, and Jacob H. Stillman, Solicitor, were on supplemental brief, for appellant.
Arthur R. Miller, William B. Scoville, Jr., Peter G.A. Safirstein, Milberg LLP, Kevin P. Roddy, Wilentz, Goldman & Spitzer, P.A., Salvatore J. Graziano, Ann M. Lipton, and Bernstein Litowitz Berger & Grossmann LLP, on supplemental brief for National Association of Shareholder and Consumer Attorneys (NASCAT), amicus curiae.
Paula J. DeGiacomo, with whom Elliot H. Scherker, Greenberg Traurig LLP, A. John Pappalardo, John A. Sten, and Greenberg Traurig, P.A. were on supplemental brief, for appellee Tambone.
Clifford M. Sloan, with whom Christopher M. Joralemon, Gibson,

Dunn & Crutcher LLP, Warren L. Feldman, Skadden, Arps, Slate, Meagher & Flom LLP, Frank A. Libby, Jr., John J. Commisso, and LibbyHoopes, P.C. were on supplemental brief, for appellee Hussey.

Douglas R. Cox, Michael J. Scanlon, Jason J. Mendro, Gibson, Dunn & Crutcher LLP on supplemental brief for Center for Audit Quality, amicus curiae.

Carter G. Phillips, Jonathan F. Cohn, Daniel A. McLaughlin, Eric D. McArthur, Sidley Austin LLP, Ira D. Hammerman, Kevin M. Carroll on supplemental brief for Securities Industry and Financial Markets Association, amicus curiae.

Richard D. Bernstein, Barry P. Barbash, Frank M. Scaduto, Willkie Farr & Gallagher LLP, Robin S. Conrad, and Amar D. Sarwal on supplemental brief for United States Chamber of Commerce, amicus curiae.

John Pagliaro, Staff Attorney, and Martin J. Newhouse on supplemental brief for New England Legal Foundation and Associated Industries of Massachusetts, amici curiae.

---

OPINION EN BANC

---

March 10, 2010

---

SELYA, **Circuit Judge**.  Rule 10b-5(b), promulgated by the Securities and Exchange Commission (SEC) under the aegis of section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), renders it unlawful "[t]o make any untrue statement of a material fact . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  The issue before us is one of first impression.  It turns on the meaning of the word "make" as used in Rule 10b-5(b).  The SEC advocates an expansive definition, contending that one may "make" a statement within the purview of the rule by merely using or disseminating a statement without regard to the authorship of that statement or, in the alternative, that securities professionals who direct the offering and sale of shares on behalf of an underwriter impliedly "make" a statement, covered by the rule, to the effect that the disclosures in a prospectus are truthful and complete.

We reject the SEC's expansive interpretation.  It is inconsistent with the text of the rule and with the ordinary meanings of the phrase "to make a statement," inconsistent with the structure of the rule and relevant statutes, and in considerable tension with Supreme Court precedent.  Consequently, we affirm the district court's dismissal of the SEC's Rule 10b-5(b) claim.

**I.  BACKGROUND**

Because this appeal follows the district court's granting of a motion to dismiss, we rehearse the facts as well-pleaded in

the SEC's complaint.  See Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 5 (1st Cir. 2005).

At all times material hereto (roughly, 1998-2003), the defendants, James Tambone and Robert Hussey, were senior executives of a registered broker-dealer, Columbia Funds Distributor, Inc. (Columbia Distributor), or its predecessor in interest.  Columbia Distributor underwrites and markets mutual funds.  The SEC alleges that the defendants violated sundry provisions of both the Securities Act of 1933 (Securities Act) and the Exchange Act.  Its complaint depicts a tangled web of interlocking entities.  We briefly trace the fibers within that web.

During the relevant period, Columbia Distributor was a wholly-owned subsidiary of Columbia Management Group, Inc. (Columbia Management) and an indirect subsidiary of FleetBoston Financial Corporation (Fleet).  Columbia Distributor was known as Liberty Funds Distributor, Inc. (Liberty Distributor) until 2001, when Fleet purchased its parent corporation, Liberty Financial Group (Liberty).

Columbia Distributor acted as the principal underwriter and distributor of over 140 mutual funds in the Columbia mutual fund complex (the Columbia Funds).  The Columbia Funds included several funds that had been owned by Liberty prior to the take-over by Fleet.  In its wonted role, Columbia Distributor sold shares in

the Columbia Funds and disseminated their prospectuses to investors.

Direct responsibility for the representations contained in the prospectuses rested with the funds' sponsor, Columbia Management Advisors, Inc., and its predecessors in interest (collectively, Columbia Advisors). Like Columbia Distributor, Columbia Advisors was a wholly-owned subsidiary of Columbia Management and, thus, an indirect subsidiary of Fleet for much of the relevant period.

The defendants held positions of trust and responsibility in this corporate pyramid. Tambone served as co-president of Columbia Distributor from 2001 to 2004. Prior thereto, he held the same post with Liberty Distributor. Hussey served as managing director (national accounts) of Columbia Distributor from 2002 until 2004. Before that, he occupied a comparable position with Liberty Distributor. The SEC does not allege that either defendant worked for the Columbia Funds' sponsor, Columbia Advisors, during the relevant time frame.

The short-term trading practice that lies at the epicenter of this case is known in the trade as "market timing." Market timing is the practice of frequent buying and selling of shares of a single mutual fund in order to exploit inefficiencies in mutual fund pricing. According to the SEC, market timing, though not illegal per se, can harm other fund investors and,

therefore, is commonly barred (or at least restricted) by those in charge of mutual funds.

The Columbia Funds' prospectuses contained representations touching upon the subject of market timing. Starting at least as early as 1998, language was inserted into many Columbia Funds' prospectuses restricting the number and frequency of round-trips (i.e., exchanges from one fund to another and back again) in which an investor could indulge. Emblematic of this prophylaxis was language, first appearing in May of 1999, inserted in prospectuses for funds belonging to the Acorn Fund Group, a constituent of the Columbia Funds. That language stated that the funds within the group "do not permit market-timing and have adopted policies to discourage this practice."

This effort to curb market timing escalated over time. In 2000, Hussey co-chaired an internet working group formed to create procedures designed to detect and deter market timing in the Columbia Funds. The working group ultimately recommended that each of the member funds take a consistent position against market timing in future prospectuses. As a result, a number of funds began to include a "strict prohibition" in every prospectus, expressly barring short-term or excessive trading. By 2003, the strict prohibition language, or a variant of it, appeared in all the Columbia Funds' prospectuses.

The SEC alleges that, despite the language in the prospectuses expressing hostility toward market timing — the existence of which Tambone and Hussey allegedly either knew or recklessly ignored — the defendants jointly and severally entered into, approved, and/or knowingly permitted arrangements allowing certain preferred customers to engage in market timing forays in at least sixteen different Columbia Funds during the relevant period. The SEC also alleges that the defendants used the prospectuses in their sales efforts by allowing them to be disseminated and referring potential clients to them.

## II.  TRAVEL OF THE CASE

On May 19, 2006, the SEC filed a civil complaint in the United States District Court for the District of Massachusetts.[1] In its complaint, the SEC alleged that Tambone and Hussey had violated section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.  In addition, the SEC alleged that the defendants had aided and abetted primary violations of section 10(b) and Rule 10b-5 by Columbia Advisors and Columbia Distributor, primary violations of section 15(c) of the Exchange Act by Columbia Distributor, and primary violations of section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6, by Columbia Advisors.

---

[1] An earlier action, filed in February of 2005, was dismissed without prejudice for failure to plead fraud with particularity. That action is of no moment here.

In due season, each defendant moved to dismiss.  The SEC opposed the motions.  As the parties' arguments with respect to liability under Rule 10b-5(b) are central to this appeal, we summarize them succinctly.

The defendants premised their challenge on the thesis that the SEC had failed properly to plead any actionable misstatements on their part.  In opposition, the SEC countered that the complaint sufficiently alleged that the defendants had made material misrepresentations regarding market timing in the Columbia Funds' prospectuses.  Specifically, the SEC argued that the defendants "made" false statements of material facts within the meaning of Rule 10b-5(b) by (i) participating in the drafting process that went into the development of the market timing language,[2] and (ii) using the prospectuses in their sales efforts, allowing the prospectuses to be disseminated and referring clients to them for information.[3]  Finally, the SEC argued that the defendants were liable for a material omission under Rule 10b-5(b).

---

[2] This contention was based on the SEC's allegations that the defendants reviewed and commented on the market timing statements before those statements were included in the prospectuses.  We do not quote these allegations at length, as the SEC has not pursued this line of argument on appeal.

[3] In addition, the SEC argued that Tambone had made material misrepresentations by signing selling agreements in which he vouched for the accuracy of the statements in the prospectuses. Because the SEC has not pursued this argument on appeal, we disregard it.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The district court granted the motions to dismiss. SEC v. Tambone (Tambone I), 473 F. Supp. 2d 162, 168 (D. Mass. 2006). With respect to the Rule 10b-5(b) claim premised on the defendants' making of false statements, the court applied the bright-line test articulated in Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998), and held that the SEC's allegations about the defendants' participation in the drafting process and their subsequent use of the prospectuses were too conclusory and attenuated to satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b). Tambone I, 473 F. Supp. 2d at 166. The court found unconvincing the SEC's other arguments for liability under Rule 10b-5. Id. at 167. The court likewise rejected the SEC's section 17(a) and aiding and abetting claims. Id. at 167-68.

The SEC appealed from the granting of the motions to dismiss with respect to its section 17(a)(2), Rule 10b-5(b), and aiding and abetting claims.

With respect to Rule 10b-5(b), the SEC briefed two arguments as to how the defendants "made" the alleged misrepresentations. First, the SEC argued that the defendants "made" the misrepresentations by using the prospectuses to sell the mutual funds. Second, the SEC argued that the defendants impliedly made false representations to investors to the effect that they had a reasonable basis for believing that the key representations in the prospectuses were truthful and complete. This implied

statement theory rested on the premise that a securities professional engaged in the offering of securities has a "special duty" to undertake an investigation that would provide him with a reasonable basis for believing that the representations in the prospectus are truthful and complete. Therefore, the theory goes, a securities professional "makes" an implied representation to investors that the prospectus is truthful and complete when he engages in an offering.

What the SEC chose not to argue is also noteworthy. The SEC did not allude to its argument, which at one point had been raised below, that the defendants made the alleged misstatements through their involvement with the preparation of the prospectuses. Similarly, although the SEC had pleaded violations of subparagraphs (a) and (c) of Rule 10b-5, it did not pursue those claims on appeal. In accordance with our usual praxis, we deem abandoned all arguments that have not been briefed and developed on appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

A divided panel of this court reversed the dismissal of the SEC's section 17(a)(2), Rule 10b-5(b), and aiding and abetting claims. SEC v. Tambone (Tambone II), 550 F.3d 106, 149 (1st Cir. 2008) (withdrawn).[4] With respect to Rule 10b-5(b), the panel majority adopted the SEC's implied representation theory and held

---

[4] The panel parted ways only with respect to the Rule 10b-5(b) claims. See Tambone II, 550 F.3d at 149 (Selya, J., concurring in part and dissenting in part).

that the SEC had thereby alleged that the defendants had made false statements.  Id. at 135.

The defendants filed petitions for en banc review, Fed. R. App. P. 35, challenging all of the panel's holdings.  The full court withdrew the panel opinion but ordered rehearing en banc only on the Rule 10b-5(b) issues.  SEC v. Tambone, 573 F.3d 54, 55 (1st Cir. 2009) (order granting rehearing en banc).  The court declined to rehear the parties' arguments concerning either the section 17(a)(2) or the aiding and abetting rulings.  Id.  Following a new round of briefing (including helpful submissions by an array of amici) and reargument, we took the matter under advisement.

## III.   STANDARD OF REVIEW

We review de novo a district court's disposition of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Centro Medico del Turabo, 406 F.3d at 5.  In the process, we accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader.  In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003).

As a general proposition, a complaint must contain no more than "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But even though a complaint need not plead "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), it must nonetheless "contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).   In other words, the complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal. Twombly, 550 U.S. at 555.

Because the complaint in this case contains allegations of fraud, an additional hurdle must be surmounted: the pleader (here, the SEC) must "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b).  To satisfy this particularity requirement, the pleader must set out the "time, place, and content of the alleged misrepresentation with specificity." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999).

## IV.  ANALYSIS

This case presents the two-part question of whether a securities professional can be said to "make" a statement, such that liability under Rule 10b-5(b) may attach, either by (i) using statements to sell securities, regardless of whether those statements were crafted entirely by others, or (ii) directing the offering and sale of securities on behalf of an underwriter, thus

-12-

making an implied statement that he has a reasonable basis to believe that the key representations in the relevant prospectus are truthful and complete.  The answer to each part of this two-part question is "no."

We think it appropriate to commence our analysis with the text of the relevant statute and rule.  See Cent. Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 173 (1994).  Section 10(b) of the Exchange Act renders it unlawful for a person "[t]o use or employ . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Pursuant to its rulemaking authority under section 10(b), the SEC adopted Rule 10b-5(b), which provides, in pertinent part, that "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  The inquiry here centers on whether the defendants made untrue statements of material fact within the meaning of this rule.

In conducting this inquiry, the pivotal word in the rule's text is "make," as in "to make a statement."  The rule itself does not define that word, nor does it suggest that the word is imbued with any exotic meaning.  In the absence of either a

built-in definition or some reliable indicium that the drafters intended a special nuance, accepted canons of construction teach that the word should be given its ordinary meaning. See Smith v. United States, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."); Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 472 (1977) (interpreting Rule 10b-5 according to the "commonly accepted meaning" of its words); In re Hill, 562 F.3d 29, 32 (1st Cir. 2009) (noting that, in general, words in a statute carry their ordinary meanings if not specially defined).

One reference point for determining the ordinary meaning of a word is its accepted dictionary definition. See, e.g., Smith, 508 U.S. at 228-29 (consulting various dictionaries to discern the plain meaning of the word "use" in the relevant statute). For purposes of this analysis, we refer to several common and representative dictionary definitions of "make," which include "create [or] cause," Webster's Third New Int'l Dict. 1363 (2002); "compose," id.; and "cause (something) to exist," Black's Law Dict. 1041 (9th ed. 2009).

This case does not require us to set forth a comprehensive test for determining when a speaker may be said to have made a statement. It is enough to say that the SEC's purported reading of the word is inconsistent with each of these definitions. In any event, the question does not turn on

dictionary meanings alone.  We also look to the structure of section 10(b) and Rule 10b-5, as well as other, related provisions, to interpret the term at issue.  Chief among these structural considerations is the relationship between section 10(b) and Rule 10b-5(b).  Section 10(b) grants the SEC broad authority to proscribe conduct that "use[s] or employ[s]" any "manipulative or deceptive device or contrivance," in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b).

In Rule 10b-5(b), the SEC prohibited a specific subset of all "manipulative or deceptive device[s] or contrivance[s]," namely, untrue or misleading statements of material fact.  It likewise prohibited a specific subset of all conduct that might be said to "use or employ" such a manipulative device or contrivance: the making of untrue or misleading statements of material fact.

In light of this deliberate word choice ("make"), the SEC's asseveration that one can "make" a statement when he merely uses a statement created entirely by others cannot follow.  That asseveration ignores the obvious distinction between the verbs contained in the statute ("use," "employ") and the significantly different (and narrower) verb contained in Rule 10b-5(b) ("make"). Word choices have consequences, and this word choice virtually leaps off the page.  There is no principled way that we can treat it as meaningless.

Section 10(b) is helpful to our analysis in another way as well. That provision conferred upon the SEC authority to prohibit the "use or employ[ment]" of any manipulative device or contrivance in connection with the purchase or sale of any security. The SEC knew how to wield this authority and proscribe "use or employ[ment]" of a manipulative device or contrivance: in Rule 10b-5(a), it did just that, rendering it unlawful "to employ" a device, scheme, or artifice to defraud. See 17 C.F.R. § 240.10b-5(a). That the SEC wrote this prohibition in a <u>different</u> subparagraph of the rule and selected a more inclusive verb is a telling combination. The Supreme Court remarked on this phenomenon in <u>Affiliated Ute</u> v. <u>United States</u>, 406 U.S. 128 (1972), observing that:

> [T]he second subparagraph of the rule specifies the making of an untrue statement of a material fact and the omission to state a material fact. The first and third subparagraphs are not so restricted.

<u>Id.</u> at 152-53. It is not the judiciary's proper province to rewrite an administrative rule to sweep more broadly than its language permits. Thus, we must honor the limitation that the drafters deliberately built into Rule 10b-5(b).

In an effort to blunt the force of this reasoning, the SEC suggests that the broad language of the statute ("use or employ") requires an equally broad construction of the wording contained in Rule 10b-5(b). To support this suggestion, it touts

-16-

the Supreme Court's statement that "[t]he scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." <u>SEC</u> v. <u>Zandford</u>, 535 U.S. 813, 816 n.1 (2002).  On that basis, the SEC posits that "make" must include "use" because the statute prohibits "use" and the rule perforce must prohibit all that the statute prohibits.

This argument comprises more cry than wool.  Most notably, it fails to account for an abecedarian point: even if Rule 10b-5 is coextensive with the coverage of section 10(b), that supposed verity does not mean that each of the subparagraphs of Rule 10b-5, taken singly, is itself coextensive with the coverage of section 10(b).  That cannot be so.  If it was, then each subparagraph would proscribe exactly the same conduct.  They do not.  <u>See</u>, <u>e.g.</u>, <u>Finkel</u> v. <u>Docutel/Olivetti Corp.</u>, 817 F.2d 356, 359-60 (5th Cir. 1987).

Our view of the meaning of Rule 10b-5(b) is reinforced when we contrast the language of the rule with that of section 17(a) of the Securities Act.  By way of background, the phrasing of Rule 10b-5 largely mirrors the language of section 17(a) of the Securities Act.[5]  That is not happenstance; the drafters of Rule

---

[5] That section provides in pertinent part:

It shall be unlawful for any person . . ., directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue

10b-5 modeled the rule on section 17(a).  See United States v. Persky, 520 F.2d 283, 287 (2d Cir. 1975).  But there is a salient difference between the language of the rule and the language of section 17(a) with respect to the types of conduct that may render a person liable for a false statement.  Section 17(a)(2) makes it unlawful "to obtain money or property by means of any untrue statement of a material fact," 15 U.S.C. § 77q(a)(2), whereas Rule 10b-5(b) makes it unlawful "to make any untrue statement of a material fact," 17 C.F.R. § 240.10b-5(b).

In short, the drafters of Rule 10b-5 had before them language that would have covered the "use" of an untrue statement of material fact (regardless of who created or composed the statement).  The drafters easily could have copied that language. They declined to do so.  Instead, the drafters — who faithfully tracked section 17(a) in other respects — deliberately eschewed the expansive language of section 17(a)(2).

The import of this eschewal is clear: although section 17(a)(2) may fairly be read to cover the "use" of an untrue

statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

-18-

statement to obtain money or property, see, e.g., Edward J. Mawod & Co. v. SEC, 591 F.2d 588, 596 (10th Cir. 1979), Rule 10b-5(b) is more narrowly crafted and its reach does not extend that far.[6]  We must honor the drafters' deliberate decision to insert the word "make" in Rule 10b-5(b) in lieu of the more expansive phrase "by means of."  See United States v. Ahlers, 305 F.3d 54, 59-60 (1st Cir. 2002) (discussing court's obligation to "presume that . . . differential draftsmanship was deliberate").

The SEC's other arguments for defining "make" to encompass "use" with respect to Rule 10b-5(b) liability are unavailing.  One of the SEC's main arguments appears to be that "[i]t seems self-evident that any statute or rule that prohibits making a false statement in connection with the sale of property would cover a seller who knowingly uses misleading sales materials."  This type of abstract, decontextualized approach to the interpretation of a statute or regulation is ill-suited to the construction of a rule laden with over sixty years of interpretation in literally hundreds of opinions.  This is especially so because the rule in question is an integral part of an extensive regulatory framework forged by Congress, the SEC, and the federal courts.

---

[6] The SEC has in fact brought a separate section 17(a)(2) claim against the defendants in this case.  That claim is not before the en banc court.

-19-

At any rate, what the SEC now calls "self-evident" is not self-evident at all.  What does seem self-evident is that if the SEC intended to prohibit more than just the actual making of a false statement in Rule 10b-5(b), then it would not have employed the solitary verb "make" in the text of the rule.[7]

There is another reason to reject the SEC's interpretation; it is in tension with Supreme Court precedent. Under modern Supreme Court precedent dealing with Rule 10b-5, much turns on the distinction between primary and secondary violators. See Cent. Bank, 511 U.S. at 191.  Although Central Bank did not address the precise issue with which we are concerned, the definition of "make" that we propose is compatible with Central Bank as it holds the line between primary and secondary liability in a manner faithful to Central Bank.  We explain briefly.

---

[7] The SEC also endeavors to prop up its "use" theory of Rule 10b-5(b) liability by referring to a venerable Fourth Circuit case deciding, for venue purposes, whether a defendant violated a federal mortgage fraud statute in West Virginia or in Pennsylvania. See Reass v. United States, 99 F.2d 752, 755 (4th Cir. 1938).
     The only reason the opinion has even an epsilon's worth of relevance to the issue at hand is that the challenged statute rendered it unlawful to "make[] any statement, knowing it to be false, for the purpose of influencing in any way the action of a Federal Home Loan Bank upon any application for loan." Id. at 752. But the Reass court did not presume to act as a legal lexicographer, chiseling in stone a definition of "make" for all time and for every purpose.  The result in Reass proceeds from the simple proposition that the statute could not be violated until the defendant presented the misstatements to the bank "upon . . . application for a loan." Id. at 755.

The Exchange Act does not explicitly confer a private right of action for section 10(b) violations. The Supreme Court nevertheless has found a private right of action to be implicit in the statute and the implementing rule (Rule 10b-5). Sup't of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9 (1971). This right of action is not unbridled: private plaintiffs are permitted to bring suit under Rule 10b-5 against only "primary" violators. See Cent. Bank, 511 U.S. at 177-78.

In the wake of Central Bank, Congress amended section 20 of the Exchange Act to clarify that the SEC may bring suit against aiders and abetters, that is, persons who knowingly provide substantial assistance to primary violators of the securities laws. Pub. L. 104-67, § 104, 109 Stat. 737, 757 (1995) (codified at 15 U.S.C. § 78t(e)). Although the SEC has exhorted Congress to extend the same right to private parties, see 4 Thomas Lee Hazen, The Law of Securities Regulation 506 n.31 (6th ed. 2009), Congress has not done so. Thus, Rule 10b-5's private right of action extends only to primary violations, not to secondary violations. If Central Bank's carefully drawn circumscription of the private right of action is not to be hollowed — and we do not think that it should be — courts must be vigilant to ensure that secondary violations are not shoehorned into the category reserved for primary violations.

The SEC's position poses a threat to the integrity of this dichotomy.  Refined to bare essence, the SEC, through the instrumentality of Rule 10b-5(b), seeks to impose primary liability on the defendants for conduct that constitutes, at most, aiding and abetting (a secondary violation).  Allowing the SEC to blur the line between primary and secondary violations in this manner would be unfaithful to the taxonomy of Central Bank.

Of course, the Central Bank Court did not purpose to decide the precise issue before us.  Withal, the Court's methodology for determining the scope of the private right of action (and, thus, the scope of primary liability) is a beacon by which we must steer.  That methodology emphasizes fidelity to the text of section 10(b) and Rule 10b-5.  See Cent. Bank, 511 U.S. at 173 (explaining that a "private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)"); see also id. ("We have refused to allow 10b-5 challenges to conduct not prohibited by the text of the statute.").[8]  An expansive reading of the rule, unmoored from its text and based on judicially manufactured policy rationales, is plainly antithetic to

_____

[8] Although the Central Bank Court focused its inquiry on section 10(b), its methodology is equally applicable to Rule 10b-5. The rule is incorporated into the statutory framework and, thus, its scope "is coextensive with the coverage of § 10(b)." Zandford, 535 U.S. at 816 n.1.  Fidelity to the text of section 10(b) requires fidelity to the text of Rule 10b-5 and, therefore, fidelity to the text of each of the subsections that comprise the rule.

this restrained methodology.  See id. at 188 (warning that, absent
the prospect of a bizarre result, policy considerations cannot
override the text and structure of the statute).

There is more.  Reading "make" to include the use of a
false statement by one other than the maker would extend primary
liability beyond the scope of conduct prohibited by the text of
Rule 10b-5(b).  See id.  Furthermore, doing so would "add a gloss
to the operative language of the [rule] quite different from its
commonly accepted meaning." Id. at 174 (quoting Ernst & Ernst v.
Hochfelder, 425 U.S. 185, 199 (1976)).  Allowing courts to imply
that "X" has made a false statement with only a factual allegation
that he passed along what someone else wrote would flout a core
principle that underpins the Central Bank decision.  We decline the
SEC's invitation to go down that road.

As an aside, blurring the line between primary and
secondary violations also would create unacceptable tension with
the substantial body of case law that has evolved post-Central Bank
— case law that maps the outer boundaries of primary liability
under Rule 10b-5.  This case law, though not directly on point,
does not fit comfortably with the view that the SEC espouses here.
Let us explain.

In the aftermath of Central Bank, several courts of
appeals have had to plot the line between primary violations and
mere aiding and abetting in Rule 10b-5 actions brought by private

plaintiffs.  Two divergent strains of authority have evolved.  We have not yet chosen between these divergent strains and we have no need to do so today.  It suffices to say that the line of authority most hospitable to the establishment of primary violations of Rule 10b-5 embraces the "substantial participation" test, under which a person's "substantial participation or intricate involvement in the preparation of fraudulent statements" is enough to establish a primary violation.  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).  The other line of authority, less hospitable to plaintiffs, adheres to the "bright-line" test, under which a primary violation requires proof both that the defendant actually made a false or misleading statement and that it was attributable to him at the time of public dissemination.  See Wright, 152 F.3d at 175; see also Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1205 (11th Cir. 2001); Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir. 1996); In re Kendall Sq. Research Corp. Sec. Litig., 868 F. Supp. 26, 28 n.2 (D. Mass. 1994).

While these tests are designed for private litigation, and, thus, are poorly suited to public enforcement actions,[9] one

_____

[9]  For example, the bright-line test cannot be imported wholesale into the public enforcement context because its attribution prong reflects the need to prove reliance, see Wright, 152 F.3d at 175 — an element that the SEC need not establish in a Rule 10b-5 case.  See Schellenbach v. SEC, 989 F.2d 907, 913 (7th Cir. 1993); see also SEC v. Wolfson, 539 F.3d 1249, 1260 (10th Cir. 2008) (declining to impose the attribution requirement in an SEC

thing is crystal clear.  The conduct for which the SEC strives to hold the defendants as primary violators — the use and dissemination of prospectuses created by others — does not satisfy either test.  Both tests focus, albeit to different degrees, on the actual role that a defendant played in creating, composing, or causing the existence of an untrue statement of material fact.  The SEC's attempt to impute statements to persons who may not have had any role in their creation, composition, or preparation falls well short.[10]  As the Second Circuit put it: "If <u>Central Bank</u> is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable [as a primary violator] under section 10(b).  Anything short of such conduct is merely aiding and abetting."  <u>Shapiro</u> v. <u>Cantor</u>, 123 F.3d 717, 720 (2d Cir. 1997).

There is yet another problem with the SEC's implied statement theory: that theory effectively imposes upon securities professionals who work for underwriters an unprecedented duty.  We elaborate on this mischief below.

The SEC notes, correctly, that securities professionals working for underwriters have a duty to investigate the nature and

---

enforcement action).

[10] Although the SEC at one time argued that the defendants "made" untrue statements of material fact through some vaguely described involvement in drafting the prospectuses, it has not pursued that argument on appeal.

circumstances of an offering.  See, e.g., SEC v. Dain Rauscher, Inc., 254 F.3d 852, 857 (D.C. Cir. 2001).  Building on this foundation, the SEC theorizes that such securities professionals impliedly "make" a representation to investors that the statements in a prospectus are truthful and complete.  If we were to give credence to this theory, the upshot would be to impose primary liability under Rule 10b-5(b) on these securities professionals whenever they fail to disclose material information not included in a prospectus, regardless of who prepared the prospectus.  That would be tantamount to imposing a free-standing and unconditional duty to disclose.  The imposition of such a duty flies in the teeth of Supreme Court precedent.

        The key precedent is Chiarella v. United States, 445 U.S. 222 (1980).  It instructs that a party's nondisclosure of information to another is actionable under Rule 10b-5 only when there is an independent duty to disclose the information arising from "a fiduciary or other similar relation of trust and confidence" between the parties.  Id. at 228.  As the Fourth Circuit explained, "the duty to disclose material facts arises only when there is some basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship." Fortson v. Winstead, McGuire, Sechrest & Minick, 961 F.2d 469, 472 (4th Cir. 1992); accord SEC v. Cochran, 214 F.3d 1261, 1264 (10th Cir. 2000).  Adopting the SEC's implied statement theory would pave

-26-

the way for suits against securities professionals for
nondisclosure of material information without the required showing
of a fiduciary relationship. Fidelity to that requirement demands
that we reject the SEC's notion that a breach of a duty to
investigate, without more, is a breach of a duty to disclose (and,
thus, should be treated as a primary violation under Rule 10b-
5(b)).

The SEC labors to depict its implied statement theory as
firmly rooted in both case law and longstanding administrative
interpretation. This depiction is inaccurate.

As to case law, the SEC relies principally on three
decisions. See Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 641
(D.C. Cir. 2008); Sanders v. John Nuveen & Co., 524 F.2d 1064, 1070
(7th Cir. 1975); Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,
480 F.2d 341, 370 (2d Cir. 1973). These decisions, it asserts,
stand for the linchpin proposition that an underwriter
participating in an offering makes an implied statement,
potentially actionable under Rule 10b-5(b), that he has a
reasonable basis for believing that the prospectus is truthful and
complete.

That assertion is incorrect. To begin, neither Dolphin
nor Sanders holds that an underwriter may be found liable as a
primary violator under Rule 10b-5(b) for "making" an implied
representation that proves to be false. Those cases did not

-27-

present any issue as to whether the underwriter had "made" a statement.  In fact, in both cases the underwriter personally made the misrepresentations.  See Dolphin, 512 F.3d at 638, 640; Sanders, 524 F.2d at 1067; see also Sanders v. John Nuveen & Co., 619 F.2d 1222, 1234 (7th Cir. 1980).  Both decisions were directed toward a wholly distinct issue: whether the defendant acted with the required state of mind in making the statements.  See Dolphin, 512 F.3d at 639; Sanders, 524 F.2d at 1066.  Any language suggesting that various representations might be imputed to underwriters must be viewed in this (very different) context.

Chris-Craft also fails to breathe life into the SEC's argument.  The case holds that an underwriter's constructive representation that the statements made in registration materials are truthful and complete constitutes the making of a statement under section 14(e) of the Exchange Act.[11]  See Chris-Craft, 480 F.2d at 370.  But Chris-Craft preceded Central Bank by over twenty years, and its continued vitality with respect to this section 14(e) holding is doubtful.

In all events, nothing turned on the distinction between primary and secondary violations at that time, so the Chris-Craft

---

[11] That section provides in pertinent part that: "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, . . . in connection with any tender offer."  15 U.S.C. § 78n(e).

panel had no reason to distinguish between them. In retrospect, it is reasonable to read Chris-Craft as holding that the underwriters were liable only as secondary violators. See In re MTC Elec. Techs. S'holder Litig., 993 F. Supp. 160, 162 (E.D.N.Y. 1997) (concluding that "the holding of Chris-Craft was that an underwriter was liable as an aider and abettor").

We turn next to the array of administrative pronouncements. We freely accept the principle that the existence of a longstanding pattern of administrative interpretation might well call for Chevron deference. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984). Here, however, the SEC's claim of a "longstanding administrative interpretation" is wildly exaggerated.

The SEC has cobbled together a bricolage of agency decisions and statements all of which antedate Central Bank. Without exception, nothing in this carefully culled collection says that an implied representation of an underwriter can constitute a basis for primary liability under Rule 10b-5(b). The fact that the SEC has never before articulated the implied statement theory as a basis for Rule 10b-5(b) liability dooms its quest for Chevron deference. After all, there is no occasion for Chevron deference when there is nothing to which a court may defer.

Before leaving this topic, we wish to comment briefly on the dissent's metronomic reliance on the special role and duties of

underwriters.  We agree that underwriters have a special niche in the marketing of securities and, thus, have a special set of responsibilities.  But the duty that the dissent seeks to impose is unprecedented — and far exceeds the scope of Rule 10b-5(b).  While that rule could have been drafted to cut a wider swath, it was not.  The SEC has other, more appropriate tools that it may use to police the parade of horribilis that the dissent envisions, and it is neither necessary nor wise to attempt to expand the rule by judicial fiat.  Most importantly, doing so would, as a matter of law, be wrong.

There is one loose end, which relates to waiver.  The SEC argues to the en banc court that the defendants can be held primarily liable for violating Rule 10b-5(b) under an entanglement test.  See, e.g., In re Cabletron Sys., Inc., 311 F.3d 11, 37-38 (1st Cir. 2002); Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980).  Under this test, a defendant may be held primarily liable for misstatements appearing in reports authored by outside analysts when those misrepresentations are based on information provided by the defendant.  See Cabletron, 311 F.3d at 38.  Such liability inheres when "defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree."  Id. at 37-38.

This argument has not been preserved and, thus, need not concern us.  The SEC did not advance it before the district court in connection with the dispositive motions to dismiss.  To make a bad situation worse, the SEC did not coherently present this argument before the panel during the first stage of this appeal.  To the contrary, the SEC's panel briefs were devoid not only of any developed argumentation to the effect that the defendants entangled themselves with the statements in the prospectuses but also of citations to Cabletron, Elkind, or any comparable precedent.  In this instance, silence speak volumes.

A party cannot switch horses mid-stream, changing its theory of liability at a later stage of the litigation in hopes of securing a swifter steed.  So it is here: because the SEC unfurled its "entanglement" argument for the first time in the en banc proceedings, we have no occasion to address that argument.  See United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."); Zannino, 895 F.2d at 17 (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

This is not the only waiver that has transpired.  The SEC unveiled for the first time in its reply brief regarding rehearing en banc a contention that its implied statement theory of Rule 10b-

5(b) liability could be upheld under the so-called shingle theory. <u>See</u>, <u>e.g.</u>, <u>Duker & Duker</u>, 6 S.E.C. 386, 388-89 (1939).[12]   This belated contention is likewise waived.

## V.   CONCLUSION

We need go no further.  This is one of those happy occasions when the language and structure of a rule, the statutory framework that it implements, and the teachings of the Supreme Court coalesce to provide a well-lit decisional path.  Following that path, we affirm the district court's dismissal of the SEC's Rule 10b-5(b) claim.  Because en banc review is limited to this claim, we reinstate those portions of the vacated panel judgment that reversed the dismissal of the SEC's section 17(a)(2) and aiding and abetting claims.  To that end, we also reinstate those portions of the withdrawn panel opinion, and concurrence thereto, addressing those claims (which, when reinstated, will have the force ordinarily associated with panel opinions).  We remand the case to the district court for further proceedings on the SEC's section 17(a)(2) and aiding and abetting claims consistent, of course, with this en banc opinion.

---

[12] Under the shingle theory, a broker-dealer may be held liable under section 17(a) of the Securities Act or section 10(b) of the Exchange Act if he sells a security to a customer for a price unreasonably in excess of the current market price without disclosing the fact of the markup.  <u>See</u> <u>Grandon</u> v. <u>Merrill Lynch & Co.</u>, 147 F.3d 184, 192-93 (2d Cir. 1998); <u>Duker & Duker</u>, 6 S.E.C. at 388-89.  We have not been able to find any case in which the shingle theory has successfully been applied, under Rule 10b-5(b), to facts similar to the facts at hand.

-32-

**So Ordered**.


     — Concurring Opinion and Dissenting Opinion follow —

BOUDIN, **Circuit Judge**, with whom LYNCH, **Chief Judge**, **joins, concurring.** A "plain language" approach to statutory construction has well-known adherents, and--in construing the SEC's rule at issue ("make any untrue statement of a material fact")-- bare wording forcefully supports Judge Selya's thorough and persuasive decision. Yet even a more elastic "all things considered" reading of the rule's language would not justify the alarmingly ambitious use of it that the agency seeks to deploy in this case.

The word "make," in reference to a statement, ordinarily refers to one authoring the statement or repeating it as his own; one who lends to a friend a book is not normally deemed to "make" the statements in the book. See Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 384 n.20 (5th Cir. 2007). There is some breathing room: for example, imagine an underwriter orally or in writing specifically affirming to an investor the truth of specific statements in a prospectus that he knew to be false.

Here, the SEC propounds a far more expansive view: it asks the courts to treat securities professionals as a matter of course as impliedly representing the entire contents of prospectuses whenever they sell securities or assist those who do. The argument against so sweeping a position begins with language, but it does not end there: congressional policy, Supreme Court

precedent, practical consequences and the nearly uniform view of circuit courts that have spoken all argue against the SEC's proposed interpretation. It helps focus the issue, and underscores the reach of the SEC's position, to recite briefly the SEC's allegations--both those rejected and not appealed, and those on appeal--as to Tambone and Hussey's relationship to and use of the Columbia Funds prospectuses.

Tambone and Hussey were officers of Columbia Funds Distributor, Inc. ("Columbia Distributor"), which served as principal underwriter for Columbia mutual funds. As underwriters, they were required by law to furnish prospectuses to broker-dealers selling Columbia funds and to investors to whom they sold directly. See 15 U.S.C. § 77e(b) (2006); 17 C.F.R. § 240.15c2-8(b) (2009). The prospectuses, however, were drafted by a separate entity, Columbia Management Advisors, Inc. ("Columbia Advisors"), and the SEC admits in its complaint that Columbia Advisors rather than Columbia Distributor (and hence the defendants) "remained primarily responsible for all representations made in the prospectuses for those funds."

The SEC's more specific allegations concern the creation of the prospectuses and, separately, their use. The SEC complaint charged that the defendants were "involved in the process of revising the prospectuses," "reviewed the market timing representations before they were included in the prospectuses" and

"comment[ed] on these representations to in-house counsel for Columbia Advisors." The district court found that these allegations failed to plead fraud with requisite particularity, SEC v. Tambone, 473 F. Supp. 2d 162, 165-66 (D. Mass. 2006); the SEC does not now challenge this determination.

As to the use of the prospectuses, the SEC initially argued that Tambone and Columbia Distributor "signed hundreds of [selling] agreements" with broker-dealers that expressly represented and warranted that "each Prospectus and all sales literature . . . [would] not by statement or omission be misleading." The district court again found that these allegations "flatly fail[ed]" to meet the particularity requirements. Tambone, 473 F. Supp. at 167. The SEC does not argue otherwise, nor does it point to any other specific oral or written statements made by the two defendants.[13]

The SEC's remaining allegations regarding the defendants' use of the prospectuses, which are before us, are simply that the defendants, as required, disseminated prospectuses to broker-dealers and investors in their capacity as underwriters. The SEC does not say that the defendants explicitly represented as

_____

[13]Oral or written statements made by underwriters while placing securities can be predicates for securities violations. See, e.g., Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 638-40 (D.C. Cir. 2008); Sanders v. John Nuveen & Co., 554 F.2d 790 (7th Cir. 1977); Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 940 F. Supp. 1101, 1120-21 (W.D. Mich. 1996).

true to investors the prospectuses' market timing provisions or that they even discussed the prospectuses with investors. The SEC instead claims that in selling securities, a defendant who neither personally authorized nor repeated an inaccurate statement nevertheless "make[s]" an implied statement or representation under Rule 10b-5(b) that the prospectuses prepared by the issuer are in all respects accurate and not materially misleading.

Following <u>Central Bank of Denver, N.A.</u> v. <u>First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994), Congress gave the SEC alone statutory authority to bring actions against individuals who aided and abetted a section 10(b) violation, 15 U.S.C. § 78t(e); and this authority might be used to charge one who distributed a false prospectus knowing that it contained false statements. The SEC's position in this case would undo this deliberate legislative compromise, <u>see</u> S. Rep. No. 104-98, at 19 (1995), and it would conflict with practically all of the pertinent circuit cases.[14]

---

[14]Post <u>Central Bank</u>, this implied representation theory has been regularly rejected by the circuits, <u>see</u> <u>Lattanzio</u> v. <u>Deloitte & Touche LLP</u>, 476 F.3d 147, 155 (2d Cir. 2007) (rejecting an "implied assertion" theory because "[p]ublic understanding that an accountant is at work . . . does not create an exception to the requirement that an actionable misstatement be made by the accountant"); <u>Fidel</u> v. <u>Farley</u>, 392 F.3d 220, 235 (6th Cir. 2004); <u>Ziemba</u> v. <u>Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1205-06 (11th Cir. 2001); <u>Anixter</u> v. <u>Home-Stake Prod. Co.</u>, 77 F.3d 1215, 1226-27 (10th Cir. 1996), with the exception of the Ninth Circuit, <u>see Howard</u> v. <u>Everex Sys., Inc.</u>, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).

While the defendants in this case held significant positions, there is no obvious stopping point: virtually anyone involved in the underwriting process might under the SEC's "making a statement" theory be charged and subject to liability in a suit under section 10(b). The SEC may select its defendants sensibly; but private litigants have their own incentives, and the SEC concedes that its definition of "make," if adopted, would apply to private party actions as well. The Supreme Court has repeatedly acknowledged the unique risk of "vexatious" securities litigation,[15] and it has likewise cautioned against extending further the court-created private remedy under section 10(b). See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 165 (2008); accord Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199-201 (1976).

Nothing justifies the adventure proposed by the agency. The conduct charged is already covered by an aiding and abetting remedy available to the SEC itself. 15 U.S.C. § 78t(e). Sections 11 and 12 of the 1933 Act, 15 U.S.C. §§ 77k, 77l, allow private suits--but with important limitations--against underwriters who fail to make reasonable investigations into the prospectuses they distribute. And private litigants are free to sue the actual

---

[15]See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 86 (2006); Cent. Bank, 511 U.S. at 189; Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1105 (1991); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 739 (1975).

authors of misstatements in the prospectus under section 10(b) itself.  <u>See</u> note 1, above.

More than enough is too much.  No one sophisticated about markets believes that multiplying liability is free of cost.  And the cost, initially borne by those who raise capital or provide audit or other services to companies, gets passed along to the public.  <u>Cent. Bank</u>, 511 U.S. at 189; Winter, <u>Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America</u>, 42 Duke L.J. 945, 962 (1993).  Congress and the Supreme Court have struck a balance; the SEC is obliged to respect it.

**LIPEZ, Circuit Judge, with whom TORUELLA, Circuit Judge, joins, dissenting in part.**  The majority acknowledges that the Supreme Court in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), "did not purpose to decide the precise issue before us" – what it means to "make" a statement – but asserts that a construction of "make" that embraces the conduct alleged in this case would be at odds with Central Bank's careful distinction between primary and secondary liability. There is no such conflict.  My colleagues overstate the significance of Central Bank for the interpretive issue before us, fail to account for the underwriter's unique statutory duty to provide investors with accurate information, and misguidedly allow concerns about excessive private litigation to influence their judgment on the scope of public enforcement by the Securities and Exchange Commission.  In my view, the language of section 10(b) and Rule 10b-5(b), the underwriter's role and duties in the securities market, and decades of case law – including Central Bank – inescapably permit the SEC to proceed against Tambone and Hussey for making false statements within the purview of Rule 10b-5(b). I therefore respectfully dissent.[16]

---

[16] I join the majority's decision to reinstate the portions of the panel opinion addressing the SEC's section 17(a)(2) and aiding and abetting claims and the portions of the panel judgment reversing those claims.

## I.

The important issue before the en banc court is whether the defendants' _use_ of false and misleading prospectus statements can constitute the _making_ of statements that render the defendants primarily liable under Rule 10b-5(b).  The Commission asserts that, as senior executives of the primary underwriter for the Columbia Funds, Tambone and Hussey had a duty to confirm the accuracy and completeness of the prospectuses they were responsible for distributing to broker-dealers and potential investors.  It further contends that, by using the prospectuses as required to perform their duties to potential investors, defendants made implied statements asserting that they had a reasonable basis to believe that the key statements in the prospectuses regarding market timing were accurate and complete.  Because the defendants allegedly knew that those statements were false, or were reckless in not knowing, their implied statements were also false.  The SEC argues that these direct representations of Tambone and Hussey, albeit implied, subject the defendants to primary liability under section 10(b) and Rule 10b-5(b).

The majority dismisses the SEC's position as untenable on the basis of "the language and structure of [the] rule, the statutory framework that it implements, and the teachings of the Supreme Court."  It is the majority's view that is untenable. It construes the Rule to exclude the long accepted understanding that

underwriters "make" implied statements to investors about the accuracy and completeness of prospectuses they are using to induce investments. It rejects primary liability for fraudulent conduct at the heart of Rule 10b-5's prohibitions by stretching <u>Central Bank</u> beyond both its text and context and using that unjustified expansion to justify its contraction of the Rule's scope.

As I shall explain, the language of the statute and the Rule, viewed in the context of the unique role of underwriters in selling securities, supports the Commission's allegation that Tambone and Hussey made implied statements to investors that are actionable as primary violations of Rule 10b-5(b). I begin, however, by addressing the premise at the heart of the majority's position – its unfounded assumption that <u>Central Bank</u>'s "carefully drawn circumscription of the private right of action" substantially changed the landscape for securities claims under Rule 10b-5 in the very different context of an SEC enforcement action against underwriters.

## A. <u>Central Bank</u> and Rule 10b-5

The majority argues that reading Rule 10b-5(b) to reach the making of implied statements would be to disregard the Supreme Court's holding in Central Bank and to effectively eliminate the boundaries between primary and secondary liability required by that decision. This contention overstates the substance of the case and, consequently, its reach.

1.  What the Court Decided

The issue in Central Bank was whether the bank, the indenture trustee for bonds issued by the public Building Authority to finance improvements at a planned development in Colorado Springs, could be held liable in a private cause of action under Rule 10b-5 for aiding and abetting a primary violation of the law. Although Central Bank had become aware that the collateral for the bonds had likely become insufficient to support them, it delayed undertaking an independent review of the original appraisal. Before an independent review could be done, the Building Authority defaulted on a portion of the bonds.

The plaintiff raised claims of primary liability against four violators: the Building Authority, which issued the defaulted bonds in question, two underwriters for the bonds, and a director of the development company in charge of providing an appraisal of the bonds.  The Building Authority defaulted early in the litigation and the claims against the underwriters were settled. See First Interstate Bank of Denver, N.A. v. Pring, 969 F.2d 891, 893 n.1 (10th Cir. 1992).

The Supreme Court, relying on the text of section 10(b) and Rule 10b-5, concluded that the aiding and abetting claims against Central Bank had to be dismissed because private plaintiffs may only bring claims of primary liability, not aiding and abetting liability.  Nevertheless, the Court noted that "[i]n any complex

-43-

securities fraud . . . there are likely to be multiple violators; in this case, for example, respondents named four defendants as primary violators."[17]   511 U.S. at 191.   Finally, the Court concluded that it is not the identity of a securities actor but his conduct that determines whether he may be liable as a primary violator:

> The absence of § 10(b) aiding and abetting
> liability does not mean that secondary actors
> in the securities markets are always free from
> liability under the securities Acts.  Any
> person   or   entity,   including   a   lawyer,
> accountant,   or   bank,   who   employs   a
> manipulative   device   or   makes   a   material
> misstatement   (or   omission)   on   which   a
> purchaser or seller of securities relies may

---

[17] Tambone and Hussey argue, inter alia, that the Commission's claims of primary liability should be rejected because of the SEC's own admission that Columbia Advisors, not defendants, "remained primarily responsible for all representations made" in the fund prospectuses.   However,   this   quotation   from   Central   Bank illustrates the Supreme Court's recognition that a securities fraud will likely involve multiple violators, thereby suggesting that individuals with different responsibilities could be primarily liable for the same misstatement. See 511 U.S. at 191. Therefore, the primary liability of Columbia Advisors does not preclude the primary liability of Tambone and Hussey for their own use of the false and misleading statements contained in those prospectuses. The Supreme Court recently confirmed this principle in a private lawsuit by indicating that defendants Charter Communications, Scientific-Atlanta, Inc., and Motorola, Inc., had all engaged in the fraudulent conduct at issue.   See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 158-61 (2008).  Although the Court's statement in Central Bank referred to Rule 10b-5(b), addressing material statements and omissions, and its comment in Stoneridge applied to 10b-5(a) or (c), addressing other types of deceptive   conduct,   the   scope   of   primary   liability   in   each subsection is governed by the language of section 10(b) of the Exchange Act.   Therefore, the Supreme Court's recent confirmation that multiple individuals may be primarily liable under Rule 10b-5(a) or (c) is applicable to its interpretation of Rule 10b-5(b).

> be liable as a primary violator under 10b-5,
> assuming all of the requirements for primary
> liability under Rule 10b-5 are met.

Id. (emphasis omitted).

    2.  What the Court Did Not Decide

    The Court in Central Bank addressed only the question of "whether private civil liability under § 10(b) extends as well to those who do not engage in the manipulative or deceptive practice, but who aid and abet the violation." 511 U.S. at 167; see also id. at 176 ("The problem, of course, is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do."). The issue here is whether the defendants themselves "engage[d] in the manipulative or deceptive practice," i.e., whether the defendants' acts are "sufficient to show that they 'made' the [alleged] material misstatements and omissions . . . such that they can be held primarily liable." SEC v. Wolfson, 539 F.3d 1249, 1258 (10th Cir. 2008). Holding Tambone and Hussey responsible for their own false implied statements does not threaten the primary/secondary dichotomy.

    Moreover, it is critical to recognize that Central Bank analyzes the scope of section 10(b) and Rule 10b-5 in a suit brought by a private plaintiff. Although the Court focused on the text of the provisions, it also emphasized the element of reliance

(which was not satisfied in that case), as well as a set of policy considerations that arise exclusively in the context of private securities litigation.  See 511 U.S. at 173-178, 180, 188-89.  In this respect, Central Bank reflected the Court's desire to limit the scope of the judicially implied private cause of action under Rule 10b-5.[18]  Indeed, the Court has consistently distinguished between the broad contours of the SEC's "express statutory authority to enforce [Rule 10b-5]," Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71, 79-81 (2006), and the "narrow dimensions" of the implied private right of action, Stoneridge, 552 U.S. at 167; see also SEC v. Zandford, 535 U.S. 813, 819 (2002) (noting, in a Commission action, that the Securities Exchange Act, including § 10(b), "should be 'construed "not technically and restrictively, but flexibly to effectuate its remedial purposes"'") (citations omitted).

Thus, as the SEC argues, "[p]olicy considerations concerning private litigation can have no relevance in defining the scope of primary liability under Section 10(b) in a Commission enforcement action." The Court's restrictive application of Rule 10b-5 in Central Bank – a case brought by a private plaintiff –

_____

[18] Cf. United States v. O'Hagan, 521 U.S. 642, 664 (1997) (noting that Central Bank "concerned only private civil litigation under § 10(b) and Rule 10b-5, not criminal liability[,]" and therefore that its "reference to purchasers or sellers of securities must be read in light of a longstanding limitation on private § 10(b) suits").

-46-

cannot sensibly be stretched beyond its logic to invalidate, in an SEC enforcement action, an interpretation of an element of Rule 10b-5(b) on which the Supreme Court was silent.

3. Distinguishing between Primary and Secondary Violations

Although the private action context limits <u>Central Bank</u>'s significance for the SEC enforcement action at issue here, the Court did effect an important change in securities law by holding that aiding and abetting claims were no longer available in private actions. In its aftermath, lower courts sought to delineate the outer boundaries of primary liability, an issue the Supreme Court had not addressed. As the majority notes, our sister circuits have crafted two divergent standards to analyze the question: the "bright-line" test, associated most closely with the Second Circuit, and the broader "substantial participation" test, articulated by the Ninth Circuit. The majority observes that it is unnecessary to choose one of these paths in this case because the conduct at issue – "the use and dissemination of prospectuses created by others" – does not satisfy either test. I agree that there is no need to choose between these standards, but for a different reason: neither the bright-line nor substantial participation test is relevant here.

The substantial participation test evaluates whether one actor can be deemed to have made a statement made or created by another because of the actor's "substantial participation" in the

making or creation of that statement.   In this case, the SEC
alleges that Tambone and Hussey are accountable for their own
implied statements, making the "substantial participation" inquiry
unnecessary.   See In re LDK Solar Sec. Litig., No. C07-05182WHA,
2008 WL 4369987, at *8 n.9 (N.D. Cal. Sept. 24, 2008) (declining to
address defendants' claim that they had not "substantially
participated" in making the fraudulent statements at issue because
the court had already determined that they should be "deemed
actually to have made those statements").   Similarly, the bright
line test does not address what it means to "make" a statement.   It
simply requires that the defendant "actually make" the statement at
issue, Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.
1998), and it imposes an attribution requirement that is
inapplicable to SEC enforcement actions because it relates to the
element of reliance that is required only in a private Rule 10b-5
action.   See Wolfson, 539 F.3d at 1259-60 (observing that the
attribution requirement "stems directly from the need for private
litigants to prove reliance on alleged fraud to succeed on a
private cause of action").

        Whether or not these tests are useful in distinguishing
primary from secondary conduct, they shed no light on the issue
that is before us: determining whether the defendants have "made"
a statement, which unquestionably would subject them to primary
liability.

    4.   The Limited Relevance of <u>Central Bank</u>

The Supreme Court in <u>Central Bank</u> focused on the crucial dichotomy between those who, regardless of their role in a securities transaction, make misleading representations themselves, and those who assist the culpable actor without personally using or employing any "manipulative or deceptive device" as prohibited by section 10(b).  In this SEC enforcement action, primary liability is premised on the defendants' having themselves impliedly stated that they had a reasonable basis to believe that the market timing disclosures in the prospectuses were truthful and complete.

<u>Central Bank</u> does not address the important issue in this case – whether the defendants "made" statements within the meaning of Rule 10b-5(b) – and we must look elsewhere for guidance.  As I describe below, both the language of the Rule and substantial precedent on the role and status of underwriters in the distribution of securities support the SEC's argument that Tambone's and Hussey's alleged actions fall within the purview of the "make a statement" requirement of Rule 10b-5(b).

## B. The Scope of Liability under Rule 10b-5(b): Making a Statement

    1. Text of Section 10(b)

Although Rule 10b-5 itself offers little guidance on how to define "make," the text of section 10(b), its authorizing statute, also must be examined.  <u>Ernst & Ernst</u> v. <u>Hochfelder</u>, 425 U.S. 185, 197 (1976) ("In addressing [the question of the proper

scienter requirement under section 10(b) and Rule 10b-5], we turn first to the language of s 10(b), for '(t)he starting point in every case involving construction of a statute is the language itself.'" (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975) (Powell, J., concurring))); Pinter v. Dahl, 486 U.S. 622, 653 (1988) ("The ascertainment of congressional intent with respect to the scope of liability created by a particular section of the Securities Act must rest primarily on the language of that section."). The statutory language is particularly relevant in this case because "[t]he scope of Rule 10b-5 is coextensive with the coverage of § 10(b)," a view that has led the Supreme Court to "use § 10(b) to refer to both the statutory provision and the Rule." Zandford, 535 U.S. at 816 n.1; see also Stoneridge, 552 U.S. at 157 ("Rule 10b-5 encompasses only conduct already prohibited by § 10(b).").

    In other words, the term "make a statement" in Rule 10b-5[19] must be read in conjunction with the text of section 10(b),

---

[19] The Rule states:

It shall be unlawful for any person, directly or indirectly . . .
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase

which deems it "unlawful for any person . . . [t]o <u>use or employ</u>, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b) (emphasis added).  The SEC's allegations against appellants are stated in precisely those statutory terms.  The SEC avers that defendants <u>used</u> and <u>employed</u> prospectuses containing statements prohibiting market timing practices – statements that they knew or were reckless in not knowing were false – and in so doing impliedly stated that they had a reasonable basis to believe that the market timing disclosures in the prospectuses were truthful and complete.

        The majority counters that one cannot "'make' a statement when he merely uses a statement created entirely by others."  It asserts that subsection (b) of Rule 10b-5 applies to only a subset of the conduct that falls within the statute's proscription – i.e., only the literal "making" of statements and not all "uses" of them. <u>Id.</u>  The majority reinforces this pronouncement by pointing out that another section of the Rule, 10b-5(a), <u>does</u> prohibit the "employ[ment]" of any "device, scheme or artifice to defraud," and it concludes that this difference in language proves that

---

        or sale of any security.

17 C.F.R. § 240.10b-5.

subsection (b) of the Rule was deliberately framed as a narrower prohibition against "making," but not "using," statements.

The question before us is not whether the words "use" and "make" are interchangeable, however – I agree they are not – but whether the conduct that occurred here could constitute "making" a statement within the meaning of Rule 10b-5(b).  The majority's position is that one cannot make a statement without explicitly speaking or writing the words at issue.  The statutory language, however – prohibiting the "use," inter alia, of "deceptive device[s]" – is broad enough to encompass less literal forms of "making" a statement.  Indeed, it defies ordinary experience to say that a statement can only be "made" by "the physical or manual act of writing or transcribing [a] report" or speaking words.  State v. O'Neil, 135 P. 60, 63 (Idaho 1913).  It is a commonplace observation that someone has "made a statement" through his or her conduct.

Unsurprisingly, a broader reading of "make" also is consistent with the dictionary definitions, which are more inclusive than the majority acknowledges and include "deliver, utter, or put forth."  See The Random House Dictionary of the English Language 1161 (2d ed. 1987).  Those meanings embrace the SEC's argument that, by using the prospectuses as they did, the defendants "deliver[ed]" or "put forth" implied statements of their own attesting to the accuracy and completeness of the prospectuses.

-52-

In case law, as well as common parlance, this is not an unprecedented interpretation of the word "make." In <u>Reass</u> v. <u>United States</u>, 99 F.2d 752 (4th Cir. 1938), for example, the court held that "making" a false statement for purposes of a federal mortgage fraud statute meant communicating it and not merely composing it. <u>Id.</u> at 755. Although the majority correctly points out the very different context in <u>Reass</u>, the fact remains that the court did not confine "making a statement" to the literal meaning on which the majority insists. <u>See</u> <u>also</u>, <u>e.g.</u>, <u>O'Neil</u>, 135 P. at 63.

To be sure, Rule 10b-5(b) contemplates some range of conduct narrower than the statute's all-encompassing "use or employ." But that fact does not mean that particular uses of statements by particular players in the sale of securities cannot constitute the "making" of implied statements. The Rule thus does not require Tambone and Hussey to have explicitly spoken or written the false statement at issue here, i.e., that "I have a reasonable basis for believing that the market timing disclosures in the prospectuses are truthful and complete." Rather, given the statutory duties imposed upon them as underwriters, <u>see infra</u>, that representation was implicit in the defendants' conduct in using the prospectuses to induce individuals to invest in Columbia Funds.

As the SEC explains in its en banc brief, this understanding of what it means to "make" a statement is necessary

to fulfill the objective of Congress and the Commission to punish "any untrue statement of a material fact" made with knowledge or reckless disregard for its truth.  <u>See</u> Rule 10b-5(b).  An underwriter could well know that representations in a prospectus are false even when the individual who actually wrote the words was unaware of the inaccuracies.  In those circumstances, an underwriter who knowingly gives investors a prospectus containing falsehoods could not be held liable in an SEC enforcement action for aiding and abetting the unwitting drafter, who did not himself commit fraud.  If such an underwriter could not be held responsible as a primary offender, the underwriter would, in the SEC's words, "be free from any liability under Section 10(b) whatsoever."[20]  It takes no stretch of the language of Rule 10b-5(b) to view such an underwriter as having attested to the accuracy of the prospectus contents, i.e., to have knowingly "made" an implied – false – statement to investors that the prospectus accurately describes the fund's risks.  <u>See</u> <u>Hanly</u> v. <u>SEC</u>, 415 F.2d 589, 597 (2d Cir. 1969) ("By [an underwriter's] recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation.").

---

[20] Although deceptive conduct in the sale of securities could trigger liability under section 17(a), that provision does not cover purchases and therefore would not always offer an alternative vehicle for SEC enforcement.

2. The Duties of an Underwriter

In assessing whether a defendant has committed a primary violation of the securities laws, courts have examined the defendant's role in the securities market in addition to the specific conduct alleged in the complaint. These decisions indicate that a defendant's general responsibilities and statutory duties with respect to the sale and distribution of securities inform the legal significance of specific conduct under Rule 10b-5(b). See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001) (analyzing a corporate executive's liability for "making" misleading statements in light of his duties and responsibilities); SEC v. KPMG LLP, 412 F. Supp. 2d 349, 376-77 (S.D.N.Y. 2006) (holding that three engagement partners of an auditing firm who possessed the "ultimate authority to determine whether an audit opinion should be issued" could be primarily liable under the securities laws for misstatements contained in the audit opinion letters, although a fourth defendant, who only acted as a concurring review partner, could not be held primarily liable, as his responsibilities were "not the equivalent of the audit engagement partner's responsibilities"). Indeed, the Second Circuit has made the particularly relevant observation that "[s]ilence where there is a duty to disclose can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b-5." Wright, 152 F.3d at 177 (emphasis added). Thus, by virtue

-55-

of his role in the securities market and his statutory duties, a defendant may make an implied statement without actually uttering the words in question.

Underwriters play an essential role in the sale and distribution of mutual funds to the investing public, which occurs either directly or through other broker-dealers.  The text and statutory history of the Securities Act of 1933, and specifically the statute's treatment of underwriters in sections 11[21] and 12,[22] highlight the unique position they occupy in the securities industry.  As the Southern District of New York has observed in the context of evaluating several securities claims:

> [I]n enacting Section 11, "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions would provide the necessary incentive to ensure their careful investigation of the offering."

In re Worldcom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) (quoting The Regulation of Securities Offerings, Securities Act Release No. 7606A, 63 Fed. Reg. 67174, 67230 (Dec.

---

[21] Section 11 of the Securities Act "prohibits false statements or omissions of material fact in registration statements" and "identifies the various categories of defendants subject to liability for a violation," including underwriters. Central Bank, 511 U.S. at 179; see also 15 U.S.C. § 77k(a)(5).

[22] Section 12 "prohibits the sale of unregistered, nonexempt securities as well as the sale of securities by means of a material misstatement or omission; and it limits liability to those who offer or sell the security." Central Bank, 511 U.S. at 179; see also 15 U.S.C. § 77l(a).

4, 1998), 1998 WL 833389).  Although underwriters are not insurers

for offerings, id., Congress has mandated that they "exercise

diligence of a type commensurate with the confidence, both as to

integrity and competence, that is placed in [them]."  H.R. Conf.

Rep. No. 73-152, 1933 WL 984, at *26 (1933).  The duty of an

underwriter to conduct a reasonable investigation was explained by

the SEC more than forty years ago as follows:

> "By associating himself with a proposed offering [an
> underwriter] impliedly represents that he has made such
> an investigation in accordance with professional
> standards.  Investors properly rely on this added
> protection which has a direct bearing on their appraisal
> of the reliability of the representations in the
> prospectus.  The underwriter who does not make a
> reasonable investigation is derelict in his
> responsibilities to deal fairly with the investigating
> public."

In re Worldcom, 346 F. Supp. 2d at 662-63 (insertions in original)

(quoting In re the Richmond Corp., Exchange Act Release No. 4585,

41 SEC Docket 398 [1961-1964 Transfer Binder], Fed. L. Sec. Rep.

(CCB) ¶ 76,904, 1963 WL 63647, at *7 (Feb. 27, 1963)); see also

Municipal Securities Disclosure, Exchange Act Release No. 26,100,

41 SEC Docket 1131, 1988 WL 999989, at *20 (Sept. 22, 1988)

(observing that the underwriter "occupies a vital position in an

offering" and that, by its participation in a sale of securities,

the underwriter makes a recommendation that "implies that the

underwriter has a reasonable basis for belief in the truthfulness

and completeness of the key representations made in any disclosure documents used in the offerings").[23]

The case law addressing the duties of underwriters buttresses the SEC's analysis and extends it beyond the traditional context of sections 11 and 12 of the Securities Act, which specifically concern an underwriter's obligation to ensure the accuracy of registration statements and prospectuses.  Courts have repeatedly applied section 10(b) to underwriters.  See, e.g., SEC v. Dain Rauscher, Inc., 254 F.3d 852, 858 (9th Cir. 2001) (finding genuine issue of material fact as to whether underwriter violated Rule 10b-5 by not complying with its "duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete"); Flecker v. Hollywood Entm't Corp., 1997 WL 269488, at *9 (D. Or. Feb. 12, 1997) (finding triable issue of section 10(b) primary liability against underwriter for allegedly false statements that inflated stock prices); In re MTC Elec. Techs. S'holder Litig., 993 F. Supp. 160, 162 (E.D.N.Y. 1997) (applying the standard of primary liability to underwriters in the context of private allegations of Rule 10b-5 violations); Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303, 315-16 (S.D.N.Y. 1996)

---

[23]  The SEC specifically observes in this Release that the underwriters' "obligation to have a reasonable basis for belief in the accuracy of statements directly made concerning the offering is underscored when a broker-dealer underwrites securities."  Id. at *21.

(same); In re U.S.A. Classic Sec. Litig., No. 93 Civ. 6667 (JSM), 1995 WL 363841, at *5 (S.D.N.Y. June 19, 1995) (finding that an underwriter's participation in the issuance of a prospectus was sufficient to state a claim of primary liability under Rule 10b-5); In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 629 (9th Cir. 1994) (finding disputed issues of material fact as to whether underwriters' participation in drafting an allegedly misleading letter to the SEC violated section 10(b)); In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 612 (S.D. Tex. 2002) (finding, based on case law highlighting an underwriter's duty to investigate an issuer and the securities it offers to investors, that an underwriter of a public offering could be held liable under section 10(b) and section 11 of the Securities Act "for any material misstatements or omissions in the registration statement made with scienter").

These precedents reflect the unique position of underwriters as securities insiders whose role is "that of a trail guide – not a mere hiking companion," and who are relied upon by investors for their "reputation, integrity, independence, and expertise." Dolphin and Bradbury, Inc. v. SEC, 512 F.3d 634, 640-41 (D.C. Cir. 2008) ("Although other broker-dealers may have the same responsibilities in certain contexts, underwriters have a 'heightened obligation' to ensure adequate disclosure."); see also Chris-Craft Indus., Inc. v. Piper Aircraft Corp. 480 F.2d 341, 370

(2d Cir. 1973) ("No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter."). Underwriters have access to information of substantive interest and consequence to investors, and a concomitant duty to investigate and confirm the accuracy of the prospectuses and other fund materials that they distribute. Chris-Craft, 480 F.2d at 370; see also Sanders v. John Nuveen & Co., 524 F.2d 1064, 1071 (7th Cir. 1975) ("Although the underwriter cannot be a guarantor of the soundness of any issue, he may not give it his implied stamp of approval without having a reasonable basis for concluding that the issue is sound."); Walker v. SEC, 383 F.2d 344, 345 (2d Cir. 1967) ("The Commission is justified in holding a securities salesman chargeable with knowledge of the contents of sales literature.").

The underwriter's statutory duty to review and confirm the accuracy of the material in the documentation that it distributes generates the implied statement to investors that the underwriter has a reasonable basis to believe that the information contained in the prospectus it uses to offer or sell securities is truthful and complete. See Sanders, 524 F.2d at 1070, 1073 ("[T]he relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. . . . [A]s an underwriter selling the . . . notes, Nuveen made an implied representation that it had reasonable grounds for belief that these

notes would be paid at maturity." (footnote omitted));[24] see also
Chris-Craft, 480 F.2d at 370.   Thus, contrary to the majority's
assertion, this is not a situation in which the liability alleged
is based "merely" on the use of "a statement created entirely by
others."   In this limited context, where the duties of underwriters
to potential investors are prescribed by statute, the knowing or
reckless use of a prospectus containing false statements involves
the underwriter's own implied statement falsely affirming the
accuracy of the prospectus content.

The majority attempts to discredit some of this
inconvenient precedent because it pre-dates Central Bank.   The
majority's treatment of Chris-Craft, which strongly supports the
SEC's position, is illustrative.   The Second Circuit held that an
underwriter "makes" a statement under section 14(e) of the Exchange
Act when constructively representing that registration materials

---

[24] The judgment in Sanders was vacated and remanded for further
consideration in light of the Supreme Court's decision in Ernst &
Ernst v. Hochfelder, 425 U.S. 185 (1976), which held that scienter
is an element of a private cause of action under section 10(b) and
Rule 10b-5.   See John Nuveen & Co. v. Sanders, 425 U.S. 929 (1976);
Hochfelder, 425 U.S. at 193.   The Seventh Circuit on remand held
that liability could no longer rest on Rule 10b-5 because the
defendant's conduct had been "mistaken but honest in belief."   554
F.2d at 792.   As the majority points out, when the Seventh Circuit
subsequently re-heard the case, it referred to explicit statements
made by the defendant underwriter.   See 619 F.2d 1222, 1234 (7th
Cir. 1980).   In its earlier ruling, however, the court had noted
that "the evidence does not indicate that all members of the class
relied on express recommendations," 524 F.2d at 1069, and it
therefore based liability on the underwriter's implied statements.

are accurate and complete.[25]  480 F.2d at 370 (noting that, although an underwriter does not "in a literal sense" make statements to potential investors, we do not read § 14(e) so narrowly").  The majority disregards Chris-Craft because it preceded Central Bank by more than twenty years, observing that the Second Circuit had no reason to distinguish between primary and secondary liability at that time.  As the SEC points out, however, and our discussion above confirms, Central Bank did not diminish the statutory duties of underwriters or otherwise affect the courts' identification of the duties owed by underwriters to the investing public.

Hence, Chris-Craft and similar cases may not be cast aside as no longer relevant.  The majority errs in its dismissal of precedent, fully consistent with Central Bank, indicating that implied statements made by underwriters – a unique class of securities professionals – may fall within the scope of Rule 10b-5.

## II.

My colleagues fear that including implied statements within the purview of Rule 10b-5(b) would trigger a flood of vexatious private lawsuits against a wide spectrum of participants

---

[25] Section 14(e) provides, in relevant part: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, . . . in connection with any tender offer." 15 U.S.C. § 78n(e).  That language is in pertinent respects identical to the language in Rule 10b-5(b) that is at issue here.

in the securities industry.  I cannot deny that private plaintiffs would try to push the SEC's implied statement position beyond its context in this case.  That is a predictable and familiar phenomenon in our legal system.  It then becomes the responsibility of courts to determine which attempts to expand the law are meritorious and which are not.  Inescapably, this method of developing the law imposes costs on defendants who ultimately prevail.  These inevitable costs should not deter us, however, from reaching the result required by the applicable law in the case before us.  Specifically, they should not lead us here to circumscribe the authority of the SEC to meet its responsibility to the public to prevent fraud in the securities industry.

In addition, the majority's fears discount too readily the particular context of this case.  As I have described, underwriters play a unique role in the securities industry, and they have responsibilities and a statutory duty not shared by every securities professional.  Indeed, the cases cited in the concurrence for the proposition that the implied representation theory "has been regularly rejected by the circuits" all involve secondary players, such as accountants, auditors and lawyers, who typically lack the "trail guide" relationship with the investing public that is the hallmark of the underwriter's role.[26]

_____

[26]  See Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 155 (2d Cir. 2007) (accountant); Fidel v. Farley, 392 F.3d 220, 235 (6th Cir. 2004) (auditor), overruled on other grounds by Tellabs,

Tambone's and Hussey's implied statements about their belief in the accuracy of the prospectuses arise from their special status, enforced by statute, which is both widely acknowledged and of long duration. The majority, quoting <u>Chiarella</u> v. <u>United States</u>, 445 U.S. 222, 228 (1980), acknowledges that a duty to disclose information in the securities setting may arise from "'a fiduciary or other similar relation of trust and confidence' between the parties" that exists outside the obligations imposed by Rule 10b-5. <u>See</u> <u>SEC</u> v. <u>Cochran</u>, 214 F.3d 1261, 1265 (10th Cir. 2000) (noting that "a duty to disclose under § 10(b) may be present if either a federal statute (other than § 10(b) itself) or a state statutory or common law recognizes a fiduciary or similar relationship of trust and confidence"). Federal law imposes such a duty on underwriters,[27] and that duty provides the context in which an underwriter's conduct may generate an implied statement attesting to the accuracy of a prospectus the underwriter is using

---

Inc. v. <u>Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007); <u>Ziemba</u> v. <u>Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1205-06 (11th Cir. 2001) (accounting and law firms); <u>Anixter</u> v. <u>Home-Stake Prod. Co.</u>, 77 F.3d 1215, 1226-27 (10th Cir. 1996) (accountant).

[27] The majority quotes <u>Fortson</u> v. <u>Winstead, McGuire, Sechrest & Minick</u>, 961 F.2d 469 (4th Cir. 1992), for the proposition that "'the duty to disclose material facts arises only when there is some basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship.'" <u>Id.</u> at 472. Several circuits have adopted the proposition that federal securities law cannot establish the requisite duty. <u>Id.</u> That exclusion would be inappropriate for underwriters, whose unique duty to investors is deeply embedded in federal law independent of section 10(b) and Rule 10b-5. <u>See</u> <u>supra</u> Section B.2.

-64-

to sell securities.  Plaintiffs seeking to expand the SEC's implied statement approach beyond underwriters will face the challenge of identifying an equivalent duty on the part of other actors in the securities industry.

Moreover, private litigants face multiple burdens in pleading securities claims.  Not only must they meet the standard requirement that allegations of fraud be pleaded with particularity, see Fed. R. Civ. P. 9(b), but – unlike the SEC – they also must prove reliance on the alleged misrepresentations, economic loss, and loss causation, see, e.g., Stoneridge, 552 U.S. at 157.  The reliance requirement, in particular, weakens my colleagues' concern that private litigants will be able to bring impermissible aiding and abetting claims in the guise of primary claims.  With significant barriers already in place to protect against excessive securities litigation by private plaintiffs, the way to protect against overreaching by private plaintiffs is to strictly enforce those requirements – not to deny the SEC the full scope of its enforcement authority.

### III.

The underwriter's special duty to investors is anchored in statutes and administrative guidance and confirmed by case law whose relevant wisdom was unaffected by the Supreme Court's decision in Central Bank.  In light of that duty, an underwriter who uses a prospectus in a securities transaction in the manner

-65-

alleged here impliedly states that he has reason to believe the contents of the prospectus are accurate.  If the underwriter knows, or is reckless in not knowing, that the statements contained within the prospectus are in fact false, the underwriter's implied statement is likewise false.  An underwriter who makes such a statement has violated Rule 10b-5(b).

The SEC in this case alleges that Tambone and Hussey made such statements to investors when they used the prospectuses containing false statements about timing practices to sell the Columbia Funds.  They allegedly knew, or were reckless in not knowing, that those statements were false.  These allegations were stated with sufficient particularity to meet the requirements of Fed. R. Civ. P. 12(b)(6), in conjunction with Rule 9(b).[28] Defendants' motions to dismiss the primary liability claims under section 10(b) and Rule 10b-5(b) should therefore have been denied.

Hence, I would reverse the dismissal of the SEC's claims under section 10(b) and Rule 10b-5(b) and remand to the district court for further proceedings on those claims, as well as on the section 17(a)(2) and aiding and abetting claims.

---

[28] The allegations in the SEC's complaint are described in detail in the panel decision, SEC v. Tambone, 550 F.3d 106, 141-143 (1st Cir. 2008), and need not be repeated here.  It suffices to say that the SEC meticulously identified the alleged misrepresentations, the defendants' roles in overseeing the distribution of fund prospectuses in connection with the sale of Columbia Funds, and the basis for their knowledge or recklessness in not knowing that prohibited market timing arrangements existed (rendering the prospectus statements false).