UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| JAMES TAMBONE and ROBERT HUSSEY, | ) ) |
| Defendants. | ) ) ) |

No. 06-10885-NMG

**MEMORANDUM OF LAW IN SUPPORT OF**
**ROBERT HUSSEY'S MOTION FOR SUMMARY JUDGMENT**

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Robert Hussey*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 2

    *The Commission's Oversight of the Mutual Fund Industry* ............................... 2

    *"Asleep at the Switch"* ..................................................................................... 3

    *Targeting Robert Hussey* .................................................................................. 4

    *The Commission's Legal Theories – "More Cry than Wool"* ........................... 5

    *Mr. Hussey Picks Up the Pieces* ....................................................................... 7

DISCUSSION ............................................................................................................. 8

I.     THE COMMISSION IS NOT ENTITLED TO INJUNCTIVE RELIEF ........................ 9

    A.    The Complaint Challenges Stale Conduct from which the
           Commission Did Not Seek Interlocutory Relief ................................. 10

    B.    The Nature of the Commission's Surviving Case
           Does Not Support an Injunction .......................................................... 12

    C.    An Injunction Would Be Inequitable Given Mr. Hussey's
           Assurances to the Court and Exemplary Post-Complaint Record ...... 13

II.    THE COMMISSION'S MONETARY CLAIMS ARE TIME BARRED .................... 15

    A.    All of the Commission's Remaining Claims Accrued
           Outside the Applicable Five-Year Limitations Period ......................... 15

    B.    The Commission Deserves No Equitable Tolling ............................... 16

         1.    The Commission was on inquiry notice of the possibility
              that market timing trades were occurring in Columbia funds
              after adoption of the prospectus language at issue. ................... 17

         2.    The Commission failed to exercise due diligence
              in detecting the challenged conduct ......................................... 19

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aaron v. SEC*, 446 U.S. 680 (1980)..................................................................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).......................................................8

*Commerce Oil Refining Corp. v. Miner*, 303 F.2d 125 (1st Cir. 1962)..............................16

*Earnhardt v. Puerto Rico*, 691 F.2d 69 (1st Cir. 1982)....................................................16

*Holmberg v. Armbrecht*, 327 U.S. 392 (1946) ................................................................16

*Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996) ...............................................................14

*Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123 (1st Cir. 1987) ..........................17, 18

*Mesnick v. General Electric Co.*, 950 F.2d 816 (1st Cir. 1991).........................................8

*Moskowitz*, 77 SEC Docket 446, 2002 WL 434524 (2002) .............................................10

*Ramos v. Roman*, 83 F. Supp. 2d 233 (D. Puerto Rico 2000) .........................................16

*SEC v. Bausch & Lomb Inc.*, 565 F.2d 8 (2d Cir. 1977) ..................................................9

*SEC v. DiBella*, No. 3:04cv1342, 2008 WL 6965807 (D. Conn. Mar. 13, 2008), *aff'd*, 587
    F.3d 553 (2d Cir. 2009) .......................................................................................10, 13

*SEC v. Freiberg*, No. 2:05-CV-00233, 2007 WL 2692041 (D. Utah Sept. 12, 2007) ...........10, 12

*SEC v. Gabelli*, No. 08 CV 3868, 2010 WL 1253603 (S.D.N.Y. Mar. 17, 2010) .......................12

*SEC v. Happ*, 295 F. Supp. 2d 189 (D. Mass. 2003), *aff'd*, 392 F.3d 12 (1st Cir. 2004) ..............12

*SEC v. Ingoldsby*, No. 88-1001, 1990 WL 120731 (D. Mass. May 15,
    1990).................................................................................................11, 12, 13, 14

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ........................................11, 15, 16

*SEC v. Monarch Fund*, 608 F.2d 938 (2d Cir. 1979) .................................................12, 16

*SEC v. National Student Marketing Corp.*, 457 F. Supp. 682 (D.D.C. 1978)..................11, 12, 15

*SEC v. Sargent*, 329 F.3d 34 (1st Cir. 2003) ..................................................................10

*SEC v. Shanahan*, No. 07-2879, 2010 WL 173819 (D. Minn. Jan. 13, 2010) ....................... 10, 11

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ........................................................ 10

*SEC v. Tambone*, 417 F. Supp. 2d 127 (D. Mass. 2006) ....................................... 5, 6, 12

*SEC v. Tambone*, 473 F. Supp. 2d 162 (D. Mass. 2006), *aff'd*, 597 F.3d 436 (1st Cir. 2010) .................................................................................................. 7, 12

*SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008), *vacated on other grounds*, 573 F.3d 54 (1st Cir. 2009), *and reinstated in part on rehearing*, 597 F.3d 436 (1st Cir. 2010) ............ 7, 17

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010) .............................................. 2, 7, 8, 12

*SEC v. Tambone*, No. 05-10247 (D. Mass. May 5, 2006) .............................................. 6

*Waldock v. M.J. Select Global, Ltd.*, No. 03 C 5293, 2004 WL 2278549 (N.D. Ill. Oct. 7, 2004) .......................................................................................................... 17

*Windsor Securities Inc. v. Hartford Life Insurance Co.*, 986 F.2d 655 (3d Cir. 1993) ................ 18

## STATUTES

15 U.S.C. 78a, *et seq.* ............................................................................................ 2

15 U.S.C. 80a-1, *et seq.* ......................................................................................... 2

15 U.S.C. 80b-1, *et seq.* ..................................................................................... 2, 3

28 U.S.C. § 2462 ................................................................................................. 16

Fed. R. Civ. P. 56(c)(2) .......................................................................................... 9

## OTHER

Steve Bailey, Op-Ed., *Asleep at the Switch*, Boston Globe, Oct. 24, 2003 ...................... 3

Senator Joseph Lieberman Press Release, *Lieberman Strafes SEC for Lax Oversight of Mutual Funds* (Nov. 3, 2003), *available at* http://hsgac.senate.gov/public/index.cfm?FuseAction=Press.MajorityNews&Content Record_id=374c1b6f-ae65-459e-afdc-f719bdef09be&Region_id=&Issue_id=2ed9adc5-1c1e-4035-90b5-62bd98bdff7f. ................ 4

Gretchen Morgenson & Landon Thomas, Jr., *S.E.C. Finding Fund Abuses, Official Says*, N.Y. Times, Oct. 25, 2003, *available at*

http://www.nytimes.com/2003/10/25/business/sec-finding-fund-abuses-official-
says.html. ...................................................................................................................4

Annette L. Nazareth, Remarks before the ABA (Sept. 28, 2006), *available at*
http://www.sec.gov/news/speech/2006/spch092806aln.htm. .....................................................4

Lori Richards, Director, Office of Compliance Inspections and Examinations, *The
Evolution of the SEC's Inspection Program for Advisers and Funds:  Keeping Apace
of a Changing Industry* (Oct. 30, 2002), *available at*
http://www.sec.gov/news/speech/spch597.htm. ...............................................................3, 20

SEC Audit Report No. 254 (Mar. 18, 1998), *available at*
http://www.sec.gov/about/oig/audit/254fin.htm. ......................................................................2

## PRELIMINARY STATEMENT

Enough is enough. For almost six years now, Plaintiff Securities and Exchange Commission (the "Commission") has clung to claims—twice dismissed in their entirety by this Court—arising out of alleged conduct involving Mr. Hussey that dates back thirteen years. In its relentless pursuit of this case, the Commission has offered up a never-ending, ever-shifting parade of liability theories, the most recent of which has been rejected by an *en banc* panel of the Court of Appeals for the First Circuit as contrary to the plain language of the securities laws and Supreme Court precedent.

Mercifully, the time to bring this ill-considered case to a close (already long overdue) has arrived. In support of his motion for summary judgment, Mr. Hussey cites undisputed material facts conclusively establishing that the Commission is not entitled to any relief on its remaining claims.

First, the Commission's request for an injunction is unwarranted, as there is no reasonable likelihood of any future securities law violations by Mr. Hussey. Many years have passed without incident since the conduct in question, and never once during the pendency of this matter has the Commission deemed it necessary to seek any interlocutory protection. The nature of the Commission's reduced case against Mr. Hussey also does not support injunctive relief, as the Commission is left only with claims based on secondary liability or requiring mere negligence. Mr. Hussey's exemplary professional conduct in recent years and his assurances to the Court further confirm that there is no reasonable likelihood of future violations.

Second, the Commission's claims for monetary relief accrued at least five years before the Complaint was filed, and thus are barred by the applicable statute of limitations. The

Commission's failure to act when faced with overwhelming notice regarding the conduct at issue, moreover, precludes the application of equitable tolling to save these delinquent claims.

## BACKGROUND

This case concerns mutual fund "market timing," a widely used investment strategy during the relevant period designed to capture gains from pricing inefficiencies and current economic or financial trends. As the First Circuit has recognized (along with many others), market timing is not illegal. *See SEC v. Tambone*, 597 F.3d 436, 439 (1st Cir. 2010). Indeed, prior to the events of September 2003 (see below), the Commission long had been aware of— and tacitly had permitted—this investment strategy. (*See* Section II.B, *infra*.)

*The Commission's Oversight of the Mutual Fund Industry*

The federal securities laws charge the Commission with regulating the mutual fund industry. *See, e.g.*, Securities & Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*; Investment Company Act of 1940, 15 U.S.C. 80a-1, *et seq.*; Investment Advisers Act of 1940, 15 U.S.C. 80b-1, *et seq.* In this role, the Commission's responsibilities include reviewing proposed public disclosures (such as prospectuses), and conducting regular examinations of mutual fund investment companies and affiliated investment advisers. In 1995, the Commission sought to consolidate and enhance its examination procedures by creating the Office of Compliance Inspections and Examinations ("OCIE"). *See* SEC Audit Report No. 254 (Mar. 18, 1998). OCIE's mandate includes "protect[ing] investors through fostering compliance with the securities laws, detecting volatile conduct, and ensuring that the Commission is informed of developments in the regulated community." *Id.* During the relevant period, OCIE employed hundreds of examiners in eleven regional and district offices across the country. *Id.*

2

In 1998, OCIE embarked on a "five-year plan" to inspect each mutual fund complex, investment adviser, and transfer agent affiliated with a fund group. *See* Lori Richards, Director, Office of Compliance Inspections and Examinations, *The Evolution of the SEC's Inspection Program for Advisers and Funds: Keeping Apace of a Changing Industry* (Oct. 30, 2002). In connection with this effort, OCIE reportedly refined its examination techniques to focus on detecting securities violations impacting mutual fund shareholders. *Id.* During the height of the relevant period here, OCIE conducted over 8,000 inspections of investment advisers and mutual fund complexes. *Id.* These efforts included twenty different examinations of seven different entities within the Columbia mutual fund family. (Robert Hussey's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1(a) ("SOF") ¶ [13]; Declaration of Christopher M. Joralemon ("Joralemon Decl."), Exs. A-T.)

*"Asleep at the Switch"*

In September 2003, state officials in Massachusetts and New York announced that they had launched independent inquiries into certain mutual fund trading practices, including market timing. These state investigations prompted widespread criticism of the Commission's failures to monitor or regulate such conduct. *See, e.g.*, Steve Bailey, Op-Ed., *Asleep at the Switch*, Boston Globe, Oct. 24, 2003, at D1 ("As the scandals roll out across Wall Street and beyond, . . . the question 'Where was the Securities and Exchange Commission?' is becoming part of the lexicon."); Senator Joseph Lieberman Press Release, *Lieberman Strafes SEC for Lax Oversight of Mutual Funds* (Nov. 3, 2003).

In the wake of this condemnation, the Commission sent information requests to over 100 of the largest mutual fund complexes and broker dealers across the country. Fully *half* of the respondents confirmed that they permitted investors to engage in market timing. *See* Gretchen

Morgenson & Landon Thomas, Jr., *S.E.C. Finding Fund Abuses, Official Says*, N.Y. Times, Oct. 25, 2003. Stung by the ongoing criticism—and ignoring its long-standing awareness of this activity—the Commission aggressively initiated dozens of face-saving enforcement actions against a wide range of entities and individuals. *See* Annette L. Nazareth, Remarks before the ABA (Sept. 28, 2006).

Swept up in the Commission's broadly tossed enforcement net were Columbia Advisors (the investment adviser to over 140 mutual funds in the Columbia complex) and Columbia Distributor (the principal underwriter/distributor of those funds, and also Mr. Hussey's employer at the time). Like many similarly situated parties, the Columbia entities—without admitting or denying any wrongdoing—opted to resolve the Commission's claims via settlement. *See In the Matter of Columbia Management Advisors, Inc. and Columbia Funds Distributor, Inc.*, Release No. 33-8534 (Feb. 9, 2005) (Joralemon Decl., Ex. V).

*Targeting Robert Hussey*

The Commission's objection to market timing in Columbia funds focused principally on the following language that appeared in certain prospectuses beginning in 2000:

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short term or excessive trading or whose trading has been or may be disruptive to the Fund.

(*See* Compl. ¶ 35.)

In contemplating claims against Mr. Hussey for this language, however, the Commission faced a number of significant hurdles. For example, Mr. Hussey did not actually *make* any of the alleged misstatements in the Columbia prospectuses. Also, the prospectus language in question

plainly states that each fund's investment adviser—not Mr. Hussey—was responsible for determining which transactions should be rejected because they were disruptive to the fund or constituted a pattern of "short-term" or "excessive" trading.

Undeterred by these inescapable facts, the Commission filed a complaint against Mr. Hussey on February 9, 2005 (the "Initial Complaint"), alleging that he "permitted" or "approved" market timing arrangements that were inconsistent with the prospectus language above. *See SEC v. Tambone*, 417 F. Supp. 2d 127, 129-30 (D. Mass. 2006) ("*Tambone I*").

### *The Commission's Legal Theories – "More Cry than Wool"*

In its blind pursuit of Mr. Hussey for allowing certain investors to engage in market timing, the Commission has raised and abandoned virtually all conceivable—and a few inconceivable—theories of securities law liability.   From alleged duties, to omissions, to schemes, to phantom drafting roles, to "implied statements," the Commission's approach has produced the enforcement action equivalent of trying to force a square peg into a round hole.

On April 15, 2005, Mr. Hussey moved to dismiss the Initial Complaint on multiple grounds, and, on January 27, 2006, the Court granted his motion. *See Tambone I.*  In dismissing the Commission's action, the Court found that the alleged claims against Mr. Hussey rested on a "shaky legal foundation" and "d[id] not withstand the weight of contravening case law."  417 F. Supp. 2d at 133-34.

Shortly thereafter, the Commission—failing to heed First Circuit law concerning the finality of the Court's judgment—sought leave to file an amended complaint that was virtually identical to the Initial Complaint.  Upon belatedly recognizing that the case had been closed, the Commission stubbornly opted to recast its leave motion as a request for extraordinary relief under Rule 60(b) of the Federal Rules of Civil Procedure.  The Court properly denied the motion.

*See SEC v. Tambone*, No. 05-10247, slip op. at 3, 6, 7 (D. Mass. May 5, 2006) (rejecting "inexplicabl[e]" arguments offered by Commission, and identifying "other troubling concerns" relating to merits of restyled allegations).

A mere fourteen days after the Court's ruling on the Rule 60(b) motion, the Commission instituted a new action against Mr. Hussey by filing yet another complaint (the "Complaint") virtually identical to its previously proposed amended complaint (as well as, of course, its dismissed Initial Complaint). The Complaint offered scant new allegations against Mr. Hussey, and merely reorganized certain sentences into new paragraphs and added independently meaningless words such as "scheme" and "duty."

On December 29, 2006, the Court once again dismissed the Commission's claims against Mr. Hussey – this time, *with prejudice*. *See SEC v. Tambone*, 473 F. Supp. 2d 162 (D. Mass. 2006) ("*Tambone II*"), *aff'd*, 597 F.3d 436 (1st Cir. 2010). In finding this third "bite at the apple" insufficient as a matter of law, the Court observed that the Commission appeared to be "merely guessing" as to whether Mr. Hussey had engaged in any actionable conduct concerning the alleged prospectus misstatements. 473 F. Supp. 2d at 167 n.1.

Refusing to accept this Court's judgment, the Commission appealed the dismissal to the Court of Appeals for the First Circuit. In an eleventh-hour attempt to recast its primary securities fraud claim against Mr. Hussey, the Commission invented an "implied statement" theory, which attempted to graft onto the third-party prospectus statements at issue an implicit guarantee of veracity from Mr. Hussey allegedly springing from his employer's "central role" in the securities markets. *See SEC v. Tambone*, 550 F.3d 106, 132 (1st Cir. 2008), *vacated on other grounds*, 573 F.3d 54 (1st Cir. 2009), *and reinstated in part on rehearing*, 597 F.3d 436 (1st Cir. 2010). Following a divided panel opinion, an *en banc* panel of the First Circuit Court rejected the

Commission's unprecedented claim. *See Tambone*, 597 F.3d at 444, 449-50 (affirming Court's dismissal of Section 10(b) claim and noting that various arguments offered by Commission were "wildly exaggerated" and "more cry than wool").[1]

## *Mr. Hussey Picks Up the Pieces*

Shortly after the Court's second dismissal of the Commission's claims, Mr. Hussey (who is married with three children) was able to secure new employment as a Senior Vice President with Natixis Global Associates ("Natixis") in Boston, Massachusetts. (*See* Affidavit of Robert Hussey ("Hussey Aff.") ¶ 4.) Natixis is affiliated with mutual fund investment companies, and is an indirect subsidiary of Natixis Global Asset Management, one of the world's largest asset management firms. (*See* Affidavit of Coleen Downs Dinneen ("Dinneen Aff.") ¶ 3.)

Before extending an offer of employment to Mr. Hussey, Natixis conducted extensive due diligence on his background, including a review of the Commission's claims (which, at the time, again had been dismissed by the Court). (*See* Dinneen Aff. ¶ 6.) Upon joining Natixis, Mr. Hussey was placed on enhanced supervision. As part of this program, he met on a monthly basis with a compliance officer to review Mr. Hussey's adherence to applicable securities regulations and internal compliance guidelines and to discuss related matters. (*See* Dinneen Aff. ¶ 7.) The enhanced supervision also included increased surveillance of Mr. Hussey's e-mail communications to detect any regulatory or compliance issues. (*Id.*) Mr. Hussey successfully completed Natixis's enhanced supervision program in September 2009. (*See* Dinneen Aff. ¶ 8.)

---

[1] The *en banc* ruling also reinstated a portion of the divided panel's opinion, which allowed the Commission's secondary claims, along with its claim under Section 17(a) of the Securities Act, to proceed beyond the motion to dismiss stage. *See Tambone*, 597 F.3d at 450.

Following a series of promotions, Mr. Hussey today serves as an Executive Vice President in charge of Natixis's Wealth Solutions and Global Relationships groups. He supervises approximately twenty-five employees responsible for sales and relationship efforts directed at various financial intermediaries such as registered investment advisers, trust organizations, and independent broker-dealers. (*See* Hussey Aff. ¶ 6.) Throughout his tenure with Natixis, "Mr. Hussey's performance—from a legal and compliance perspective—has been exemplary." (*See* Dinneen Aff. ¶ 8.)

## DISCUSSION

When considering a motion for summary judgment, a court must "'pierce the pleadings and . . . assess the proof in order to see whether there is a genuine need for trial.'" *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, summary judgment should be granted if the available evidence demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Here, the relevant evidence conclusively establishes that the Commission is not entitled to any relief on its remaining claims. First, the Commission's request for an injunction is unwarranted, as there is no reasonable likelihood of any future securities law violations by Mr. Hussey. Second, the Commission's claims for monetary relief are barred by the applicable statute of limitations. These claims cannot be resuscitated through equitable tolling because the Commission (a) was on inquiry notice of the possibility of market timing in Columbia funds, and (b) failed to exercise due diligence in detecting the alleged wrongdoing.

## I.      THE COMMISSION IS NOT ENTITLED TO INJUNCTIVE RELIEF

"A permanent injunction is a drastic remedy and should not be granted lightly, especially when the conduct has ceased." *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (internal quotation marks and citation omitted).  Indeed, "[i]t is well settled that the Commission cannot obtain [injunctive] relief without *positive proof* of a reasonable likelihood that past wrongdoing will recur." *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 18 (2d Cir. 1977) (emphasis added) (affirming district court decision denying Commission's request for injunction).  Importantly, a court can resolve this issue on a motion for summary judgment. *See, e.g.*, *SEC v. Shanahan*, No. 07-2879, 2010 WL 173819, at *14, *16 (D. Minn. Jan. 13, 2010) (granting defendants' motion for summary after concluding that Commission not entitled to injunctive relief even if it succeeded in establishing securities law violations at trial).

Courts assess the reasonable likelihood of future violations by looking at a number of different factors, none of which is determinative. *See, e.g.*, *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (concluding that injunction against defendants not warranted based on several considerations); *Bausch & Lomb Inc.*, 565 F.2d at 18 (noting that analysis depends on "totality of the circumstances").  Appropriate factors to consider include:

- the passage of time since the alleged wrongdoing without further incident;

- whether the Commission pursued interlocutory injunctive relief while the matter was pending;

- the nature of the infraction at issue, including the degree of scienter involved;

- the sincerity of defendant's assurances against future misconduct; and

- considerations of fairness to defendant given the severe collateral consequences of an injunction.

*See, e.g., SEC v. DiBella*, No. 3:04cv1342, 2008 WL 6965807, at *12-13 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009); *SEC v. Ingoldsby*, No. 88-1001, 1990 WL 120731, at *2-3 (D. Mass. May 15, 1990); *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 715-16 (D.D.C. 1978).

While not an exhaustive list, *every* factor identified above indisputably counsels against the issuance of an injunction here.

### A.  The Complaint Challenges Stale Conduct from which the Commission Did Not Seek Interlocutory Relief

This case involves the securities law equivalent of ancient history. The market timing at issue dates back almost *thirteen* years, and we fast are approaching the six-year anniversary of the date on which the claims against Mr. Hussey were first filed. The Commission, moreover, does not allege that Mr. Hussey has run afoul of any securities laws since September 2003 (over seven years ago).

Courts routinely have denied the Commission's claims for injunctive relief in cases with similar passages of time. *See, e.g., Shanahan*, 2010 WL 173819, at *14 (finding that Commission not entitled to permanent injunction where five years had passed since alleged violations); *DiBella*, 2008 WL 6965807, at *13 ("[T]he passage of nearly 10 years without another violation weighs heavily against an injunction."); *SEC v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) (rejecting request for permanent injunction and noting that "several years have passed since Defendants' alleged misconduct apparently without incident"); *SEC v. Freiberg*, No. 2:05-CV-00233, 2007 WL 2692041, at *22 (D. Utah Sept. 12, 2007) (citing passage of "more than five years" as reason for no injunction); *accord Moskowitz*, 77 SEC Docket 446, 2002 WL 434524, at *8 (2002) (explaining that the passage of six years since defendant's violative conduct "militates against the issuance of a cease-and-desist order").

Another undisputed factor supporting the denial of injunctive relief here is the Commission's failure to seek an interlocutory injunction against Mr. Hussey at any point since first filing its claims almost six years ago. Indeed, this inaction speaks volumes about the Commission's own assessment of the likelihood of future transgressions. *See, e.g., SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (finding imposition of injunction inappropriate, and citing Commission's concession during oral argument that "at no time during [the] seven years [the case was pending] did it attempt to expedite the requested injunctive relief"); *Nat'l Student Mktg.*, 457 F. Supp. at 716 ("[I]n the six years since the filing of this action, [the Commission] has made no attempt to obtain interlocutory injunctive relief against these defendants. Such inaction argues strongly against the need for injunctive relief.").

**B.     The Nature of the Commission's
         Surviving Case Does Not Support an Injunction**

In assessing the likelihood of future violations to determine whether injunctive relief is warranted, courts also may consider the "egregiousness" of defendant's conduct and the "degree of scienter involved." *See, e.g., Ingoldsby*, 1990 WL 120731, at *2. These factors similarly do not support the Commission's request for an injunction here.

The Court previously dismissed all of the Commission's claims against Mr. Hussey. Twice. *See Tambone I; Tambone II*. The First Circuit Court of Appeals agreed with this Court that the Commission cannot articulate any basis for its gravest accusation—securities fraud under Section 10(b) of the Securities and Exchange Act—and thus affirmed the Court's rejection of the Commission's most significant claim against Mr. Hussey. *Tambone*, 597 F.3d at 438. The Commission now is left only with secondary liability claims arising out of others' alleged misconduct, and a claim under Section 17(a) of the Securities Act with a scienter element that is satisfied by a showing of mere negligence. *See Aaron v. SEC*, 446 U.S. 680, 689-97 (1980).

11

As the Complaint indicates, the Commission bases these surviving claims on Mr. Hussey's acquiescence in others' (perfectly legal) market timing trades allegedly prohibited by prospectus language that explicitly assigned responsibility for accepting or rejecting such trades to someone else. (*See* Compl. ¶ 35 (quoting so-called "strict prohibition" prospectus language stating that investment adviser would decide whether to reject market timing transactions).) Such conduct does not warrant an injunction. *See, e.g.*, *SEC v. Gabelli*, No. 08 CV 3868, 2010 WL 1253603, at *10 (S.D.N.Y. Mar. 17, 2010) (denying request for injunctive relief in market timing case because Commission failed to show how conduct was "particularly egregious," and noting Commission's concession that "market-timing was not, by itself, fraudulent or illegal").

### C.    An Injunction Would Be Inequitable Given Mr. Hussey's Assurances to the Court and Exemplary Post-Complaint Record

In refusing to issue an injunction, a court also may rely on a defendant's assurances against future violations. *See, e.g.*, *Ingoldsby*, 1990 WL 120731, at *3 (finding defendant's assurances that he will not violate any securities laws to be "genuine and sincere"); *SEC v. Freiberg*, 2007 WL 2692041, at *23 (accepting defendant's representation that, with the benefit of hindsight, he will not again engage in type of conduct challenged by Commission).

Mr. Hussey has promised the Court that he will avoid any involvement in conduct that even remotely could be deemed inconsistent with the securities laws. (*See* Hussey Aff. ¶¶ 7-8.) He further has assured the Court that he strives every day to meet his responsibilities as a securities professional in a manner beyond reproach. (*See* Hussey Aff. ¶ 7.) In assessing the sincerity of these assurances, the Court need look no further than the exemplary record compiled by Mr. Hussey following the Court's dismissal with prejudice of the Commission's claims almost four years ago. (*See* Dinneen Aff. ¶¶ 5-9.)

Serving as a senior officer in the mutual fund industry since 2007, Mr. Hussey has successfully completed a two-year enhanced supervision program, and has not been the subject of a single complaint by any regulator, client or colleague in his new career. (*See* Dinneen Aff. ¶ 8.) Ms. Dinneen, General Counsel for Mr. Hussey's current employer with oversight responsibility for a registered investment adviser, broker-dealer, and affiliated mutual fund investment companies, states that she has "found [Mr. Hussey] always to act with the highest integrity." (*See* Dinneen Aff. ¶ 9.) She further notes that, "[a]s an attorney with over twenty-one years of management and legal experience in the securities industry, [she has] encountered very few individuals as committed as Robert Hussey to honoring all applicable rules and regulations." (*Id.*)

These admirable efforts by Mr. Hussey to move beyond the ill-fated market timing saga and attempt to rebuild his professional reputation also are relevant to another factor supporting the denial of an injunction. Specifically, it is well within the Court's discretion to consider the adverse effects that an injunction would have on Mr. Hussey and his family. *See, e.g., SEC v. DiBella*, 2008 WL 6965807, at *12 ("'[I]n deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts . . . .'" (citation omitted)); *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. at 715 (citing "harmful impact of the injunction on the defendant" as an objective factor to be considered). Indeed, "the potential collateral consequences of a permanent injunction are quite serious." *SEC v. Jones*, 476 F. Supp. 2d at 385 (noting that injunction, *inter alia*, can cause professional stigma, result in license revocation, and otherwise significantly impair defendant's ability to make a living). In short, there would be nothing equitable about the professional and personal consequences that would befall Mr. Hussey as the result of an injunction.

* * * *

13

As the foregoing demonstrates, the Commission is not entitled to injunctive relief against Mr. Hussey.  Many years have passed without incident since the conduct in question, and never once during that period has the Commission deemed it necessary to seek any interlocutory protection.  The nature of the Commission's reduced case against Mr. Hussey further confirms that no injunction is warranted, as the Commission is left with only claims based on secondary liability or negligence.  Finally, Mr. Hussey's assurances to the Court—supported by his recent unassailable professional record—confirm that there is no reasonable likelihood of future violations.  All of these considerations lead inexorably to one conclusion:  Mr. Hussey deserves summary judgment denying the Commission's request for an injunction.

## II.   THE COMMISSION'S MONETARY CLAIMS ARE TIME BARRED

Civil enforcement actions brought by the Commission are subject to a five-year statute of limitations period.  *See* 28 U.S.C. § 2462 ("[A]n action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."); *see also Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996) (ruling that § 2462 limitations period applies to any action in which Commission seeks relief in "a form of punishment . . . for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties").[2]

---

2       The statute of limitations applies both to the Commission's request for "civil monetary penalties" and to its so-called "disgorgement" claim.  While the Commission may attempt to wrap the latter duplicative remedy in the cloak of equity, it amounts to nothing more than another attempt by the Commission to punish Mr. Hussey.  *See SEC v. Jones*, 476 F. Supp. 2d at 381 (holding that limitations period in § 2462 "applies to civil penalties and equitable relief that seeks to punish").  In any event, the considerations discussed above supporting denial of injunctive relief also establish that the Commission is not entitled to disgorgement here.  *See*

[Footnote continued on next page]

## A.      All of the Commission's Remaining Claims Accrued
## Outside the Applicable Five-Year Limitations Period

The Commission did not file its Complaint until May 19, 2006. Thus, any claim that accrued prior to May 19, 2001 is time barred. They all did, and they all are.

Claims by the Commission's accrue "when the factual and legal prerequisites for filing suit [are] in place." *See Jones*, 476 F. Supp. 2d at 381. Here, the disconnect between Mr. Hussey's alleged actions (permitting market timing) and the *actual* basis for the Commission's claims (prospectus statements) produces two approaches to the claim calculation, neither of which gives the Commission a post-May 19, 2001 accrual date. All of the alleged market timing arrangements identified in the Complaint were in place well before May 19, 2001. (SOF ¶¶ [16].) Also, the Complaint itself reflects that the funds at issue had incorporated restrictive language into their respective prospectuses by that date. (*See* Compl. ¶¶ 33, 46, 54, 57, 87.) *See, e.g.*, *Waldock v. M.J. Select Global, Ltd.*, No. 03 C 5293, 2004 WL 2278549, at *4 (N.D. Ill. Oct. 7, 2004) (noting that causes of action premised on material misstatement accrue at time statement first made). Therefore, regardless of the accrual approach, all of the Commission's claims are untimely.

## B.      The Commission Deserves No Equitable Tolling

In an effort to mask its delinquency (at least temporarily), the Commission argued on appeal that its otherwise time barred claims should be resuscitated via equitable tolling of the

---

[Footnote continued from previous page]

*SEC v. Monarch Fund*, 608 F.2d at 943 (reversing issuance of injunction and concluding that, "[f]or substantially the same reasons, we do not believe that disgorgement was properly authorized").

statute of limitations. According to the Commission, the market timing activities at issue remained "concealed" until September 2003 (apparently, when officials in Massachusetts and New York pointed them out). (*See* Compl. ¶¶ 100-101.) The divided First Circuit panel— accepting all tolling allegations in the Complaint as true—permitted the Commission's stale claims to proceed beyond the motion to dismiss stage. *See Tambone*, 550 F.3d at 148-49 ("*As stated in its complaint*, the SEC received no information prior to September 2003 that alerted it to any potential fraud or that triggered a duty to inquire whether the defendants or the Columbia entities were engaged in such activity." (emphasis added)).

In considering Mr. Hussey's summary judgment motion, the Court now can look beyond the pleadings to discover that the Commission's "equitable tolling" claim is built on patent falsehoods. *See, e.g., Ramos v. Roman*, 83 F. Supp. 2d 233, 236 (D. Puerto Rico 2000) (noting that denial of statute of limitations defense on motion to dismiss has no impact on consideration of same defense at summary judgment stage); *accord Commerce Oil Refining Corp. v. Miner*, 303 F.2d 125, 128 (1st Cir. 1962) ("A ruling denying a motion to dismiss is not the law of the case . . . .").

Courts long have taken a narrow view of equitable exceptions to federal limitations periods. *See Earnhardt v. Puerto Rico*, 691 F.2d 69, 71 (1st Cir. 1982). The federal doctrine of fraudulent concealment operates to toll the statute of limitations only "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part.'" *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946) (citation omitted). For the Commission to gain the advantage of equitable tolling, it must demonstrate that (1) sufficient facts were not available to put it on inquiry notice of the *possibility* that market timing was taking place in the relevant funds following adoption of the prospectus language at issue, and (2)

it exercised due diligence in attempting to uncover such trading. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987). As explained below, undisputed material facts here foreclose such a showing.

**1.    The Commission was on inquiry notice of the possibility that market timing trades were occurring in Columbia <u>funds after adoption of the prospectus language at issue.</u>**

It now is beyond dispute that the Commission's awareness (and implicit approval) of market timing in mutual funds dates back over twenty years. *See, e.g., Windsor Sec. Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 666 (3d Cir. 1993) (noting Commission's discussion of market timing issues in 1988). *See also WestAmerica Inv. Co.*, SEC No-Action Letter (Nov. 26, 1991) (authorizing investment advisor to provide clients with transaction-based "professional guidance as to timing the investment of funds through mutual fund groups"); *Triad Asset Mgmt., Inc.*, SEC No-Action Letter (Apr. 22, 1993) (providing guidance to investment advisor in business of "Mutual Fund Market Timing") (Joralemon Decl. Ex. V). There also is no dispute that the Commission long ago recognized the potential harmful impact that market timing could have on mutual funds and long-term shareholders. *See, e.g.*, Keynote Address of Paul Roye (Oct. 25, 2001) ("The staff also is very aware of the problems that arbitrageurs and market-timers cause funds and their long-term shareholders.") (Joralemon Decl. Ex. W).

Mr. Hussey, however, does not merely rely on the Commission's general awareness of market timing to establish inquiry notice here. During the relevant period, the Commission also plainly was aware of the fact that mutual fund companies were beginning to adopt prospectus

language that addressed restrictions on market timing.[3] *Indeed, the Commission actually considered and commented on the so-called "strict prohibition" language at issue before it was adopted by the Liberty funds.* See Letter from Liberty Funds Group to SEC Division of Investment Management (Jan. 28, 2002) (Joralemon Decl. Ex. Z). Specifically, the Commission requested that Liberty expand the "strict prohibition" language to include a description of the criteria that would be applied in identifying and rejecting "short-term or excessive trading." *Id.* In other words, the Commission itself recognized—long before filing the Complaint—that the prospectus language at the heart of this case explicitly called for the exercise of judgment in deciding whether market timing trades would be accepted or rejected.

To recap, material facts not in dispute reveal that during the relevant period the Commission: (1) was aware that investors were engaged in mutual fund market timing; (2) recognized the potential harm that such trading could cause; (3) reviewed and commented on mutual fund prospectus language that outlined various trading restrictions; and (4) understood that the specific prospectus language at issue allowed certain market timing transactions and prohibited others in the discretion of the fund advisor. These facts are fatal to the Commission's request for equitable tolling, as they plainly put it on inquiry notice of the possibility that the market timing trades identified in the Complaint were occurring in Columbia funds after adoption of the prospectus language cited in the Complaint. *See, e.g., Maggio*, 824 F.2d at 128.

---

[3]    *See, e.g.*, Letter from SEC to Cova Financial Ins. Co. (Sept, 28, 1999) (commenting on proposed prospectus language, and asking issuer to explain to SEC "how the company determines that a pattern of exchanges coincides with a market timing strategy and is disruptive to the Investment Funds") (Joralemon Aff. Ex. X); Letter from SEC to American General Financial Group (Jan. 12, 2000) (requesting additional information concerning circumstances under which company will refuse market timing trades) (Joralemon Aff. Ex. Y).

### 2.    The Commission failed to exercise
### due diligence in detecting the challenged conduct.

The Commission's lack of diligence here also precludes any equitable revival of its time-barred claims.  As previously noted, the Commission has touted the fact that it conducted over 8,000 inspections of investment advisers and mutual fund complexes during the relevant period.  *See* Lori Richards, Director, Office of Compliance Inspections and Examinations, *The Evolution of the SEC's Inspection Program for Advisers and Funds:  Keeping Apace of a Changing Industry* (Oct. 30, 2002).  Materials produced by the Commission in response to Mr. Hussey's discovery requests indicate that these efforts included twenty different examinations of seven different entities within the Columbia mutual fund complex.  (SOF ¶¶ [13]; Joralemon Decl. Exs. A-T.)  The Commission also examined two of the market timing investors referenced in the Complaint.  (SOF ¶¶ [15]; Joralemon Decl. AA, BB.)  Not once in the Commission's entire production of examination materials—tens of thousands of pages—does there appear any indication that the Commission inquired about market timing in general, arrangements with investors engaged in the trading strategy, or the application of relevant prospectus language to such trading.  *Not once*.  They simply never asked.

The foregoing provides the Court with more than enough undisputed evidence to conclude that the Commission failed to exercise due diligence in uncovering the conduct at issue in the Complaint.  In any event, the Commission already has essentially conceded the point.  In November 18, 2003 testimony before the United States Senate, Commission Chairman William Donaldson admitted that the Commission had not even considered looking for mutual fund transgressions involving market timing:

> We did not inspect for late trading and market timing, nor has the Commission inspected for that for many years.  This is not a new thing.  This has been going on for a long time.

(Joralemon Decl. Ex. CC, Pg. 26.)

\* \* \* \*

As explained above, undisputed material facts establish that the claims upon which the Commission hopes to extract a monetary ransom from Mr. Hussey are time barred. All of these claims accrued beyond the applicable five-year limitations period, and the Commission's failure to act in the face of abundant notice regarding the conduct at issue precludes any equitable tolling. As the Commission also deserves no injunctive relief (*see* Section I, *supra*), the Court should grant Mr. Hussey's motion for summary judgment and mercifully bring this case to its long-overdue conclusion.

## CONCLUSION

For each and every reason set forth herein, Robert Hussey respectfully requests that the Court grant summary judgment in his favor on the Commission's remaining claims.

Respectfully submitted,

/s/ Christopher M. Joralemon

Christopher M. Joralemon
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2668

Warren L. Feldman
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

*Attorneys for Robert Hussey*

**CERTIFICATE OF SERVICE**

I, Christopher M. Joralemon, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 8, 2010.

Dated: October 8, 2010    /s/ Christopher M. Joralemon
                          Christopher M. Joralemon

Dated: October 8, 2010

20