# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) PLAINTIFF, ) ) v. ) ) JAMES TAMBONE AND ROBERT HUSSEY, ) ) DEFENDANTS. ) | CIVIL ACTION NO. 06-10885-NMG |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
LOCAL RULE 56.1 STATEMENT OF FACTS**

Michael D. Foster (IL Bar #6257063)
David London (BBO #638289)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8824 (Foster)
(617) 573-4590 (fax)

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") respectfully submits this Local Rule 56.1 Statement of Facts in opposition to the summary judgment motion of Defendant Robert Hussey ("Hussey"). This statement is divided into two parts. Part One is the Commission's statement of additional undisputed facts. Part Two, beginning on page 8, is a paragraph-by-paragraph response to defendant Hussey's statement of facts (set forth in italics).

## THE COMMISSION'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS

The Commission respectfully submits, pursuant to Local Rule 56.1, the following statement of additional undisputed facts.

1. From 1998 to 2003, Hussey and James Tambone ("Tambone") were senior executives of Columbia Funds Distributor, Inc. ("Columbia Distributor") or its predecessor entity. Hussey was Managing Director, National Accounts and, in late 2000, reported directly to Tambone, who was Co-President of Columbia Distributor, a registered broker-dealer which acted as the principal underwriter for the Columbia mutual fund complex (the "Columbia Funds"). From 1998 to late 2000, Hussey was Senior Vice President of the Fee-Based Alliance Group of the predecessor of Columbia Distributor. The investment adviser to the funds was Columbia Management Advisors, Inc. (including predecessor companies) ("Columbia Advisers"). Complaint, ¶¶ 3, 20, 21, 23; Robert Hussey's Answer and Affirmative Defenses to the Commission's Complaint ("Hussey Ans."), ¶¶ 21, 23; James Tambone's Answer to Plaintiff's Complaint ("Tambone Ans."), ¶¶ 3, 20, 23.

2. Hussey and Tambone had responsibility for selling the Columbia Funds to investors. Complaint, ¶ 26; Hussey Ans., ¶ 26; SEC Appendix (hereinafter "SEC App."),

Exhibit ("Ex.") 1 (Investigative Testimony of James Tambone, dated January 15, 2004), at 12:14 – 14:18.

3. Hussey's compensation (like Tambone's) depended in significant part on mutual fund sales. SEC App., Ex. 2 (Investigative Testimony of Robert Hussey, dated December 12, 2003), at 27:23 – 31:4; SEC App., Ex. 1, at 39:11 – 41:9.

4. From 1998 through 2000, the prospectuses for various of the Columbia funds contained disclosures stating that shareholders would be limited in the number of exchanges they could make during a given period. SEC App., Ex. 3 (Stein Roe Mutual Funds Prospectus, Feb. 2, 1998), at 30; SEC App., Ex. 4 (Newport Tiger Fund Prospectus, April 30, 1998), at 13; SEC App., Ex. 5 (Liberty Acorn International Fund Prospectus, September 29, 2000), at 15; SEC App., Ex. 6 (Newport Tiger Fund Prospectus, May 3, 1999), at 10; SEC App., Ex. 7 (Newport Tiger Fund Prospectus, May 1, 2000), at 7. The prospectuses for certain funds went even further, stating that the "funds do not permit market timing and have adopted policies to discourage this practice." SEC App., Ex. 8 (Acorn Family of Funds Prospectus, May 1, 2000), at 22.

5. By early 2000, Hussey helped lead a working group that proposed processes and procedures designed to detect and deter market timing in the Columbia Funds. SEC App., Ex 9 (Investigative Testimony of Joseph Palombo, dated 1/20/04), at 82:19 – 83:3; 85:19 – 86:9; SEC App., Ex. 10 (Memorandum dated April 6, 2000 re: Market Timers). This group recommended formulating a consistent position regarding market timing and communicating that position "via appropriate language in the funds' prospectuses." SEC App., Ex. 9, at 88:5 -17; SEC App., Ex. 10. As a result of the working group's efforts, changes were made to prospectus language. SEC

App., Ex. 9, at 70:2 – 71:6; 71:23 – 72:20; 88:18 – 23.

6.  In the fall of 2000, a number of the Columbia funds began including in their respective prospectuses the following disclosure (the "Strict Prohibition"):

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

Robert Hussey's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a) ("Hussey's SOF"), ¶ 9. Other funds adopted this same disclosure in the spring of 2001. *See., e.g.,* SEC App., Ex. 11 (Liberty Newport Tiger Fund Prospectus dated May 1, 2001), at 14.

7.  Short-term trading arrangements between clients (or potential clients) and Columbia Distributor could not come to fruition without Hussey's consent. For example, in early 2000, Hussey consented to an arrangement allowing Ilytat, L.P. ("Ilytat"), a San Francisco hedge fund, to engage in short-term trading in the Columbia Newport Tiger Fund ("Newport Tiger Fund"). SEC App., Ex. 2, at 84:12 – 19; 85: 9 – 86:15; 87:7 – 88:1; 89:16 – 90:6; 91:22 – 92: 11; SEC App., Ex. 12 (Investigative Testimony of Robert Hussey, dated December 15, 2003), at 109:21 – 110:1; 111:19 – 112:4; 118:7 – 19; 183:14 – 25; SEC App., Ex. 13 (email dated August 24, 2000 from Hussey to Sinatra and Martin); SEC App., Ex.14 (email dated October 25, 2000 from Hussey to Legallet).

8.  Pursuant to this particular "sticky assets" arrangement, it was agreed Ilytat would place $20 million in the Newport Tiger Fund, with two-thirds of that amount to remain static and

3

one-third to be actively traded. SEC App., Ex. 2, at 87:12 – 91:15; SEC App., Ex. 15, (Investigative Testimony of Peter Martin, dated December 9, 2003), at 56:4 – 12; SEC App., Ex. 16 (Investigative Testimony of Christopher Legallet, dated December 11, 2003), at 265:21 – 267:14; SEC App., Ex. 17 (email dated August 27, 2002 from Legallet to Lai). The resultant trading activity in the Newport Tiger Fund included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Strict Prohibition. Complaint, ¶ 53, SEC App., Ex. 12, at 160:16 – 162:4; SEC App., Ex. 18, (excerpts from Newport Tiger Fund Prospectuses 2001 – 2003); Hussey's SOF, ¶ 9.

9. Ilytat also was allowed to trade extensively in the Acorn International Fund (plus other funds in and outside of the Acorn Fund Group), with such short-term trading activity continuing after May 2001. Complaint, ¶¶ 54-59. From April 2000 through October 2002, Ilytat and its affiliates made almost 350 round trips in seven international Columbia funds. Complaint, ¶ 45.

10. Hussey also allowed hedge fund manager Ritchie Capital Management, Inc. ("Ritchie") to trade frequently in the Newport Tiger Fund and the Columbia Growth Stock Fund from January 2000 through September 2003. SEC App., Ex. 12, at 178:14 – 179:21; SEC App., Ex. 19 (email dated August 27, 2003 from Gustafson to Kamin); Complaint, ¶ 61. From May 2001 through September 2002, while the fund's prospectus included the Strict Prohibition, Ritchie made over 100 trades in the Newport Tiger Fund. Complaint, ¶ 62; SEC App., Ex. 18; Hussey's SOF, ¶ 9.

11. In late 2001, Hussey's direct report met with Ritchie's principals and discussed the possibility of Ritchie placing "long term" assets in a fixed income fund "to offset their

4

activity in Tiger." SEC App., Ex. 20 (email dated September 4, 2001 from Rezk to Martin and Hussey). In an email to Hussey, the subordinate concluded: "we would need to see some money from them . . . if they were going to continue to use Tiger." SEC App., Ex. 21(email dated January 3, 2002 from Rezk to Hussey); SEC App., Ex. 12, at 197:4 – 17.

12. From June 2002 through September 2003, Ritchie made approximately 18 round trips in the Growth Stock Fund, contrary to the Strict Prohibition in the fund's prospectus. Complaint, ¶ 65; Hussey's SOF, ¶ 9. During this time frame Ritchie negotiated timing arrangements with Columbia Distributor and ultimately entered into a "sticky-asset" arrangement approved by Hussey pursuant to which Ritchie agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with non limits on the number of trades per month, and place another $10 million in the Columbia Short Term Bond Fund as "static" (non-trading) asset. SEC App., Ex. 22 (Investigative Testimony of Erik Kamin, dated December 12, 2003), at 53:1 – 56:9; 58:9 – 60:14; 72:22 – 73:20; 76:25 -82:10; 85:3 – 87:14; 94:1 – 96:18; SEC App., Ex. 15, at 143:8 -144:13; 161:4 – 162:22; SEC App., Ex. 12, at 177:14 – 183:25, 189:4 – 190:13; 200:15 – 202:8; SEC App., Ex. 23 (email dated January 23, 2002 from Schug to Martin); SEC App., Ex. 19.

13. The portfolio manager for the Newport Tiger Fund repeatedly wrote to Hussey and Tambone expressing concern about Ilytat's trading activity and the harm that this trading activity could have on the fund and its investors. SEC App., Ex. 14; SEC App., Ex. 24 (email dated March 15, 2001 from Hussey to Martin and Sinatra).

14. In an October 2000 e-mail discussing Ilytat, the portfolio manager for the Newport Tiger Fund stated to Hussey: "[T]heir active trading has increased and it has become

5

unbearable. There will be long term damage to the fund." He further noted, "Let's understand that they [timers] really are not investors. They take advantage of the fund's delayed pricing mechanism which almost guarantees a risk free return . . . I hope wholesalers understand that by accepting a flipper's [*i.e.*, short-term trader's] investment they do damage to the fund's performance, tax status, and the other shareholders (their clients)." SEC App., Ex. 12, 118:7 – 19; 124:7 – 18; 126:12 – 14; SEC App., Ex. 14.

15. In March 2001, in another e-mail sent to Tambone, Hussey and others, the portfolio manager stated that "Newport . . . and the fund's long-term shareholders are all negatively impacted by flippers" and he suggested that action be taken. SEC App., Ex. 24.

16. Although Hussey represented that he would halt Ilytat's trading, Hussey instead took affirmative steps to shield Ilytat from any action by personnel at Columbia Fund Services, Inc. ("Columbia Services"), the transfer agent for the Columbia funds tasked with market timing surveillance. *See* SEC App., Ex. 14; SEC App., Ex. 25 (memo dated August 20, 2002 from Loranger to Smith re: Bear Stearns Illytat Account), at 00119.

17. Hussey was the designated contact at Columbia Distributor for inquiries by the market timing surveillance personnel about apparent market timers and market timing policy. SEC App., Ex. 26, (memo re: Market Timing Audits); SEC App., Ex. 2, at 45:21 – 47:6; 74:23 – 76:10.

18. By March 2001, with Hussey's approval and contrary to prospectus disclosures, Ilytat had been placed on a list of "Authorized Accounts for Frequent Trading," a list of accounts maintained by Columbia Services against which no action was to be taken, however frequent the trading. SEC App., Ex. 27 (Authorized Accounts for Frequent Trading chart); SEC App., Ex. 28

(Investigative Testimony of Matthew Pepe, dated December 8, 2003), at 54:6 – 58:8.

19.     In March 2001, Hussey interceded when a portfolio assistant to the Acorn International Fund had telephoned the broker responsible for the Ilytat account and asked him to stop Ilytat from violating the fund's short-term trading policy.  SEC App., Ex. 29 (email dated May 2, 2001 from Hussey to Martin); SEC App., Ex. 12, at 136:18 – 137:17.  Hussey caused a manager at Columbia Services to telephone the portfolio assistant and tell her that it was "inappropriate" for her to take any direct steps to halt Ilytat's trading.  SEC App., Ex.29; SEC App., Ex. 12, at 136:18 – 137:17.

20.     In December 2001, Hussey's subordinate, copying Hussey on his e-mail, intervened when the portfolio manager for the fund complained about Ilytat's market timing adversely impacting her fund and tried to halt it.  SEC App., Ex. 30 (email dated December 12, 2001 from Peters to Pepe), at 1286.  Further, in 2002, Hussey reversed a stop placed on Iltyat's trading by Columbia Services market timing surveillance personnel.  SEC App., Ex. 25, at 00119; SEC App., Ex. 31 (Investigative Testimony of Robin Smith, dated December 8, 2003), at 159:9 – 160:23.

# THE COMMISSION'S RESPONSES TO
# HUSSEY'S SUGGESTED STATEMENTS OF MATERIAL FACT[1]

*History of Case*

1.  *The Commission first filed a complaint against Mr. Hussey on February 9, 2005 (the "Initial Complaint"), alleging that he "permitted" or "approved" market timing arrangements that were inconsistent with prospectus language included in certain mutual funds. These arrangements date back almost thirteen years.*

**SEC Response:** The SEC does not dispute that it filed a complaint against Hussey (and co-defendant James Tambone) on February 9, 2005, alleging violations of the federal securities laws. The SEC objects to Hussey's characterization of the allegations in the complaint and respectfully refers the Court to the complaint itself.

2.  *On April 15, 2005, Mr. Hussey moved to dismiss the Initial Complaint on multiple grounds. On January 27, 2006, the United States District Court for the District of Massachusetts (Gorton, J.) granted Mr. Hussey's motion to dismiss the Commission's Initial Complaint, concluding, inter alia, that the alleged claims against Mr. Hussey rested on a "shaky legal foundation" and "d[id] not withstand the weight of contravening case law."*

**SEC Response:** The SEC does not dispute that Hussey moved to dismiss the Initial Complaint on multiple grounds. Nor does the SEC dispute that on January 27, 2006, this Court granted Hussey's motion to dismiss the Initial Complaint. The Court's January 27, 2006 Opinion speaks for itself.

3.  *Following the Court's January 27, 2006 ruling, the Commission--failing to realize that the case had been closed -- sought leave to file an amended complaint that similar to the*

---

[1] The SEC disputes that the facts set forth in the following statements are material to this action and/or this summary judgment motion: 1-8, 10-15, 17, 18, 20. Many of the purported "facts" set forth therein are merely procedural steps in this case. Further, they do not include any "page references to affidavits, depositions and other documentation" as required by Local Rule 56.1: 1-7, 11-12, 17-21. *See, e.g., Gosselin v. Webb,* 242 F.3d 412, 415 n.2 (1st Cir. 2001) (moving party must "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation.") To the extent that the SEC does not dispute a proffered fact set forth in Hussey's statement of facts, the SEC does not waive the right to do so in the future.

8

*Initial Complaint. Upon realizing its procedural error, the Commission recast its motion to leave as a request for extraordinary relief under Rule 60(b) of the Federal Rules of Civil procedure. On May 5, 2006, the Court denied the Commission's Rule 60(b) motion.*

**SEC Response:** The SEC does not dispute that it sought leave to file an amended complaint or that it moved for relief under Rule 60(b) of the Federal Rules of Civil Procedure. Nor does the SEC dispute that the Court denied the Commission's Rule 60(b) motion. The SEC disputes the remainder of Statement 3, which attempts to characterize the Commission's state of mind.

*4.     On May 19, 2006, the Commission instituted the present action against Mr. Hussey by filing a complaint (the "Complaint") essentially asserting the same allegations and claims as those set forth in the dismissed Initial Complaint.*

**SEC Response:** The SEC does not dispute that it filed a complaint against Mr. Hussey (and co-defendant James Tambone) on May 19, 2006, alleging violations of the federal securities laws. The SEC objects to Hussey's characterization of the allegations in the complaint and respectfully refers the Court to the complaint itself.

*5.     On December 29, 2006, the Court once again dismissed the Commission's claims against Mr. Hussey -- this time, with prejudice. In issuing its ruling, the Court noted, inter alia, that the Commission appeared to be "merely guessing" as to whether Mr. Hussey had engaged in any actionable conduct concerning the alleged prospectus misstatements.*

**SEC Response:** The SEC does not dispute that the Court dismissed the May 19, 2006 Complaint with prejudice. The SEC nonetheless objects to Hussey's characterization of the reasoning in the Court's December 29, 2006 Opinion, which speaks for itself.

*6.     The Commission appealed the Court's ruling to the Court of Appeals for the First Circuit. Following a December 3, 2008 split panel opinion reversing the dismissal, an en banc panel of the First Circuit Court on March 10, 2010 rejected the Commission's securities fraud claim against Mr. Hussey under Section 10(b) of the Securities and Exchange Act, finding the*

*Commission's "expansive interpretation" to be "inconsistent with the structure of the rule and relevant statutes, and in considerable tension with Supreme Court precedent." The en banc panel also reinstated a portion of the split panel decision, leaving the Commission with secondary liability claims and a claim under Section 17(a) of the Securities Act.*

**SEC Response:** The SEC does not dispute that it appealed this Court's ruling to the Court of Appeals for the First Circuit. Nor does the SEC dispute that on March 10, 2010, an *en banc* panel of the First Circuit reinstated the split panel opinion, other than one of the SEC's five claims. The SEC nonetheless objects to the remainder of Statement 6, which attempts to characterize the First Circuit's reasoning in its March 10, 2010 Opinion and respectfully refers the Court to the opinion.

*Market Timing and Mutual Fund Prospectus Language*

*7.     The Commission has been aware of the practice of market timing in mutual funds for at least twenty years.*

**SEC Response:** Disputed to the extent that Statement 7 implies that the SEC has been aware of misconduct with respect to market timing in mutual funds that violates the securities laws. In addition, the SEC objects to Statement #7 as a material fact.

*8.     By virtue of its responsibilities to regulate the mutual fund industry and to review proposed public disclosures (such as prospectuses), the Commission during the relevant period was aware that mutual fund companies were beginning to adopt prospectus language that addressed restrictions on market timing. (Joralemon Decl. Exs. V, X, Y, Z.)*

**SEC Response:** Undisputed. The SEC nonetheless objects to Statement #8 as a material fact. The cited evidence, as it explicitly states, identifies a written colloquy of Commission staff "comments" and entity "responses." None of the cited evidence concerns an examination of a Columbia mutual fund entity (or of either defendant) for possible market timing activity in contravention of prospectus language.

   9.   *The prospectus language principally at issue in the Complaint, which began appearing in certain prospectuses beginning in 2000, states:*

   > *The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short term or excessive trading or whose trading has been or may be disruptive to the Fund.*

*(See Compl. ¶ 35).*

   **SEC Response:** Undisputed

   10.   *In early 2002, the Commission had the opportunity to consider and comment on the prospectus language set forth in Paragraph 9 above, and actually suggested to Liberty Funds Group that the language be altered to include a description of the criteria that would be applied in identifying and rejecting market timing trades. (Joralemon Decl. Ex. Z.)*

   **SEC Response:** Undisputed.  The SEC nonetheless objects to Statement # 10 as a material fact. The cited evidence, as it explicitly states, identifies a written colloquy of Commission staff "comments" and entity "responses" to language in a Registration Statement.  It does not concern an SEC examination of Liberty Funds Group (or of either defendant) for possible market timing activity in contravention of prospectus language.

*The Commission's Examination of Mutual Funds*

   11.   *The Commission is responsible for conducting regular examinations of mutual fund investment companies and affiliated investment advisers.  In 1995, the Commission sought to consolidate and enhance its examination procedures by creating the Office of Compliance Inspections and Examinations ("OCIE").  During the relevant period, OCIE employed hundreds of examiners in eleven regional and district offices across the country.*

   **SEC Response:** The SEC does not dispute the first two sentences of Statement 11.  The SEC disputes the third sentence.  Between 1998 and 2001, OCIE's investment adviser and investment company examination staff employed between approximately 320 – 375 total staff,

which included administrative personnel, senior management, and others.  The SEC also objects to Statement # 11 as a material fact.

   *12.   In 1998, OCIE embarked on a "five-year plan" to inspect each mutual fund complex, investment adviser, and transfer agent affiliated with a fund group.  In connection with this effort, OCIE reportedly refined its examination techniques to focus on detecting securities violations impacting mutual fund shareholders.*

   **SEC Response:**  The SEC does not dispute the first sentence of Statement 12.  The SEC disputes the second sentence.  During the time in question, OCIE continued to refine its exam scoping process to focus on the areas within firms that the staff perceived to form the greatest risk for compliance breaches and/or harm to investors.  The SEC also objects to Statement # 12 as a material fact.

   *13.   During the height of the relevant period here, OCIE conducted over 8,000 inspections of investment advisers and mutual fund complexes. These efforts included twenty different examinations of seven different entities within the Columbia mutual fund family. (Joralemon Decl., Exs. A-T.)*

   **SEC Response:**  Disputed.  The SEC objects to the undefined term "relevant period."  To the extent "relevant period" means 1998 to 2003, OCIE inspected closer to 6,500 investment advisers and investment companies combined.  The investment company component of this number was a small percentage of the 6,500 exams conducted.  In addition, the SEC objects to Statement # 13 as a material fact.  Each document cited by Hussey specifically states the scope and/or purpose of the SEC examination.  In no case, however, does the cited evidence state that the exam involved inspection of whether (or uncovered indications that) any person or entity affiliated with the Columbia Funds allowed certain customers to engage in short-term or excessive trading in contravention of prospectus language.  For example, Joralemon Decl., Ex. B (examination of Columbia Trust Company, a Transfer Agent), specifically states that "the

examination was limited to a review of compliance with the rules . . . that are relevant to mutual fund transfer agents . . .").  Likewise, Joralemon Decl., Ex. D (examination of Columbia Management Company) specifically states that "the staff focused on the following areas: brokerage practices including best execution; soft dollar arrangements and related disclosure; principal and agency cross trades effected through affiliated broker-dealers; IPO allocation; personal securities transactions; performance advertising; possible custody issues because Registrant uses an affiliated custodian to hold client assets; and Regulations FD and S-P."

*14.    One such investigation lead by the Investment Company branch of OCIE examined the Liberty/Stein Roe Funds, which included the Stein Roe Advisor Growth Stock Fund ("Growth Stock Fund").  (Joralemon Decl. Ex. S.) This investigation occurred from October 12, 1999 through October 21, 1999. (Id.) During the time of the Commission's examination, the Columbia and Liberty mutual fund family maintained trading relationships involving the Growth Stock Fund with Daniel Calugar (see Complaint ¶¶ 70-71), D.R. Loeser & Co., Inc. (see Complaint ¶ 81), and Signalert Corporation (see Complaint ¶84).*

**SEC Response:**  The SEC does not dispute the facts in the two sentences of Statement # 14, but does dispute (i) Hussey's use of the term "investigation" instead of "examination" and (ii) the implication that, during the October 1999 examination, SEC staff should have uncovered the trading relationships involving the Growth Stock Fund.  Moreover, the only Stein Roe prospectus discussed in the exam report was the High Yield Fund prospectus for its failure to disclose the practice of investing in IPOs.  Joralemon Decl., Ex. S., at 4667.[2]

*15.    OCIE similarly examined D.R. Loeser from August 7, 2000 to August 10, 2000 (Joralemon Decl. Ex. AA) and Signalert from March 22, 2000 to April 7, 2000 (Joralemon Decl. Ex. BB) while both entities maintained trading relationships with the Columbia and Liberty mutual fund families (See Joralemon Decl. Exs. S, AA, BB).*

**SEC Response:**  The SEC does not dispute the facts in Statement # 15, but does dispute

---

[2] The page reference refers to the Bates number at the bottom of the exhibit page.

13

the implication that, during the examinations, SEC staff should have uncovered trading relationships with Columbia and Liberty in contravention of prospectus language.

*16.     All of the alleged market timing arrangements identified in the Complaint were in place before May 19, 2001.  The relationship with Ilytat, L.P. began in April of 2000. (See Complaint ¶ 45.).  The relationship with Ritchie Capital Management, Inc. began in January of 2000 (See Complaint ¶ 61.)  The relationship with Daniel Calugar began in April of 1999. (See Complaint ¶ 70.)  The relationship with Sal Giacalone began in late 2000. (See Complaint ¶ 77.)  The relationship with D.R. Loeser & Co., Inc. began in late 1998. (See Complaint ¶ 81.)  The relationship with Signalert Corporation began in 1999. (See Complaint ¶ 84.)  The relationship with Tandem Financial began in early 2000. (See Complaint ¶ 90.)*

**SEC Response:**  Disputed.  The Complaint alleges that at least two arrangements were negotiated after May 19, 2001.  For example, Complaint ¶ 65 alleges that in early 2003, Ritchie entered into an arrangement with Columbia Distributor, approved by Hussey, in which Ritchie agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with no limits on the number of trades per month, and place another $10 million in a static fixed income fund.  *See also* SEC App., Ex. 4 (Hussey IT 12/15/03), at 178:14 – 179:21; SEC App., Ex. 11, Investigative Testimony Exhibit 56 ("IE56").  Also, Complaint ¶¶ 67-68 alleges that during late 2002 and early 2003, entities controlled by Edward Stern negotiated trading arrangements with Columbia Distributor.   Moreover, the SEC disputes Hussey's suggestion that a "market timing arrangement" and a "relationship" are identical.  Columbia Distributor can have an existing "relationship" with a market timer and still negotiate a new "arrangement" with that timer at a future date – as occurred with Ritchie, for example.  *See* Complaint, ¶¶ 61-66.

*Mr. Hussey's Post-Complaint Circumstances*

*17.     The Commission has not alleged that Mr. Hussey committed any violations of the securities laws since September 2003.*

**SEC Response:**  Undisputed.  The SEC nonetheless objects to Statement #17 as a

14

material fact.

   *18.   At no point from the Commission's filing of its Initial Complaint in February 2005 through today has the Commission sought from the Court interlocutory injunctive relief against Mr. Hussey.*

   **SEC Response:**  Undisputed.  The SEC nonetheless objects to Statement #18 as a material fact.

   *19.   On November 5, 2007, Mr. Hussey secured new employment as a Senior Vice president with Natixis Global Associates ("Natixis") in Boston, Massachusetts. Natixis is Affiliated with a number of mutual fund investment companies, and is an indirect subsidiary of Natixis Global Asset Management, one of the world's largest asset management firms.*

   **SEC Response:**  The SEC's discovery is ongoing at this stage of the proceedings, and, as such, the SEC has not had opportunity to confirm or deny this fact.

   *20.   Upon joining Natixis, Mr. Hussey was placed on enhanced supervision. As part of this program, he met on a monthly basis with a compliance officer to review Mr. Hussey's adherence to applicable securities regulations and internal compliance guidelines and to discuss related matters.  The enhanced supervision also included increased surveillance of Mr. Hussey's e- mail communications to detect any regulatory or compliance issues. Mr. Hussey successfully completed Natixis's enhanced supervision program in September 2009.*

   **SEC Response:**  The SEC's discovery is ongoing at this stage of the proceedings, and, as such, the SEC has not had opportunity to confirm or deny this fact.  In addition, the SEC objects to Statement #20 as a material fact.

   *21.   Following a series of promotions, Mr. Hussey today serves as an Executive Vice President in charge of Natixis's Wealth Solutions and Global Relationship groups.  He supervises approximately twenty-five employees responsible for sales and relationship efforts directed at various financial intermediaries such as registered investment advisers, trust organizations, and independent broker-dealers.*

   **SEC Response:**  The SEC's discovery is ongoing at this stage of the proceedings, and, as such, the SEC has not had opportunity to confirm or deny this fact.

        Respectfully submitted,

        **SECURITIES AND EXCHANGE COMMISSION**
        By its attorneys,

        /s/ Michael D. Foster
        ―――――――――――――――――――
        Michael D. Foster (IL Bar #6257063)
          Senior Trial Counsel
        David London (BBO #638289)
          Senior Counsel
        33 Arch Street, 23rd Floor
        Boston, MA  02110
        (617) 573-8824 (Foster)
        (617) 573-4590 (fax)

Dated:  November 24, 2010

## CERTIFICATE OF SERVICE

I certify that this document filed through the Court's Electronic Case Filing (ECF) system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that the defendants are represented by counsel registered through the ECF system.

   /s/  Michael D. Foster
Michael D. Foster

Dated: November 24, 2010