UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

JAMES TAMBONE and
ROBERT HUSSEY,

      Defendants.

**Civil Action No.:  06-10885 NMG**

**Leave to File 25-Page Memorandum
Granted on January 19, 2012**

**MEMORANDUM OF LAW IN SUPPORT OF
<u>JAMES TAMBONE'S MOTION FOR SUMMARY JUDGMENT</u>**

A. John Pappalardo (BBO# 388760)
Paula J. DeGiacomo (BBO# 118180)
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts  02110
Tel:  617-310-6000
pappalardoj@gtlaw.com
degiacomop@gtlaw.com

Michael J. Biles, *Pro Hac Vice*
GREENBERG TRAURIG, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel:  512-320-7200
bilesm@gtlaw.com

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 2

III.    ARGUMENT ...................................................................................................... 2

   A.   Summary Judgment Standard. ....................................................................... 2

   B.   No Reasonable Jury Could Find The Prospectuses Are Untrue. ................................. 3

   C.   The Alleged Market-Timing Disclosures Were Immaterial. ........................................ 8

        1.   The Market-Timing Disclosures Were Quantitatively Immaterial. ........................... 9

        2.   The Market-Timing Disclosures Were Qualitatively Immaterial. ........................... 11

   D.   Summary Judgment Should Be Granted On The § 17(A) Claim. ............................... 12

        1.   Tambone Was Not Negligent. ................................................................... 12

        2.   Tambone Did Not Obtain Money or Property By Means of a False Statement. ...... 17

   E.   Tambone Did Not Aid and Abet the Violations. ............................................... 19

   F.   Janus Mandates Dismissal of The Entire Complaint. ....................................... 19

        1.   Janus Mandates Dismissal of the Claim
             For Aiding and Abetting § 10(b). .......................................................... 19

        2.   Janus Mandates Dismissal of the § 17(a)(2) Claim. ................................... 20

        3.   Janus Mandates Dismissal of the Claim
             For Aiding and Abetting § 15(c)(1)(A). .................................................. 21

        4.   Janus Mandates Dismissal of the Claim
             For Aiding and Abetting §§ 206(1) and (2) .............................................. 22

   G.   The SEC Has No Evidence To Support Its Claim For Injunctive Relief. ..................... 23

IV.    CONCLUSION .................................................................................................. 25

## TABLE OF AUTHORITIES

### Federal Cases

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...................................................................... 3, 9

*SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8 (2d Cir. 1977) ............................................................ 23

*SEC v. Brethen*, 1992 WL 420867 (S.D. Ohio Oct. 15, 1992) .................................................... 25

*SEC v. Burns*, 1986 WL 36318 (S.D. Cal. Feb. 19, 1986) ........................................................... 17

*SEC v. Daifotis*, 2011 WL 2183314 (N.D. Cal. June 6, 2011) .................................................... 19

*SEC v. DiBella*, 2008 WL 6965807 (D. Conn. Mar. 13, 2008) .................................................... 24

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) ...................................... 4, 6

*SEC v. Durgarian*, 477 F. Supp. 2d 342 (D. Mass. 2007) ............................................................ 3

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
   705 F. Supp. 2d 86 (D. Mass. 2010) ....................................................................................... 4

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) ................................................... 25

*SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450 (2d Cir. 1996) ..................................................... 21

*SEC v. Freiberg*, 2007 WL 2692041 (D. Utah Sept. 12, 2007) ................................................... 25

*FTC v. Direct Marketing Concepts, Inc.*, 569 F. Supp. 2d 285 (D. Mass. 2008) ....................... 16

*Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) ................................................................. 8

*Geffon v. Micrion Corp.*, 76 F. Supp. 2d 134 (D. Mass. 1999) ..................................................... 3

*Glassman v. ComputerVision Corp.*, 90 F.3d 617 (1st Cir. 1996) ............................................ 3, 8

*Good v. Altria Group, Inc.*, 501 F.3d 29 (1st Cir. 2007) .............................................................. 3

*SEC v. Hopper*, 2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ................................................... 17

*Hunt v. Alliance North Am. Gov't Income Trust*, 159 F.3d 723 (2nd Cir. 1998) .......................... 4

*I. Meyer Pincus & Assoc.s, P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759 (2d Cir. 1991) ......... 3

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011) .................. *passim*

*In re: K-Tel Int'l, Inc. Secs. Litig. v. K-Tel, Inc.*, 300 F.3d 881 (8th Cir. 2002) ........................... 4

*Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004) .................................................. 4, 6

*SEC v. Kelly*, 2011 WL 4431161 (S.D.N.Y. Sept. 22, 2011) ................................................ *passim*

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ...................................................................... 23

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) ................................................... 9

*Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir. 1994) ..................... 8, 10

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) ............................................ 9, 10

*McMurray v. C.I.R.*, 985 F.2d 36 (1st Cir. 1993) ........................................................................ 12

*Milton v. Van Dorn Co.*, 961 F. 2d 965 (1st Cir. 1992) ................................................................. 9

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
   649 F.3d 5 (1st Cir. 2011) ......................................................................................................... 2

*SEC v. Monarch Fund*, 608 F.2d 938 (2d Cir. 1979) .................................................................. 24

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ................................................... 21

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997) .................................................... 11

*SEC v. Patel*, 2008 WL 781912 (D.N.H. Mar. 24, 2008) ...................................................... 11, 19

*SEC v. Peretz*, 317 F. Supp. 2d 58 (D. Mass. 2004) .................................................................. 19

*SEC v. Pros Int'l, Inc.*, 994 F.2d 767 (10th Cir. 1993) .............................................................. 24

*In re Segue Software, Inc. Secs. Litig.*, 106 F. Supp. 2d 161 (D. Mass. 2000) ............................ 11

*SEC v. Shanahan*, 2010 WL 173819 (D. Minn. Jan. 13, 2010) .................................................. 24

*SEC v. Slocum, Gordon Co.*, 334 F. Supp. 2d 144 (D.R.I. 2004) ................................................. 8

*In re Smith & Wesson Secs. Litig.*, 2011 WL 6089727 (D. Mass. Mar. 25, 2011) ......................... 3

*SEC v. Tambone*, 417 F. Supp. 2d 127 (D. Mass. 2006) ....................................................... 8, 23

*SEC v. Tambone*, 550 F.3d 106 (1st Cir. 2008) ................................................................... *passim*

*SEC v. Tambone,* 597 F.3d 436 (1st Cir. 2010) ...................................................................... 3, 20

*SEC v. Tambone*, 802 F. Supp. 2d 299 (D. Mass. 2011) ....................................................... *passim*

*SEC v. The Better Life Club of America, Inc.*, 995 F. Supp. 167 (D.D.C. 1998) ......................... 21

*SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) ............................................................. 8

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ...................................................................... 21

*United States v. Faulhaber*, 929 F.2d 16 (1st Cir. 1991) .................................................. 9

**Federal Statutes**

Section 9(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-9(a)(2) ........................ 23

Section 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(c) ...................... 1, 21, 22

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) .......................................... *passim*

Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6 ..................... 1, 8, 22, 23

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. Law. 111-203 (HR 4173) (July 21, 2010) ....................................................... 19

**Federal Rules**

Fed. R. Civ. P. 56 ............................................................................................................. 2, 3

**Federal Regulations**

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) .......................................... 11

SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ................................................................................... 1

**SEC Administrative Decisions**

*In re Flannery and Hopkins*, SEC Administrative Decision,
    File NO. 3-14081 (October 28, 2011) ....................................................... 12, 20, 21

*In re Moskowitz*, Exchange Act Release No. 45,609, 77 SEC Docket 446 (Mar. 21, 2002) ........ 24

**Other Authorities**

Black's Law Dictionary (7th ed. 1999) ....................................................................................... 12

## I.    INTRODUCTION

The undisputed material facts demonstrate that Tambone is entitled to summary judgment as a matter of law on the SEC's four remaining claims.[1]  First, no reasonable jury could conclude that the prospectuses contain any untrue statement of material fact.  The plain language of the prospectus permits Columbia Advisors (the "Advisor" or portfolio manager) to reject market timing trades that in the investment "advisor's opinion" were "disruptive."  The portfolio managers within the Advisor approved all of the trading arrangements in which the SEC alleges Tambone had any knowledge or involvement.

Second, the SEC cannot show that any alleged misstatements in the prospectuses at issue were material.  Investors in the mutual funds would not have deemed the disclosure of the arrangements significant because the determination to permit trading was within the discretion of the Advisor and because the relevant trades did not cause any dilution in any but one of the funds at issue, and had only a relatively small dilutive impact in one fund.

Third, the § 17(a)(2) claim fails because the SEC cannot prove that Tambone "obtain[ed] money or property by means of" the alleged misstatements.  The SEC's expert admits he did not have sufficient information to calculate the money, if any, Tambone derived from the alleged unlawful trades.  The undisputed facts demonstrate that market timing transactions were excluded from the sales figures used to determine Tambone's compensation.  Nor can the SEC establish that Tambone acted with negligence; he acted with reasonable care.

Fourth, the SEC's claims for aiding and abetting fail because the SEC cannot show that Tambone "knowingly and substantially assisted" in the primary violations.

---

[1] The SEC's four remaining claims are that Tambone negligently "obtain[ed] money or property by means of any untrue statement of a material fact" in violation of § 17(a)(2) of the Securities Act of 1933 and aided and abetted Columbia Advisors (the "Advisor") and/or Columbia Distributor (the "Distributor") in making false statements in violation of Rule 10b-5, §§ 206(1) and 206(2) of the Investment Advisors Act, and § 15(c) of the Securities Exchange Act.

Fifth, *Janus Capital Group Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) holds that the only entities responsible for the allegedly misstatements in the mutual fund prospectuses are the mutual funds themselves, which have "ultimate authority" and "control" over the prospectuses. *Janus* directly precludes the Third Claim that Tambone aided and abetted a violation of Rule 10b-5(b) by the Advisor or the Distributor since neither entity has ultimate authority over the alleged misstatements. *Janus* applies equally to the remaining claims—the parties responsible for those statements are the funds themselves, not the Advisor, Distributor, or Defendants as the SEC alleges.

Finally, the SEC does not have "positive proof" that, a decade after the events, Tambone will violate the securities laws in the future.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Tambone incorporates his Local Rule 56.1 Statement of Undisputed Material Facts ("56.1 Stat.").

## III.    ARGUMENT

### A.    Summary Judgment Standard.

The Court should grant Tambone's motion for summary judgment because "there is no genuine dispute as to any material fact, and [Tambone] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets his burden to identify that there is no genuine issue of material fact, the burden shifts to the non-moving party to demonstrate that a genuine issue of material fact exists such that a reasonable jury could return a verdict in the non-moving party's favor. *SEC v. Tambone*, 802 F. Supp. 2d 299, 303 (D. Mass. 2011). "With respect to each issue on which plaintiff has the burden of proof at trial, it must present definite, competent evidence to rebut the motion." *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 28 (1st Cir. 2011) (internal quotations omitted); *see also* Fed. R.

Civ. P. 56(c)(B).  "[T]he plaintiff must present affirmative evidence in order to defeat a properly

supported motion for summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

### B.      No Reasonable Jury Could Find The Prospectuses Are Untrue.

The SEC's case is based on the first sentence of the emblematic paragraph entitled "Fund

Policy On Trading Shares" which appears, for example, in the May 1, 2001 Newport Tiger

prospectus ("the Advisor Discretion").  Compl. ¶ 35.  The SEC erroneously labels this a "Strict

Prohibition" and reads this sentence in isolation from both the rest of the paragraph and from the

statement entitled "How to Exchange Shares."  But, in context, no reasonable jury could find that

any of the thirty-two statements identified by the SEC are materially untrue.[2]

To determine whether a prospectus contains a misstatement,[3] the court must consider the

plain language of the statement, the context in which the statement occurs, and the prospectus as

a whole; it cannot read one sentence in isolation.  *Glassman*, 90 F.3d at 633-34, 635.  A

determination of whether a statement is materially misleading may be made by considering the

prospectus alone or in conjunction with facts adduced in discovery.  *Id.*[4]  Applying these

---

[2] *See Glassman v. Computer Vision Corp.*, 90 F.3d 617, 633-34 (1st Cir. 1996) (affirming denial of motion to amend complaint where plaintiffs' assertion was based on misinterpretation of statement in prospectus as a result of failure to read statement in context); *In re Smith & Wesson Secs. Litig.*, 2011 WL 6089727, *1 (D. Mass. Mar. 25, 2011) (granting summary judgment because no reasonable jury could conclude statements were untrue).  *See also In re: K-Tel Int'l, Inc. Secs. Litig. v. K-Tel, Inc.*, 300 F.3d 881, 897 (8th Cir. 2002) ("if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law"); *I. Meyer Pincus & Assoc.s, P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 763 (2d Cir. 1991) (affirming dismissal where "[n]o reasonable investor would be misled by the prospectus into believing that the Fund was predicting the success of its shares in a secondary market" as plaintiff alleged).

[3] The SEC is precluded from basing any of its claims on an omission theory.  This is because an omission claim may only be maintained when there is a duty to disclose.  *SEC v. Durgarian*, 477 F. Supp. 2d 342, 349 (D. Mass. 2007).  But here, the First Circuit held there is no such duty to disclose because the defendants did not prepare the prospectus and there was no "basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship."  *SEC v. Tambone* 597 F.3d 436, 447-48 (1st Cir. 2010) (citation omitted).  Therefore, the SEC can only proceed on a misstatement theory.

[4] *Good v. Altria Group, Inc.*, 501 F.3d 29, 42 (1st Cir. 2007) ("Indeed, we have trouble imagining any misrepresentation claim wholly independent of what else the defendant said or did not say, given the 'well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law.'"); *Geffon v. Micrion Corp.*, 76 F. Supp. 2d 134, 140 (D. Mass. 1999)

standards, no reasonable jury could conclude that any of the prospectuses contain untrue statements of material fact.

Although the SEC identifies misstatements in thirty-two prospectuses, only twenty-eight are potentially relevant.[5]  Those alleged misstatements can be grouped into three categories: (1) statements concerning "telephone exchanges" alone; (2) statements in the Newport Tiger prospectuses in 1999 and 2000; and (3) the Advisor Discretion.  In the first category, the SEC has identified six prospectuses that contain language regarding a limitation on "telephone exchange[s]."  56.1 Stat. ¶¶ 8, 9 (Nos. 14, 15, 16, 25, 26, and 32).  An "exchange" is a transaction in which an investor sells shares of one mutual fund in exchange for shares of another fund.  A "telephone exchange" is an exchange that takes place over the telephone.  There were no limitations on exchanges which used means other than the telephone.  And, the SEC has provided no evidence that any of the exchanges in this case occurred over the telephone.  Without any evidence of telephone transactions, no reasonable jury could find that the prospectus statements that "limited [investors] to four Telephone Exchange round-trips [eight exchanges] per year" are untrue.  That the statements in these prospectuses are true also eliminates any claim involving trading by D.R. Loeser, because its arrangement trading occurred in funds governed by

---

*aff'd on other grounds*, 249 F.3d 29 (1st Cir. 2001) ("underlying principles bearing upon interpretation of spoken, written, or printed statements extend … to the law governing claims of misrepresentation and deceit and with distinctive force in relation to transactions in securities."); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 92 (D. Mass. 2010) ("to the extent that the prospectus did contain general statements regarding the Fund's goals, the meaning of those statements was clarified by the context in which they appeared"); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 217 (5th Cir. 2004) (allegedly misleading sentence must be read in light of the section of prospectus at issue and, in particular, the immediately preceding sentence of the same paragraph); *Hunt v. Alliance North Am. Gov't Income Trust*, 159 F.3d 723, 728–29 (2nd Cir. 1998) ("the central issue is . . . whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities") (internal citations omitted); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993) ("a prospective investor would have also read . . . the sentence immediately following the challenged statement").

[5] Four of the prospectuses identified by the SEC as containing misstatements are Acorn fund prospectuses from prior to October 2000.  *See* 56.1 Stat. ¶ 9 (Prospectus Nos. 1, 7, 8, and 12).  Because Liberty did not acquire Wanger (and the Acorn funds) until October 2000, those prospectuses did not govern the mutual funds sold by the Distributor and cannot be the basis of the claim in this litigation.  56.1 Stat. ¶ 5.

these prospectuses.  56.1 Stat. ¶¶ 9, 41, 42.

The second category concerns the May 3, 1999 and May 1, 2000 Newport Tiger prospectuses.  56.1 Stat. ¶¶ 8, 9 (Nos. 28 and 29).  No reasonable jury could read these statements to mean that Liberty prohibited market timing.  The first statement under "How to Exchange Shares" provides only that the "Fund *may* terminate your exchange privilege if the *advisor* determines that your exchange activity is likely to adversely impact its ability to manage the fund."  56.1 Stat. ¶ 12.  While a decision to remove a trader under that provision would require, as a prerequisite, a discretionary determination by the advisor (portfolio manager) that the exchange activity adversely impacted "the advisor's ability to manage the Fund," even if such a determination was made, the Fund was not required (but only permitted) to terminate the exchange privileges.[6]  Similarly, the statement under "How to Sell Shares" provides that "[t]he Fund will assess a contingent redemption fee in the amount of 2.00% on redemptions and exchanges of Fund shares purchased and held for five business days or less."[7]  56.1 Stat. ¶ 12. This statement does not "prohibit" such trading.  Rather, it provides that the Fund will assess a fee.  Moreover, this paragraph states that "the fee may not apply to omnibus accounts and wrap fee programs."  *Id*.  Because there is no evidence that any market timing activities violated these prospectuses (*e.g.*, the SEC has not established that arrangement traders were not in omnibus accounts or wrap fee programs), no reasonable jury could find that these prospectuses contained untrue statements of material fact.

---

[6] Chris Legallet, the Newport Tiger portfolio manager, explained that in 2003, based on the fund's holdings, he would consider excessive trading to be daily trading in an amount of 2-3% of the fund's holdings.  56.1 Stat. ¶ 17. There is no evidence that any of the arrangement trading reached this threshold.

[7] The first sentence of this paragraph states, "The Fund can experience substantial fluctuation and is intended for long-term investors."  56.1 Stat. ¶ 12.

In the third category, the SEC identified twenty prospectuses[8] that contain the Advisor Discretion.  Compl. ¶ 35; 56.1 Stat. ¶ 9 (Nos. 2-6, 9-11, 13, 17-24, 27, and 30-31).  The SEC mischaracterizes this paragraph as a "Strict Prohibition"—the statement does not prohibit anything.  Compl. ¶ 35.  The SEC relies on the first sentence, asserting that the sentence "[t]he Fund does not permit short-term or excessive trading in its shares" should be read in isolation and is rendered untrue by the arrangements.  But that position entirely ignores the remainder of the paragraph—something the case law is clear that the Court cannot do.  *E.g.*, *Kapps*, 379 F.3d at 217; *Trump*, 7 F.3d at 371.

Reading the paragraph as a whole clarifies that the fund does not say that there will be no market timing.  Rather the fund "reserves the right" to terminate a trade when it determines based on "the advisor's opinion" that the trader has "a pattern of short-term or excessive trading" or where the trading "has been or may be disruptive to the fund."  While, none of the terms "short-term," "excessive," or "disruptive" is defined in the prospectus, the record reflects that the various portfolio managers, who under the policy were charged with determining whether a purchase or exchange request should be rejected, had vastly different interpretations of those terms.  56.1 Stat. ¶ 16-17.  They also believed that whether to reject a trade was in their discretion.  *Id.* ¶ 13.  So did Tambone and others.  *Id.*  Their view is corroborated by the fact that such a determination is of necessity based on non-static information which the portfolio manager has and bases his trading decisions on.  For example, the Newport Tiger portfolio manager testified that his determination of whether trading was excessive or disruptive was "based on [his] relative view of excessive" and that he took "a bunch of different variables" into consideration "at any one time," such as "volume of the fund … market volatility," cash and the

---

[8] While the twenty prospectuses include slight variations in this language, those variations do not change the overall meaning.  56.1 Stat. ¶ 9.

portfolio manager's own trading strategy.  56.1 Stat. ¶ 17.  Thus, regardless of what "short-term," "excessive" and "disruptive" mean, and regardless of the portfolio manager's "opinion," this paragraph states only that the fund "reserved the right" to reject a trade, and that the decision to do so was *entirely discretionary*.

That the decision was discretionary and that it was within the subjective opinion of the portfolio manager is confirmed by the additional statement under "How to Exchange Shares" that "The Fund may terminate your exchange privilege *if the advisor [portfolio manager] determines that your exchange activity is likely to adversely impact its ability to manage the Fund*."  561. Stat. ¶ 14.  For example, Legallet testified that he determined that the market timing arrangement with Ilytat, which he pre-approved, "certainly would not have any impact on our fund," and that Ilytat's "asset allocation … wasn't an issue."  *Id.* ¶ 63.  He testified that it was only "if there is excessive trading of a two percent of the fund or three percent of the fund, it would make me focus."  *Id.*  Legallet and his colleagues requested and received reports that showed specific transaction information related to transactions in the funds that he managed.  *Id.* ¶ 77.  It was Legallet's opinion that "2002 was the first year where [he] sensed performance could be impacted from the cash activity in several of our funds . . . ."  *Id.* ¶ 80.  Legallet's testimony is corroborated by the fact that even if it is assumed that Ilytat's active trading was as much as one third of its $20 million static asset (*i.e.*, $6,660,000) this did not represent more than 2% of the fund's total net assets of the fund.  Rather, during the relevant period it ranged from a low of .57% in 1999 to a high of 1.92% in 2002.[9]

As the SEC admits, in each of the six arrangements in which the SEC alleges Tambone had knowledge, the portfolio managers exercised the discretion given to them by the Funds and

---

[9] Newport Tiger's total net assets were $1,167,300,000 in 1999; $834,130,000 in 2000; $524,570,000 in 2001 and $342,450,000 in 2002.  56.1 Stat. ¶ 62.

approved the market timing arrangements before they began.  56.1 Stat. ¶ 23.  Moreover, the

undisputed evidence is that the Distributor sought such approval in conformance with the

Advisor Discretion and there is no evidence that the defendants knew the statements were

materially misleading in light of that approval.[10]

In *Glassman*, 90 F.3d at 633-34, after three years of litigation and full discovery, the First

Circuit upheld the district court's denial of a motion to amend the complaint, finding that where

"the Plaintiffs misread[] the prospectus," ignored the plain meaning of the statement and another

statement on the very same page which was contrary to their interpretation, there was no

actionable misrepresentation.  *Id*.  That same rationale is applicable here and should result in a

grant of summary judgment in favor of Tambone.[11]

### C.    The Alleged Market-Timing Disclosures Were Immaterial.

The SEC has the burden to establish the element of materiality for each of its remaining

claims.[12]  "The boundaries of materiality in the securities context are clearly enunciated in [the]

case law [of the First Circuit]."  *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170,

175 (1st Cir. 1994).  Specifically,

[t]he mere fact that an investor might find information interesting

---

[10] *See Geffon v. Micrion Corp.*, 249 F.3d 29, 36, n.8 (1st Cir. 2001) (court found insufficient evidence of *scienter* to survive a motion for summary judgment where even "if the statements at issue were material and false or misleading, the evidence does not support a finding that defendants *knew* the statements would materially mislead the investing public").

[11] Tambone is aware of the decision in *SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) concluding that the disclosures in the PIMCO funds concerning market timing presented a disputed issue of fact that could not be resolved on summary judgment.  But that case is readily distinguishable based on two key factors.  First, the two defendants there "present[ed] vastly different versions of the events," including whether there even existed a market timing arrangement, effectively precluding the entry of summary judgment.  *Id*. at 299, 326.  Second, the PIMCO fund prospectuses included a specific limitation of "six round trip exchanges in any twelve-month period."  *Id*. at 311.  Because neither of those factors is present in this case, the holding in *Treadway* is not applicable.

[12] *SEC v. Tambone*, 417 F. Supp. 2d 127, 131-132 (D. Mass. 2006) (for a misstatement or omission to be actionable under § 17(a) of the Securities Act or § 10(b) of the Exchange Act, it must be material); *SEC v. Slocum, Gordon Co.*, 334 F. Supp. 2d 144, 182 (D.R.I. 2004) ("to establish a violation of section 206(2) [of the Investment Adviser's Act] the Commission must show that Defendants failed to disclose or omitted material facts in their dealings with clients.")

> or desirable is not sufficient to satisfy the materiality requirement. Rather, information is "material" only if its disclosure would alter the "total mix" of facts available to the investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision.

*Id.* (*quoting Milton v. Van Dorn Co.*, 961 F. 2d 965, 969 (1st Cir. 1992)).

The SEC has not presented "significant probative" or "concrete" evidence, *Anderson*, 477 U.S. at 256, that there is a substantial likelihood that the disclosure of the arrangements "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011). Disclosure of the arrangements would not be material because the statements were not false, as set forth above, and due to the nature of the purported omitted disclosure (i.e. an opinion by the fund advisor that a handful of arrangements would not be disruptive).

Second, the SEC has no "definite competent evidence" that the Advisor Discretion is material under both quantitative and qualitative factors that federal courts consider in assessing a disclosure's materiality. *Litwin v. Blackstone Group, L.P.,* 634 F.3d 706, 717 (2d Cir. 2011); *Matrixx*, 131 S. Ct. at 1318.

       1.    <u>The Market-Timing Disclosures Were Quantitatively Immaterial.</u>

Here, the SEC alleges misstatements for a number of different mutual funds. Since each mutual fund is a separate and distinct security with unique prospectuses and different shareholders, the SEC must establish materiality based on the importance of each disclosure to the investors of each fund. *See e.g., United States v. Faulhaber*, 929 F.2d 16, 19 (1st Cir. 1991) (holding that mutual fund shares are securities); *see also* **Ex. 47** at 122 (conceding that each Columbia mutual fund is a unique security with different investors). That is, the SEC must demonstrate "a substantial likelihood that a reasonable shareholder would consider" the fact

"important" to their decision to invest in the specific fund at issue.  *Lucia*, 36 F.3d at 175
(citation omitted); *Matrixx*, 131 S.Ct. at 1318.  The SEC has not, and cannot, do this.

The SEC cannot establish quantitative materiality because it does not calculate the
financial impact (or dilution) of the alleged market-timing trades on a fund-by-fund basis.
Rather, the SEC aggregates all of the trades by the so-called "Preferred Customers" (including
trades in numerous funds that are not at issue in this case) over a five-year period.  **Ex. 67**
(identifying 28 funds).  The SEC assumes that the Preferred Customers' first-day gains (for
buys) and first-day losses avoided (for sales) equals the total amount of dilution to all fund
investors.[13]  Thus, the SEC cannot say what, if any, impact the alleged misstatement in a
prospectus had on that fund's performance.

Although the SEC's expert does not calculate dilution on a fund-by-fund basis, he does
calculate dilution caused by each arrangement trader on an aggregate basis.  **Ex. 67** at Ex. 7.
Prof. Harris's own calculations demonstrate that two arrangement traders—Giacalone and
Stern—did not cause <u>any</u> dilution to the Columbia funds (Giacalone's and Stern's trades actually
benefitted long-term investors).  56.1 Stat. ¶¶ 47, 56.  Consequently, those two arrangements
were immaterial as a matter of law.

Of course, the SEC does not calculate dilution on a fund-by-fund basis because doing so
establishes the immateriality of the market-timing disclosures.  As Prof. Ferrell establishes in his
report, the market-timing trades had ***no financial impact*** on all but one of the funds at issue—

---

[13] Prof. Harris does not calculate or estimate dilution.  Rather, he "characterizes" the total dilution in a range from
$13.13 to $28.25 million (the amount of dilution depends on the filters applied by Harris).  **Ex. 67** ¶ 130 & **Ex. 110**
at Ex. 14.3.  As explained in Prof. Ferrell's Rebuttal report, this figure is grossly inflated and misleading because (1)
it includes over $1 billion in trades that were never identified by the SEC in its Complaint or discovery responses;
(2) it includes trades in domestic funds that are not susceptible to marketing-timing, (3) does not impose holding-
period limitations on the round-trips (thus, includes trades that are not market-timing at all), and (4) includes trades
by the "Preferred Customers" in funds that were not included in the alleged arrangement.  These failures, among
others, will be the subject of Tambone's Motion to Strike Prof. Harris's Report.

after the appropriate filters are applied.[14]  56.1 Stat. ¶ 23.  Although market-timing trades from

all arrangement traders diluted investor returns in Newport Tiger by $1.07 million after the

Advisor Discretion was put in place, that amount is immaterial as a matter of law in relation to

the fund's total assets—Newport Tiger Fund had over $520 million in total assets on December

31, 2001.  *Id.* ¶ 62.  Thus, the dilution caused by the market-timing in Newport Tiger amounts to

less than 0.2% of the fund's total assets in 2001.[15]  Such a minimal amount is well below levels

other courts have held immaterial as a matter of law.[16]

2.     The Market-Timing Disclosures Were Qualitatively Immaterial.

Federal courts often rely on SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150

(1999), which identifies three qualitative factors relevant to materiality:  "(1) concealment of an

unlawful transaction, (2) significance of the misstatement in relation to the company's

operations, and (3) management's expectation that the misstatement will result in a significant

market reaction."  None of the SEC's qualitative factors demonstrate materiality.

First, the SEC concedes that market-timing is not illegal.  Compl. ¶ 28.  Thus, the

disclosures did not conceal unlawful activity, or "conceal" anything; the disclosures state that

whether a trade is considered short-term or excessive is within the discretion of the Advisor.

---

[14] Prof. Ferrell calculates dilution after applying the following filters which exclude trades that are either not market-timing or are not actionable under the SEC's claims:  (1) trades in Acorn funds prior to October 16, 2000 (*i.e.,* before Columbia acquired the fund), (2) trades in funds other than the six funds for which the SEC claims that defendants permitted market-timing arrangements, (3) trades before the Advisor Discretion in fund prospectuses, (4) trades during periods when portfolio managers approved arrangement trading, (5) round-trips exceeding five trading days, and (6) trades before Tambone allegedly approved the arrangement.  56.1 Stat. ¶ 24 n.10.  Prof. Ferrell provides a complete description of each filter in his Report.  **Ex. 6** ¶¶ 26-49.

[15] The $1.07 dilution calculation includes trades by Ilytat over a two-year period from May 1, 2001 (*i.e.,* the date of the first Newport Tiger Prospectus that included the "Advisor Discretion" disclosure) to October 4, 2002 (*i.e.,* the date of the last trade by Ilytat in the Tiger Fund).  **Ex. 6** at Ex. 1.  Thus, if the Court compared the dilution caused by Ilytat's 2001 trades to the fund's 2001 assets, the percentage impact would be much smaller than 0.2%.

[16] *See SEC v. Patel*, 2008 WL 781912, *8-9 (D.N.H. Mar. 24, 2008) (court had "little difficulty" concluding misstatement of less than 1% was immaterial); *In re Segue Software, Inc. Secs. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000) (overstatement of revenue of 2.6% deemed immaterial); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (2% overstatement of company's assets held immaterial as a matter of law).

Columbia had no *duty to disclose* anything further.  Second, the SEC has presented no evidence that the market-timing transactions were significant to Columbia's operations as the market-timing trades had no impact on any but one of the funds at issue—and at most a mere 0.2% dilutive impact on Newport Tiger in 2001.  Third, the SEC has no evidence that Columbia management had an expectation that the misstatement would result in a significant market reaction.  As Prof. Ferrell establishes in his rebuttal report, the alleged market-timing trades had a negligible impact on the performance rankings of Columbia's funds versus their peers.  56.1 Stat. ¶ 24.  Consequently, this factor does not indicate materiality.

> **D.     Summary Judgment Should Be Granted On The § 17(A) Claim.**

> 1.     Tambone Was Not Negligent.

The SEC cannot show—as it must to prove a violation of §17(a)(2)—that Tambone was negligent with respect to the alleged misstatements in the prospectuses.[17]  Negligence is "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation . . . .  The term connotes culpable carelessness."[18]

*First*, Tambone reasonably interpreted the fund prospectuses that the decision to reject a market timing trade was vested with the portfolio manager, not the distributor.  *See* 56.1 Stat. ¶ 14 (stating language).  Tambone's boss, Gary Countryman, instructed him that it was the Advisor's decision to allow arrangements.  *Id.* ¶ 15.  The reasonableness of Tambone's understanding of the prospectus is supported by the undisputed fact that the Advisor communicated regularly with the transfer agent, *id.* ¶ 22, and that several people understood this

---

[17] *See SEC v. Tambone*, 550 F.3d 106, 125 (1st Cir. 2008) (negligence an element of §17(a)(2)); *In re Flannery and Hopkins*, SEC Administrative Decision, File No. 3-14081, at 39 (October 28, 2011).

[18] *In re Flannery*, File No. 3-14081, at 41 (*citing* Black's Law Dictionary, 1056 (7th ed. 1999)); *Cf. McMurray v. C.I.R.*, 985 F.2d 36, 42 (1st Cir. 1993) ("Negligence in this context [of a tax violation] is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.").

plain meaning of the prospectus language, including the Newport Tiger portfolio managers Legallet and Tim Tuttle; the Head of Equities, Roger Sayler; the CEO of Columbia Fund Services, Joe Palombo; and the head of the Newport funds, Lindsay Cook. *Id.* ¶ 15. Legallet's rejection of Tambone's proposed comprehensive solution to market timing—to take the fund out of the channels being used by the market timers—in Newport Tiger is a clear indication of the Advisor's exercise of its discretion. *Id.* ¶ 70.

**_Second_**, Tambone reasonably deferred to the transfer agent, which had responsibility for "identifying" and "detecting and halting" market timing deemed to violate the prospectus, 56.1 Stat. ¶ 4, and the portfolio managers, who "were in a better position than the distributor to identify whether an overall 'pattern of short-term or excessive trading' was occurring within their funds, and to determine whether such large or correlated small trading was harmful or 'disruptive'" 56.1 Stat. ¶ 15. Indeed, the portfolio managers approved each of the six trading arrangements that the SEC alleges Tambone had knowledge of. *Id.* ¶ 23. Thus, it was entirely reasonable for Tambone to rely on the transfer agent and the Advisor's portfolio managers to provide clear direction as to their wishes with respect to the interpretation of terms in the prospectuses. Notably, there is no evidence that Tambone interfered or blocked any effort by a portfolio manager or transfer agent to halt a market-timing transaction. In fact, when Leah Zell, portfolio manager for Acorn International, instructed that Ilytat be removed from her fund, the transfer agent executed the removal immediately. *Id.* ¶ 85.

**_Third_**, as detailed in the Statement of Undisputed Material Facts, Tambone's actions with regard to each of the alleged arrangement traders demonstrates that he acted as a reasonably prudent co-president of a distributor with regard to those episodes he had knowledge of.

***Tandem and Signalert***:  The SEC does not allege and there is no evidence that Tambone had any knowledge or involvement in the arrangements entered into or trading by Signalert and Tandem.  Compl. ¶¶ 84-87; 90-93; 56.1 Stat. ¶¶ 25, 30.

***Calugar and Loeser***:  The SEC alleges Calugar was permitted to market time in Growth Stock and Young Investor and that Loeser was permitted to market time in Growth Stock.[19] Compl. ¶¶ 70-76; 81-83.  First, there is no evidence Tambone had knowledge of or involvement in the arrangement entered into with Calugar or Calugar's trading in Growth Stock, which was approved by the Advisor.  The only evidence Tambone had any knowledge of Calugar's trading in Young Investor and Loeser's trading in Growth Stock (also approved by the Advisor) are two e-mails that were sent to Tambone in January and February 2000, a year before the Advisor Discretion was added, which he did not recall having received or reviewed at the time.  *See* 56.1 Stat. ¶ 34, 42.

Even if these two e-mails actually put Tambone on notice of the market timing by Calugar and Loeser in Young Investor and Growth Stock, both the Young Investor and Growth Stock prospectuses at that time contained only the limitation on "telephone exchanges," and had no limits on non-telephone exchanges.  56.1 Stat. ¶ 9 (Nos. 15, 16, and 26).  The SEC has failed to show that these exchanges occurred over the telephone and the prospectuses have nothing regarding market timing or frequent trading in general, so the emails are not evidence that Tambone had any role in the alleged false statements.  Moreover, Loeser's trading in Growth Stock ended two months later by May 2000, a year before the Advisor Discretion.  Calugar's trading ended by February 16, 2001, a mere two weeks after the Advisor Discretion.  *Id.* ¶ 33. Tambone had no supervisory authority over the direct sales of Stein Roe at that time through which Loeser traded; Loeser had been approved by the President of Stein Roe and the portfolio

---

[19] There is no evidence that Loeser in Young Investor was pursuant to an arrangement.

manager, not Tambone.  *Id.*  ¶ 44. Finally, there is no evidence that Tambone had any involvement after February 2000 when he reasonably directed his subordinates to reach a solution.  *Id.*  ¶¶ 37, 43.

*Giacalone*:  All of Giacalone's trading occurred at a time when there were *no statements* in the Newport Tiger prospectus concerning short-term or frequent trading.[20]  The SEC's expert establishes Giacalone's trading did not have any dilutive impact.  56.1 Stat. ¶ 47.  As a result, Tambone's limited involvement could not have been unreasonable.

*Ritchie*:  The SEC alleges Ritchie was permitted to market time in Newport Tiger and Growth Stock.  Compl. ¶¶ 61-66.  First, there are no allegations (or evidence) Tambone had knowledge of or any involvement in the arrangement entered into in 2001 with Ritchie or Ritchie's trading in Newport Tiger.  56.1 Stat. ¶ 49.  With regard to Growth Stock, there is no competent evidence that Tambone approved the initial Ritchie arrangement or had knowledge of the alleged market timing prior to August 15, 2003, the date of a single e-mail the SEC relies on which contained a new proposal for a trading relationship with Ritchie that never occurred.  56.1 Stat. ¶¶ 52-54.  The SEC's allegations are based on the inadmissible hearsay of a salesman, Eric Kamin who said he was told by Martin and Hussey that Tambone approved the initial arrangement.  *Id.* ¶ 52.  Tambone testified that he told Peter Martin to work with Drew Lynch and it should not go forward until he got the right information.  Two weeks later, Ritchie was kicked out of the fund.  *Id.* ¶ 54.

*Stern*:  There is no admissible evidence that Tambone had any knowledge of the arrangement with Stern or of Stern's trading in Growth and Income, Select Value, Growth Stock,

---

[20] Giacalone traded in Newport Tiger from November 24, 2000 until February 27, 2001, making four minor redemptions in Newport Tiger on April 27, 2001 totaling $497.90.  56.1 Stat. ¶ 44.  In October 2000, Liberty amended the Newport Tiger prospectus to remove any discussion of short-term or frequent trading and statements on that topic were not theraafter included in the prospectus until the May 2001 revision.  *Id.* ¶ 46.

or High Yield.  *See* Compl. ¶¶ 67-69.  The only relevant information is Peter Martin's hearsay testimony.  Martin testified only that he [Martin] approved the arrangement and he "believed" Val Wess spoke with Tambone at or around February 2003, but had no "knowledge or understanding as to the substance of this discussion."  56.1 Stat. ¶ 58 n.16; *see FTC v. Direct Marketing Concepts, Inc.*, 569 F. Supp. 2d 285, 301 (D. Mass. 2008) (striking testimony offered in support of summary judgment not based on personal knowledge).

Though there are documents indicating Wess made a different proposal to Tambone with respect to Stern's trading in the Acorn funds and/or the retail banking business, that arrangement never happened.  56.1 Stat. ¶ 59.  Moreover, the SEC's expert concludes that Stern's trading did not have any dilution impact on the funds.  *Id.* ¶ 56.

*Ilytat:*  There is no evidence Tambone had any knowledge of or involvement in Ilytat's trading in any fund, except for Newport Tiger.  With regard to Newport Tiger, the undisputed evidence is that Tambone acted reasonably.  First, Chris Legallet, the Advisor's portfolio manager for the fund, originally approved Ilytat's arrangement and trading and had met with Ilytat's principals at least twice.  *See* 56.1 Stat. ¶¶ 62-63.

When Legallet initially expressed concern about Ilytat's trading in October 2000 the trading was investigated by Tambone's subordinates and understood not to be Ilytat.  56.1 Stat. ¶¶ 65-66.  Subsequently, in response to a March 2001 from Legallet, Tambone proposed a simple solution that would have stopped Ilytat's (and any other market timer's) trading—he suggested removing the fund from the sales channels that the market timers used.  *Id.* ¶ 70.  But Legallet rejected the proposal because "[i]t will impair our ability to raise assets in the future" "at a time when raising money is next to impossible."  *Id.*  Moreover, Legallet's suggested use of a redemption fee was addressed and pursued by senior management, including Tambone, and

Legallet's superiors and attorneys at Columbia from May 2001 to November 2002. *Id.* ¶ 71. Ultimately, Tambone proposed a solution in November 2002 which he estimated would result in a $250-$500[21] million reduction in sales but which he believed would "send a clear message to the timing community they are not welcome at [Columbia]"; it was approved and voted on by the mutual funds. 56.1 Stat. ¶¶ 90-91. In May 2003, Legallet complained to Tambone of these "draconian restrictions." 56.1 Stat. ¶ 94.

2.  Tambone Did Not Obtain Money or Property By Means of a False
    Statement.

The SEC does not have "definite, competent evidence"—as it must to succeed on its § 17(a) claim—that Tambone "obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact." 15 U.S.C. § 77q. Under the "literal language of the statute," the SEC must prove that he "*personally* acquire[] money or property." *SEC v. Burns*, 1986 WL 36318, *3-4 (S.D. Cal. Feb. 19, 1986) (emphasis added). The SEC argues that Tambone acquired money because his "compensation depended in significant part on the level of mutual fund sales by Columbia Distributor, and he engaged in the misconduct at issue in order to increase those sales." **Ex. 62** at 2. Under this theory, the SEC must show that some "portion of this [compensation] was attributable" to the alleged unlawful transactions— here, the arrangement trades. *SEC v. Hopper*, 2006 WL 778640, *12 (S.D. Tex. Mar. 24, 2006).

First, the SEC has no "definite, competent evidence" that Tambone's compensation increased as a result of the market timing trades. The only information the SEC has is its expert, Prof. Harris. But Prof. Harris's report is inadmissible[22] for a number of reasons, most

---

[21] This projected reduction would not be due to a reduction in market timing trades (which did not count as sales anyway), but would be the result of fewer long-term investors purchasing the funds, since the funds would no longer be sold through various third-party dealers. 56.1 Stat. ¶ 90 n.18.

[22] The complete grounds for excluding Prof. Harris's report will be the subject of Tambone's Motion to Strike the Harris Report.

importantly, because, as Prof. Harris admits, he did not have sufficient information upon which to accurately calculate the amount of money Tambone derived from the alleged unlawful trades. As Prof. Harris states, "I received incomplete information about how Columbia compensated the Defendants." 56.1 Stat. ¶ 96. Numerous other statements in Prof. Harris's reports make clear that he did not have the information necessary to reliably estimate the compensation, if any, Tambone derived from the trades at issue. *Id.*

Second, the undisputed evidence shows that Tambone's compensation, even though based on so-called "gross" sales, did not increase as a result of the trades at issue because "gross" sales excluded transactions by market timers. The Distributor had a policy of excluding market timing transactions from "gross" sales figures used in compensation calculations. As Andrew Lynch attests, the company "had a policy and practice to remove or back out from sales reports the purchases of mutual fund shares that were identified, at that time, as market timing transactions" and that "any identified market timing transaction did not 'count' as a sale for compensation or sales reporting purposes." 56.1 Stat. ¶ 98. Lynch provided these gross sales figures (which did not include market timing sales) to Phil Iudice, who used those numbers to calculate Tambone's commission payments. *Id.*

Additionally, numerous documents show that trades that were suspected to be the result of market timing were regularly "backed out" of "gross" sales figures for purposes of sales reporting and compensation. *See* 56.1 Stat. ¶ 99. Although the SEC's expert initially contended that the market timing trades were not backed out, he subsequently conceded that "[b]ased on numerous documents that I read since [his initial report,] I conclude that more of those sales were indeed excluded than I formerly believed." *Id.* ¶ 101.

### E.      Tambone Did Not Aid and Abet the Violations.

The Third, Fourth, and Fifth Claims of the Complaint should be dismissed because the

SEC cannot prove that Tambone "was generally aware that his role or conduct was part of an

overall activity that was improper" or that he "knowingly[23] and substantially assisted in the

primary violation[s]" alleged. *Tambone*, 550 F.3d at 144.  Although "recklessness will suffice,"

if the defendant has a duty to disclose, *id.*, because there is no such duty here, *supra* note *2*,  the

standard under the aiding and abetting claims is "actual knowledge."  *SEC v. Peretz*, 317 F.

Supp. 2d 58, 64; (D. Mass. 2004); *Patel*, 2008 WL 781912 at *15.

The factual record with regard to the eight arrangements, as detailed in the Statement of

Undisputed Material Facts, and summarized in § D.1, *supra*, makes clear that the SEC cannot

prove that Tambone "knowingly and substantially assisted" in the use of the alleged untrue

statements.

### F.      *Janus* Mandates Dismissal of The Entire Complaint.

1.      *Janus* Mandates Dismissal of the Claim For Aiding and Abetting § 10(b).

While the panel opinion held that the Complaint stated a claim for aiding and abetting

Columbia Advisors' violation of  § 10(b) and Rule 10b-5, *Tambone*, 550 F.3d at 144-145, it did

so prior to *Janus*, 131 S. Ct. at 2301-03, 2305, which mandates dismissal of this claim.  *Janus*

concluded that a complaint alleging facts virtually identical to those alleged here must be

dismissed because the only entity that could be primarily liable as the "maker" of the statement

was the mutual fund as it was the only entity with "ultimate authority" over the statement.   *Id*.

The Court unequivocally held:

---

[23] As the SEC conceded in *SEC v. Daifotis*, 2011 WL 2183314, *14 (N.D. Cal. June 6, 2011), the new recklessness standard for aiding and abetting claims adopted in Section 929O of the Dodd-Frank Act does not apply retroactively to pending cases, so it does not apply here.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), Pub. Law. 111-203 (HR 4173) (July 21, 2010).

> For purposes of Rule 10b-5, the maker of a statement is the person
> or entity with ultimate authority over the statement, including its
> content and whether and how to communicate it.  Without control,
> a person or entity can merely suggest what to say, not "make" a
> statement in its own right.  One who prepares or publishes a
> statement on behalf of another is not its maker.

*Id*. at 2302.  Accordingly, the Supreme Court dismissed the complaint, which alleged only that

the management company and the investment advisor were the primary violators.[24]  As the SEC

fails to allege that the mutual fund was the primary violator, the Third Claim must be dismissed.

2.      *Janus* Mandates Dismissal of the § 17(a)(2) Claim.

The panel opinion concluded that "the scope of conduct encompassed by" § 17(a)(2)

"may in certain circumstances, be broader than" § 10(b) or Rule 10b-5(b) in that "by means of"

in § 17(a) included the use of the statements by the Defendants.  *Tambone*, 550 F.3d. at 110-111,

141.[25]  It also found that its holding was "supported by Congress's inclusion of the phrase

"directly or indirectly" in the statutory text of  §17(a), noting that the statute makes it "'unlawful

for any person . . . directly or indirectly . . . to obtain money or property by means of any untrue

statement . . . .'"  *Tambone*, 550 F.3d at 127-128.  However, neither the panel nor the *en banc*

Court had the benefit of *Janus,* which requires dismissal of the §17(a) claim.  *See SEC v. Kelly*,

2011 WL 4431161 at *4-5; *Flannery*, at *41-42 & n.70.

---

[24] *See also SEC v. Kelly*, 2011 WL 4431161, *2-4 (S.D.N.Y. Sept. 22, 2011) (SEC conceded *Janus* foreclosed its ability to assert misstatement claim under Rule 10b-5(b) where alleged misstatements were not "made" by defendants even though they "engineered, oversaw and executed a scheme to … inflate … online advertising revenue"); *In re John P. Flannery et al.*, at *43. (Rule 10b-5(b) claims dismissed where CIO and VP of State Street Global Advisor did not have ultimate authority over alleged misstatements in presentations to investors notwithstanding allegations that VP was asked to "review and make corrections" to Fact Sheets).

[25] The *Tambone en banc* Court in dicta, concluded that the phrase "by means of" in § 17(a) included "the use of" an untrue statement.  597 F.3d at 444 ("[T]here is a salient difference between the language of the rule [10b-5] and the language of section 17(a) with respect to the types of conduct that may render a person liable for a false statement. … In short the drafters of Rule 10b-5 had before them language that would have covered the 'use' of an untrue statement of material fact (regardless of who created or composed the statement.")).

Failure to do so would be inconsistent with *Janus* and its rationale which hold that the mutual fund is the party responsible for those statements and which draw a clean line between primary and secondary liability.  Failure to do so would also be inconsistent with the Supreme Court's rejection of the Tambone panel's reading of "indirectly."  *Janus*, 131 S. Ct. at 2302 & n.6,  2305; *Flannery*, at 42 n.70 *citing Kelly*, 2011 WL 4431161 at *2-5.  Janus held that "the phrase [directly or indirectly] merely clarifies that as long as a statement is made, it does not matter whether the statement was communicated directly or indirectly to the recipient."  *Janus*, 131 S. Ct. at 2305 n.11.  "A different understanding of 'indirectly' would, like a broad definition of  'make,' threaten to erase the line between primary violators and aiders and abettors established by *Central Bank*."  *Janus*, 131 S. Ct. at 2305 n. 11.

Finally, failure to dismiss the § 17(a) would result in an inexplicable anomaly which would permit §17(a) (fraud in the *offer or sale* of security) to reach persons who do not make the statement whereas *Janus* now has clearly held that Rule 10b-5 (fraud in the *purchase or sale* of a security) does not reach those same persons.[26]

3.      *Janus* Mandates Dismissal of the Claim For Aiding and Abetting § 15(c)(1)(A).

The panel opinion found that the elements required to prove a primary violation under § 15(c)(1)(A) "are equivalent to those required under … [§] 17(a)(2), including that the defendant acted negligently" and that "the SEC has adequately stated a primary violation by [the] Distributor of § 15(c)(1) and related aiding and abetting violations by Tambone and Hussey."

---

[26] Even before *Janus*, courts of appeals and the SEC recognized that §§ 17(a) and 10(b) and Rule 10b-5: (a) proscribe the same conduct;(b) require essentially the same proof; or (c) are made up of the same elements, including that the defendant "make" a misstatement.  *SEC v. Wolfson*, 539 F.3d 1249, 1256-57 (10th Cir. 2008) ("In cases of alleged misstatements in public filings …the scope of the two sections is essentially coextensive.").  *See e.g., SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. Kelly, 2011 WL 4431161* at *5; *SEC v. The Better Life Club of America, Inc.*, 995 F. Supp. 167, 175-76 (D.D.C. 1998); *SEC v. First Jersey Sec. Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996).

*Tambone*, 550 F.3d at 147.  Section 15(c)(1)(A) is identical in all material respects to § 17(a) with respect to the "by means of" language and must be dismissed for the same reasons set forth *supra*.

        4.     <u>*Janus* Mandates Dismissal of the Claim For Aiding and Abetting §§ 206(1) and (2).</u>

The SEC alleges that Columbia Advisors, "(a) acting knowingly or recklessly has employed devices, schemes or artifices to defraud; or (b) has engaged in transactions, practices or courses of business which operate as a fraud or deceit upon a client or prospective client" in violation of §§ 206(1) and (2).  Compl. ¶113.  It further alleges that the defendants "knew or recklessly disregarded that Columbia Advisor's conduct was improper and by engaging in the conduct described … each knowingly rendered to Columbia Advisors substantial assistance in this conduct." *Id.* ¶ 115.  The SEC's theory is that the misstatements themselves were the "scheme," or "course of business" which operated as a fraud or deceit and that the Advisor was the primary violator.  Not having had the benefit of *Janus*, the First Circuit panel held:

> These fraudulent disclosures or omissions allegedly constituted a "device, scheme, or artifice to defraud" under section 206(1) and "a practice, or course of business which operates as a fraud or deceit upon any client or prospective client" under section 206(2).

550 F.3d at 146 (citation omitted).  This conclusion is not viable post *Janus* and the SEC cannot avoid the strictures of the *Janus* rule simply by calling a misstatement, a scheme.  *SEC v. Kelly*, 2011 WL 4431161 *3-4.  As stated in *Kelly*, in which the SEC alleged scheme liability under Rule 10b-5(a) and (c) in connection with AOL's recognition of revenue and alleged misstatements to the public,[27] "this case is not about conduct that is itself deceptive - it is about conduct that became deceptive only through [alleged] misstatements in its public filings." *Kelly*, at *3.  The court further explained, "[i]t is the manner in which those transactions were

---

[27] The language in Rule 10b-5(a) and (c) is identical to that in §§ 206(1) and (2).

accounted for by AOL and reported to the public—AOL's alleged improper recognition of advertising revenue from such transactions—that is deceptive, and not the act of engaging in such transactions itself." *Id*. at *4.  Because the court found that the scheme liability claim was essentially a misstatement claim, it held *Janus* applied and the SEC had not sufficiently alleged that the primary violator had "made" the statement.  *Id*.  Because, under *Janus* the alleged primary violator could not be deemed to have "made" the statement, the court dismissed SEC's scheme liability claim.  *Id*.  Similarly here, because the SEC's scheme liability claim under §§ 206(1) and (2) is premised solely upon a misstatement and the alleged primary violator— Columbia Advisors—did not "make" the misstatement as required under *Janus*, the SEC's claims under §§ 206(1) and (2) must be dismissed.[28]

###    G.    The SEC Has No Evidence To Support Its Claim For Injunctive Relief.

The SEC seeks to enjoin Tambone from future violations of the securities laws.  Compl. at 38.  Such relief, however, requires "positive proof of a reasonable likelihood that past wrongdoing will recur."  *Tambone*, 802 F. Supp. 2d at 305 *quoting SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977) (there is no per se rule requiring injunction be issued upon showing of past violation).  An injunction here would automatically disqualify Tambone from employment in the mutual fund industry.  *See* 15 U.S.C. § 80a-9(a)(2).

The SEC has no evidence that any "past wrongdoing will recur."  Numerous cases have held that the passage of a long period of time between the defendant's wrongful conduct and the

---

[28]  In addition, "the SEC has failed to allege that the market timing arrangement was a scheme to defraud."  *SEC v. Tambone*, 417 F. Supp. 2d 127, 135-136 (D. Mass. Jan. 27, 2006) ("the defect in the SEC's allegations is that market timing arrangements are not the kind of sham transactions which have been held to qualify as schemes to defraud"; "market timing standing alone could not constitute a fraudulent device" ).  *See Kelly*, 2011 WL 4431161 *3-4  and cases cited therein; *SEC v. Lee*, 720 F. Supp. 2d 305, 333-334 (S.D.N.Y. 2010).

request for an injunction "without another violation weighs heavily against an injunction."[29]   An order denying a request for a permanent injunction is appropriate after the completion of discovery where, as here, the SEC has not set forth evidence demonstrating a reasonable likelihood of future violations.[30]

Nearly eight years have passed since Tambone left Columbia and there is no evidence that he has violated the securities laws since that time, nor in the twenty years prior to these allegations.  In fact, much of the conduct that the SEC complains of occurred more than a decade ago.  Although Tambone was out of the industry for a time, he has recently been working as a consultant.  56.1 Stat. ¶ 7.  That the SEC never sought to preliminarily enjoin Tambone during the many years of this proceeding, speaks volumes about any purported future risk.

Nor do other factors often considered weigh in favor of an injunction, *Tambone*, 802 F. Supp. 2d at 305 (listing factors).  There is no evidence that Tambone acted negligently, let alone recklessly or with fraudulent intent, and no evidence that Tambone was involved in a recurring, egregious violation.  Even if the SEC could show that Tambone had knowledge of a market timing relationship during the time the Advisor Discretion language was in effect, that would not

---

[29]  *SEC v. DiBella*, 2008 WL 6965807, at *14 (D. Conn. Mar. 13, 2008) (finding that "the single violation, the passage of 10 years since the misconduct, and the lack of evidence . . . could indicate a likelihood of future violations, lead this Court to deny the SEC's request for a permanent injunction"); *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (reversing district court's imposition of an injunction where "judgment below was not entered until more than seven years after the alleged violations," there was no "evidence that the defendants committed any prior or subsequent violations of the securities laws," and "SEC conceded that at no time during [the seven years after the violative conduct] did it attempt to expedite the requested injunctive relief"); *In re Moskowitz*, Exchange Act Release No. 45,609, 77 SEC Docket 446 (Mar. 21, 2002) (after six years, "[t]he passage of time since Moskowitz's violative conduct militates against the issuance of a cease-and-desist order").

[30] *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 770 (10th Cir. 1993) (affirming summary judgment entered in favor of accountant and denying permanent injunction based on SEC's failure to present evidence establishing likelihood of future violations); *Monarch Fund*, 608 F.2d at 943 (reversing district court's imposition of an injunction on appeal from entry of summary judgment for SEC); *SEC v. Shanahan*, 2010 WL 173819, *14 (D. Minn. Jan. 13, 2010) (granting summary judgment on claim for injunction where "[i]t is undisputed that Defendants have never before been charged with or committed any violations of the securities laws, and no evidence indicates that Defendants have been charged with a violation of the securities laws in the five years since their departure from" the company).

justify imposing an injunction.[31]  And even if the Court found that there was a dispute as to whether Tambone acted recklessly, such a finding would also be insufficient to justify entering an injunction.[32]  Nor is the fact that Tambone "vigorously contest[s] the government's accusations" grounds to impose an injunction against him.  *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989).

When the Court previously considered this issue in the context of Defendant Hussey's motion for summary judgment, it found that "precluding the S.E.C. from seeking a preliminary injunction at this stage is premature," because discovery was still in progress.  *Tambone*, 802 F. Supp. 2d at 306.  Now discovery has closed, the SEC still has no evidence to show that Tambone is likely to violate the securities laws.

## IV.   CONCLUSION

For all of these reasons, Tambone's Motion for Summary Judgment should be granted and the claims against him should be dismissed in their entirety.

Dated:  January 27, 2012

Respectfully Submitted,

JAMES TAMBONE
By his attorneys,

*/s Paula J. DeGiacomo*
A. John Pappalardo (BBO# 388760)
Paula J. DeGiacomo (BBO# 118180)
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts  02110
Tel:  617-310-6000
pappalardoj@gtlaw.com
degiacomop@gtlaw.com

Michael J. Biles, *Pro Hac Vice*
GREENBERG TRAURIG, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel:  512-320-7200
Email:  bilesm@gtlaw.com

---

[31] *SEC v. Freiberg*, 2007 WL 2692041, at *23 (D. Utah Sept. 12, 2007) ("The court simply cannot conclude there exists a 'reasonable and substantial likelihood' [defendant] will again violate securities laws from his one-time violation with a scienter of recklessness.").

[32] *SEC v. Brethen*, 1992 WL 420867, at *24 (S.D. Ohio Oct. 15, 1992) ("[W]hile the Defendant did act with a degree of scienter which exceeded recklessness, the Court does not consider the degree of scienter with which the Defendant acted to be sufficient, by itself, to warrant an injunction.").

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent via U.S. first class mail to those indicated as non-registered participants on January 27, 2012.

*/s Paula J. DeGiacomo*