## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION NO. 06-10885-NMG |
| v. | ) | |
| | ) | |
| JAMES TAMBONE AND ROBERT HUSSEY, | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| | ) | |
| DEFENDANTS. | ) | **LEAVE TO FILE GRANTED ON** |
| | ) | **FEBRUARY 27, 2012** |

## SECURITIES AND EXCHANGE COMMISSION'S REVISED OPPOSITION TO DEFENDANT JAMES TAMBONE'S MOTION FOR SUMMARY JUDGMENT

Michael D. Foster (IL Bar #6257063)
David H. London (BBO #638289)
Rachel E. Hershfang (BBO #631898)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8824 (Foster)
(617) 573-4590 (fax)

**Table of Contents**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ....................................................................................................... 2

   I. There are Disputed Issues of Fact as to Whether the Columbia Funds Prospectuses Were Misleading, Rendering Summary Judgment Inappropriate. .................................................... 2

     A.  The "Strict Prohibition" Language. .............................................................. 3

     B.  The Remaining Prospectus Language. ......................................................... 8

   II. There are Disputed Issues of Fact as to Whether the Market Timing Disclosures were Material, Rendering Summary Judgment Inappropriate. ..................................................... 10

   III.  Summary Judgment is Not Appropriate on the 17(a) Claim. ........................................... 14

     A.  Tambone Acted Negligently, if Not With Scienter, and is Liable Under § 17(a). .......... 14

     B.  Tambone Obtained Money or Property By Means of A False Statement...................... 17

   IV. Tambone Aided and Abetted the Columbia Entities' Violations. .................................... 18

     A.  Securities Law Violations By Primary Wrongdoers ...................................... 19

     B.  Tambone's Knowing and Substantial Assistance ........................................ 20

   V.  *Janus* Has No Effect on the Remaining Claims in the Complaint...................................... 21

   VI. It is Premature to Claim the Commission Cannot Seek an Injunction. ............................ 23

CONCLUSION..................................................................................................... 24

REQUEST FOR ORAL ARGUMENT ............................................................... 25

## Table of Authorities

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 65 (1st Cir. 2007) ...................................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 2

*Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 180 (2d Cir. 2001)................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 2

*Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 109 (D. Mass. 1998)................................................. 5

*Garside v. Osco Drug, Inc.,* 895 F.2d 46 (1st Cir. 1990) ............................................................ 2

*Geffon v. Micrion Corp.*, 76 F. Supp. 2d 134, 140 (D. Mass. 1999) .......................................... 4

*Gianino v. Citizens Utilities. Co.*, 228 F. 3rd 154, 162  (2nd Cir. 2000) ...................................... 13

*Hanly v. SEC*, 415 F.2d 589, 595-97 (2d Cir. 1969)..................................................................... 17

*Hershey v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 317 F.3d 16 (1st Cir. 2003)..................... 2

*In re Mutual Funds Inv. Litig.*, 608 F. Supp. 2d 672, 675 (D. Md. 2009) .................................... 12

*In re Segue Siftware,Inc.Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass 2000)................................. 13

*In re Washington Public Power Supply System Sec. Litig.*, 823 F.2d 1349, 1358 …
   (9th Cir. 1987). ........................................................................................................................ 23

*In re Worldcom*, 346 F. Supp. 2d 628, 662-63 (S.D.N.Y. 2004).................................................. 17

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (U.S. 2011)...... 21, 22, 23

*Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994) ................. 11

*Milton v. Van Dorn Co.,*  961 F.2d 965, 969 (1st Cir. 1992)........................................................ 11

*Parnes v. Gateway 2000, Inc.,* 122 F. 3rd 539, 547 (8th Cir. 1997)............................................ 13

*Powershare, Inc. v. Syntel, Inc.*, 597 F. 3d 10, 16 (1st Cir. 2010).............................................. 4, 5

*Roberts v. Smith Barney, Harris Upham & Co., Inc.*, 653 F. Supp. 406, 413 (D. Mass. 1986)... 23

*S.E.C. v. Gabelli*, 653 F.3d 49, 58 (2d Cir. 2011)................................................................. 12, 13

*SEC v. Brown*, 579 F. Supp. 2d 1228, 1231-32, 1238 (D. Minn. 2008) ...................................... 24

*SEC v. Capital Gains*, 375 U.S. 180, 84 S. Ct. 275 (1963) ........................................................ 19

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 857-58 (9th Cir. 2001) ............................................ 17

*SEC v. Druffner*, 517 F. Supp. 2d 502 (D. Mass. 2007) ............................................................. 2

*SEC v, Daifotis,* 2011 WL 3295139, at *5-6 (N.D. Cal Aug. 1, 2011)……………………… .22

*SEC v. Durgarian,* 477 F. Supp. 2d 342, 357 (D. Mass. 2007) .................................................. 19

*SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996)............................................................................ 24

*SEC v. Mercury Interactive, LLC*, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) ............ 22

*SEC v. Patel*, 2008 WL 781912, *9-10 (D. N.H. Mar. 24, 2008)............................................... 13

*SEC v. Moran,*  922 F. Supp. 867 (S.D.N.Y. 1996)..................................................................... 20

*SEC v. Pentagon Capital Mgt. PLC*, No. 08-cv-3224, 2012 U.S. Dist. LEXIS 18504, at…………
   *115-16 (S.D.N.Y. Feb 14. 2012). ........................................................................................ 21

*SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 471 (S.D.N.Y. 2004). . 10,13,19

*SEC v. Tambone*, 550 F.3d 106, 141 (1st Cir. 2008)...................................................... 17, 18, 21

*SEC v. Tambone*, 573 F.3d 54 (1st Cir. 2009) .............................................................................. 17

*SEC v. Tambone,* 597 F.3d 436, 450 (1st Cir. 2010). .............................................. 17, 21

*SEC v. Tambone*, 802 F. Supp. 2d 299, 306 (D. Mass. 2011) ...................................... 23

*SEC v. Treadway*, 430 F. Supp. 2d 293, 324-25 (S.D.N.Y. 2006) ...................... 7, 8, 23

*SEC v. Treadway*, 438 F. Supp. 2d 314 (S.D.N.Y. 2006)...................................... 7, 10

*Transamerica Mortgage Advisors, Inc. v. Lewis* 444 U.S. 11, 100 S. Ct. 242 (1979) .......... 19, 23

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976) .............................. 11, 13

*United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ............................................ 19

*Walker v. SEC*, 383 F.2d 344, 345 (2d Cir. 1967 ...................................................... 17

## Statutes

15 U.S.C. § 80b-6 ....................................................................................................... 22

15 U.S.C. § 77(q)(a) ................................................................................................... 21

15 U.S.C. § 78o(c) ...................................................................................................... 22

## Other Authorities

SEC Staff Accounting Bulletin No. 99 ...................................................................... 13

## Rules

Fed. R. Civ. P. 56(c) .................................................................................................... 2

## Regulations

17 C.F.R. parts 239 and 274 ...................................................................................... 14

64 Fed. Reg. 45,150 (1999) ("SAB 99") at *45150....................................................... 13

*Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings*, 69 Fed.

    Reg. 22,300 (April 23, 2004) ............................................................................... 14

**<u>INTRODUCTION</u>**

The Securities and Exchange Commission (the "Commission" or "SEC") hereby opposes defendant James Tambone's Motion for Summary Judgment.  Tambone seeks to escape liability for his role in facilitating undisclosed sales arrangements that permitted market timing in the Columbia mutual fund complex from 1998 to 2003, in violation of restrictions set forth in fund prospectuses.  Tambone's scattershot arguments—about supposed portfolio manager "discretion," his expert's disputed conclusions on investor harm, the impact of *Janus*, and more—conveniently overlook the considerable evidence supporting the Commission's claims and misconstrue the legal basis for the same.

The evidence shows that the Columbia mutual funds were intended for long-term investors, but Tambone and the Columbia entities were willing to make the funds available as short-term trading vehicles if the price was right.  Ordinary investors—those without the assets of a hedge fund or other private wealth manager—were not afforded this privileged opportunity, nor even the more basic opportunity to make a fully informed decision before investing in the Columbia funds.

Tambone would now have the Court believe the relevant prospectus language, including words stating in plain English that Columbia "did ***not*** permit short term or excessive trading," didn't actually prohibit anything.  Or even if it did, the translation was reasonably lost on Tambone.

For all the reasons that follow, the jury should have the chance to consider the documents and testimony in the record, in order to decide for itself what is true or not in this particular case. It will find more than sufficient support for the Commission's claim that Tambone obtained money or property (in the form of increased compensation) when directing the sale of mutual

fund shares through prospectuses that were rendered false or misleading by clandestine market

timing arrangements.   The jury will also have ample basis to find that Tambone knew or should

have known that, contrary to his warranty that they were not misleading "by statement or

omission," Columbia's public disclosures did not accord with reality.   Finally, there is a

sufficient basis for a jury to reasonably conclude that Tambone aided and abetted securities law

violations of the involved Columbia entities.

<u>**FACTUAL BACKGROUND**</u>

The Commission refers the Court to its Local Rule 56.1 Statement of Facts.

<u>**ARGUMENT**</u>

In addressing Tambone's motion, the Court must review the facts in the light most

favorable to the Commission and draw all reasonable inferences in its favor. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *SEC v. Druffner*, 517 F. Supp. 2d 502, 508 (D.

Mass. 2007) (Gorton, J.).   Tambone bears the burden of showing that there is no genuine issue as

to any material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

*Anderson*, 477 U.S. at 256.   A genuine issue is one "supported by such evidence that a

reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party."

*Hershey v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 317 F.3d 16, 19 (1st Cir. 2003) (internal

quotations omitted).   In other words, to prevail on his motion, Tambone must show "an absence

of evidence" to support the Commission's case. *Garside v. Osco Drug*, *Inc.,* 895 F.2d 46, 48 (1st

Cir. 1990).   Tambone has not met and cannot meet this standard.

I.     **There are Disputed Issues of Fact as to Whether the Columbia Funds Prospectuses**
       **Were Misleading, Rendering Summary Judgment Inappropriate.**

The prospectuses at issue, collectively and individually, set forth a clear anti-market

timing policy by expressly prohibiting short term and/or excessive trading or otherwise

2

discouraging such trading.  At the same time, and with knowledge of the relevant prospectus

language, Tambone approved or allowed the continuation of numerous market timing

arrangements with investment advisers, hedge funds and brokers.  None of the prospectuses

disclosed the market timing arrangements or that selected shareholders could make long-term

investments in some Columbia funds in order to obtain the right to market time those or other

Columbia funds.  As a result, the prospectuses were misleading to fund shareholders and

potential investors.  The disclosures in the Columbia Funds prospectuses constituted material

misrepresentations because they gave the false impression that the Columbia Funds were hostile

to marketing timing activities and were intended solely for use by long-term investors.

Moreover, the failures to disclose the secret market timing arrangements constituted material

omissions.[1]

     Unable to dispute that he was aware of the relevant timing arrangements and the fund

prospectus disclosures they contravened, Tambone resorts to arguing that the prospectuses did

not mean what they said.  To this end, Tambone characterizes Columbia's market timing policy

as discretionary, dependent upon a determination of harm by the investment adviser.  This

interpretation is not credible.  At a minimum, material issues of fact exist as to the meaning of

the prospectus language, precluding summary judgment in Tambone's favor.

### A.      The "Strict Prohibition" Language.

     Most prospectuses at issue contained the following disclosure (or a nearly identical one):

---

[1] Tambone mistakenly argues in a footnote that the "SEC is precluded from basing any of its claims on an omission theory." (Tambone SJ Memo at 3 n.3)  As discussed further below, Tambone attempts to conflate liability under Section 17(a) with liability under Section 10(b).  They are not necessarily the same.  The Commission's direct claims are not premised on whether Tambone himself "made a statement" or similarly had a duty to speak, but rather they concern whether he obtained money or property "by means of" misleading statements.  The evidence shows that in fact he did, and further shows that he knew or should have known that the prospectuses at issue were misleading by statement and omission.

FUND POLICY ON TRADING OF FUND SHARES

> The Fund does not permit short-term or excessive trading in its shares.
> Excessive purchases, redemptions or exchanges of Fund shares disrupt
> portfolio management and increase Fund expenses.  In order to promote the
> best interests of the Fund, the Fund reserves the right to reject any purchase
> order or exchange request, particularly from market timers or investors
> who, in the advisor's opinion, have a pattern of short-term or excessive
> trading or whose trading has been or may be disruptive to the Fund.  The
> funds into which you would like to exchange may also reject your request.

SEC SOF ¶ 21 (emphasis added); *see also* Tambone SOF ¶¶ 14, 15.

Tambone correctly notes that "the [C]ourt must consider the plain language of the statement" and "cannot read one sentence in isolation," (Tambone SJ Memo at 3); but then does exactly that, focusing exclusively on the third sentence.  (*Id.* at 6)[2]  Tambone suggests that because the fund "reserves the right" to reject specific trades, the paragraph "does not prohibit anything."  *Id*.  This self-serving interpretation of the prospectus cannot be reconciled with the paragraph's opening sentence, which expressly prohibits (without qualification) both short-term and excessive trading.  *See, e.g., Powershare, Inc. v. Syntel, Inc.*, 597 F.3d 10,16 (1st Cir. 2010) (in deciding whether arbitration provision was mandatory or optional, court was "mindful that an interpretation which gives effect to all the terms of a contract is preferable to one that harps on isolated provision" and strove for "a reasonable interpretation of the Agreement as a whole, while avoiding constructions that would render any term within it meaningless" (internal quotations and citations omitted)); *see generally Geffon v. Micrion Corp.*, 76 F. Supp. 2d 134,

---

[2] Tambone argues as follows:  "Reading the paragraph as a whole clarifies that the fund does not say that there will be no market timing.  Rather the fund 'reserves the right' to terminate a trade when it determines based on 'the advisor's opinion' that the trader has a 'pattern of short-term or excessive trading' or where the trading 'has been or may be disruptive to the fund'." (Tambone SJ Memo at 6.)  However, far from "reading the paragraph as a whole," the language quoted by Tambone comes entirely from the third sentence of the disclosure and no other.  Worse, Tambone does not even correctly read the sentence upon which he places such singular reliance.  The third sentence provides notice that the fund reserves the right to reject *any* purchase order or exchange request, *including* those from market timers or similar investors.

4

140 (D. Mass. 1999) (principles of contract interpretation extend to law governing claims of misrepresentation in relation to transactions in securities).

Tambone cannot, and does not, attempt to square the "reserves the right" language with the flat prohibition of the paragraph's topic sentence, which his interpretation would render devoid of meaning.  *See, e.g., Powershare*, 597 F.3d at 16 (that party's interpretation of arbitration provision as optional "would negate the obvious meaning of the second sentence is a powerful argument against accepting that interpretation"); *Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 109 (D. Mass. 1998) ("[A] construction of an agreement which renders part of an agreement a nullity is disfavored inasmuch as no part of [a] contract should be deemed superfluous." (internal quotations omitted).)[3]  The only sensible reading of the disclosure is the plain one:  that the funds <u>do</u> <u>not</u> permit short term or excessive trading.  Contrary to Tambone's strained interpretation, the third sentence of the disclosure does not change the obvious meaning of the first sentence, but merely affords the Columbia Funds sufficient flexibility to enforce the strict prohibition by "reserv[ing] the right to reject *any* purchase order or exchange request."

Whatever he might say now, Tambone surely understood at the time that the Columbia Funds uniformly adopted this disclosure for purposes of communicating a consistent anti-market timing policy, as opposed to some non-descript policy that "did not prohibit anything."  In early 2000, Tambone was aware of efforts by an internal working group to develop an "approach for policing and eliminating market timers from the [Columbia] funds."  SEC SOF ¶ 19.  He even purported to approve the group's recommendations to senior Columbia management that timing

---

[3] If the Columbia Funds had intended to convey merely that short term or excessive trading may or may not be prohibited depending on the circumstances, it would have been easy enough to craft a disclosure that said so. Similarly, if the only message being conveyed to investors was that the Columbia Funds had the option to reject trading deemed harmful by the respective fund advisor, the first sentence of the disclosure would be unnecessary.

activity be reviewed by account managers at the Distributor so that it could be "eliminated" from any sales relationships.  *Id.*

These efforts resulted in the adoption of the prospectus language cited above.  *See, e.g., id.* at ¶¶ 20, 21.  Based on this language, the transfer agent for the Columbia Funds, in conjunction with the Distributor, actively policed market timing activities.  *See, e.g., id.* at ¶¶ 61-63.  As Tambone would have it, the language in question indisputably vests authority in the adviser to make these determinations.  But no one ever saw it that way.  The transfer agent monitored trading patterns and based on those trading patterns, routinely issued warning letters to investors, or blocked trades and/or froze accounts of investors whose trading violated the prospectus policy.  *Id.* at ¶ 64.  In those communications, the transfer agent interpreted the prospectus disclosure as a strict prohibition against short term trading.  *Id.* (Ex. 70).  The adviser was not consulted about whether each trade or trader was harmful or disruptive.

And when the advisers (in the person of the portfolio managers) tried to remove disruptive approved timers, they learned they did not have the unilateral authority Tambone now attributes to them.  SEC SOF ¶¶ 45-60.  Furthermore, both Tambone and his subordinate Hussey acknowledged having independent discretion to reject market timing arrangements without consulting the fund adviser.  *Id.* ¶¶ 47-49.  This understanding was consistent with the selling agreements Tambone signed, governing sales of shares of the Columbia Funds to other broker-dealers, which said that the Distributor could reject any order for shares of any fund in its "sole discretion."  *Id.* ¶¶ 25-27, 46.  These facts, among others, contradict Tambone's exculpatory tale that the prospectuses granted portfolio managers exclusive and unfettered discretion to permit market timing in their funds.

6

In sum, the evidence in this case is more than sufficient to allow a jury to conclude that the "policy on trading of fund shares" disclosed in twenty of the prospectuses at issue represented a strict anti-market timing policy.  Tambone's contrary argument simply misconstrues the prospectus language and ignores much of the record.  The same argument was rejected by the court in a prior SEC market timing case, even though that prospectus language was less definitive than the language at issue here. [4]  *See SEC v. Treadway*, 430 F. Supp. 2d 293, 324-25 (S.D.N.Y. 2006) (denying motion for summary judgment and finding that the jury could read the relevant PIMCO fund prospectuses to suggest that the funds discouraged all market timing, particularly in light of other evidence such as actions taken by the distributor to stop market timing and warning letters stating that frequent trades violated fund policy); *see also SEC v. Treadway*, 438 F. Supp. 2d 314, 317-18 (S.D.N.Y. 2006) (denying motion for judgment as a matter of law, and finding that "[a]lthough Treadway argues that the 'touchstone' of the prospectus is harm to shareholders, and indicated that PIMCO had discretion to allow market timing if it was determined to be not harmful to shareholders, evidence presented at trial indicates that the PIMCO prospectus is reasonably susceptible to other interpretations, including one in which market timing was discouraged or disallowed").  Just as in *Treadway*, genuine issues of material fact exist as to whether the Columbia Funds prospectuses contained material misrepresentations or omissions, precluding summary judgment on this issue. [5]

---

[4] The PIMCO disclosure stated that the fund reserved the right to refuse certain exchange activity if deemed by the fund adviser to adversely affect a fund or its shareholder, and further reserved the right to refuse any exchange that would cause an investor to exceed six round trip exchanges in a twelve-month period.  *See Treadway*, 438 F. Supp. 2d at 311.  Unlike the disclosure in this matter, the PIMCO disclosure did not expressly state that the fund "does not permit short-term or excessive trading in its shares."

[5] Tambone's meager attempt to distinguish *Treadway* is frivolous. (*See* Tambone SJ Memo at 8, n.11)  Tambone appears to erroneously suggest that finger-pointing by the two defendants there precluded summary judgment on the issue of the meaning of the prospectus language, when in fact both defendants (who were senior executives at the

### B.   The Remaining Prospectus Language.

Even prior to the adoption of Strict Prohibition language addressed above, certain Columbia Funds prospectuses were misleading because they contained other language that discouraged or limited market timing at the same time that Tambone and the Columbia Entities were negotiating, approving or knowingly permitting market timing relationships with select investors.  Tambone groups these other prospectuses into two categories:  (1) those containing limitations on "telephone exchanges;" and (2) the Newport Tiger prospectuses of 1999 and 2000.

**Telephone Exchange Limitations.**  With respect to the prospectuses containing language restricting telephone exchanges, Tambone argues that non-telephone exchanges were not similarly restricted and there is "no evidence that any of the exchanges in this case occurred over the telephone."  (Tambone SJ Memo at 4.)  Tambone's argument misses the mark.

The documents and testimony in this case conclusively establish that the Columbia Entities entered into a market timing arrangement that permitted D.R. Loeser to frequently trade (through exchanges) the Stein Roe Growth Stock Fund in excess of the fund prospectus limitation of four telephone exchange round trips per year.[6]  SEC SOF ¶¶ 28-29.  The records memorializing the Columbia Entities' approval of the Loeser timing arrangement show that, from the outset, it was understood internally that the arrangement violated the prospectus

---

PIMCO adviser and/or distributor entities) argued that the PIMCO prospectus set forth a policy under which PIMCO had discretion to permit market timing considered not to be harmful to shareholders. *See* 430 F. Supp. 2d at 324. Like Tambone does here, the two defendants in *Treadway* premised this argument on prospectus language stating that the fund "reserves the right" or "has the right" to refuse certain activity.  The only meaningful distinction between this case and *Treadway* works in the SEC's favor – the language here is stronger.

[6] At the time this arrangement was entered into, the Growth Stock Fund prospectus also stated that:  "Investment Trust [for the Growth Stock and other Stein Roe Funds] believes use of the Telephone Exchange Privilege by investors utilizing market-timing strategies adversely affects the Funds.  Therefore, regardless of the number of telephone exchange round-trips made by an investor, Investment Trust generally will not honor requests for Telephone Exchanges by shareholders identified by Investment Trust as 'market timers' if the officers of Investment Trust determine the order not to be in the best interests of Investment Trust or its shareholders."  SEC SOF ¶ 16.

limitation of four round trips per year. *Id*. ¶ 29.  Similarly, the record evidence shows that the Columbia Entities entered into a market timing arrangement that permitted Daniel Calugar to frequently trade (through exchanges) both the Stein Roe Growth Stock Fund and Stein Roe Young Investor Fund in excess of the funds' prospectus limitation of four telephone exchange round trips per year. *Id*. ¶ 30.  Telephone exchanges were the only means available under the prospectuses by which D.R. Loeser and Calugar could have engaged in such market timing activity.  SEC Resp. to Tambone SOF ¶ 11.  It is nonsensical to suggest that these timers conducted their trading (exchanging between the timed funds and Columbia money market funds) by written requests sent in the mail (the only other method available under the relevant prospectuses) because this would have resulted in delays counterproductive to their trading strategies.[7]  The often-daily trading patterns of D.R. Loeser and Calugar (where they bought a large number of shares one day, and sold them the very next day) further confirm that these investors were not conducting their trades via mail.  Ex. 28 to the Affidavit of Michael Foster, filed herewith.

**Newport Tiger Prospectuses (1999-2000).**  The Newport Tiger Fund prospectuses contain language hostile to market timing and state that the fund "is intended for long-term investors[.]"  SEC SOF ¶ 18.  To deter market timing activity, the prospectuses mandated a contingent redemption fee "on redemptions and exchanges of Fund shares purchased and held for five business days or less." *Id*.  The respective prospectuses also disclosed that the "Fund may terminate your exchange privilege if the advisor determines that your exchange activity is

---

[7] Similarly, it is nonsensical to suggest that the funds would selectively limit market timing by one means of trading but not limit market timing by other supposed means, when the harm to the Funds would be the same.  The market timing issue was addressed in the context of the telephone exchange provisions of these prospectuses for the obvious and practical reason that in order to market time the funds an investor would have to utilize the telephone exchange privileges.

likely to adversely impact its ability to manage the fund." *Id.*  A jury could reasonably interpret these prospectuses to discourage or disallow market timing.  Indeed, Columbia interpreted the prospectus policy this way when providing guidance to its own employees seeking to invest in the Columbia Funds.  *See id.* ¶ 10.

The disconnect between this articulated policy and the actual practices means that there are triable issues of fact as to whether the 1999 and 2000 Newport Tiger prospectuses were misleading.  *See Treadway*, 438 F. Supp. 2d at 325 (resolution of issues concerning whether PIMCO prospectuses were misleading under the circumstances involved "weighing and assessing the credibility of the evidence put forth" and was "not within the authority the Court at the summary judgment stage to perform that function"); *see also SEC v. PIMCO Advisors Fund Management LLC, ("PIMCO I")*, 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004) (denying motion to dismiss and finding that "even if the [market timing] arrangement was not strictly prohibited by the alleged disclosures, the disclosures were clearly misleading under the circumstances because they informed investors that the management of the PIMCO Funds would act to protect the interests of long-term investors from market-timers at the same time that the Funds were . . . allegedly facilitating an undisclosed market timing arrangement").

## II.  There are Disputed Issues of Fact as to Whether the Market Timing Disclosures were Material, Rendering Summary Judgment Inappropriate.

Tambone's materiality argument begins with a misunderstanding of the SEC's case.  He claims that the "purported omitted disclosure" was "an opinion by the fund advisor that a handful of arrangements would not be disruptive."  (Tambone SJ Memo at 9.)  This is Tambone's defense, not the SEC's case.  As set out above, the SEC's claim is that the disconnect between the prospectus language and reality was material.  Its disclosure would "alter the 'total mix' of

10

facts available to the investor" and "'there is a substantial likelihood that a reasonable

shareholder would consider it important' to the investment decision." *Lucia v. Prospect St. High*

*Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994) (*quoting Milton v. Van Dorn Co.*, 961

F.2d 965, 969 (1st Cir. 1992)).

Tambone's materiality argument is fundamentally flawed. For one, he goes at it

backward. The question is not whether the market timing had a material effect on the fund's

performance, or just how bad the market timing was, but rather whether a reasonable investor

would have found it material that the Columbia funds allowed market timing, contrary to

representations in the prospectuses. This is not a question that can be answered through a post-

hoc analysis. The question as to "whether any harm actually occurred" is "not decisive, as a

reasonable investor would want to know information regarding potential risks, even if, in

hindsight, such risks did not come to pass." *Treadway*, 430 F. Supp. 2d at 330, n.21. All of

Tambone's analysis is directed at looking at how harmful the timing was in retrospect, and none

of it focuses on what really matters—whether allowing timing, in contravention to prospectus

limitations, would have been material to a reasonable investor at the time.[8]

Evaluating materiality "requires delicate assessments of the inferences a 'reasonable

shareholder' would draw from a given set of facts and the significance of those inferences to

him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 450 (1976); *accord ACA Fin. Guar. Corp. v. Advest, Inc.*, 512

---

[8] Tambone's attempt to escape any liability for the Giacalone and Stern timing, which he claims "actually benefitted long-term investors," must fail for this same reason. (Tambone SJ Memo at 10.) First, he is wrong about Professor Harris's calculations. SEC Response to Tambone SOF ¶¶ 47, 56. Second, whether or not Giacalone and Stern were successful at market timing, there can be no dispute that their intention was to succeed, and that such success would come at the expense of long-term investors in the funds. For the reasons described above and below, this would be material to a reasonable investor.

11

F.3d 46, 65 (1st Cir. 2007) (materiality is a mixed question of law and fact that should usually be presented to the jury). "To the extent that the Court is asked to weigh questions of materiality, the court may grant summary judgment only when the omissions or misrepresentations in question[] are 'so obviously [important or] unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Treadway*, 430 F. Supp. 2d at 329 (*quoting Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 180 (2d Cir. 2001)) (modification in original).

Prospectus disclosures that are contradicted or undermined by undisclosed secret arrangements present a material issue of fact. *See, e.g., S.E.C. v. Gabelli*, 653 F.3d 49, 58 (2d Cir. 2011) (secret arrangements allowing market timing, contrary to policy stated in company memorandum, were material; noting that "the notion that a reasonable investor would regard as immaterial the failure to disclose the secret arrangement by which the Fund and its Adviser, in return for a pay-off to another fund, allowed one [fund] investor to engage in highly profitable market timing while denying this opportunity to all other investors, borders on the frivolous"); *see also In re Mutual Funds Inv. Litig.*, 608 F. Supp. 2d 672, 675 (D. Md. 2009) (defendant made an untrue statement of material fact by "representing in the prospectuses that its investors could not make exchanges more than four times in a twelve-month period, while at the same time entering into explicit agreements allowing investors to violate this provision of the prospectuses"); *Treadway*, 430 F. Supp. 2d at 330 ("[A] reasonable investor would want to know of any risks or potential harms associated with his or her investment. In the case of a mutual fund, such risks and potential harms include increased trading and brokerage costs; disruption of portfolio management activities, including hindering the ability of mutual fund managers to act in the best interests of fund investors seeking to maximize long-term investment gains; and

12

additional capital gains that increase shareholders' tax liabilities"); *Pimco I*, 341 F. Supp. 2d at 465("*Pimco I*") (failure to disclose market timing arrangement with one investor at same time that funds issued a blanket statement indicating hostility to market timing may give rise to 10b-5 liability).[9],[10]

Here, the relevant facts indicate that a reasonable jury could find that the misstatements were material.  First, the arrangement trading caused millions of dollars in investor losses.  SEC SOF ¶¶ 78, 82.  Columbia recognized this when it settled with the SEC and agreed to pay $70 million in disgorgement.  *See id*. ¶¶ 75-77.  Second, the cash concerns related to timing meant there was a material difference between the prospectus disclosure about the nature of the fund investments and the actual fund investments.  SEC SOF ¶ 83.  Third,by including language

---

[9] Tambone's reliance on a SEC Staff Accounting Bulletin is misplaced.  First, that bulletin doesn't apply to this type of materiality analysis.  On the first page of the bulletin, it states, "The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval.  They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws."  SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) ("SAB 99") at *45150.  Second, even were SAB 99 relevant, it forbids Tambone's approach, cautioning, "exclusive reliance on certain quantitative benchmarks to assess materiality in preparing financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.*" Id*.  Third, Tambone's "qualitative" arguments simply recycle his quantitative claims.  *Compare* Tambone SJ Memo 12 to *id*. 10-11.  Like the cases applicable here – *TSC*, *Gabelli*, *Treadway*, *Pimco I* – SAB 99 recognizes that, in the context of a financial statement, "materiality judgments can properly be made only by those who have all the facts."  SAB 99 at *45151; *compare Ganino v. Citizens Utils. Co*., 228 F.3d 154, 162 (2d Cir. 2000) ("[W]e have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation.").

[10] The cases cited in Tambone's footnote 16 are not to the contrary.  Each of these three cases addresses the materiality of a disclosure in a financial statement of some type – a situation distinguishable from that in this case -- and in each case, the court evaluated the significance of the statement in context.  *See, e.g., In re Segue Software, Inc. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000) (overstatement of revenues by 2.6% of total sales not significant in absence of further allegations about why those particular results were meaningful to investors, what defendants' motivation might have been, or how this quarter differed from others in which price of stock dropped following positive predictions by analysts); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (misstatement of assets by amount equal to 2% of assets not material in context of high-risk/high-yield investment opportunity in company with history of very rapid growth); *S.E.C. v. Patel*, 2008 WL 781912, *9-10 (D.N.H. Mar. 24, 2008) (in revenue-recognition case, court finds false statements in filings to be quantitatively immaterial, faults plaintiff for identifying no other factors that "persuasively enhance the materiality" of the financial misstatements).

hostile to or forbidding market timing in the prospectuses for each of the funds at issue, Columbia signaled the funds' approach to market timers would be material to its investors.  SEC SOF ¶ 15.  Fourth, Columbia devoted significant resources to defining, identifying, and removing market timers from its funds.  *See id*. ¶¶ 19, 20, 61-64.  It did so for a reason.  Fifth, the SEC recognized such disclosures as material to investors by rule, issued in April 2004, requiring disclosures surrounding market-timing arrangements.  *Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings*, 69 Fed. Reg. 22,300 (April 23, 2004) (codified at 17 C.F.R. parts 239 and 274) (requiring that mutual funds disclose in their prospectuses "both the risks to shareholders of frequent purchases and redemptions of investment company shares, and the investment company's policies and procedures with respect to such frequent purchases and redemptions," *id*., including disclosure of "any arrangements to permit frequent purchases and redemptions of fund shares."  *Id.* at 22301.).

**III.     Summary Judgment is Not Appropriate on the 17(a) Claim.**

> **A. Tambone Acted Negligently, if Not With Scienter, and is Liable Under §
> 17(a).**

There are many issues in dispute in this case, but it cannot seriously be disputed that there is sufficient evidence of Tambone's negligence (if not *scienter*) for this case to proceed to trial. Tambone was the senior-most executive with supervisory responsibility for the firm's efforts to sell the Columbia Funds to investors.  Despite the anti-marketing disclosures in the fund prospectuses, the Columbia Entities allowed certain investors of means to engage in frequent trading of fund shares (often in exchange for a sizable investment in the timed fund or another fund), while ordinary investors were not provided the same opportunity.  This sales-driven practice, while undisclosed to the public, was not hidden from Tambone.  Rather, it occurred, if not at his direction, then with his knowledge and tacit approval.

14

Tambone was aware of market timing arrangements with D.R. Loeser, Calugar and Ilytat—and aware of the "rules of engagement" used by the sales staff when bargaining with such market timers—by no later than February 2000. SEC SOF ¶¶ 32-36. Around this same time frame, Tambone received and purported to endorse an internal memorandum (dated April 6, 2000) circulated to senior Columbia personnel recommending that all existing timing relationships be "eliminated." *See id.* ¶¶ 19, 37-38. Nevertheless, Tambone continued to entertain timing arrangements and make exceptions for certain timers. *Id.* ¶¶ 38-44. In the case of Giacolone, Tambone personally intervened in September 2000 to seek consent for "[t]his *timing* request within the Tiger Fund" from Tim Tuttle, one of the fund's portfolio managers. *Id.* ¶ 40.[11]

The very next month, however, the other Newport Tiger portfolio manager, Chris Legallet, instructed Tambone that Newport no longer approved of any timing arrangements, including those with Ilytat and Giacolone. *Id.* ¶ 50. But Columbia Distributor did not rescind either Ilytat or Giacolone's active trading privileges, prompting Legallet to send Tambone another missive on March 14, 2001, re-iterating Newport's disapproval of the presence of market timers in Newport-managed funds. SEC SOF ¶¶ 55-57.[12] Columbia Distributor "disengage[d

---

[11] Tambone argues that all of Giacolone's trading occurred after a November supplement to the May 2000 Newport Tiger prospectus eliminated the language restrictive of market timing. But Tambone approved the arrangement prior to this change. Moreover, the evidence shows that this supplement was meant only to remove the particular contingent redemption fee then in place (due in large part to apparent problems with migration to a new system) rather than any change in Columbia's or Newport Tiger's market timing policy between October 2000 and the issuance of its new prospectus in 2001.

[12] Legallet suggested that Columbia would not have to close the fund to Ilytat only *if* "a large early redemption fee" was imposed because "[a]n early redemption fee does not discriminate and directly benefits the shareholders of the fund." But no redemption fee was imposed at this time. Tambone tries to argue that he offered Legallet a simpler solution, involving taking the Newport Tiger Fund out of certain sales channels. (*See* Tambone SJ Memo at 16) Undeniably, however, the simplest and most expedient solution was to remove Ilytat from the fund, just as Legallet had repeatedly asked.

the relationship" with Giacolone (with Hussey alluding to "mixed signals from Newport on whether they approved this specific arrangement"), but Ilytat was allowed to continue market timing Tiger for at least another year-and-a-half. *Id*. ¶ 58. Indeed, the next month, as in following months, Ilytat continued to appear on an internal list of approved "active traders." *Id*. ¶ 59.[13] These facts, among others, negate Tambone's argument that he and the distributor played a passive role, deferring at all times to the judgment of the portfolio managers on market timing related matters.

In actuality, despite the objection of portfolio managers like Legallet, Columbia Distributor's practice of letting timers in through the back door continued unabated until the fall of 2003–all on Tambone's watch, with his eyes wide open. For example, Tambone was aware that distributor personnel were engaged in ongoing negotiations in 2002 with market timer Ed Stern prior to the onset of Stern's approved trading activity. *Id*. ¶ 42. And in August 2003, Tambone signed off on an expansion of the arrangement permitting Ritchie Capital to time the Growth Stock Fund. *Id*. ¶ 44. In so doing, Tambone necessarily ratified the pre-existing timing arrangement (which, as described to Tambone, allowed Ritchie to trade $2 million in Growth Stock in exchange for a total $20 million investment in the fund, plus $10 million in a bond fund). *Id*. Tambone approved the August 2003 Ritchie proposal, even though in February 2003 he had belatedly (and, it seems, disingenuously) endorsed Legallet's "zero tolerance" policy for market timing activity at a national sales meeting. *Id*. ¶ 43.

Tambone's approval of the foregoing arrangements was not only a glaring exception to prospectus policy, but also to the Columbia Entities' enforcement of the prospectus policy. While preferred shareholders (like Loeser, Calugar, Ilytat, Giacolone, Ritchie and Stern) were

---

[13] These lists reflect that, in addition to Newport Tiger, Ilytat was approved to time certain Acorn funds.

allowed to market time the Columbia Funds, the Columbia transfer agent and distributor entities prevented many other shareholders from engaging in short term or excessive trading.  *See* SEC SOF ¶¶ 61-64.  Tambone knew or should have known that this course of conduct rendered the prospectuses misleading to investors.  Yet he signed all those selling agreements on behalf of the distributor, expressly warranting to customers of the Columbia Funds that the fund prospectuses would not "by statement or omission be misleading."  *Id*. ¶¶ 25-27.[14]  Tambone's negligence is well-established in the record.

> **B.**     **Tambone Obtained Money or Property By Means of A False Statement.**

Tambone argues that the SEC has adduced insufficient evidence that he profited from the market timing arrangements at issue.  (Tambone SJ Memo at 17-18.)  In so doing, he mischaracterizes Professor Harris's testimony.  Despite failures by the defendants and their former employers to produce documents exclusively within their control, Professor Harris had sufficient information to reliably estimate Tambone's unjust enrichment.  He estimated that Tambone made between $53,374 and $182,489, depending on the filters imposed, as a result of the timing arrangements described in the Complaint.  SEC SOF ¶ 89.

Tambone wrongly claims that the "undisputed evidence" shows that his compensation "did not increase as a result of the trades at issue because 'gross' sales excluded transactions by

---

[14] *See, e.g., SEC v. Tambone*, 550 F.3d 106, 141 (1st Cir. 2008) ("As executives of the primary underwriter, the defendants had a duty to reasonably investigate the fund prospectuses and other disclosure documents released to the investing public to confirm their accuracy and truthfulness.  Tambone's obligation is confirmed by the hundreds of selling agreements allegedly entered into by Columbia Distributor and signed by Tambone, . . . ."), *vacated on other grounds*, 573 F.3d 54 (1st Cir. 2009), *and reinstated in part on rehearing*,  597 F.3d 436, 447 (1st Cir. 2010) ("The SEC notes, correctly, that securities professionals working for underwriters have a duty to investigate the nature and circumstances of an offering."); *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 857-58 (9th Cir. 2001); *Hanly v. SEC*, 415 F.2d 589, 595-97 (2d Cir. 1969); *Walker v. SEC*, 383 F.2d 344, 345 (2d Cir. 1967); *In re Worldcom*, 346 F. Supp. 2d 628, 662-63 (S.D.N.Y. 2004).

market timers." (Tambone SJ Memo at 18.)  But despite some efforts to exclude certain timing

sales from compensation, not all sales were excluded (hence the careful use of the phrase

"*identified* market timing transaction" in the first Lynch Affidavit).  SEC SOF ¶¶ 86-88; Second

Affidavit of Andrew Lynch, dated February 24, 2012, ¶¶ 4-5.  As Lynch makes clear, Tambone's

claim that suspected timing trades were regularly excluded from gross sales figures is not

sustainable. (*Compare* Tambone SJ Memo at 18.)  Even the documents reflect a piecemeal

approach that evolved over time.  Some documents show that suspected timing trades were

caught after the fact, implying that many were likely never caught at all.  SEC SOF ¶¶ 87-88.[15]

It cannot be reasonably disputed that Tambone received some compensation from the timing

arrangements described above; disputes as to the amount of compensation do not provide a basis

for granting summary judgment.

**IV.     Tambone Aided and Abetted the Columbia Entities' Violations.**

Aiding and abetting liability consists of three elements: (1) the existence of a securities

violation by a primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and

(3) proof that the aider and abettor knowingly assisted in the primary violation.  *SEC v.*

*Tambone*, 550 F.3d 106, 144 (1st Cir. 2008).  Tambone argues, in passing, that he is not liable for

aiding and abetting because he did not "knowingly and substantially assist" primary securities

law violations. (Tambone SJ Memo at 19.)  His argument is inadequate and should be denied

outright.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely

to mention a possible argument in the most skeletal way, leaving the Court to do counsel's work,

---

[15] Tambone cites ten documents, of which none addresses the exclusion of timing trades from compensation
calculations during 1999 or 2000.  A document from April 2000 speaks prospectively of adjustments that "will need
to be considered," implying that no such adjustments were yet being made.  SEC Response to Tambone's Statement
of Material Undisputed Facts, No. 99.  Four of the documents are from 2001, two from 2002; and two from 2003.
*Id*.

18

create the ossature for the argument and put flesh on its bones. . . . 'a litigant has an obligation "to spell out its arguments squarely and distinctly," or else forever hold its peace.'") (internal citations omitted).  Even considered on its merits, the claim fails.

### A.    Securities Law Violations By Primary Wrongdoers

The Columbia Funds' prospectuses failed to disclose the market timing arrangements with the preferred customers—including sticky asset agreements—creating the misleading impression that the Funds prohibited or otherwise discouraged such trading.  The prospectuses were also materially misleading because Columbia Distributor (acting through Tambone)[16] and Columbia Advisors permitted the preferred customers to market time Columbia Funds while Columbia's transfer agent simultaneously prevented others from doing the same.  As a result of the misleading prospectus language, Columbia Distributor and Columbia Advisors violated the Exchange Act and the Advisers Act.

Moreover, Columbia Advisors, by allowing certain investors to receive preferential treatment to the exclusion and at the expense of other investors, further violated the Advisers Act.  Columbia Advisors, as investment adviser charged with managing the Columbia Funds, owed to the shareholders the highest fiduciary duty to act at all times in their best interests.  *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 200-01 (1963) (holding that information necessary to evaluate the objectivity of the advice of an investment adviser is material and must be disclosed to potential investors).  This duty required Columbia Advisors to act for the benefit of its clients, to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to

---

[16] A corporate entity's *scienter* is "ascertained through the mental state of its management."  *SEC v. Durgarian,* 477 F. Supp. 2d 342, 357 (D. Mass. 2007) (Gorton, J.) (*quoting SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 471 (S.D.N.Y. 2004)).

employ reasonable care to avoid misleading clients.  *See* 15 U.S.C. 80b-6(1); *SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996) (internal citations omitted).  By allowing the undisclosed market timing arrangements with the preferred customers, Columbia Advisors violated this duty.

## B.     Tambone's Knowing and Substantial Assistance

Tambone, as the senior executive of Columbia Distributor, should be held liable for aiding and abetting because he knowingly allowed preferred customers to engage in market timing while prohibiting other investors without an approved arrangement from doing the same. As discussed above, Tambone had the requisite *scienter* to establish aiding and abetting liability. SEC SOF ¶¶ 22-44.  Tambone's central role in approving arrangements substantially assisted the primary violations of Columbia Distributors and Columbia Advisors.  Although Tambone attempts to distance himself from approval or knowledge of the trading arrangements, the SEC has shown that he knew about (and in certain cases directly approved) the preferred customers' frequent trading activities, and that he did so while also knowing that the funds' prospectuses prohibited or otherwise limited such trading.  *Id.*  Tambone's facilitation of the undisclosed arrangements, his knowledge of the harm such trading caused and of the transfer agent's blocking of non-arrangement trading, and Tambone's (and the Columbia entities') failure to correct the misleading nature of the prospectus language show that Tambone provided substantial assistance to the entities' primary securities laws violations.

20

**V.      *Janus* Has No Effect on the Remaining Claims in the Complaint.**

Tambone argues that *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct.

2296 (U.S. 2011), requires the dismissal of the Commission's remaining claims.  But *Janus* does

not apply to Commission actions.  *SEC v. Pentagon Capital Mgt PLC*, No. 08-cv-3224, 2012

U.S. Dist. LEXIS 18504, at *115-16 (S.D.N.Y. Feb 14. 2012).  Even if it did, its narrow holding

has no application in this case.  *Janus* speaks directly to Rule 10b-5(b)'s prohibition against

"mak[ing]" an untrue statement of material fact in connection with the purchase or sale of a

security; the Court held that one "makes a statement by stating it."  *Janus,* 131 S. Ct. at 2302.

None of the laws at issue here (Sections 17(a) of the Securities Act, Sections 206(1) and(2) of the

Advisers Act, and Section 15(c) of the Exchange Act) base liability on a defendant's "making" a

false statement.[17]

As the First Circuit recognized in this case, there is a crucial difference between the

conduct prohibited by Section 17(a) and Rule 10b-5.  The First Circuit held that § 17(a)(2)

covers conduct that may not be prohibited by § 10(b) and Rule 10b-5, and that "primary liability

may attach under section 17(a)(2) *even when the defendant has not himself made a false*

*statement* in connection with the offer or sale of a security."  *Tambone,* 550 F.3d at 128

(emphasis added).[18]  This is so because Section 17(a)(2) "prohibits an individual from

---

[17] Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77(q)(a)] makes it unlawful:

> (1)  to employ any device, scheme, or artifice to defraud;
> (2)  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

[18] The First Circuit initially vacated, but later reinstated the portions of *Tambone* regarding Section 17(a)(2), among other points. *See SEC v. Tambone,* 597 F.3d 436, 450 (1st Cir. 2010).

21

'obtain[ing] money or property by means of any untrue statement.'  It does not state, however, that the seller must himself make that untrue statement." *Id.* at 127.  Because primary liability under § 17(a)(2) does not depend on a defendant's "making" a misstatement, *Janus* is not relevant to § 17(a)(2) claims.  *See also SEC v. Mercury Interactive, LLC*, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) (holding that *Janus* does not extend to § 17(a) because *Janus* "may not be extended to statutes lacking the very language that *Janus* construed"); *SEC v. Daifotis*, 2011 WL 3295139, at *5-6 (N.D. Cal. Aug. 1, 2011) (holding that *Janus* does not extend to § 17(a) because "the word 'make,' which was the very thing the Supreme Court was interpreting in *Janus,* is absent from the operative language of Section 17(a)").

Similarly, *Janus* should not be extended to the SEC's remaining claims under §§ 206(1), 206(2) and 15(c)(1)(A).  Sections 206(1) and (2) make it unlawful (1) "to employ any device, scheme, or artifice to defraud," and (2) "to engage in" certain types of transactions.[19]  Section 15(c)(1)(A) makes it unlawful to "induce or attempt to induce the purchase or sale of, any security" by means of any manipulative, deceptive, or other fraudulent device.[20]  Because the operative language in these sections, like Section 17(a)(2), lacks a proscription on "making" a statement, *Janus* does not apply to those statutes.

[19] Sections 206 (1) and (2) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6] make it unlawful for investment advisers:
> (1)  to employ any device, scheme, or artifice to defraud any client or prospective client;
> to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client

[20] Section 15(c)1(A) of the Securities Exchange Act of 1934 [15 U.S.C. § 78o(c)] prohibits brokers and dealers from "mak[ing] use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills), or any security-based swap agreement, by means of any manipulative, deceptive, or other fraudulent device or contrivance."

Tambone argues that allowing Section 17(a) to reach conduct not prohibited by Rule 10b-5 would be an "inexplicable anomaly," but the explanation is clear. *Janus* involved a private right of action. Its holding "accords with the narrow scope" such actions are given. *Janus,* 131 S. Ct. at 2303. Since there is no private right of action under Sections 17(a), 206(1), 206(2) and 15(c)(1)(a),[21] there is no anomaly.

## VI.   It is Premature to Claim the Commission Cannot Seek an Injunction.

Before a jury has even been impaneled, and long before hearing the evidence that could lead to a finding of liability, Tambone claims the Commission cannot obtain a permanent injunction. This claim comes too soon. If the jury finds him liable, the facts that led to that finding will necessarily inform the Court's analysis as to imposing an injunction. *See SEC v. Treadway*, 430 F. Supp. 2d 293, 346 (S.D.N.Y. 2006) (declining to rule on issues of remedies because there were material issues of fact precluding summary judgment on liability). Tambone musters no case law indicating that this Court should decide the Commission's right to an injunction in isolation from the question of liability, and, as the Court has recognized, relevant information is "likely to be elicited at trial." *SEC v. Tambone*, 802 F. Supp. 2d 299, 306 (D. Mass. 2011). After trial, the Court will know the totality of the circumstances, including the degree of scienter involved in the violation; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; the sincerity of the

---

[21] *See, e.g., In re Washington Public Power Supply System Sec. Litig.*, 823 F.2d 1349, 1358 (9th Cir. 1987) (no private right of action under § 17(a)); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979) (no private right of action under § 206); *Roberts v. Smith Barney, Harris Upham & Co., Inc.*, 653 F. Supp. 406, 413 (D. Mass. 1986) (no private right of action under § 15(c)).

23

defendant's assurances against future violations; the egregiousness of the violation; and the existence of past violations. *Id.* at 305.

Even applying these factors now, there is considerable evidence to support entry of an injunction against Tambone.  He was the Co-President of Columbia Distributor and, as a key decision-maker, acted with a high degree of *scienter*.  His violations of the securities laws spanned multiple years.  And he has obviously not recognized the wrongfulness of his conduct, nor given any assurance that it will not happen again.

The passage of time is not an appropriate reason to deny an injunction.  *See, e.g., SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) ("While a district court may properly consider the amount of time between the violations and the trial in deciding whether to issue an injunction, that interval is just one factor among several to be weighed.").  Neither is the fact that the SEC did not seek emergency relief.  *Id*. at 461 (permanent injunction warranted even though SEC had not moved for injunctive relief in seven years between time of defendant's conduct and time of trial).  This is particularly so given that the wrongdoing here occurred over several years.  *SEC v. Brown*, 579 F. Supp. 2d 1228, 1231-32, 1238 (D. Minn. 2008).  In effect, Tambone attempts (as Hussey did, unsuccessfully, in a prior motion) to impose a statute of limitations on injunctive relief where none exists.  This effort should be rejected.

## <u>CONCLUSION</u>

For all the reasons above, and any further adduced at argument, Tambone's motion should be denied.

24

## REQUEST FOR ORAL ARGUMENT

Believing that it may assist the Court, the Commission requests oral argument on this matter.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSIO**N

By its attorneys,

/s/ Michael D. Foster
Michael D. Foster (IL Bar #6257063)
David London (BBO #638289)
Rachel E. Hershfang (BBO #631898)
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8824 (Foster)
(617) 573-4590 (fax)

Dated: February 28, 2012

### CERTIFICATE OF SERVICE

I, Michael D. Foster, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants (representing all parties in this action) as identified on the Notice of Electronic Filing.

Dated:  February 28, 2012

/s/ Michael D. Foster