UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

JAMES TAMBONE and
ROBERT HUSSEY,

      Defendants.

Civil Action No.:  06-10885 NMG

## JAMES TAMBONE'S REPLY MEMORANDUM
## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

A. John Pappalardo (BBO# 388760)
Paula J. DeGiacomo (BBO# 118180)
Eric M. Gold (BBO# 660393)
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts  02110
Tel:  617-310-6000
pappalardoj@gtlaw.com
degiacomop@gtlaw.com
golde@gtlaw.com

Michael J. Biles, *Pro Hac Vice*
GREENBERG TRAURIG, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel:  512-320-7200
bilesm@gtlaw.com

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 2

   A.   No Reasonable Jury Could Find The Prospectuses Are Untrue ................................... 2

   B.   The Alleged Market-Timing Disclosures Were Immaterial ........................................... 5

   C.   Summary Judgment Should Be Granted On The § 17(a) Claim ................................... 6

     1.   Tambone Was Not Negligent ................................................................................... 6

     2.   Tambone Did Not Obtain Money or Property By Means of a False Statement ......... 8

   D.   Tambone Did Not Aid and Abet the Violations ............................................................ 9

   E.   *Janus* Mandates Dismissal of The Entire Complaint .................................................... 15

   F.   The SEC Has No Evidence To Support Its Claim For Injunctive Relief ...................... 15

III.  CONCLUSION .................................................................................................. 16

## TABLE OF AUTHORITIES

### Federal Cases

*Alten v. Berman*, 1993 WL 541668 (E.D. Pa. 1993) ........................................................4

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999)..............................................14

*Glassman v. ComputerVision Corp.*, 90 F.3d 617 (1st Cir. 1996)....................................2, 4

*Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011)................10

*Marrie v. SEC.*, 374 F.3d 1196 (D.C. Cir. 2004)...............................................................6

*McInnis v. A.M. F. Inc.*, 765 F.2d 240 (1st Cir. 1985).......................................................6

*Mississippi Pub. Emp. Ret. Sys. v. Boston Scientific Corp*, 649 F.3d 5 (1st Cir. 2008) ...............12, 13

*Powershare, Inc. v. Syntel, Inc.*, 597 F.3d 10 (1st Cir. 2010)............................................5

*Rocky River Condo Corp. v. FDIC*, 855 F. Supp. 489 (D. Mass. 1994).............................2

*Rogers v. Fair*, 902 F.2d 140 (1st Cir. 1990).....................................................................2

*Scott v. Harris*, 550 U.S. 372 (2007) ...............................................................................13

*SEC v. Brown,* 579 F. Supp. 2d 1228 (D. Minn. 2008) .....................................................16

*SEC v. Coleman,* 1993 WL 13653773 (D.D.C. 1993).........................................................15

*SEC v. Durgarian,* 477 F. Supp. 2d 342 (D. Mass. 2007) .............................................6, 10

*SEC v. Forman,* 2010 WL 2367372 (D. Mass. June 9, 2010) ............................................8

*SEC v. Gabelli,* 653 F.3d 49 (2d Cir. 2011).......................................................................6

*SEC v. Kelly,* 2011 WL 4431161 (S.D.N.Y. Sept. 22, 2011) ............................................15

*SEC v. Lorin,* 76 F.3d 458 (2d Cir. 1996).........................................................................16

*SEC v. Papa,* 555 F.3d 31 (1st Cir. 2009).........................................................................10

*SEC v. Pentagon Capital Mgt PLC,* 2012 WL 479576 (S.D.N.Y. Feb. 14, 2012)............15

*SEC v. Shanahan,* 2010 WL 173819 (D. Minn. Jan. 13, 2010)........................................16

*SEC v. Tambone,* 473 F. Supp. 2d 162 (D. Mass 2006) .....................................................7

*SEC v. Tambone,* 550 F.3d 106 (1st Cir. 2008) ................................................................10

*SEC v. Tambone,* 597 F.3d 436, 438 (1st Cir. 2010) ......................................................5, 7

*SEC v. Tambone,* 802 F. Supp. 2d 299 (D. Mass. 2011) ...................................................16

*SEC v. Todd,* 2007 WL 1574756 (S.D. Cal. May 30, 2007)..............................................16

*Silver v. H&R Block, Inc.,* 105 F.3d 394 (8th Cir. 1997)....................................................4

**Federal Statutes**

15 U.S.C. § 77q(a)(2)............................................................................................................8

**Federal Rules**

Fed. R. Civ. P. 56(c)(2) .......................................................................................................2

Fed. R. Evid. 408(a) .............................................................................................................6

**Administrative Decision**

In re Flannery & Hopkins, SEC Release No. 438,2011 WL 5130058, at *34 (Oct. 28, 2011) .......6, 15

**Other Authority**

Webster's Third New International Dictionary ......................................................................5

## I.    INTRODUCTION

The SEC does not attempt to avoid summary judgment on three aspects of its case: (1) the Third Claim alleging aiding and abetting a violation of §10(b) and Rule 10b-5(b); (2) claims concerning trading by Tandem and Signalert; and (3) claims concerning the four Acorn fund prospectuses from prior to October 2000 (before Columbia acquired the funds).  They must therefore, be dismissed.  Where it responded to Tambone's motion, the SEC did not dispute (or admitted) key factual and legal issues that are fatal to its case, including:

- Whether the prospectus is true must be determined by a plain reading of the relevant statement as a whole, and in context.  SEC Mem. at 3-4.[1]

- The terms "short-term" or "excessive trading" or "trading [that] has or may be disruptive" are not defined in the prospectuses.  SEC Resp. SOF ¶ 16.

- "Market timing" was not defined in the SEC rules during the time period alleged in the complaint, SEC Resp. SOF ¶ 19, nor is market timing defined in any of the prospectus language the SEC alleges is false.

- The third sentence of the Advisor Discretion alleged in the Complaint "affords the Columbia Funds sufficient flexibility."  SEC. Mem. at 5

- The portfolio managers approved all six trading arrangements at issue.  SEC Resp. SOF ¶ 23.

- The transfer agent was responsible for "identifying market timing activity in the funds," and "detecting and halting market timing."  SEC Resp. SOF ¶ 4.

- Materiality must be determined on a fund-by-fund basis SEC Mem. 11-14.

- On November 26, 2000, the Newport Tiger fund prospectus was amended to remove the language concerning the contingent redemption fee, SEC Resp. SOF ¶ 46, the only section in the prospectus which uses the terms "short term" "market timers" or "frequent purchases and redemptions."  SEC Ex. 7.

- Tambone was not responsible for distribution of direct sales of the Stein Roe funds at the time of the arrangement and trading by Loeser.  SEC Resp. SOF ¶ 41

- Loeser's and Calugar's arrangements and trading were approved by Hussey (not

---

[1] References are: Tambone's Memorandum in Support of Summary Judgment ("Tambone Mem."); Tambone's Statement of Undisputed Facts ("Tambone SOF"); SEC's Corrected Local Rule 56.1 Statement of Facts, Part I: Commission's Statement of Additional Facts ("SEC SOF"); SEC's Corrected Local Rule 56.1 Statement of Facts, Part II:  Commission's Responses to Tambone's Statement of Facts ("SEC Resp. SOF"); SEC's Revised Opposition to Tambone's Motion for Summary Judgment  ("SEC Mem."); Exhibits to the Affidavit of Paula J. DeGiacomo ("Tambone Ex. _"); Exhibits to the Affidavit of Michael D. Foster ("SEC Ex. _").

Tambone), SEC SOF ¶ 28, 30, and Hussey reported to Kevin O'Shea (not Tambone) at the time.  SEC SOF ¶ 3.

- Tambone has a clean regulatory record (save this case), and nearly ten years have passed since the events at issue. SEC Resp. SOF ¶ 7.

Where the SEC has disputed the factual predicate for Tambone's motion, it fails to provide "specific, provable facts demonstrating there is a triable issue."  *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990) (internal citations omitted):[2]

- Though the SEC disputes the Stern arrangement and trading was approved by Peter Martin (not Tambone), it fails to provide admissible evidence to support this "disputed" fact or its allegation that Tambone had any knowledge of Stern's arrangement or trading.  It relies solely on hearsay.  SEC Resp. SOF ¶ 58.

- The SEC admits that its only support of Tambone's knowledge of Ritchie's arrangement and trading in Growth Stock before August 2003 "may constitute inadmissible hearsay."[3]  SEC Resp. SOF ¶ 51.  The SEC does not dispute that Hussey testified that he did not have such  a conversation with Tambone.  SEC Resp. SOF ¶ 52.

## II.   ARGUMENT

### A.   No Reasonable Jury Could Find The Prospectuses Are Untrue.   The SEC

agrees that whether the prospectus[4] is true must be determined by a plain reading of the relevant statement as a whole.  SEC Mem. at 4.  Applying this rule, no reasonable jury could conclude that the 28 prospectuses are untrue as "the Prospectus[es] [will] not bear the characterizations plaintiffs [seek] to place on [them], and that the allegedly actionable 'representations' [are] no more than unreasonable inferences drawn by plaintiff[] and unsupported by the surrounding language."  *Glassman v. ComputerVision Corp.*, 90 F.3d 617, 624 (1st Cir. 1996).

---

[2] The SEC cannot rely on allegations in the complaint to defeat summary judgment.  *Rogers*, 902 F.2d at 143; *Rocky River Condo Corp. v. FDIC*, 855 F. Supp. 489, 491 (D. Mass. 1994); D. Mass. L.R. 56.1; Fed. R. Civ. P. 56(c)(2).

[3] The substance of  Kamin's and Martin's investigative testimony is hearsay.

[4] The SEC does not dispute the Acorn fund prospectuses (Nos. 1, 7, 8, and 12 in ¶9 of  Tambone's SOF)  were prior to Liberty's acquisition of the Acorn funds.  SEC Resp. SOF ¶ 5.  Thus, claims relating to those must be dismissed.

***Telephone Exchange Language***.  The SEC alleges that the statement in six Stein Roe

prospectuses, which states, "*Generally*, we limit you to four telephone exchange roundtrips per

year . . ." is false.  SEC Resp. SOF ¶ 8, 10.  The SEC speculates that the arrangement traders (in

particular, D.R. Loeser[5]) traded through "telephone exchanges."  But it presents no "definite,

competent evidence," Tambone Mem. at 2-3, that any of the traders in fact traded over the

telephone.[6]  The page of the prospectuses the SEC relies on states that investors could trade by

"mail," "phone," "wire," "electronic transfer," "exchange," or "automatic exchange."  SEC Ex.

55.  The emails the SEC relies on with respect to Loeser's trading provide that Loeser sought

permission to "set up a direct link" to trade in Growth Stock through "omnibus" accounts,[7] SEC

Ex. 12 at 1603, 1611, and that Loeser traded through a broker.[8]  The prospectus language and the

emails support the inference that these trades were electronic and the lack of evidence of

telephone trading require the dismissal of all claims related to these six prospectuses.

***1999 / 2000 Newport Tiger Prospectuses.***  The SEC does not have "definite, competent

evidence" to support its claim that the 1999 and 2000[9] Newport Tiger prospectuses are untrue.

These prospectuses permit (but do not require) the fund to terminate an investor's exchange

privilege "if the advisor determines that [the] exchange activity is likely to adversely impact its

---

[5] *See* Loeser discussion at § II. D.

[6] There is no limit for or prohibition against electronic trades.  Telephone trades would impose additional administrative costs in that Columbia would have to provide staff to answer the telephones and process the trades, while electronic trades (as it appears Loeser conducted) could be executed with fewer administrative costs.

[7] Trading through omnibus accounts is indicative of electronic trading.  Tambone **Ex. 114.**

[8] Like Loeser, Calugar traded through brokerage firms (Security Brokerage and DLJ) indicating that it too traded electronically.  Tambone Ex. 61.

[9] The SEC does not dispute that the May 1, 2000 Newport Tiger prospectus was amended in November 2000 to remove all language concerning "market timers" or "frequent purchases."  SEC Resp. SOF ¶ 13; SEC Mem. at 15 n.11.  Its argument that the amendment "was meant only to remove the … contingent redemption fee … rather than any change in Columbia's or Newport Tiger's market timing policy" is speculation and beside the point.  Even if its speculation is so, there was no public statement that could be false as a result of approved arrangement trading during this period.  *E.g.*, Giacalone.  *See* § II D, *infra*.

3

ability to manage the Fund" and provide for a contingent redemption fee on shares held less than

five business days.  SEC Resp. SOF ¶ 12.  These disclosures do not state that the funds "disallow

market timing," SEC Mem. at 10, but rather, assess a fee for same.  The only document the SEC

cites to support this claim is an internal Columbia memo, which is hearsay and concerns personal

investments by employees.  SEC Ex. 5 ("you cannot speculate or time your personal transactions

in any Colonial, Stein Roe or Newport Fund to the detriment of that fund").  Assuming *arguendo*

Columbia had an internal policy prohibiting market timing, the SEC has not charged Tambone

with violating an internal corporate policy—but with using a false statement in a prospectus.[10]

    ***Advisor Discretion***.  No reasonable jury could conclude that the "Advisor Discretion"

*i.e.*, "Fund Policy on Trading of Fund Shares" in 20 prospectuses, was rendered false by any of

the six arrangements, all of which were approved by the advisor.  Therefore, summary judgment

should enter for Tambone on all claims.  *Silver v. H&R Block, Inc.*, 105 F.3d 394, 396 (8th Cir.

1997) ("if no reasonable investor could conclude public statements, taken together and in

context, were misleading, then the issue is appropriately resolved as a matter of law");

*Glassman*, 90 F.3d at 633-634 (finding on motion to dismiss that "Plaintiffs misread the

Prospectus").  While the first sentence of the Fund Policy on Trading of Fund Shares cannot be

ignored, SEC Mem. at 4, the SEC is wrong that the "opening sentence . . . expressly prohibits

(without qualification) both short-term and excessive trading." *Id*.  The first sentence is

"qualified" by the three succeeding sentences, so when read as a whole, the paragraph makes

clear that short-term or excessive trades will be rejected only *if* those traders "in the advisor's

opinion, have a pattern of short-term or excessive trading or whose trading has been or may be

disruptive to the fund."  SEC Resp. SOF ¶ 14.  This is the only reasonable reading of the

---

[10] *Alten v. Berman*, 1993 WL 541668, at *4 & n.6 (E.D. Pa. 1993) ("failure to follow internal company policy does not amount to tortious conduct or a violation of federal securities laws").

language.  First, the opening sentence cannot stand alone for the simple reason that the phrase

"short-term or excessive trading" is not defined.  SEC Resp. SOF ¶ 16.  And, the Columbia

portfolio managers had various understandings of those phrases, ranging from daily trading, to

trading once every three months.  SEC Resp. SOF ¶ 17.  Because those terms standing alone are

ambiguous and undefined, the remainder of the paragraph is necessary to explain the policy in

full.  Under the SEC's interpretation, the remainder of the paragraph could have been deleted,

which would have "render[ed] … terms within [the statement] meaningless."  *Powershare, Inc.*

*v. Syntel, Inc.*, 597 F.3d 10, 16 (1st Cir. 2010).  Second, the SEC's interpretation warps the

meaning of the word "opinion" in the phrase "advisor's opinion."  As the Court of Appeals

stated in "reject[ing] the SEC's expansive interpretation" of the word "make," an undefined word

"should be given its ordinary meaning."  *SEC v. Tambone*, 597 F.3d 436, 438, 442-443 (1st Cir.

2010).  An "opinion" is a "view, judgment, or appraisal formed in the mind about a particular

matter."  *See* Webster's Third New Int'l Dict. 1582 (2002).  Thus, the SEC cannot ignore that

whether a certain trade would be rejected depended upon the "opinion" of the fund advisor.

Third, the SEC concedes that the third sentence of the paragraph provides the advisor with

needed "flexibility."  SEC Mem. at 5.  But if the paragraph was a "strict prohibition," there

would be no need for any "flexibility."  Finally, numerous Columbia employees testified that the

prospectus permitted trading that, in the opinion of the portfolio manager, was not disruptive.

SEC Resp. SOF ¶ 15.

**B.      The Alleged Market-Timing Disclosures Were Immaterial.**  The SEC does not

refute Tambone's argument that materiality must be determined on a fund by fund basis.

Because the SEC has no evidence of the impact of the arrangement trading on any of the funds

individually, it cannot show that any of the alleged false statements are material.  SEC Mem. at

10-14.[11]   Though the SEC argues that materiality cannot "be answered through a post-hoc"

analysis of the harm to the funds, it cites no authority and several cases (even those cited by the

SEC) assess materiality by considering financial harm to investors.[12]   The SEC itself argues that

the misstatements are material because "the arrangement trading caused millions of dollars in

investor losses," *id*. at 13-14, improperly relying on the settlement with Columbia Distributor, as

evidence of the relevant dilution.[13]   *Id*. at 13.

### C.   Summary Judgment Should Be Granted On The § 17(a) Claim.

1.   <u>**Tambone Was Not Negligent.**</u>   The SEC's claim that Tambone was

negligent depends on its incorrect reading of the prospectuses as "strictly prohibiting" market

timing. *See, supra*.  However, even if the Court finds that a reasonable jury could agree with the

SEC's interpretation of the prospectus, no jury could conclude that *Tambone's* interpretation is

unreasonable, as it must to find he is negligent.  *In re Flannery & Hopkins*, SEC Release No.

438, 2011 WL 5130058, at *34 (Oct. 28, 2011).  The SEC does not cite "definite, competent

evidence" to refute the conclusion that Tambone's interpretation of the prospectus language was

consistent with the language itself and the expressed views of numerous individuals including

---

[11] The SEC cites no authority for its arguments as to why the statements were material.  Any "difference between the prospectus disclosure about the nature of the fund investments and actual fund investments" is irrelevant because the SEC has not alleged that the disclosure of the funds' investment holdings were false.  The fact that the language was included in the prospectuses does not make that language material.  If that were so, every statement in a prospectus would be material, which would read out the materiality requirement.  Columbia's devotion of resources to ridding the funds of trading which had not been approved by the advisor does not show that a reasonable investor would find important the trading by these six traders.  Without dilution to a fund (and with advisor approval as per the prospectus) no reasonable investor would find the trading important.  The SEC's 2004 Rule which requires disclosure of arrangements cannot be applied retroactively.  *Marrie v. SEC*., 374 F.3d 1196, 1209-10 (D.C. Cir. 2004).  It did not exist during the period alleged; its absence shows no requirement to make such a disclosure.

[12] *SEC v. Gabelli*, 653 F.3d 49, 57-58 (2d Cir. 2011) (court relied on allegations that conduct at issue caused annual dilution of 1-4% of the mutual fund's assets to determine that SEC met materiality); *SEC v. Durgarian*, 477 F. Supp. 2d 342, 350 (D. Mass. 2007) (alleged losses material where losses in funds of $4 million and $2.7 million).

[13] The Columbia settlement is inadmissible to prove the amount of dilution.  Fed. R. Evid. 408(a); *McInnis v. A.M. F. Inc*., 765 F.2d 240, 246-52 (1st Cir. 1985).  *See also* Rule 403, 404(b).  Moreover, the Columbia OIP involved at least three arrangements not at issue here (Signalert and Tandem which the SEC has admitted it has no evidence for and Waldenbaum which is not part of this case).  Even if the settlement accurately reflected dilution in the Columbia funds, it is not accurate with regard to this case.  *Compare* SEC Ex. 1 *with* Complaint.

portfolio managers, a fund trustee, and senior management outside the Distributor, all of whom, believed that frequent trading was permitted if the fund's advisor approved.  SEC Resp. SOF ¶15.  This testimony is consistent with documentary evidence.  *E.g.*, Tambone **Ex. 61** (February 17, 2000 e-mail from Hussey to Tambone noting "we seek pre-approval from the portfolio manager and outline the terms and nature of the relationship"); Tambone SOF ¶ 15.[14]

The SEC admits that the portfolio managers approved each of the six arrangements at issue, SEC Resp. SOF ¶ 23, and that the transfer agent was responsible for "identifying market timing activity in the funds," and "detecting and halting market timing," *Id*. ¶ 4.  These facts support Prof. Sirri's conclusion that the portfolio manager and transfer agent, not Tambone, were in the best position to determine whether trading was disruptive to the fund.  *Id.* ¶ 15.

The SEC's reliance on Tambone's signing of six selling agreements—as evidence of his negligence in the use of the prospectuses at issue—is misplaced.  *See* SEC Mem. at 17, SEC Ex. 11.  As this court found in dismissing the complaint, the allegations regarding the selling agreements did not support the SEC's claim because the SEC did "not allege when the selling agreements were signed, to which mutual funds they pertained, who the parties to the agreement were, what prospectuses the parties to the agreements received or when or whether those parties bought or sold mutual funds in which market timing was occurring."  *SEC v. Tambone*, 473 F. Supp. 2d 162,167 (D. Mass 2006).[15]  The six selling agreements confirm that none of the parties to the agreements are the investors at issue, the agreements do not show what prospectuses the investor received or if, or when, that investor bought or sold mutual funds in which market timing was occurring.  They are inadmissible.

---

[14]The SEC disputes Tambone SOF ¶15, but does not provide admissible evidence to rebut the stated facts.

[15] *See also SEC v. Tambone*, 597 F.3d 436, 451 (1st Cir. 2010) (en banc) (SEC did not contest findings).

The SEC's argument that the arrangements violated the prospectuses because Columbia allowed market timing by "preferred shareholders" while "prevent[ing] many other shareholders from short term or excessive trading," SEC Mem. at 16-17, misses the point. Any shareholder could have sought the advisor's approval, which the prospectus provides as a condition precedent to any such trading.[16] Lastly, as summarized in § II.D *infra*, Tambone had little, if any, knowledge or involvement in the six arrangements and acted reasonably with regard to each.

2.  **Tambone Did Not Obtain Money or Property By Means of a False Statement**. A central aspect of the SEC's case is that Tambone "*reaped financial benefits* by allowing certain preferred customers to engage in short-term or excessive trading to the potential detriment of other investors . . . ." Compl. ¶ 2 (emphasis added). The SEC does not dispute that under §17(a)(2) it must prove that Tambone "obtain[ed] money or property by means of any untrue statement." 15 U.S.C. § 77q(a)(2). Yet, it has no "definite, competent evidence" to support its theory that Tambone received commissions as a result of the trades at issue.[17]

The only evidence the SEC cites is the opinion of its expert, Lawrence Harris. But Harris's opinion is fundamentally flawed as detailed in Tambone's Motion to Preclude His Testimony ("Daubert Mem."). As discussed there, one of those flaws is Harris erroneously assumes that Tambone received commissions from *all of the trades by all preferred customers whether or not they were pursuant to special arrangements*. Daubert Mem. at 16. Harris did so even though he admits that Columbia had a policy and practice to remove market timing trades

---

[16] While Columbia monitored and kicked out unapproved traders engaged in disruptive market timing, SEC SOF ¶¶ 61-64, the transfer agent's policies set "fund by fund thresholds," SEC Ex. 10, and called for stopping the largest trades. SEC Ex. 8 (targeting of trades "of $250,000 or $500,000 or more"); Tambone **Ex. 6** at App C. Trades below the thresholds were allowed because they were not disruptive in the opinion of the advisor.

[17] *See SEC v. Forman*, 2010 WL 2367372, at *8 (D. Mass. June 9, 2010) (Zobel, J.) (entering summary judgment for defendant on § 17(a)(2) claim where "SEC has produced no evidence that the improper revenue recognition caused an increase in share price on the dates Forman or [the company] sold securities" or "that the employee bonus was tied to company performance or that Forman was an executive within the meaning of the bonus plan").

from sales used to calculate commissions.[18]  In an effort to justify Harris's failure to exclude the market-timing trades, the SEC obtained a second affidavit from Drew Lynch to assert that "many [market timers] were likely never caught," so "i[t] cannot be reasonably disputed that Tambone received some compensation from the timing arrangements."  SEC Mem. at 18.  But Tambone need not prove that every single market timer was excluded.  The SEC has the burden to prove he actually "obtain[ed] money or property" by means of or "use" of the statements which the SEC alleges were rendered false as a result of the arrangement trades at issue.[19]

Drew Lynch's second affidavit confirms the testimony of Tambone, Hussey, and Palombo, as well as the April 6, 2000 memo (attached to Lynch's first affidavit) that Columbia's policy and practice was to search for and exclude market timing trades.  *See* Lynch Affidavits; Daubert Mem. at 16-17 & n.21.  This policy makes sense; Columbia had no interest in paying commissions based on trades that consisted of the same money moving in and out of a fund. Tambone **Ex. 111** at 80  Even if Columbia did not catch every trade, the SEC has no evidence that any of the arrangement trades alleged were *not* excluded.  And, it stands to reason that the arrangement traders (which were pre-approved by the portfolio managers and known to the transfer agent) are the trades most likely to have been identified and removed.[20]

**D.    Tambone Did Not Aid and Abet the Violations.**  The SEC cannot prove the existence of any primary violation, because (1) the prospectus statements were not untrue, (2) the

---

[18] Even if the Court finds that Harris's opinion is admissible to prove that Tambone "obtained money or property" as a result of the market timing trades, Harris opines that Tambone received zero commissions in 1998, 1999, 2002, and 2003.  Tambone **Ex. 110** at Exs. 26.1, 26.2.  As a result, the § 17(a)(2) claim must, at a minimum, be dismissed for those years.  This is so even assuming *arguendo*, as the SEC claims, that Columbia did not begin backing out the market timing trades until 2000.  *See* SEC Mem. at 18 n.15.

[19] To the extent the SEC suggests it lacks evidence because Tambone and third parties did not produce documents requested is false. SEC Mem. at 17.  Tambone produced all documents properly requested of him.

[20] For example, Harris notes, but ignores, that sales by Ilytat in 2001 were backed out ("72 million associated with Ilytat in 2001").  Tambone **Ex. 67 ¶** 113.  The Lynch Affidavit also notes that over $20 million in Ritchie trades were excluded for compensation purposes.

statements were not material, and (3) the claims are barred under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011).  The SEC also cannot prove that Tambone "was generally aware that his role or conduct was part of an overall activity that was improper" or that he "knowingly and substantially assisted in the primary violation[s]."  *SEC v. Tambone*, 550 F.3d 106, 144 (1st Cir. 2008).  The SEC does not cite a single case in support of its claim that Tambone's alleged "knowledge," "facilitation," or "failure to correct" the alleged improper arrangements constitutes "substantial assistance," and the law is to the contrary.  *SEC v. Durgarian*, 477 F. Supp. 2d 342, 357 (D. Mass. 2007) ("attendance at the meetings, agreement to the plan, and failures to make appropriate disclosures" did not constitute "substantial assistance") *aff'd sub nom. SEC v. Papa*, 555 F.3d 31 (1st Cir. 2009).

       **D.R. Loeser**.[21]  There is no evidence that Tambone had any knowledge or involvement in the approval of Loeser's arrangement in Growth Stock in December 1998.[22]  *First*, at the time of Loeser's trading in Growth Stock, Hussey did not report to Tambone, but rather to Kevin O'Shea.  SEC SOF ¶3.  O'Shea, not Tambone, had knowledge of the Loeser arrangement.  SEC Ex 12 (Hussey wrote, "we will move forward ... unless I hear back to the contrary from you or Kevin [O'Shea])."  *Second*, at the time of the arrangement and Loeser's trading in Growth Stock, Tambone had no supervisory control over the direct sales of Stein Roe.  Tambone SOF ¶ 41.  The SEC objects to this as material, but does not dispute it.  SEC Resp. SOF ¶¶ 41, 42.  *Third*, the prospectuses in effect during Loeser's trading only state, "*Generally*, we limit you to four telephone exchange 'roundtrips' per year . . .",  Tambone SOF  ¶¶ 9-11, but as the SEC dose not dispute, the President of Stein Roe approved this arrangement, SEC SOF ¶41, which takes it

---

[21] The below arguments incorporate by reference Tambone Mem. at 12-17.

[22] The only information the SEC has is that Tambone learned about the arrangement in January and February 2000 *after* the arrangement was entered.  SEC Resp. SOF ¶ 41.

out of the realm of "generally." *Fourth*, as discussed *supra*, although the SEC speculates that the

Loeser transactions were via telephone, it has offered no "definite, competent evidence" of this

assertion. *Fifth*, once Tambone learned about the trading, he had Lynch address it and the

trading ended in April and May 2000 before the Advisor Discretion language was added. SEC

Resp. SOF ¶¶ 43.

**Daniel Calugar**. As with Loeser, the only evidence of Tambone's "knowledge" of the

Calugar arrangement in 1999 and trading are the January 14, 2000 Knudsen memo and the

February 17, 2000 e-mail referring to the same memo. There is no evidence that Tambone

provided any "assistance," let alone "substantial" assistance with regard to Calugar's

arrangement or trading. As the SEC admits, Calugar's trading was approved by Hussey (not

Tambone), and the portfolio manager, Erik Gustafson. SEC SOF ¶¶ 30,33,34. Hussey reported

to Kevin O'Shea at the time, not Tambone. SEC SOF ¶ 3. Tambone's alleged knowledge in

February 2000 occurred before the February 2001 Advisor Discretion language appeared in the

prospectuses for the Growth Stock and Young Investor funds in which Calugar traded. There is

no evidence Calugar traded by telephone. *See*, *supra*, at 2 & n.5-8.

**Giacalone**. The SEC admits that prior to Giacalone's trading, on November 24, 2000,

the Newport Tiger fund prospectus was amended to remove the language concerning the

contingent redemption fee. SEC Resp. SOF ¶¶ 44, 46. The SEC relies solely on the statement

"[t]he Fund *may* terminate your exchange privilege if the advisor determines your exchange

activity is likely to adversely impact its ability to manage the Fund"—but it previously admitted

that the "head of the Newport Group," approved the arrangement.[23]  Tambone SOF ¶ 45.

---

[23] SEC SOF ¶ 45 disputes that Newport Tiger portfolio manager, Tim Tuttle, approved the Giacalone arrangement, citing paragraph 77 of the Complaint. But that paragraph clearly states that the "head of the Newport Group" approved the arrangement with Giacalone. *Id.* Tuttle was the head of the Newport Group. Tambone **Ex. 34** at 16.

11

Because there can be no false statement under these circumstances, there is nothing that Tambone could have "substantially assisted."

**Ritchie**.  The only evidence the SEC has with regard to Ritchie is one email sent to Tambone years after Richie started trading (and less a month before it stopped) in Growth Stock[24] and testimony that it admits is inadmissible hearsay.  SEC Resp. SOF ¶ 51.  Nevertheless, the SEC argues Tambone "approved" the trading from 1999 through 2003, because his response to the August 2003 e-mail "necessarily ratified the pre-existing timing arrangement."  SEC Mem. at 16.  But "[o]ne cannot aid and abet a fraudulent scheme that is already complete."  *Papa*, 555 F.3d at 36.  Ritchie had been trading for 4 years; Tambone could not retroactively approve it.

The SEC admits that the investigative testimony of Eric Kamin and Peter Martin, which it relies on to show that Tambone earlier "approved" Ritchie's trading, "may constitute inadmissible hearsay," and argues "that the testimony may become admissible" at trial.  SEC Resp. SOF ¶ 51.  But, the testimony is inadmissible because both testified that they had no personal knowledge that Tambone approved the Ritchie arrangement.  Tambone SOF ¶ 52 & n.16; Tambone **Ex. 112** at 60-62.  In addition, Hussey (who Kamin and Martin testified was the one who spoke to Tambone) testified that he did not recall a conversation with Tambone and would not have had such a discussion—Hussey approved it.  The SEC does not dispute Hussey's testimony.  SEC Resp. SOF ¶52.  The SEC needs "definite, competent evidence" now, not the possibility of it later, to rebut Tambone's motion.[25]

**Stern**.  Though the SEC alleges Tambone approved Stern's trading in three funds, it has presented no admissible evidence to show Tambone knew of the arrangement or the trading.  The

---

[24] Though the SEC alleges that Ritchie also traded in Newport Tiger, there is no evidence that Tambone ever had knowledge of such trading.  Tambone SOF ¶ 49.

[25] *Mississippi Pub. Emp. Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 28 (1st Cir. 2008).

SEC offers the inadmissible hearsay testimony of Peter Martin that he "belie[ved]" Tambone "had some notification" of the trading.  SEC Resp. SOF ¶ 58.  It fails to dispute Martin's testimony, set forth in Tambone's SOF ¶ 58 n.17, that Martin's "belief" is based on hearsay.  The SEC argues that Martin's testimony "may become admissible" at trial, but, again, the SEC must have "definite, competent evidence" now, not at trial, in order to defeat summary judgment.  *Mississippi*, 649 F.3d at 28.  At best, Martin's testimony shows Tambone had "knowledge" of Stern's past trading.  There is no evidence of "substantial participation."

**Ilytat**.  There is no evidence Tambone knew of Ilytat's trading in any fund other than Newport Tiger.  Though the SEC "dispute[s]" this, it cites no evidence that "Tambone was aware that Ilytat was on a list of approved timers, which list identified that Ilytat was allowed to actively trade Acorn International …and Acorn Foreign Forty …"  SEC Resp. SOF ¶ 84.  Neither of the lists cited were sent to Tambone.  *Id.* ¶ 59 (*citing* SEC Exs. 30, 31).

Tambone also did not "knowingly" provide "substantial assistance" to any violation concerning Ilytat's trading in Newport Tiger, which was approved by the portfolio manager, Chris Legallet.  *See* Tambone SOF ¶¶ 63-82.  The SEC argues that there is a dispute as to whether Legallet revoked his approval because "Legallet testified [in his 2011 deposition] that, following the October 24, 2000 email . . . it was his position from that point onward that Ilytat should be removed from the Fund."  SEC Resp. SOF ¶ 65 (*citing* SEC Ex. 27 at 82-83.[26]  But Legallet's 2011 testimony is insufficient to defeat summary judgment.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

[26] *See* SEC Resp. SOF ¶65 and SEC Supp. Resp. to Statements 65-71, 75-82.

Furthermore, "courts have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . ." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  Here, both the contemporaneous documents and Legallet's 2003 testimony, show (contrary to his 2011 testimony) that he knew Ilytat was in Newport Tiger through August 2002, (Tambone SOF ¶79 citing **Ex. 91**[27]) when it was kicked out, but that he did not revoke his approval or stop Ilytat's trading before then.  In November 2001, Legallet received information from the transfer agent which stated that Ilytat was trading in Newport "over $200,000 more than 2 times in a month" "without interruption from [the transfer agent] due to their Liberty relationship."  Tambone **Ex. 39** at 86-90; Tambone **Ex. 89**.  In July 2001, the transfer agent notified Newport that it had identified market timing trades of "$4.8 million from Ilytat."  SEC Resp. SOF ¶ 77.

The SEC disputes the fact that Legallet did not rescind his approval until August 2002.  But the paragraphs it references in support of its statement that "[a]dditional documents cited in the SEC's Statement of Facts indicate that Legallet tried to remove Ilytat from Newport Tiger at various points before August 2002[s] *[s]ee supra* ¶¶ 39-42, 45-46", SEC Resp. SOF ¶79, have nothing to do with Ilytat in Newport Tiger.  Moreover, in his 2003 testimony, Legallet said he *did not know of and could not identify any efforts he made to get Ilytat out of the fund or ensure it had withdrawn, between March 2001 and August 2002*.  Tambone **Ex. 39** at 271-272.[28]  Because Legallet's 2011 testimony that his "position" regarding Ilytat did not change after October 2000,  SEC Resp. SOF ¶¶ 65, 66, 76, 78, 79, contradicts his 2003 testimony, it cannot

---

[27] On August 27, 2002, Legallet also communicated to Larry Lai at Newport that "the decision was *finally made to tolerate* no flipping. … and that "some like Ilytat *had been tolerated* given they held 20mm or so long term in the fund.  *now* there is 0 tolerance."  Tambone **Ex. 92**.

[28] The SEC does not dispute that Legallet testified "2002 was the first year where he sensed performance could be impacted from cash activity in several of our funds … ."  SEC Resp. SOF ¶ 82; Tambone **Ex. 39** at 180 and **Ex. 79** at 42.

create a genuine issue of fact sufficient to survive summary judgment.  Moreover, there is no

evidence that Legallet's "position" as articulated in his 2011 testimony, even if true, was ever

communicated to Tambone.  And, the SEC does not cite any admissible evidence that Tambone

knew about, or was "substantially" involved in, anything to do with Ilytat in Newport Tiger after

"management pursued a imposition of the redemption fee," SEC Resp. SOF ¶ 74, which Legallet

had proposed in March 14, 2001 for Ilytat remaining in the fund.

   **E.** ***Janus* Mandates Dismissal of The Entire Complaint.** The SEC's response to

Tambone's argument that *Janus* forecloses the remaining claims omits any discussion of its

claim for aiding and abetting Columbia's violations of Rule 10b-5, so that claim must be

dismissed.  Though the SEC cites *SEC v. Pentagon Capital Mgt PLC*, 2012 WL 479576

(S.D.N.Y. Feb. 14, 2012), for the proposition that "*Janus* does not apply to Commission

actions," SEC Mem. at 21, the case only holds that *Janus* does not "apply to SEC enforcement

actions brought pursuant to Section 17(a) . . . ." *Id.* at *42.  Even on that ground, *Pentagon*

*Capital* conflicts with well-reasoned opinions in *SEC v. Kelly*, 2011 WL 4431161, at *5

(S.D.N.Y. Sept. 22, 2011) and *In re Flannery & Hopkins*, 2011 WL 5130058, at *35.  Tambone

Mem. at 19-23.

   **F.** **The SEC Has No Evidence To Support Its Claim For Injunctive Relief.** The

SEC must present "definite, competent, evidence" demonstrating a sufficient triable issue of fact

on its claim for injunctive relief or face entry of summary judgment against it.[29]   The SEC fails

to distinguish the cases Tambone cites, which bar the entry of an injunction where, as here, the

SEC failed to present evidence to support its injunction claim at the summary judgment stage.

Tambone Mem. at 24 n.30.  The SEC cannot wait until "[a]fter trial," to present the evidence

---

[29]*See SEC v. Coleman*, 1993 WL 13653773, *2 (D.D.C. 1993) (finding, on summary judgment, that "court need not address whether or not Mr. Fleming violated § 17(a)" where SEC had not met burden for permanent injunction).

required to support its claim.[30] In any event, the SEC does not present "definite, competent

evidence" of "positive proof of a reasonable likelihood that past wrongdoing will recur."

Tambone Mem. at 23.  It ignores the fact that Tambone has had a clean regulatory record for his

entire career (save this case), and that nearly ten years have passed since the relevant events.[31]  It

only argues that an injunction may be appropriate because of Tambone's alleged role "as a key

decision-maker," who acted "with a high degree of *scienter*" in violations over a number of

years.  SEC Mem. at 24.  But the only remaining claims against Tambone are for negligent

misrepresentation in violation of § 17(a)(2) and "aiding and abetting" the fraud of others.[32]  Even

assuming a finding of liability, the SEC does not present "positive proof" that any "past

wrongdoing will recur." *SEC v. Tambone*, 802 F. Supp. 2d 299, 305 (D. Mass. 2011).

## III.   CONCLUSION

For these reasons and those set forth in Tambone's opening Memorandum, summary

judgment should enter in favor of Tambone on all claims.

---

[30]*SEC v. Shanahan*, 2010 WL 173819 (D. Minn. Jan. 13, 2010) (granting defendant's motion for summary judgment as to permanent injunction at summary judgment stage).

[31]Cases the SEC cites in which injunctions were imposed after long delays are inapposite as they involve egregious conduct not at issue here.  *SEC v. Lorin*, 76 F.3d 458, 460 (2d Cir. 1996) (defendants were "participants in an agreement" to manipulate market with co-defendants "who had had been convicted of criminal offenses relating to these activities"); *SEC v. Brown*, 579 F. Supp. 2d 1228, 1238 (D. Minn. 2008) (defendant had been "held in contempt for violating [the] preliminary injunction . . . in combination with the defendant's series of unlawful transfers").

[32] *SEC v. Todd*, 2007 WL 1574756, at *17 (S.D. Cal. May 30, 2007) (denying injunction where defendants liable only for aiding and abetting violations of reporting and books and records provisions).

Dated:  March 12, 2012                          Respectfully Submitted,

                                                JAMES TAMBONE
                                                By his attorneys,

                                                */s Eric M. Gold*_____
                                                A. John Pappalardo (BBO# 388760)
Michael J. Biles, *Pro Hac Vice*                Paula J. DeGiacomo (BBO# 118180)
GREENBERG TRAURIG, LLP                          Eric M. Gold (BBO# 660393)
300 West 6th Street, Suite 2050                 GREENBERG TRAURIG, LLP
Austin, Texas 78701                             One International Place
Tel:  512-320-7200                              Boston, Massachusetts  02110
Email:  bilesm@gtlaw.com                        Tel:  617-310-6000
                                                pappalardoj@gtlaw.com
                                                degiacomop@gtlaw.com
                                                golde@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent via U.S. first class mail to those indicated as non-registered participants on March 12, 2012.

                                                */s Eric M. Gold*_____

17