# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 06-10885-NMG |
| JAMES TAMBONE and ROBERT HUSSEY, | ) ) | |
| Defendants. | ) ) ) | |

**EXPERT REPORT OF PROFESSOR ERIK R. SIRRI**

**October 19, 2011**

I.    **Qualifications**

1.    I have been a Professor of Finance at Babson College in Wellesley, Massachusetts since

2009, where I also previously held the same position from 1999 to 2006. I was an

Assistant Professor of Finance at Harvard Business School from 1989 to 1995. I received

my B.S. from the California Institute of Technology, an M.B.A. from the University of

California, Irvine, and a Ph.D. in Finance from the University of California, Los Angeles.

2.    I was the Director of the Division of Trading and Markets at the U.S. Securities and

Exchange Commission ("SEC" or "Commission") from 2006 to 2009. As the Director of

the Division of Trading and Markets, I was responsible to the SEC for matters relating to

the regulation of stock and option exchanges, national securities associations, brokers,

dealers, clearing agencies, and transfer agents. I was responsible to the Commission for

regulating credit rating agencies and implementing the Credit Rating Agency Reform Act

of 2006 (the "Reform Act").

3.    I served as the SEC's Chief Economist from 1996 to 1999, where I managed the SEC's

Office of Economic Analysis. As the Chief Economist, I was responsible for overseeing a

staff of researchers that provided analysis to assist the SEC in an ongoing evaluation of

policies, markets, and systems.

4.    I have served as a Governor of the Boston Stock Exchange, and a member of the regulatory

board of the Boston Options Exchange. I am currently an independent trustee of the

Natixis family of mutual funds. Over the course of my career I have consulted for

securities firms, stock exchanges, mutual fund companies, issuers, and information vendors

on a variety of regulatory and business matters.

5.    My areas of research include securities market structure, the interaction of securities law

and finance, and investment management. My written work includes publications in peer-

reviewed academic journals, financial articles, cases, and book chapters. See Exhibit 1 for

my curriculum vitae, which includes a list of publications I have authored and a list of the

proceedings during which I have provided sworn testimony during the last four years by

deposition, at trial or arbitration, and in front of the United States Congress.

6.    I am being compensated on this matter at my regular rate of $900 per hour. My

compensation does not depend on the outcome of this matter. My work on this matter is

on-going and I reserve the right to supplement this report as new information becomes

available.


II.    **Assignment**

7.    I have been retained by counsel for Mr. James Tambone and Mr. Robert Hussey (the

"Defendants") to: (1) review the "market timing" representations that were included in the

Columbia Fund prospectuses; (2) provide the Court with background information

concerning the mutual fund industry, the organizational structure of mutual fund

complexes, and market timing within the mutual fund industry; and (3) review the SEC's

posture and guidance with respect to market timing within the mutual fund industry and the

pricing of mutual fund shares.

8.    In formulating my opinions and preparing this report, I have relied on my background and

experience, and considered the materials listed on Exhibit 2.

### III.  Summary of Opinions

9.    Throughout this report I use the term "market timing" to describe the collection of

activities that includes frequent trading, tactical asset allocation, stale price arbitrage,

portfolio rebalancing and other trading intensive investment strategies.  On the issues I

have been asked to consider, I have formed the following opinions:

–   The SEC provided limited guidance on "market timing" or "stale price arbitrage" prior

to the fall of 2003.[1]  The regulatory environment surrounding market timing was

therefore uncertain and uncharted.

–   Market timing in mutual funds was an industry-wide issue prior to the fall of 2003,

when the SEC began to address frequent trading and stale price arbitrage within mutual

funds.

–   A review of the prospectuses for the Columbia Funds at issue in this matter reveals that

the fund advisor had the responsibility to exclude trading they believed to be

detrimental to the fund.[2]

–   In their role as the manager of a fund's investments, the portfolio manager and the

advisor have knowledge of a fund's day-to-day cash balances and aggregate investor

cash flows that would allow the portfolio manager and the advisor to determine if

overall investor subscriptions or redemptions are disruptive or harmful to the fund.  A

distributor employee would not typically have access to this information, and I have

seen no evidence to indicate that Columbia's distribution entity was provided daily cash

balance or daily cash flow information.

---

[1] The guidance that the SEC provided in 2001–that a fund should fair value price its portfolio securities when significant events occur–is an example of the limited guidance provided by the SEC.
[2] See footnote 12 for a list of the funds traded under the alleged arrangements.

      &minus;  Daily fair value pricing was the only method that would eliminate both the incentives

for, and the harmful effects of, stale price arbitrage trading. Working for the funds'

distributor, the Defendants had no role in daily fair value pricing the Columbia Funds.

10.    The bases for each of these opinions are set forth in the body of this Report.


**IV.  Mutual Fund Industry Background**

**Mutual Funds**

11.    A mutual fund is a professionally-managed corporation or trust that pools money from

many investors to invest in stocks, bonds, or other financial instruments. Oversight of the

management and operations of a mutual fund is the responsibility of the fund's board of

directors (may also be structured as a board of trustees), but the board is not involved in the

day-to-day management of the fund. While federal securities laws require a minimum of

40 percent of the directors of a mutual fund to be "independent," according to the

Investment Company Institute ("ICI"), "[i]n nearly 90 percent of fund complexes, 75

percent or more of fund directors are independent" and "98 percent of independent

directors have never been employed by the fund complex."[3] A mutual fund has no

employees, and the board of directors of the fund hires other entities to provide advisory

and operational support to the fund. The mutual fund's investments are managed,

according to the fund's stated investment objective as set forth in its prospectus, by an

advisor or management company contracted to provide these services to the fund. Mutual

funds offer the advantages of portfolio diversification and professional management that

many investors would not be able to achieve within their individual investment portfolios.

---

[3] ICI *Mutual Fund Governance Overview*, available at www.ici.org/idc/policy/governance/overview_fund_gov_idc.

**The Various Roles within a Mutual Fund Complex**

12.   A mutual fund complex includes a number of distinct entities with separate functions; for

purposes of this report I focus on the investment advisor, the distributor, and the transfer

agent.[4]

13.   The investment advisor for a mutual fund is generally the sponsor of the fund, and is

responsible for launching the fund and complying with regulations governing investment

advisors and investment companies.  A portfolio manager (or managers), who is generally

an employee of the investment adviser, is responsible for managing the assets of the

individual mutual fund.  This includes implementing the investment strategy of the mutual

fund by selecting the appropriate mix of asset classes, choosing individual investments,

managing risk, and conducting the day-to-day trading within the portfolio.

14.   In managing the day-to-day trading of the portfolio, the portfolio manager is generally

aware of aggregate flows of investor money within the investment portfolio from

shareholders who are purchasing, redeeming, or exchanging mutual fund shares.  As the

manager of the fund's cash balances, the portfolio manager is able to monitor the

appropriate level of cash to ensure that the fund does not experience difficulties with its

cash management.

15.   The role of the distributor is to market and sell shares of the mutual funds to investors.  In

general, the distributor is responsible for maintaining relationships with large investors,

wholesalers, and individual financial advisors.  As part of maintaining these relationships

the distributor disseminates sales materials and prospectuses for the funds to prospective

purchasers.  The sales materials refer investors to the prospectuses for additional

---

[4] The operative complaint in this matter (the "Complaint"), filed on May 19, 2006, treats each of these entities as separate and distinct and I agree with this view. See Complaint ¶¶ 22-24.

information on the funds.[5]  The Defendants worked for the distributor, Columbia

Distributors (formerly known as Liberty Distributors).

16.    The role of the transfer agent is to maintain the records of investors, such as account

balances and transactions.  The transfer agent may also provide additional customer service

functions such as monitoring, registering, exchanging, and transferring shares and

maintaining beneficial ownership statements on behalf of shareholders.  It is my

understanding that most individual investors will interact with the mutual fund complex

through the transfer agent, receiving information such as semi-annual reports and

prospectuses directly from the transfer agent or their designee.  The transfer agent will also

provide descriptive information about the funds to investors, and will answer questions

about fund performance and strategy.


V.    **"Market Timing" in Mutual Funds**

17.    In the context of financial markets, "market timing" does not have a unique or consistent

definition.  In the context of mutual funds, the term "market timing" has been associated

with various types of trading behaviors and strategies including frequent trading, short-term

tactical asset allocation, portfolio rebalancing, and stale price arbitrage trading.  Kevin

Rupert, an accountant with the SEC's Division of Investment Management, offered three

different definitions of the term "market timing."[6]  Despite the evolving definitions and


[5] For example, a Liberty Newport Greater China Fund brochure included the fund's prospectus: "A prospectus,
which describes in detail the Fund's objectives, investment policies, risks, sales charges, fees and other matters of
interest, accompanies this brochure.  Please be sure to read it carefully before you invest or send money."
[6] See Rupert testimony, 10/5/11, pp. 34 - 37.

negative connotations associated with "market timing," these practices themselves have

never been illegal.[7]

18.  Frequent trading is the practice of buying and selling a mutual fund within a short period of

time, although there is no fixed time period for when a purchase and sale is considered

"frequent."  Often, frequent trading is combined with an investment strategy such as

tactical asset allocation or stale price arbitrage.  Tactical asset allocation is a strategy that

attempts to generate investment returns by changing an investor's mix of asset classes, such

as fixed income and equities, over time.  Tactical asset allocation is a "short-term to

intermediate-term timing strategy designed to benefit from identifiable misevaluation in an

asset class and seeks to add value to the overall fund performance."[8]  Unlike trades based

on stale price arbitrage (defined below), trades based on tactical asset allocation strategies

are not designed to take advantage of mutual fund mispricing, which is expected to dilute

fund shareholders.

19.  Portfolio rebalancing is the practice of buying and selling mutual funds to bring a portfolio

back to an original asset allocation mix.  An investor attempting to maintain a portfolio

with certain risk and return characteristics may choose to implement a portfolio rebalancing

strategy.  The frequency of rebalancing is determined by several factors including expected

returns, asset mix, market environment, risk tolerance, and investment time horizon.  As

with tactical asset allocation trading strategies, trades based on portfolio rebalancing are not

designed to take advantage of mutual fund mispricing, which is expected to dilute fund

shareholders.

---

[7] "Although market timing itself is not illegal..."  See Stephen M. Cutler, Director of Division of Enforcement, SEC, Testimony Concerning Recent Commission Activity to Combat Misconduct Relating to Mutual Funds before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Government Affairs (November 3, 2003).
[8] Fabozzi, Frank J. and Harry M. Markowitz, "The Theory and Practice of Investment Management," 2011.

20.   Stale price arbitrage occurs when the prices used by a fund to strike its Net Asset Value

("NAV") at market close are not fully reflective of the actual value of the fund's assets at

the time.  Most often, stale price arbitrage is associated with international mutual funds

whose NAV reflects prices of portfolio securities that were set in an international market

that closed prior to the U.S. trading market close.[9]  International fund stale price arbitrage

"takes advantage of three facts:

1)  Asian and European exchanges close well before the U.S. market, which closes at 4
p.m. Eastern time;

2)  funds that focus on international stocks can be purchased at their closing NAV until 4
p.m. Eastern time; and

3)  events often occur during that interval, such as a sharp rally in U.S. blue chips, that all
but guarantee foreign markets will surge the next day." [10]

For example, consider a U.S. mutual fund that is composed mostly of stocks that are traded

on the London Stock Exchange ("LSE").  Although the NAV of this U.S. fund is struck at

4:00 PM ET, most of the asset prices used to calculate the NAV are based on 11:30 AM ET

LSE closing prices.  That is, the NAV price will be "stale" as it does not incorporate

information that occurred during the four and a half hours after the LSE closed.  A market

timer may take advantage of information occurring after 11:30 AM ET that indicates the

closing NAV does not reflect the true asset value.

21.   Market timing, including frequent trading and stale price arbitrage, was prevalent

throughout the mutual fund industry in the late 1990s through 2003 time period.  In fact,

the SEC has estimated that by November 2003, "50 percent of the 80 largest mutual fund

companies had entered into undisclosed arrangements permitting certain shareholders to

---

[9] Prices for mutual funds that hold thinly traded assets such as high yield bonds and small capitalization stocks may also be "stale" as of the time that the NAV is calculated.

[10] Rocco, William Samuel, "Are you Safe from Market-Timers?" June 22, 2004.  Available at http://www.morningstaradvisor.com/articles/doc.asp?docId=3674.

engage in market timing practices ....”[11]  The SEC and the New York Attorney General

commenced numerous investigations into market timing within mutual funds beginning in

the fall of 2003.

22.    It is difficult for a casual observer of an investor's trading record to determine if the

investor's trades are based on a stale price arbitrage market timing strategy.  Identifying

whether an investor is engaged in stale price arbitrage requires empirical analysis and,

absent confirmation from the investor, must be statistically inferred from the investor's

purchase and sale activity.


## VI.   The Columbia Funds' Policies Toward Market Timing[12]

### The Treatment of Market Timing within the Columbia Funds Evolved Over Time

23.    I reviewed prospectuses from the Columbia Funds, Liberty Funds, Galaxy Funds, Newport

Funds, Acorn Funds, and Stein Roe Funds from 1998 to 2003 to evaluate the information

that the fund complex relayed to the investing public regarding its policies towards

---

[11] *Mutual Fund Trading Abuses – Lessons Can Be Learned from SEC Not Having Detected Violations at an Earlier Stage, GAO-05-313* (April 2005).
[12] I use "Columbia Funds" in this report to refer to the funds the SEC included in Exhibits A and C of its Supplemental Responses to Interrogatories Propounded by James Tambone, dated July 1, 2011. The "Columbia Funds" include:  Columbia Acorn Fund (formerly Acorn Fund and Liberty Acorn Fund), Columbia Acorn International Fund (formerly Acorn International Fund and Liberty Acorn International Fund), Columbia Acorn International Select Fund (formerly Acorn Foreign Forty Fund and Liberty Acorn Foreign Forty Fund), Columbia Growth & Income Fund (formerly Galaxy Growth & Income Fund and Liberty Growth & Income Fund), Columbia Growth Stock Fund (formerly Stein Roe Advisor Growth Stock Fund, Stein Roe Growth Stock Fund, and Liberty Growth Stock Fund), Columbia High Yield Fund, Columbia International Equity Fund (formerly Galaxy International Equity Fund and Liberty International Equity Fund), Columbia International Stock Fund (formerly Colonial International Horizons Fund, Stein Roe International Fund, and Liberty Newport International Equity Fund), Columbia Mid Cap Value Fund (formerly Colonial Select Value Fund and Liberty Select Value Fund), Columbia Newport Tiger Fund (formerly Newport Tiger Fund and Liberty Newport Tiger Fund), Columbia Small Cap Value Fund (formerly Colonial Small Cap Value Fund and Liberty Small Cap Value Fund), Columbia Tax Exempt Fund (formerly Colonial Tax Exempt Fund and Liberty Tax Exempt Fund), and Columbia Young Investor Fund (formerly Stein Roe Advisor Young Investor Fund, Stein Roe Young Investor Fund, and Liberty Young Investor Fund).

potentially harmful trading in the mutual funds.[13]  Importantly, the Columbia Funds did not

refer to "stale price arbitrage" within their prospectuses, instead choosing to employ the

terms "frequent" and "short-term" trading.  Based upon my review of the prospectuses, it is

evident that Columbia's policies with regard to frequent trading of mutual fund shares were

evolving during the 1998 to 2003 time period.  Both the fund prospectuses and the

testimony of Columbia's employees reveal that the written and accepted policies were

revised several times over the 1998 to 2003 time period.[14]

24.  Summarized portions of the prospectuses for the Columbia Funds during the 1998 to 2003

time period regarding short-term or frequent trading are presented in Exhibit 3.  In addition

to demonstrating that the treatment of short-term or frequent trading evolved over time,

Exhibit 3 shows that the language regarding short-term trading varied from fund to fund.[15]

25.  I am aware that the SEC has alleged that, based on the prospectus language added to a

subset of the Columbia Funds, these funds began to prohibit stale price arbitrage trading

[13] In November 2001, Fleet acquired Liberty Financial investment entities including: Liberty Advisory Corp, Colonial Management Associates, Stein Roe and Farnham, Newport Pacific Management, Inc., Newport Fund Management, Inc., and Columbia Funds Management Company.  These entities and Fleet Investment Advisors merged in April 2003 to form Columbia Advisors.  As a result of the 2001 acquisition, Liberty Distributors became Columbia Distributors and Liberty Fund Services became Columbia Fund Services.  For purposes of this report I refer to the successor entities when discussing events throughout the relevant time period (1998 – 2003).

[14] For example, as response to a question on what the thresholds were for reviewing accounts for frequent trading, Matthew Pepe, a transfer agent employee for Columbia Fund Services, Inc., testified that, "When I first began in July of 2000, the threshold was at $200,000. And then over the course of my tenure there, we reviewed trades over [$]100,000. My action was usually taken at an aggregate amount over $200,000. So, for instance, if you had two $150,000 for the same representative, we would take action against that particular account/representative." See Pepe testimony, 12/9/03, p. 5; Smith testimony, 12/08/03, p. 39.  See also memo (RE: Market Timers) to Joe Palombo, et al., dated April 6, 2000 (Fleet D 30241-42): "We have targeted for our initial review across all funds debit/credit transactions of $500,000 or more which are occurring within a rolling 30 day period in the same amount."

[15] For example, prospectuses for the Newport Tiger Fund first discussed frequent trading in 1998 by stating, "Short-term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders.  For these reasons, effective June 15, 1998, the Fund will assess a redemption fee in the amount of 2.00% on redemptions and exchanges of Fund shares purchased and held for five business days or less."  This was replaced in 2001 with "The Fund does not permit short-term or excessive trading. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request."

beginning in the fall of 2000 and in the spring of 2001.  The language captioned below (or

similar language), from the March 2001 Newport International Equity Fund prospectus,

was added to the prospectuses of several of the Columbia Funds during the time period

2001 to 2002.  In addition, four of the funds added the language in 2000.  See Exhibit 4 for

a list of funds and the dates this type of language first appeared.

> "The Fund does not permit short-term or excessive trading. Excessive
> purchases, redemptions or exchanges of Fund shares disrupt portfolio
> management and increase Fund expenses. In order to promote the best
> interests of the Fund, the Fund reserves the right to reject any purchase order
> or exchange request, particularly from market timers or investors who, **in
> the advisor's opinion**, have a pattern of short-term or excessive trading or
> whose trading has been or may be disruptive to the Fund.  The fund into
> which you would like to exchange also may reject your request." (emphasis
> added)

26.  The language quoted above that is at issue in this matter, referred to as the "Strict

Prohibition" language in the Complaint,[16] should be read in its entirety, and not in

isolation.[17]  In its entirety, the language clearly states that the fund's advisor determines if

an investor's trading is or will be "disruptive" to the Fund.  Consistent with my opinion,

Kevin Rupert testified that, according to the language within the Liberty Funds

prospectuses (n/k/a the Columbia Funds), the advisor is responsible for determining

whether trading constitutes market timing.[18]

27.  In addition, the prospectus language was not accompanied by supporting discussion that

defined the terms "short-term trading," "excessive trading," "excessive purchases,

redemptions or exchanges," or "disruptive."  In fact, the deposition testimony of Thomas

Tuttle, a portfolio manager for the Newport Tiger Fund and President and CEO of

---

[16] Complaint ¶¶ 35, 38.
[17] The testimony of Kevin Rupert is consistent with my opinion.  When asked whether the first and third sentence of
the "Strict Prohibition" language referred to different trading activity Kevin Rupert replied, "I mean it [the first
sentence] -- it's the topic sentence of the paragraph. So I'm -- I would guess the paragraph is expounding on that."
See Rupert testimony, 10/5/11, p. 69.
[18] Rupert testimony, 10/5/11, p. 73.

Newport, shows that the investment advisors understood that this language was required to be vague.

> Q: "...Sir, you would never sign off on a prospectus that you believed was false and misleading, would you?
>
> A: Not knowingly, although I would also state that counsel advised us that very broad, very nonspecific language was required for prospectuses." [19]

28. Further, the investigative testimony of Peter Martin, an employee of the Independent Advisor Division of Columbia Distributors, Matthew Pepe, a transfer agent employee for Columbia Fund Services, Inc., Erik Gustafson, a portfolio manager with Columbia Investment Advisors, and Thomas Tuttle reveals that the prospectus language regarding "market timing" was not understood in a uniform fashion among Columbia's investment professionals. [20]

> Q: "Before I go on, I just want to mention, you said a zero tolerance policy against timing. What is your understanding of what Mr. Tambone meant when he used the word 'timing'?
>
> A: I still don't know what the clear definition is for timing. I took it to -- basically, what I interpreted it was kind of the short-term trading type definition.
> ...
> Q: Do you think there should be a zero tolerance policy against market timing?

---

[19] Tuttle testimony, 9/12/11, p. 85.
[20] See also Robin Smith email, dated March 4, 2003. (Fleet D 28787 – 88)  In response to a question asking how long an investor is required to stay invested to not be classified as a market timer, Robin Smith, a transfer agent employee for Columbia Fund Services, Inc., replied that "There is no specific date range specified in the fund prospectus. The prospectus uses general language stating that restrictions may be placed on accounts that the Fund deems as trading excessively or if the trading adversely affects the advisors ability to manage the fund."; Matthew Pepe email, dated June 19, 2003. (Fleet D 21156 – 57) In response to a question asking for Columbia's market timing policy, Matthew Pepe replied that he can provide letters produced in the past or "... simply cite the prospectus, which is vague, but allows us the flexibility to halt timing as noted."; Legallet testimony, 12/11/03, pp. 40 – 44 (defined as someone who takes advantage of stale pricing); Smith testimony, 12/8/03, p. 16 (defined as someone who "purchased in a sum of money larger than a hundred thousand dollars and then sold or exchanged within that thirty-day time period.").

A:   Again, the definition of market timing I think is somewhat of an
      opinion."
                                    *Testimony of Peter Martin, pages 42-43*


Q:   "Do you understand what the term market timing means?
      What's your understanding of the term market timing?

A:    Market timing as I understand it is … making gains off the
      fund in a short term capacity…"
                                    *Testimony of Matthew Pepe, page 14*


Q:   "Have you ever heard of the time [*sic*] 'market timing'?

A:   I've heard the term.

Q:   What is your understanding of that term?

A:   Market timing, to me, is trading multiple times a day or every day,
      rapid fire trading that -- that's what it is, in my mind.
…
Q:   Do you consider short term or excessive trading to be market timing?

A:   Not necessarily."
                                    *Testimony of Erik Gustafson, pages 37-38*


Q:   "Mr. Tuttle, I'm going to ask you to provide me with your
      understanding of some terms, some terminology. And if you could, I
      would appreciate if you could tell me what your understanding
      was at the time you were at Newport in the 2000/2001 time frame. Okay.
      Can you provide me your understanding of the term 'market
      timing'?

A:   My understanding of market timing is an investor who is trying to
      make short-term cash flow movements in and out of funds to take
      advantage of some anomaly of timing.

Q:   Okay. In your understanding, is market timing always short-term
      investments?

A:   No. In the greater scope of things, market timing can mean trying to
      make asset allocations on an annual basis, quarterly basis. Just it's a
      matter of trying to time markets when they go up or down."
                                    *Testimony of Thomas Tuttle, page 29*

**VII.** **Neither The Defendants Nor The Distributor Had the Capacity to Determine Whether the Actual Trading was Harmful to Fund Shareholders**

29.   As discussed above, the language included in the prospectuses for the Columbia Funds stated that it was the responsibility of the advisor to protect the interests of fund shareholders by not allowing disruptive trading of market timers who, "in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund."

30.   Portfolio managers may only receive data on net investor flows and it is possible that frequent trading by individual accounts will be masked by the trading of other accounts. At the extreme, an "anti-timer" investor who traded exactly opposite of a market timing strategy could completely offset the trades of an investor who was following a market timing trading strategy.   Market timing trades can be classified as a combination of two factors: first, how the trades are reported to the transfer agent (individual account, omnibus), and second, the size of the trade (small trades, large trades, several correlated small trades).   The table below represents which entities may be able to assess the level of frequent trading, tactical asset allocation, or stale price arbitrage activity.

**Type of Market Timing**

| Account Type | | Small | Large | Small Correlated |
|---|---|---|---|---|
| | Individual | Transfer Agent | Portfolio Manager<br>Transfer Agent | Portfolio Manager<br>Transfer Agent |
| | Omnibus | | Portfolio Manager | Portfolio Manager |

31. Since the portfolio manager will view net investor cash flow on a daily basis, the portfolio manager may only become aware of frequent trading if it were to occur in the right two columns of the trading matrix:  large trades and small trades that are correlated.  To further complicate the identification of market timing trading, the transfer agent only has the ability to analyze the pattern of trading for individual accounts for which it directly maintains records and would have difficulty tracking individual trading that occurs within omnibus accounts.[21]  Notwithstanding the limitations of the portfolio manager to fully understand the trading by individual accounts, the portfolio managers were in a better position than the distributor to identify whether an overall "pattern of short-term or excessive trading" was occurring within their funds, and to determine whether such large or correlated small trading was harmful or "disruptive."

32. There were a number of factors that would contribute to a portfolio manager's determination of whether such market timing trades were disruptive to fund shareholders. These factors include the overall size of the fund, the dollar amount of short term "in and out" trading, the fair value pricing policy of the fund, the volatility of the fund's assets, the percentage of fund assets held in cash, the fund strategy, the level of recent inflows and outflows, and additional factors. [22]  Christopher Legallet, the portfolio manager for the Newport Tiger Fund, confirmed that he would evaluate many factors in determining whether trading was excessive in the funds he managed.

> Q:  "What's your understanding of what's meant by excessive trading there?
>
> A:  Again, it all is dependent for me on determine [sic] the asset size and the market volatility, the same with short-term; just all

[21] SEC Rule 22c-2 that became effective in 2005 provided increased transparency requirements for accounts trading through omnibus platforms.
[22] See for example, Tuttle testimony, 9/12/11, p. 90.

> dependent…[W]ith the asset size [of the Newport Tiger Fund]
> changing over time that definitely has had an impact. The ability to
> manage the fund is dependent, too, on the market volatility. If the
> market's fairly flat it -- with no movements, it doesn't have a big
> impact.
>
> …
>
> Excessive is dependent on the volume of the fund, like I said, and a
> bunch of different variables that we could -- of what would be
> excessive at any one time.
>
> …
>
> Q:   Looking at the second sentence of that portion of the text, and it states:
>      'Excessive purchases, redemptions or exchanges of fund shares disrupt
>      portfolio management.' Is that a correct statement?
>
> A:   My feeling is it's a -- again, it's a highly ambiguous term and all
>      dependent on different sets of variables."
>
> *Testimony of Christopher Legallet, pages 44-49*

33. My understanding from counsel for the Defendants is that the trading strategies of the third parties in the alleged trading agreements were not disclosed to the Defendants, only the approximate frequency of trading activity and the approximate dollar amount. In my opinion, the portfolio manager was in a better position than the distributor to determine whether investor transactions from alleged timing arrangements were disruptive or harmful to the fund.[23] The portfolio manager would be able to identify trading that was harmful to the fund by evaluating whether the activity was disrupting cash flows or management of the funds or was following a pattern indicative of stale price arbitrage. In his or her role as the manager of a fund's investments, the portfolio manager has knowledge of the fund's day-to-day cash balances and investor cash flows that would allow him or her to determine

---

[23] My opinion is consistent with industry commentary - see ICI letter to the U.S. Department of Labor, January 21, 2004: "Whether, and at what level, certain trading activity may be harmful to fund investors is a question of facts and circumstances. (Among other things, relevant factors include the size and frequency of the transactions and the types of securities held by the fund.) A fund (or its manager) typically would be in the best position to make this determination for the fund…"

if overall investor subscriptions or redemptions are harmful to the fund or disruptive to trading.

34. Employees of a mutual fund's distributor would not have independent knowledge of whether investor transactions were disruptive or harmful to the mutual fund or whether the transactions followed a stale price arbitrage trading strategy. Instead, the distributor's main responsibilities as the broker are to manage investor relationships and increase the assets under management for the mutual fund.

## VIII. SEC's Actions Regarding Market Timing Prior to Fall 2003

35. Prior to the fall of 2003, the SEC provided no explicit guidance on the prohibition of market timing, nor did it take any market timing enforcement actions against mutual funds.[24]

### Fair Value Pricing

36. The rules implementing the Investment Company Act of 1940, and SEC Releases interpreting those rules, indicate that a fund's board of directors is responsible for the pricing of fund securities. Securities for which "market quotations are readily available" must be valued at "market value" for the purpose of calculating daily NAVs.[25] When market quotations are not readily available, securities should be valued at "fair value as

---

[24] "Prior to September 2003, SEC did not examine for market timing abuses because agency staff viewed market timing as a relatively low-risk area and believed that companies had financial incentives to establish effective controls, that is, by maximizing fund returns in order to sell fund shares. SEC staff also said that agency examiners were told by company officials that they had established 'market timing police' to control frequent trading." See *Mutual Fund Trading Abuses – Lessons Can Be Learned from SEC Not Having Detected Violations at an Earlier Stage, GAO-05-313* (April 2005). The guidance that the SEC provided in 2001–that a fund should fair value price its portfolio securities when "significant events" occur–is an exception. See letter from Douglas Scheidt, Associate Director and Chief Counsel, Division of Investment Management, SEC to Craig S. Tyle, General Counsel, Investment Company Institute, April 30, 2001.

[25] See Section 2(a)(41) of the Investment Company Act of 1940.

determined in good faith by the board of directors."[26] The practice of fair value pricing

allows funds to replace market quotes used to price assets within their portfolio with "fair

value" prices that are more reflective of current market value at the time the fund strikes its

NAV. For example, instead of using the 11:30 AM ET prices from the LSE cited in the

example used earlier in my report, a "fair value price" would start with the LSE price, and

then adjust the price for changes that occurred between 11:30 AM ET and 4:00 PM ET.

37.   Columbia maintained a fair valuation committee, which was in place at least since 1998,

that had authority to fair value price portfolio securities.[27] The committee was composed

of "senior members of [Columbia] Investment Advisors" and representatives from the

"legal, compliance, accounting, investment team-fixed, [and] investment team-equity"

departments.[28] The Defendants, as employees of Columbia Distributor, were not members

of this committee and thus had no role in fair value pricing any of the securities underlying

the Columbia Funds.

38.   It is important to understand that stale price arbitrage can occur within mutual funds even if

the fund advisors eliminate the ability of investors to trade "frequently" using round trip

transactions. If a fund's NAV is mispriced, then investors who choose to purchase (or sell)

on the mispriced days may benefit from that fund's mispricing. For example, long-term

investors who make monthly purchases of international mutual funds could take advantage

of stale price arbitrage by selectively choosing the date of their share purchases each month

to occur when their fund's shares are underpriced. These investors would not fall under

any fund's definition of a short-term or excessive trader and they were not the focus of

---

[26] See Section 2(a)(41) of the Investment Company Act of 1940.
[27] See Fleet B 0610-14, Fleet B 705-6, Fleet E 000030-67, and Fleet E 000094.
[28] See Fleet E 000030-67 and Fleet B 705-6. According to meeting notes from a Fair Valuation Committee meeting in August 2002, two portfolio managers (Chris Legallet and Linda Couch) and two accounting oversight personnel (Peyton Carter and Patty Mullen) were listed under "Other Attendees."

regulatory inquiry.  However, these long-term investors are clearly taking advantage of

stale pricing, and their actions dilute the position of other shareholders.  In my opinion, as it

relates to stale price arbitrage, implementing fair value pricing on a daily basis is the only

method that will eliminate all opportunities for stale price arbitrage and its potential

harmful affects.

39.   In 1981, the SEC stated in a "no-action letter" to two Putnam mutual funds that it would

not recommend any enforcement action against the funds if NAVs were calculated using

local closing prices.  The letter agreed with representations by Putnam that cited

"extraordinary event[s]" as circumstances in which Putnam would use fair value pricing

instead of relying on local closing prices.[29]

40.   Prior to fall 2003, the SEC's guidance on fair value pricing was limited to times of

significant or unusual events.  The SEC staff provided no guidance on using fair value

pricing to address small but predictable deviations in the value of closing NAVs that are at

the heart of stale price arbitrage strategies.  In response to a debate regarding whether it

was appropriate for mutual funds to have used fair value pricing during the Asian crisis of

1997 to eliminate the ability for investors to take advantage of stale price arbitrage,[30] the

SEC issued a letter on November 25, 1997 that stated, "[i]f intervening events resulting in

---

[29] See 1981 WL 25522 (S.E.C. No - Action Letter).

[30] Market movements associated with the Asian financial crisis in 1997 demonstrated to the SEC the need for fair value pricing of mutual funds after large-scale market dislocations.  The U.S. market, as measured by the S&P 500 Index, decreased 6.9 percent on Monday, October 27, 1997.  Anticipating that Asian markets would open at decreased price levels, some holders of international mutual funds holding Asian equities sold fund shares on October 27.  As anticipated, the Hong Kong Stock Exchange's Hang Seng Index fell on Tuesday, October 28 (by 13.7 percent).  By anticipating the fall in the Hong Kong market, investors who sold their international mutual funds on Monday at the 4:00 PM ET NAV were able to avoid the losses that occurred when the Hong Kong market opened on Tuesday.  Even further, the S&P 500 recovered by 5.1 percent by 4:00 PM ET on Tuesday.  Again, some investors purchased shares of international mutual funds that held Asian equities on Tuesday, allowing these investors to pay a low NAV that was based on closing prices in the Hong Kong market.  As expected, the Hang Seng index rose on Wednesday, October 29 (by 18.8 percent), allowing investors who purchased the international mutual funds on Tuesday to take advantage of the correlation between the U.S. and Hong Kong market that was not reflected in the mutual funds' NAV until Wednesday.

market volatility have significantly affected the value of the securities after the close of the foreign exchanges, ... a fund is permitted, but not required, to use fair value pricing to value more accurately the securities it owns."[31]

41. The SEC staff next addressed fair value pricing in a December 8, 1999 letter to the ICI. Similar to SEC's November 1997 guidance following the Asian crisis, the December 1999 letter focused on obligations to use fair value pricing during "emergency or unusual situations."[32] The letter used the 1999 earthquake in Taiwan and the subsequent closure of the Taiwan Stock Exchange for a number of days as an example of times when market quotations would not be considered "readily available." Similar to the SEC response to the Asian crisis in November 1997, the December 1999 letter did not address fair value pricing for small deviations in the value of closing NAVs.

42. The SEC again focused on "significant events" in an April 30, 2001 letter to the ICI regarding fair value pricing. The letter stated that funds must provide fair value pricing for times when a significant event occurs between the time of the market quotation and the time when the fund strikes its NAV. Similar to prior guidance, the April 2001 letter provided large-scale examples such as "natural disasters, armed conflicts, or significant governmental actions" and did not address obligations for small pricing deviations.[33]

---

[31] See SEC letter to William N. Bernstein, November 25, 1997.
[32] See letter from Douglas Scheidt, Associate Director and Chief Counsel, Division of Investment Management, SEC to Craig S. Tyle, General Counsel, Investment Company Institute, December 8, 1999.
[33] See letter from Douglas Scheidt, Associate Director and Chief Counsel, Division of Investment Management, SEC to Craig S. Tyle, General Counsel, Investment Company Institute, April 30, 2001.

**SEC Rules**

43. I found no SEC rule prior to fall 2003 that addressed market timing, short-term trading, frequent trading, or stale price arbitrage trading within mutual funds.[34]  In addition, prior to the fall of 2003, the SEC did not require fund complexes to include language in prospectuses that addressed short-term or frequent trading.

**SEC Enforcement Actions and Examinations**

44. A review of the SEC Litigation Database for the period from January 1, 1998 to September 1, 2003 reveals that there were no SEC enforcement actions that addressed stale price arbitrage market timing during this time period.

45. Prior to the fall of 2003, the SEC's Office of Compliance Inspections and Examinations ("OCIE") did not focus on market timing practices when conducting examinations of fund complexes.[35]  For example, OCIE examined Liberty and Columbia without ever inquiring about market timing practices or arrangements.[36]

**Speeches by SEC Commissioners**

46. I did not find any speeches by SEC Commissioners prior to fall 2003 that addressed market timing or stale price arbitrage trading.  However, the SEC's focus with regard to market

---

[34] I searched the Morningstar SEC Guidance Database for related keywords from January 1, 1998 through September 1, 2003.  This database includes SEC No Action Letters and SEC Regulatory items including Exemptive Orders, Concept Releases, Interpretative Releases, Final Rules, Proposed Rules, Policy Statements, PCAOB Rule Proposals, and Chairman and Commissioner Speeches.

[35] "Prior to the recent revelation of market timing and late trading abuses, examiners reviewed trading *by* a fund (*i.e.*, the fund's purchases and sales of securities on behalf of investors), but did not review trading *in* the fund's own shares....Because examiners' focus was on the fund itself, and not on trading in the fund's shares, however, examiners did not detect aberrant trading patterns that could be indicative of abusive market timing." See Lori A. Richards, Director of OCIE, SEC, in memorandum to William H. Donaldson, Chairman, SEC, on Request by Senator Richard C. Shelby, Chairman, U.S. Senate Committee on Banking, Housing, and Urban Affairs (March 10, 2004).

[36] I have reviewed 58 OCIE examination reports of Columbia from the period 9/20/95 to 8/16/01 and have found no mention of market timing practices or arrangements.

timing within mutual funds took a dramatic turn in the fall of 2003 after Eliot Spitzer, the New York Attorney General at the time, announced an investigation of mutual fund trading practices by the hedge fund Canary Capital Partners, LLC.  Testimony by SEC staff following September 2003 provides further evidence that the SEC was not focused on market timing prior to this time.[37]

_Erik Sirri_

Erik R. Sirri

_October 19, 2011_

Date

---

[37] Lori A. Richards, Director of OCIE, SEC, in memorandum to William H. Donaldson, Chairman, SEC, on Request by Senator Richard C. Shelby, Chairman, U.S. Senate Committee on Banking, Housing, and Urban Affairs (March 10, 2004).

**EXHIBIT 1**

**Erik R. Sirri**

100 Nason Hill Road
Sherborn, MA  01770-1232

(508) 655-1068
(781) 465-6017 (fax)
sirri@babson.edu

### Education
University of California, Los Angeles:  Ph.D., Finance, 1990.
University of California, Irvine:  M.B.A., 1984.
California Institute of Technology:  Bachelor of Science, Astronomy, 1979.

### Employment
Professor
Babson College, Babson Park, MA, 2004-present.

Visiting Professor
Harvard Business School, Cambridge, MA, 2009-2010.

Director, Division of Trading and Markets
U.S. Securities and Exchange Commission, Washington, D.C., 2006-2009.

Visiting Scholar
Harvard Law School, Cambridge, MA, 2005-2006.

Associate Professor
Babson College, Babson Park, MA, 1999-2004.

Chief Economist
U.S. Securities and Exchange Commission, Washington, D.C., 1996-1999

Assistant Professor
Babson College, Babson Park, MA, 1995-1996.

Assistant Professor
Harvard Business School, Boston, MA, 1989-1995.

Research Scientist
Nichols Research Corporation, Newport Beach, California, 1979-1983.

### Academic Articles
"Regulatory Politics and Short Selling," *University of Pittsburgh Law Review*, 2010, Vol. 71, No. 3, pp. 517-544.

"Consolidation and Competition in U.S. Equity Markets," with Robert L.D. Colby, *Capital Markets Law Journal*, 2010, Vol. 5, No. 2, pp. 169-196.

"Transparency and Liquidity:  A Controlled Experiment on Corporate Bonds" , with Edie Hotchkiss and Michael Goldstein, *Review of Financial Studies,* 2007, Vol. 20, No. 2., 235-273.

**EXHIBIT 1**

"Investment Banks, Scope, and Unavoidable Conflicts of Interest," *Economic Review*, Federal Reserve Bank of Atlanta, Fourth Quarter 2004, pp. 23-35.

"Roundtable on Corporate Disclosure," *Journal of Applied Corporate Finance*, 16(4), Fall 2004, pp. 36-62.

"Order Preferencing and Market Quality on U.S. Equity Exchanges," with Mark Peterson, *Review of Financial Studies*, 2003, vol. 16, No. 2, 385-415.

"Evaluation of the Biases in Execution Cost Estimation Using Trade and Quote Data," with Mark Peterson, *Journal of Financial Markets*, 2003, Vol. 6, No. 3, 259-280.

"Order Submission Strategy and the Curious Case of Marketable Limit Orders," with Mark Peterson, *Journal of Financial and Quantitative Analysis*, 2002, Vol. 37, No. 2, 221-241.

"Stern Stewart Roundtable on Capital Structure and Stock Repurchases," with Clifford Smith, Tim Opler, David Ikenberry, Richard Thevenet, Dennis Soter, *Journal of Applied Corporate Finance*, 2001, Vol 14, No. 1, 8-41.

"Costly Search and Mutual Fund Flows," with Peter Tufano, *Journal of Finance*, 1998, Vol. 53, No. 5, 1589-1622.

"Express Lane or Tollbooth in the Desert?  The SEC's Framework for Security Issuance," with Jennifer E. Bethel, *Journal of Applied Corporate Finance*, Spring 1998.

"The Reaction of Investors and Stock Prices to Insider Trading," with Bradford Cornell, *Journal of Finance*, 1992, Vol 47, No. 3, 1031-1059.

**Book Chapters and Other Writings**
"The Importance of Financial Policy Makers Making Informed Decisions," with Jennifer E. Bethel, in *Current Perspectives on Modern Equity Markets*, Knight Capital Markets, December 2010.

"Examining the Main Street Benefits of our Modern Capital Markets," with Charles M. Jones, report for the Center for Capital Markets Competitiveness, U.S. Chamber of Commerce, March 2010.

"The Future of Stock Exchanges," *AIMR Conference Proceedings on Best Execution and Portfolio Performance*, December 2000, 81-90.

"Comment on Circuit Breakers, Systemic Risk, and Market Reforms," in Brookings/Wharton Papers on Financial Services, Robert Litan and Anthony Santomero, Editors, Brookings Institution Press, June 1998.

"The Economics of Pooling," with Peter Tufano, in *The Global Financial System:  A Functional Perspective*, Harvard Business School Press, 1995.

"Competition and Change in the Mutual Fund Industry," with Peter Tufano, in *Financial Services: Perspectives and Challenges for the 1990s*, edited by S.L. Hayes III, HBS Press, 1993.  (Republished in *Gestion Collective Internationale*, No. 10, Summer 1994)

"Anheuser-Busch and Campbell Taggart," in *Case Problems in Finance*, Fruhan, William E., et. al, Tenth Edition, Irwin, 1992.

### Boards and Affiliations
Governing Counsel, Independent Directors Counsel (IDC), 2011-present
Town of Sherborn, Advisory (Finance) Committee, 2011-present
Board Member, Managed Funds Association, 2010-present
SEC Historical Society, Museum Committee, 2009-present
Investment Committee, Foundation for Metrowest, 2010 to present
Trustee, Natixis, Loomis Sayles, and Hansberger Funds, 2009-present
Board Member, Boston Options Exchange (Regulatory), 2004-2006
Governor, Boston Stock Exchange, 2003-2006
Proxy Governance, Inc. Advisory Board, 2004-2006
National Association of Securities Dealers:  Economic Advisory Board, 2001-2005
Nasdaq Stock Market:  Economic Advisory Board, 2000-2002
Member, Society of Financial Studies
Member, American Finance Association

### Professional Activities
Refereed for *Journal of Finance, Journal of Financial Economics, Review of Financial Studies, Journal of Business, Management Science. Journal of Financial Intermediation, Journal of Banking and Finance, Journal of Business and Economic Statistics, Quarterly Journal of Business and Economics, Journal of Financial Services Research.*

Independent Fee Consultant for Bank of America Columbia Funds and Nations Funds, as appointed by the New York Attorney General pursuant to a regulatory settlement, 2005-2006

NASD Ahead of the Curve Committee, Member, 2005-2006

NASD Taskforce on Mutual Fund Soft Dollars and Distribution Fees, Member, 2004

Appointed an "Independent Economist" by the NASD to use TRACE bond data to assess the effects of transparency on fixed income market liquidity, 2003-2005

NASD Taskforce on Mutual Fund Breakpoints, Member, 2003

AIMR Trade Management Guidelines Taskforce, Member, 2001

**EXHIBIT 1**

**Erik Sirri testimony experience in the previous 4 years**

**Litigation Testimony**

Securities and Exchange Commission vs. Mark Cuban, United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:08-cv-02050, Expert Report (2011).

In the Matter of John P. Flannery and James D. Hopkins, SEC Administrative Proceeding, File No. 3-14081, Expert Report and Testimony (2011).

Board of Trustees of the AFTRA Retirement Fund, et al., v. JPMorgan Chase Bank, N.A., Expert Report (2010). United States District Court Southern District Of New York, Civil Action No. 09-00686.

Casey's General Stores, Inc. v. Alimentation Couche-Tard, et al., Expert Report (2010) and Deposition Testimony (2010), United States District Court, Southern District Of Iowa, Central Division, Civil Action No. 4:10-cv-265.

Heyman Investment Associates LLC v. Credit Suisse Securities (USA) LLC, et al. Expert Report (2010) and Arbitration Testimony (2010). Non-public arbitration.

Chicago Board Options Exchange Incorporated, et al. v. International Securities Exchange, et al. Expert Report (2009), Deposition Testimony (2010), and Declarations (2010). Circuit Of Cook County, Illinois, County Department, Chancery Division, Case No. 06CH24798

**Congressional Testimony**

| Date | Committee | Topic |
|------|-----------|-------|
| 5/17/2007 | SCBHUA | Consolidation of NASD & NYSE Regulatory Functions |
| 7/11/2007 | HFSC | Hedge Funds and Systemic Risk Issues |
| 7/12/2007 | SCBHUA | Cross-Border Exchange Mergers |
| 9/5/2007 | HFSC | Credit & Mortgage Markets |
| 10/4/2007 | SCBHUA | Industrial Loan Company Bill |
| 2/14/2008 | HFSC | Monoline Insurance Companies |
| 3/12/2008 | HFSC | Municipal Bond Markets Market |
| 5/7/2008 | SCBHUA | Credit Markets |
| 6/19/2008 | SCBHUA | CSE Risk Management |

**EXHIBIT 1**

| | | |
|---|---|---|
| 10/15/2008 | HAgC | Credit Default Swaps |
| 11/20/2008 | HAgC | Role of Credit Derivatives in the U.S. Economy |
| 2/4/2009 | HFSC | Bernard Madoff |
| 3/18/2009 | SCBHUA | Lessons in Risk Management Oversight in Federal Financial Regulators |
| 5/15/2010 | FCIC | SEC Regulation of Investment Banks |

| | |
|---|---|
| SCBHUA: | Senate Committee on Banking, Housing, and Urban Affairs |
| HFSC: | House Financial Services Committee |
| HAgC: | House Agricultural Committee |
| FCIC: | Financial Crisis Inquiry Commission |

**EXHIBIT 2**

# Materials Considered by Professor Erik Sirri

**Company Documents and Emails**

> Fleet B 705-706.  August 5, 2002.

> Fleet D 30241-30242.  April 6, 2000.

> Fleet B 0610-0614.  November 1998.

> Fleet E 000030-000067.

> Fleet D 21156-21157.  June 19, 2003.

> Fleet D 28787-28788.  February/March 2003.

> Fleet E 000094.  January 28, 2003.

**Government Reports and Testimony**

> Cutler, Stephen M, "Testimony Concerning Recent Commission Activity to Combat Misconduct Relating to Mutual Funds," Before the Senate Subcommittee on Financial Management, the Budget, and Internal Security, Committee on Governmental Affairs.  November 3, 2003.

> "Mutual Fund Trading Abuses: Lessons Can Be Learned from SEC Not Having Detected Violations at an Earlier Stage," United States Government Accountability Office Report to the Committee on the Judiciary, House of Representatives GAO-05-313.  April 2005.

**Legal Documents**

> Testimony of Erik Gustafson.  December 10, 2003.

> Testimony of Christopher Legallet.  December 11, 2003.

> Testimony of James S. Tambone.  January 15, 2004 and January 16, 2004.

> Testimony of Kevin Rupert.  October 5, 2011.

> Testimony of Matthew Pepe.  December 8, 2003 and December 9, 2003.

> Testimony of Peter Martin.  December 9, 2003 and December 10, 2003.

**EXHIBIT 2**

Testimony of Robert Hussey.  December 12, 2003 and December 15, 2003.

Testimony of Robin Smith.  December 8, 2003.

Testimony of Thomas R. Tuttle.  September 12, 2011.

"Securities and Exchange Commission v. James Tambone and Robert Hussey," Complaint.  May 19, 2006.

"Securities and Exchange Commission v. James Tambone and Robert Hussey," Securities and Exchange Commission's Supplemental Responses to Interrogatories Propounded by James Tambone.  July 1, 2011.

## Literature

Fabozzi, Frank J. and Harry M. Markowitz, *The Theory and Practice of Investment Management*.  2011.

## OCIE Examination Reports

SEC-LIT 00016, 02637, 03005, 03060, 03096, 03117, 03153, 03456, 03793, 03807, 03904, 03910, 03924, 03932, 03942, 03951, 03961, 03975, 04002, 04077, 04130, 04214, 04232, 04242, 04243, 04256, 04258, 04282, 04283, 04295, 04297, 04321, 04329, 04356, 04359, 04384, 04396, 04410, 04416, 04424, 04437, 04450, 04465, 04515, 04523, 04585, 04613, 04646, 04661, 04684, 04707, 04743, 04752, 04877, 04887, 04905, 04913, and 05096.

## Prospectuses and Fund Materials

Fleet CM 0501-0502.  2001.

Prospectuses dated between 1998 and 2003 for the funds listed in the report.

## Public Press

Rocco, William Samuel, "Are You Safe from Market-Timers?: How redemption fees and other steps can protect you," *MorningstarAdvisor*.  June 22, 2004.

**EXHIBIT 2**

**Securities and Exchange Commission Letters, Releases, and Rules**

Barbash, Barry P., "Letter to William N. Bernstein Regarding Investment Company Act of 1940 – Section 22(c), 2(a)(41) – Rule 22c-1." November 25, 1997.

Judd, Stanley B., "Putnam Growth Fund and Putnam International Equities Fund SEC No-Action Letter." February 23, 1981.

"Investment Company Act of 1940." Approved October 5, 2010.

"Mutual Fund Redemption Fees," Securities and Exchange Commission Final Rule (Release No. IC-26782; File No. S7-11-04). March 11, 2005.

Richards, Lori A., "Testimony Concerning The Securities and Exchange Commission's Examinations of Mutual Funds." March 10, 2004.

Scheidt, Douglas, "Division of Investment Management: April 2001 Letter to the ICI Regarding Valuation Issues." April 30, 2001.

Scheidt, Douglas, "Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues." December 8, 1999.

**Websites**

"Investment Company Institute Overview of Mutual Fund Guidance," http://www.ici.org/idc/policy/governance/overview_fund_gov_idc.

**Other**

Re: Market Timing in Retirement Plans, Letter to Alan D. Lebowitz from Craig S. Tyle, Investment Company Institute. January 21, 2004.

Bloomberg Data, S&P 500 Index and Hong Kong Hang Seng Index, October 1997.

**EXHIBIT 3**

### Selected Columbia Funds' Prospectus Language Related to Market Timing [1]
### 1998 – 2003

| Fund | Date of Prospectus | Change in Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia Acorn Fund [3]** | | | |
| | 5/1/98 | | Each fund reserves the right to reject any specific purchase order, including certain purchases through the exchange plan. . . . A purchase may be refused if, in WAM's opinion, it would disrupt management of the fund or would not be in the best interests of the fund's existing shareholders. |
| | | | Generally, you will be limited to 4 round trip exchanges per year (a round trip is an exchange out of one fund into another fund, and then back again). |
| | | | Because excessive trading can hurt fund performance and shareholders, the funds reserve the right to temporarily or permanently terminate the exchange privilege of any investor who makes excessive use of the exchange plan. |
| | | | The funds also reserve the right to refuse exchange purchases by any person or group, if Acorn believes the purchase will be harmful to existing shareholders. |
| | 5/1/99 | Market timing language added | The Acorn funds do not permit market timing and have adopted policies to discourage this practice. |
| | 5/1/00 | Strict Prohibition language added | |
| | 9/29/00 | No material change | |
| | 5/1/01 | No material change | |
| | 5/1/02 | No material change | |
| | 5/1/03 | No material change | |
| **Columbia Acorn International Fund [4]** | | | |
| | 5/1/98 | | Each fund reserves the right to reject any specific purchase order, including certain purchases through the exchange plan. . . . A purchase may be refused if, in WAM's opinion, it would disrupt management of the fund or would not be in the best interests of the fund's existing shareholders. |
| | | | Generally, you will be limited to 4 round trip exchanges per year (a round trip is an exchange out of one fund into another fund, and then back again). |
| | | | Because excessive trading can hurt fund performance and shareholders, the funds reserve the right to temporarily or permanently terminate the exchange privilege of any investor who makes excessive use of the exchange plan. |
| | | | The funds also reserve the right to refuse exchange purchases by any person or group, if Acorn believes the purchase will be harmful to existing shareholders. |
| | 5/1/99 | Market timing language added | The Acorn funds do not permit market timing and have adopted policies to discourage this practice. |
| | 5/1/00 | No material change | |
| | 9/29/00 | Strict Prohibition language added | |
| | 5/1/01 | No material change | |
| | 5/1/02 | No material change | |
| | 5/1/03 | Investment risk of market timers language added | Because the Fund invests predominantly in foreign securities, the Fund may be particularly susceptible to market timers. Market timers are short-term investors who buy shares of the Fund with the goal of selling the shares quickly for a profit. Market timers generally attempt to take advantage of the way the Fund prices its shares by trading based on market information they expect will lead to an increase in the Fund's NAV the next pricing day. Market timing activity may be disruptive to fund management, and negatively impacts the investment returns of longer-term shareholders, since a market timer's profits are effectively paid directly out of the Fund's assets. Although the Fund attempts to discourage market timing activities, it may be unable to prevent all market timing. |

**Selected Columbia Funds' Prospectus Language Related to Market Timing [1]**
**1998 – 2003**

| Fund | Date of Prospectus | Change In Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia Acorn International Select Fund [5]** | | | |
| | 10/15/98 | | Acorn reserves the right to reject any specific purchase order, including certain purchases through the exchange plan . . . A purchase may be refused if, in WAM's opinion, it would disrupt management of the Funds or would not be in the best interests of a Fund's existing shareholders. |
| | | | Generally, you will be limited to 4 round trip exchanges per year (a round trip is an exchange out of one fund into another fund, and then back again). |
| | | | Because excessive trading can hurt fund performance and shareholders, Acorn reserves the right to temporarily or permanently terminate the exchange privilege of any investor who makes excessive use of the Exchange Plan. |
| | | | Acorn also reserves the right to refuse exchange purchases by any person or group, if Acorn believes the purchase will be harmful to existing shareholders. |
| | | | The Funds are suitable for investors who are willing to hold their shares through market fluctuations and the accompanying changes in share values.  The Funds are not appropriate investments for those seeking short-term price appreciation or for "market-timers." |
| | 5/1/99 | Market timing language added | The Acorn funds do not permit market timing and have adopted policies to discourage this practice. |
| | 5/1/00 | No material change | |
| | 9/29/00 | Strict Prohibition language added | |
| | 5/1/01 | No material change | |
| | 5/1/02 | No material change | |
| | 5/1/03 | No material change | |
| **Columbia Growth & Income Fund [6]** | | | |
| | 2/28/98 | | In order to prevent abuse of this privilege to the disadvantage of other shareholders, Galaxy reserves the right to terminate the exchange privilege of any shareholder who requests more than three exchanges a year. Galaxy will determine whether to do so based on a consideration of both the number of exchanges that any particular shareholder or group of shareholders has requested and the time period over which their exchange requests have been made, together with the level of expense to Galaxy which will result from effecting additional exchange requests. The exchange privilege may be modified or terminated at any time. At least 60 days' notice of any material modification or termination will be given to shareholders except where notice is not required under the regulations of the Securities and Exchange Commission ("SEC"). |
| | | | Galaxy reserves the right to reject any purchase order, in whole or in part, or to waive any minimum investment requirement. |
| | | | Galaxy reserves the right to refuse a wire or telephone redemption if it believes it is advisable to do so. |
| | 2/28/99 | No material change | |
| | 2/28/00 | No material change | |
| | 2/28/01 | Short-term/frequent trading language added | Galaxy may reject any order to buy or exchange shares by a particular purchaser (or group of related purchasers) that has a pattern of short-term or frequent trading or whose trading activity has been or may be disruptive to the management of a Fund. |
| | 2/28/02 | No material change | |
| | 11/1/02 | Strict Prohibition language added | |
| | 11/1/03 | Revision to Strict Prohibition language | The Fund is not intended for short-term or frequent trading in its shares. Short-term or excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of shareholders, the Fund and the other funds distributed by Columbia Funds Distributor, Inc., reserve the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. |

**EXHIBIT 3**

### Selected Columbia Funds' Prospectus Language Related to Market Timing [1]
### 1998 – 2003

| Fund | Date of Prospectus | Change in Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia Growth Stock Fund [7]** | | | |
| *Stein Roe Advisor Growth Stock Fund* | | | |
| | 2/2/98 | | Advisor Trust reserves the right not to accept any purchase order that it determines not to be in the best interests of Advisor Trust or of Advisor Growth Stock Fund's shareholders. |
| | | | Advisor Growth Stock Fund reserves the right to suspend, limit, modify, or terminate the exchange privilege (including the telephone exchange privilege) or its use in any manner by any person or class.  Advisor Growth Stock Fund will terminate the exchange privilege as to a particular shareholder if the Advisor determines, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Adviser's ability to manage the investment portfolio in accordance with the investment objective or otherwise harm Advisor Growth Stock Fund or its remaining shareholders. |
| | 2/1/99 | No material change | |
| | 2/1/00 | No material change | |
| *Stein Roe Growth Stock Fund* | | | |
| | 2/22/98 | | Investment Trust reserves the right not to accept any purchase order that it determines not to be in the best interests of Investment Trust or of a Fund's shareholders. |
| | | | Generally, you will be limited to four Telephone Exchange round-trips per year and the Funds may refuse requests for Telephone Exchanges in excess of four round-trips (a round-trip being the exchange out of a Fund into another no-load Stein Roe Fund, and then back to that Fund). |
| | | | Investment Trust reserves the right to suspend or terminate, at any time and without prior notice, the use of the Telephone Exchange Privilege by any person or class of persons.  Investment Trust believes that use of the Telephone Exchange Privilege by investors utilizing market-timing strategies adversely affects the Funds.  Therefore, regardless of the number of telephone exchange round-trips made by an investor, Investment Trust generally will not honor requests for Telephone Exchanges by shareholders identified by Investment Trust as "market-timers" if the officers of Investment Trust determine the order not to be in the best interests of Investment Trust or its shareholders. Investment Trust generally identifies as a "market-timer" an investor whose investment decisions appear to be based on actual or anticipated near-term changes in the securities markets rather than for investment considerations. Moreover, Investment Trust reserves the right to suspend, limit, modify, or terminate, at any time and without prior notice, the Telephone Exchange Privilege in its entirety. |
| | 2/2/99 | Market timing language removed | |
| | 2/1/00 | No material change | |
| | 2/1/01 | Strict Prohibition language added | |
| | 2/1/02 | No material change | |
| **Liberty Growth Stock Fund** | | | |
| | 2/1/01 | | The Fund also reserves the right to refuse a purchase order for any reason, including if it believes that doing so would be in the best interest of the Fund and its shareholders. |
| | | | The Fund may terminate your exchange privilege if the advisor determines that your exchange activity is likely to adversely impact its ability to manage the Fund. |
| | | | The Fund does not permit short-term or excessive trading.  Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses.  In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund.  The fund into which you would like to exchange also may reject your request. |
| | 2/1/02 (as revised 7/15/02) | No material change | |
| | 2/1/03 | No material change | |

**EXHIBIT 3**

## Selected Columbia Funds' Prospectus Language Related to Market Timing [1]
### 1998 − 2003

| Fund | Date of Prospectus | Change in Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia High Yield Fund** | | | |
| | 2/23/98 | | Telephone exchange privileges are available to you automatically unless you decline this service by checking the appropriate box on the application. Telephone exchanges may be made from one Fund into another Fund only within the same account number. To prevent the abuse of the exchange privilege to the disadvantage of other shareholders, each Fund reserves the right to terminate the exchange privilege of any shareholder who makes more than four exchanges out of a Fund during the calendar year. The exchange privilege may be modified or terminated at any time, and any Fund may discontinue offering its shares generally or in any particular state without notice to shareholders. |
| | 2/24/99 | No material change | |
| | 2/22/00 | Market timing language added | To prevent excessive exchange activity to the detriment of other shareholders, only four exchanges per Fund are allowed per year. When exchanging into a new Fund, be sure you read the part of the Prospectus that pertains to the Fund you exchange into. This privilege may be revoked or modified at any time, and the Funds reserve the right to reject any exchange request. For example, the Funds may reject exchanges from accounts engaged in or known to engage in trading that exceeds the Fund's annual limit (including market timing transactions). |
| | 2/20/01 | No material change | |
| | 2/25/02 | No material change | |
| | 11/1/02 | Strict Prohibition language added | |
| | 5/1/03 | No material change | |
| | 10/13/03 | No material change | |
| **Columbia International Equity Fund** [8] | | | |
| | 2/28/99 | | You are generally limited to three exchanges per year.  Galaxy may change or cancel the exchange privilege with 60 days' advance written notice to shareholders. |
| | | | Galaxy may refuse any order to buy shares. |
| | | | Galaxy may refuse your order to sell or exchange shares by wire or telephone if it believes it advisable to do so. |
| | 2/29/00 | No material change | |
| | 2/28/01 | No material change | |
| | 2/28/02 | No material change | |
| | 7/15/02 | Strict Prohibition language added | |
| | 11/18/02 | No material change | |
| | 3/1/03 | No material change | |

**EXHIBIT 3**

## Selected Columbia Funds' Prospectus Language Related to Market Timing [1]
### 1998 – 2003

| Fund | Date of Prospectus | Change in Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia International Stock Fund [9]** | | | |
| *Colonial International Horizons Fund* | | | |
| | 10/30/98 | | The Fund may refuse any purchase order for its shares. |
| | | | The Fund will terminate the exchange privilege as to a particular shareholder if the Adviser determines, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Adviser's ability to manage the Fund's investments in accordance with its investment objectives or otherwise harm the Fund or its remaining shareholders. |
| | 3/1/99 | No material change | |
| | 3/1/00 | No material change | |
| *Stein Roe International Fund* | | | |
| | 2/2/98 | | Generally, you will be limited to four Telephone Exchange round-trips per year and the Funds may refuse requests for Telephone Exchanges in excess of four round-trips (a round-trip being the exchange out of a Fund into another no-load Stein Roe Fund, and then back to that Fund). |
| | | | Investment Trust reserves the right to suspend, limit, modify, or terminate, at any time and without prior notice, any Privilege or its use in any manner by any person or class. |
| | | | Investment Trust reserves the right to suspend or terminate, at any time and without prior notice, the use of the Telephone Exchange Privilege by any person or class of persons. Investment Trust believes that use of the Telephone Exchange Privilege by investors utilizing market-timing strategies adversely affects the Funds. Therefore, regardless of the number of telephone exchange round-trips made by an investor, Investment Trust generally will not honor requests for Telephone Exchanges by shareholders identified by Investment Trust as "market-timers" if the officers of Investment Trust determine the order not to be in the best interests of Investment Trust or its shareholders. Investment Trust generally identifies as a "market-timer" an investor whose investment decisions appear to be based on actual or anticipated near-term changes in the securities markets rather than for investment considerations. Moreover, Investment Trust reserves the right to suspend, limit, modify, or terminate, at any time and without prior notice, the Telephone Exchange Privilege in its entirety. |
| | 4/12/99 | No material change | |
| | 2/1/00 | No material change | |
| | 2/1/01 | Strict Prohibition language added | |
| | 2/1/02 | No material change | |
| *Liberty Newport International Equity Fund* | | | |
| | 3/1/01 | | The Fund also reserves the right to refuse a purchase order for any reason, including if it believes that doing so would be in the best interest of the Fund and its shareholders. |
| | | | The Fund may terminate your exchange privilege if the advisor determines that your exchange activity is likely to adversely impact its ability to manage the Fund. |
| | | | The Fund does not permit short-term or excessive trading. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request. |
| | 3/1/02 | No material change | |
| *Columbia International Stock Fund* | | | |
| | 10/13/03 | | The Fund may terminate your exchange privilege if the advisor determines that your exchange activity is likely to adversely impact its ability to manage the Fund. |
| | | | The Fund also reserves the right to refuse a purchase order for any reason, including if it believes that doing so would be in the best interest of the Fund and its shareholders. |
| | | | The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request. |

### Selected Columbia Funds' Prospectus Language Related to Market Timing [1]
### 1998 – 2003

| Fund | Date of Prospectus | Change in Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia Mid Cap Value Fund [10]** | | | |
| | 2/27/98 | | The Fund may refuse any purchase order for its shares. |
| | | | The Fund will terminate the exchange privilege as to a particular shareholder if the Adviser determines, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Adviser's ability to manage the Fund's investments in accordance with its investment objective or otherwise harm the Fund or its remaining shareholders. |
| | 3/1/99 | No material change | |
| | 3/1/00 | No material change | |
| | 3/1/01 | Strict Prohibition language added | |
| | 3/1/02 | No material change | |
| | 3/1/03 | No material change | |
| **Columbia Newport Tiger Fund [11]** | | | |
| | 4/30/98 | | The Fund may refuse any purchase order for its shares. |
| | | | The Fund will terminate the exchange privilege as to a particular shareholder if it is determined by the Adviser, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Adviser's ability to manage the Fund or its remaining shareholders. |
| | | | The Fund can experience substantial price fluctuations and is intended for long-term investors. Short-term "market timers" who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders. For these reasons, effective June 15, 1998, the Fund will assess a redemption fee in the amount of 2.00% on redemptions and exchanges of Fund shares purchased and held for five business days or less. |
| | 5/3/99 | No material change | |
| | 5/1/00 | No material change | |
| | 5/1/01 | Strict Prohibition language added | |
| | 5/1/02 | No material change | |
| | 5/1/03 | No material change | |
| **Columbia Small Cap Value Fund [12]** | | | |
| | 10/30/98 | | The Fund may refuse any purchase order for its shares. |
| | | | The Fund will terminate the exchange privilege as to a particular shareholder if the Advisor determines, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Advisor's ability to manage the Fund's investments in accordance with its investment objectives or otherwise harm the Fund or its remaining shareholders. |
| | 11/1/99 | No material change | |
| | 11/1/00 | Strict Prohibition language added | |
| | 11/1/01 | No material change | |
| | 11/1/02 | No material change | |
| | 11/1/03 | No material change | |
| **Columbia Tax Exempt Fund [13]** | | | |
| | 3/30/98 | | The Fund may refuse any purchase order for its shares. |
| | | | Each of the Funds will terminate the exchange privilege as to a particular shareholder if the Adviser determines, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Adviser's ability to manage each of the Fund's investments in accordance with its investment objective or otherwise harm each of the Funds or its remaining shareholders. |
| | 3/30/99 | No material change | |
| | 4/1/00 | No material change | |
| | 4/1/01 | Strict Prohibition language added | |
| | 4/1/02 | No material change | |
| | 4/1/03 | No material change | |

**EXHIBIT 3**

## Selected Columbia Funds' Prospectus Language Related to Market Timing [1]
### 1998 – 2003

| Fund | Date of Prospectus | Change in Language [2] | Prospectus Excerpts |
|---|---|---|---|
| **Columbia Young Investor Fund [14]** | | | |
| *Stein Roe Advisor Young Investor Fund* | | | |
| | 1/22/98 | | Advisor Trust reserves the right not to accept any purchase order that it determines not to be in the best interests of Advisor Trust or of a Fund's shareholders. |
| | | | Advisor Young Investor Fund will terminate the exchange privilege as to a particular shareholder if the Adviser determines, in its sole and absolute discretion, that the shareholder's exchange activity is likely to adversely impact the Adviser's ability to manage the investment portfolio in accordance with the investment objective or otherwise harm a Fund or its remaining shareholders. |
| | | | The Transfer Agent and Advisor Growth Stock Fund reserve the right to change, modify or terminate the telephone redemption or exchange services at any time upon prior written notice to shareholders. |
| | 6/3/99 | Market timing language added | The Trust believes that use of the Telephone Exchange Privilege by investors utilizing market-timing strategies adversely affects the Fund. Therefore, regardless of the number of telephone exchange roundtrips made by an investor, the Trust generally will not honor requests for Telephone Exchanges by shareholders identified by the Trust as "market-timers" if the officers of the Trust determine the order not to be in the best interests of the Trust or its shareholders. The Trust generally identifies as a "market-timer" an investor whose investment decisions appear to be based on actual or anticipated near-term changes in the securities markets other than for investment considerations. |
| | 2/1/00 | Market timing language removed | |
| *Stein Roe Young Investor Fund* | | | |
| | 2/2/98 | | Investment Trust reserves the right not to accept any purchase order that it determines not to be in the best interests of Investment Trust or of Young Investor Fund's shareholders. |
| | | | Generally, you will be limited to four Telephone Exchange round-trips per year and Young Investor Fund may refuse requests for Telephone Exchanges in excess of four round-trips (a round-trip being the exchange out of a Young Investor Fund into another no-load Stein Roe Fund, and then back to Young Investor Fund). |
| | | | Investment Trust reserves the right to suspend or terminate, at any time and without prior notice, the use of the Telephone Exchange Privilege by any person or class of persons. Investment Trust believes that use of the Telephone Exchange Privilege by investors utilizing market-timing strategies adversely affects Young Investor Fund. Therefore, regardless of the number of telephone exchange round-trips made by an investor, Investment Trust generally will not honor requests for Telephone Exchanges by shareholders identified by Investment Trust as "market-timers" if the officers of the Trust determine the order not to be in the best interests of the Trust or its shareholders. Investment Trust generally identifies as a "market-timer" an investor whose investment decisions appear to be based on actual or anticipated near-term changes in the securities markets other than for investment considerations. Moreover, Investment Trust reserves the right to suspend, limit, modify, or terminate, at any time without prior notice, the Telephone Exchange Privilege in its entirety. |
| | 2/1/99 | Market timing language removed | |
| | 2/1/00 | Market timing language added | The Fund may reject any purchase order if it determines that the order is not in the best interests of the Fund and its shareholders. |
| | | | We may change, suspend or eliminate the exchange service after notification to you. |
| | | | Generally, we limit you to four telephone exchanges "roundtrips" per year.  A roundtrip is an exchange out of the Fund into another Stein Roe no-load fund and then back to the Fund. |
| | | | The Trust reserves the right to suspend or terminate, at any time and without prior notice, the use of the Telephone Exchange Privilege by any person or class of persons. The Trust believes that use of the Telephone Exchange Privilege by investors utilizing market-timing strategies adversely affects the Fund. Therefore, regardless of the number of telephone exchange round-trips made by an investor, the Trust generally will not honor requests for Telephone Exchanges by shareholders identified by the Trust as "market-timers" if the officers of the Trust determine the order not to be in the best interests of the Trust or its shareholders. Investment Trust generally identifies as a "market-timer" an investor whose investment decisions appear to be based on actual or anticipated near-term changes in the securities markets other than for investment considerations. Moreover, the Trust reserves the right to suspend, limit, modify, or terminate, at any time and without prior notice, the Telephone Exchange Privilege in its entirety. |
| | 2/1/01 | Strict Prohibition language added | |
| | 2/1/02 | No material change | |
| *Liberty Young Investor Fund* | | | |
| | 2/1/01 | | The Fund also reserves the right to refuse a purchase order for any reason, including if it believes that doing so would be in the best interest of the Fund and its shareholders. |
| | | | The Fund may terminate your exchange privilege if the advisor determines that your exchange activity is likely to adversely impact its ability to manage the Fund. |
| | | | The Fund does not permit short-term or excessive trading.  Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses.  In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request. |
| | 2/1/02 | No material change | |
| | 2/1/03 | No material change | |

# EXHIBIT 3

## Selected Columbia Funds' Prospectus Language Related to Market Timing [1]

### 1998 – 2003

| Fund | Date of Prospectus | Change In Language [2] | Prospectus Excerpts |
|---|---|---|---|

**Note**

[1] Selected funds are those included in the SEC's last pronouncement of the funds it deems are in play in this litigation. The Complaint also refers to the Galaxy Equity Value Fund, but because the SEC did not include it in Exhibits A or C of its Supplemental Responses to Interrogatories Propounded by James Tambone, dated July 1, 2011, I did not include it. Includes changes in prospectus language as it relates to market timing, short-term trading, frequent trading, stale price arbitrage, and/or any trading restrictions.

[2] "Strict Prohibition language" refers to language similar to the following: "The Fund does not permit short-term or excessive trading. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request."

[3] Formerly Acorn Fund (until on or about 8/29/00) and Liberty Acorn Fund (until on or about 10/13/03).

[4] Formerly Acorn International Fund (until on or about 8/29/00) and Liberty Acorn International Fund (until on or about 10/13/03).

[5] Formerly Acorn Foreign Forty Fund (until on or about 8/29/00) and Liberty Acorn Foreign Forty (until on or about 10/13/03).

[6] Formerly Galaxy Growth & Income Fund (until on or about 7/29/02) and Liberty Growth & Income Fund (until on or about 10/13/03).

[7] Formerly Stein Roe Advisor Growth Stock Fund (until on or about 7/14/00), Stein Roe Growth Stock Fund (until on or about 7/15/02), and Liberty Growth Stock Fund (until on or about 10/13/03).

[8] Formerly Galaxy International Equity Fund (until approximately October 2000) and Liberty International Equity Fund (until on or about 10/13/03).

[9] Formerly Colonial International Horizons Fund (until on or about 7/14/00), Stein Roe International Fund (until on or about 11/14/02), and Liberty Newport International Equity Fund (until on or about 11/1/02);

[10] Formerly Colonial Select Value Fund (until on or about 7/14/00) and Liberty Select Value Fund (until on or about 10/13/03).

[11] Formerly Newport Tiger Fund (until on or about 7/14/00) and Liberty Newport Tiger Fund (until on or about 10/13/03).

[12] Formerly Colonial Small Cap Value Fund (until on or about 7/14/00) and Liberty Small Cap Value Fund (until on or about 10/13/03).

[13] Formerly Colonial Tax Exempt Fund (until on or about 7/14/00) and Liberty Tax Exempt Fund (until on or about 10/13/03).

[14] Formerly Stein Roe Advisor Young Investor Fund (until on or about 7/14/00), Stein Roe Young Investor Fund (until on or about 7/28/02), and Liberty Young Investor Fund (until on or about 10/13/03).

**EXHIBIT 4**

## Strict Prohibition Language in
## Prospectuses for Selected Funds [1]

| Fund Name | Date Language First Included [2] |
|---|---|
| Columbia Acorn Fund [3] | 9/29/00 |
| Columbia Acorn International Fund [4] | 9/29/00 |
| Columbia Acorn International Select Fund [5] | 9/29/00 |
| Columbia Growth & Income Fund [6] | 11/1/02 |
| Columbia Growth Stock Fund [7] | 2/1/01 |
| Columbia High Yield Fund | 11/1/02 |
| Columbia International Equity Fund [8] | 7/15/02 |
| Columbia International Stock Fund [9] | 2/1/01 |
| Columbia Mid Cap Value Fund [10] | 3/1/01 |
| Columbia Newport Tiger Fund [11] | 5/1/01 |
| Columbia Small Cap Value Fund [12] | 11/1/00 |
| Columbia Tax Exempt Fund [13] | 4/1/01 |
| Columbia Young Investor Fund [14] | 2/1/01 |

Note:

[1] Selected funds are those included in the SEC's last pronouncement of the funds it deems are in play in this litigation. The Complaint also refers to the Galaxy Equity Value Fund, but because the SEC did not include it in Exhibits A or C of its Supplemental Responses to Interrogatories Propounded by James Tambone, dated July 1, 2011, I did not include it.

[2] The first date language similar to that captioned below appeared in the Fund's prospectus: "The Fund does not permit short-term or excessive trading. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request."

[3] Formerly Acorn Fund (until on or about 9/29/00) and Liberty Acorn Fund (until on or about 10/13/03).

[4] Formerly Acorn International Fund (until on or about 9/29/00) and Liberty Acorn International Fund (until on or about 10/13/03).

[5] Formerly Acorn Foreign Forty Fund (until on or about 9/29/00) and Liberty Acorn Foreign Forty Fund (until on or about 10/13/03).

[6] Formerly Galaxy Growth & Income Fund (until on or about 7/29/02) and Liberty Growth & Income Fund (until on or about 10/13/03).

[7] Formerly Stein Roe Advisor Growth Stock Fund (until on or about 7/14/00), Stein Roe Growth Stock Fund (until on or about 7/15/02), and Liberty Growth Stock Fund (until on or about 10/13/03).

[8] Formerly Galaxy International Equity Fund (until approximately October 2002) and Liberty International Equity Fund (until on or about 10/13/03).

[9] Formerly Colonial International Horizons Fund (until on or about 7/14/00), Stein Roe International Fund (until on or about 11/1/02), and Liberty Newport International Equity Fund (until on or about 11/1/02).

[10] Formerly Colonial Select Value Fund (until on or about 7/14/00) and Liberty Select Value Fund (until on or about 10/13/03).

[11] Formerly Newport Tiger Fund (until on or about 7/14/00) and Liberty Newport Tiger Fund (until on or about 10/13/03).

[12] Formerly Colonial Small Cap Value Fund (until on or about 7/14/00) and Liberty Small Cap Value Fund (until on or about 10/13/03).

[13] Formerly Colonial Tax Exempt Fund (until on or about 7/14/00) and Liberty Tax Exempt Fund (until on or about 10/13/03).

[14] Formerly Stein Roe Advisor Young Investor Fund (until on or about 7/14/00), Stein Roe Young Investor Fund (until on or about 7/29/02), and Liberty Young Investor Fund (until on or about 10/13/03).