# EXHIBIT 2

ERIK R. SIRRI-1/13/12

---

1

VOLUME: I
PAGES: 1 - 209
EXHIBITS: SEE INDEX
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 06-10885-NMG

• • • • • • • • • • • • • • • • • •

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
vs.
JAMES TAMBONE and ROBERT HUSSEY,
Defendants.
• • • • • • • • • • • • • • • • • •

DEPOSITION OF ERIK R. SIRRI, a
witness called on behalf of the Plaintiff, taken
pursuant to provisions of the Federal
Rules of Civil Procedure, before Marsha S.
Gerber, RPR, CSR No. 111793, and Notary Public
in and for the Commonwealth of Massachusetts,
at the offices of United States Securities and
Exchange Commission, 33 Arch Street, Suite 2300,
Boston, Massachusetts, on Friday, January 13,
2012, commencing at 9:57 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET
BOSTON, MASSACHUSETTS 02116

---

2

APPEARANCES:
    DAVID H. LONDON, ESQUIRE
    PATRICIA GRANT, LAW STUDENT
    UNITED STATES SECURITIES AND
    EXCHANGE COMMISSION
    BOSTON DISTRICT OFFICE
    33 Arch Street, Suite 2300
    Boston, Massachusetts 02110-1424
    617-573-8997
    For the Plaintiff
    ERIC M. GOLD, ESQUIRE
    GREENBERG TRAURIG, LLP
    One International Place
    Boston, Massachusetts 02110
    617-310-5226
    For the Defendant James Tambone

    ERIN E. HAYES, ESQUIRE
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    One Beacon Street
    Boston, Massachusetts 02108
    617-573-4843
    For the Defendant Robert Hussey
ALSO PRESENT:
    MICHAEL LOIURIO, VIDEOGRAPHER
    NATIONAL VIDEO REPORTERS, INC.
    7 Cedar Drive
    Woburn, MA 01801
    781-937-9900

---

3

I N D E X
WITNESS                    EXAMINATION
ERIK R. SIRRI
By Mr. London                  5

E X H I B I T S
NUMBER                         PAGE
600    Copy of Expert Report of        95
       Professor Erik R. Sirri

Exhibit retained by Attorney London

---

4

PROCEEDINGS

        THE VIDEOGRAPHER: We are
now recording and on the record. My
name is Michael Loiurio. I'm a legal
video specialist for National Video
Reporters, Inc. in association with
Kaczynski Reporting. Today's date is
January 13th, 2012, and the time is
9:57 a.m.
        This is the deposition of
Erik Sirri in the matter of Securities
and Exchange Commission versus James
Tambone and Robert Hussey in the U.S.
District Court, District of
Massachusetts, 06-10885 NMG. This
deposition is being taken at 33 Arch
Street on behalf of the plaintiff. The
court reporter is Marsha Gerber of
Kaczynski Reporting. The counsel will
state their appearances, and the court
report will administer the oath.
        MR. LONDON: David London
for plaintiff, Securities and Exchange

---

1 (Pages 1 to 4)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

**5**

1    Commission. And sitting with me today
2    is a law student, Patricia Grant.
3           MR. GOLD:  Eric Gold for
4    defendant Jim Tambone.
5           MS. HAYES:  Erin Hayes for
6    defendant Robert Hussey.
7
8           ERIK R. SIRRI,
9    having been satisfactorily identified and
10   sworn by the Notary Public, was examined
11   and testified as follows:
12   BY MR. LONDON:
13   Q   Good morning, Professor.
14   A   Good morning.
15   Q   For the record, would you just state
16       your name.
17   A   Erik Sirri.
18   Q   You have a middle initial; correct?
19   A   Eric R. Sirri.
20   Q   Thank you.
21          What is your home address?
22   A   100 Nason Hill Road. Nason is N, like
23       Nancy, A-S-O-N Hill Road in Sherborn,
24       S-H-E-R-B, like boy, O-R-N,

**6**

1    Massachusetts.
2    Q   What is your current employment?
3    A   I'm a professor at Babson College.
4    Q   And how long have you been teaching at
5        Babson?
6    A   I began teaching in 1995.
7    Q   And you taught for a period, and then
8        there was a break, and you came back;
9        is that correct?
10   A   That's correct.
11   Q   So if you could just describe for the
12       record the periods of time you actually
13       taught at Babson?
14   A   I taught from 1995 to 1996. I left in
15       1996 to join the Securities and
16       Exchange Commission. I came back in
17       1999, and I began teaching again in
18       1999. I worked at the Securities -- I
19       worked at Babson College until 2006.
20          Then again I went to the
21       Securities and Exchange Commission from
22       2006 to 2009. I came back in 2009.
23       And I've been teaching at Babson
24       College since then.

**7**

1    Q   And during the periods where you've
2        been a professor at Babson, what
3        courses have you taught?
4    A   I've taught a variety of courses. One
5        has been the course called Capital
6        Markets. Another is a course Fixed
7        Income. Another is a course Equity
8        Markets. A fourth is a course Risk
9        Management. A fifth is a course
10       Marketing of Financial Services. A
11       sixth is a course Personal Financial
12       Management.
13   Q   Out of the list of courses you've
14       identified do any of the courses or do
15       more than one of the courses involve
16       teaching about the mutual fund
17       industry?
18   A   Yes.
19   Q   Can you identify which of those courses
20       involve the mutual fund industry?
21   A   Capital Markets, Personal Financial
22       Management, Marketing of Financial
23       Services.
24          What were the other ones I

**8**

1    told you about?
2    Q   To help you out, Fixed Income, Equity
3        Markets, and Risk Management.
4    A   Not Fixed Income. Equity Markets may
5        have. And not Risk Management.
6    Q   Can you describe for me at least
7        generally speaking what you teach about
8        the mutual fund industry in those
9        courses to the extent you can?
10   A   Sure. With the course Capital Markets
11       I teach about, first, two things.
12       First is that the general structure of
13       mutual funds. The fact that funds are
14       generally organized as a trust, that
15       they have no employees, and their
16       general structure. That is, the
17       outsource nature of management and
18       service providers.
19          The second thing I teach is
20       about the pricing of money market
21       funds. I teach a case on the problems
22       associated with pricing money market
23       funds at a one dollar NAV through the
24       credit crisis and the problems that

2  (Pages 5 to 8)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

9

1    arose with money funds maintaining
2    their dollar NAV while the value of
3    portfolio securities was falling.
4         In the course Personal
5    Financial Management the topic came up
6    because there I take the perspective of
7    an investor, a person who would use
8    mutual funds, and I spend a
9    considerable amount of time talking,
10   again, about their structure, about
11   their pricing, about efficiencies
12   associated with mutual funds open end
13   versus mutual funds closed end versus
14   ETFs. And I spend time talking about
15   passive management styles within mutual
16   funds versus active management styles
17   within mutual funds and the benefits
18   that mutual funds convey to retail
19   investors which have on the order of,
20   say, $50,000 to invest.
21        The last course I think I
22   mentioned was Marketing of Financial
23   Services. That's a course I taught
24   that dealt with the problem of how you

10

1    sell a financial product, in this case
2    a mutual fund, into the marketplace.
3    How you position the product. How
4    people buy the product. What is the
5    salient attributes of the product. And
6    so I talk about positioning and the
7    marketing of the mutual funds.
8    Q    Taking that last point selling mutual
9         funds into the market, where did you
10        derive your basis for learning that
11        concept in order to go ahead and teach
12        it?
13   A    I think it came from research I had
14        done in the mutual fund industry. It
15        came from contact I had with industry
16        professionals. Living in Boston it's
17        not hard to -- seems like in my town no
18        matter where you step you step on
19        someone who works for a mutual fund
20        company. I did some consulting work
21        for mutual funds.
22             I think those are the main
23        instances where I got knowledge about
24        mutual funds. And then of course I

11

1    invest in mutual funds and so being a
2    finance professor you can't help but
3    learn some things from investing.
4    Q    That sort of leads into my next
5         question. The other, one of the other
6         topics you identify, is the investor
7         perspective.
8    A    Yes.
9    Q    Where did you develop the understanding
10        in order to go ahead and teach about
11        the mutual fund industry from the
12        investor perspective?
13   A    That came from my own experience as an
14        investor. It came from research I had
15        done in mutual funds. It came from my
16        experience as a trustee on the board of
17        a mutual fund. It came from consulting
18        work. It came from conversations I had
19        with investment professionals. It came
20        from conversation I had with investment
21        advisors and brokers. And it came from
22        my experience in the Securities and
23        Exchange Commission.
24   Q    Based on how you describe your

12

1    background now it sounds like you
2    haven't worked at a mutual fund
3    company; is that correct?
4    A    That is correct.
5    Q    Have you ever worked in sales in any
6         manner?
7    A    You mean for a mutual fund company?
8    Q    Any type of sales? Have you ever had a
9         job where you've been involved in
10        sales?
11   A    I've had tasks that involved sales, but
12        I never had a position that labeled me
13        as a salesman or salesperson.
14   Q    So I'm a little confused.
15             What do you mean tasks that
16        involved sales?
17   A    I've helped raise money for my school
18        with donors. I would call that a sales
19        job because in the end you're trying to
20        talk a relatively wealthy person into
21        buying into the admission of your
22        school. You're trying to sell your
23        school and raise money. That had -- I
24        would say that's a sales position;

3 (Pages 9 to 12)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

145

1   documents produced by any of the market
2   timers identified in the Complaint;
3   correct?
4   A   So the eight -- the entities that are
5       named in the Complaint?
6   Q   Yes.
7   A   No.  Not that I can recall.
8   Q   Did you think that wouldn't be helpful
9       to you to review documents produced by
10      the market timers?
11  A   Well, I would go back to my opinions,
12      and I think in coming to the opinions
13      that I developed in this matter those
14      documents were not -- I didn't feel
15      they were necessary in coming to these
16      opinions.
17  Q   Going to the source documents that you
18      looked at back in the Exhibit 2.  The
19      section you call Legal Documents, the
20      testimony transcripts?
21  A   Yes.
22  Q   And there's a selection of various
23      people's testimony transcripts.
24              How was it determined whose

146

1   testimony was identified here?  How was
2   that chosen, which transcripts to use?
3   A   My experience and I believed that the
4       term market timing as such was not a
5       well understood time, that it was --
6       term, that it was ambiguous.  That
7       people have -- do not have a clear
8       understanding of it.  That is, at the
9       time which the allegations arose, that
10      '98 to 2003 time frame, my belief is
11      that there wasn't a uniform
12      understanding of market timing as it
13      relates to mutual funds.  And I believe
14      today there isn't a uniform
15      understanding of what it means when you
16      say market timing when it comes to
17      mutual funds.
18              Because of that, I asked
19      people to look for information that
20      would support what I believe to be true
21      that would document that in the record
22      where Columbia professionals or others
23      had statements about their view about
24      what market timing was, and it served

147

1   as illustration for the way I think
2   market timing was understood.
3   Q   So, with respect to the transcripts you
4       identify here, did you read the entire
5       transcript or did you just look at the
6       portion as you describe it that relates
7       to discussing the parameters of market
8       timing?
9   A   I did not read the entire transcripts.
10      I looked for those sections that dealt
11      with what I asked for, and I read
12      around them so I could understand the
13      context of the comment.
14  Q   Did you ask the attorney to get you
15      documents, for example, e-mail
16      documents, not transcript documents,
17      e-mail documents where the various
18      arrangements were discussed with the
19      market timers?
20  A   I did not ask them for that.
21  Q   Don't you think that would have been
22      helpful to analyze whether or not there
23      was market timing?
24              MS. HAYES:  Objection.

148

1   A   Well, again, I would point to what my
2       opinions are.  And you asked me the
3       question would it be helpful or not to
4       analyze whether or not there was market
5       timing.  None of my opinions relate to
6       in this instance whether or not there
7       was market timing.  So it was not
8       useful to me in coming to my opinions
9       in this case.
10  Q   So, in other words, documentary e-mails
11      or other documents produced in this
12      case that talk about the arrangements
13      with timers, you don't believe those
14      documents would have been helpful to
15      you to prepare your report?
16  A   Well, I would say again, I always ask
17      for what I need to come to my opinions.
18      And my opinions in this case are about
19      the SEC's guidance on market timing,
20      whether market timing was industry-wide
21      or not, was an industry-wide occurrence
22      or not; the nature of Columbia
23      prospectuses; the role of portfolio
24      manager; and the role or the importance

37 (Pages 145 to 148)

ERIK R. SIRRI-1/13/12

**149**

1    of accurate pricing of funds shares.
2    For those opinions I did not feel I
3    needed the e-mails you refer to.
4    Q   So then the simpler way of saying it is
5    you didn't think it would have been
6    helpful to you to review e-mails or
7    other documents discussing the timing
8    arrangements; is that correct?
9    A   I would say that I got what I needed
10   for my opinions and that I didn't feel
11   that I needed the e-mails you're
12   referring to for these opinions on
13   Section III of my report.
14   Q   With respect to the transcripts that
15   we've been looking at back on
16   Exhibit 2, I notice you don't list
17   depositions of either Hussey or Tambone
18   on here.
19       Is there a reason you
20   didn't request the deposition
21   transcripts of Hussey or Tambone? And,
22   when I say deposition, I mean that as
23   opposed to investigative testimony.
24       Do you understand the

**150**

1    difference?
2    A   No. I don't understand the difference.
3    Q   Let me -- for purposes of what I'm
4    asking you, do you understand that,
5    when the SEC enforcement division
6    conducts an investigation and we
7    question people on the record, that
8    transcript is something we refer to as
9    investigative testimony.
10       Does that make sense?
11   A   I didn't know that until you told me,
12   but I accept it.
13   Q   And, when you look at the Tambone and
14   Hussey transcripts in here, you'll see
15   that they're in the late '03, early '04
16   time frame. Do you see that? That's
17   the date of the transcripts.
18   A   Yes.
19   Q   Do you know, do you have an
20   understanding, that the SEC also took a
21   deposition? Like, you're sitting here
22   today. This is a deposition. We took
23   a deposition of both Hussey and Tambone
24   in this case. Do you know that that

**151**

1    happened?
2    A   I guess until you brought that up I
3    didn't appreciate that what I cite here
4    as testimony, which you've called
5    investigative testimony, was different
6    than what you're telling me is a
7    deposition. I did not understand that
8    distinction.
9    Q   So, for example, you don't know that in
10   the year 2011 the SEC also took a
11   deposition of Hussey and Tambone?
12   A   I don't think I knew that. No.
13   Q   Do you think it would be helpful for
14   you to read those transcripts?
15   A   Well, whether or not it would be
16   helpful, I'll go back and look again,
17   point to the opinions that I have. I
18   believe that with respect to the
19   opinions I have they reflect the way I
20   think about the issues that my opinions
21   are about. So I can't tell you whether
22   something I haven't read is useful or
23   not. I just -- I can't tell you.
24   Q   Okay. Well, understanding that

**152**

1    apparently you didn't realize there
2    were these transcripts out there until
3    I told you a minute ago, do you want to
4    go and read them now that you know?
5    A   Well, I guess I would try and answer
6    that question in light of what my
7    opinions are. So I'm -- let me just
8    look at my opinions and see if -- give
9    some thought to your question.
10       So, as a general matter, it
11   does not -- I would not say, yes, I
12   immediately need to see those. That's
13   not my reaction to you telling me that
14   these were there. That's not how I
15   would look at that. The only caveat I
16   would have, the only point I would --
17   to answer your question is the last
18   sentence on Page 3 where I say, a
19   distributor employee would not
20   typically have access to this
21   information and I've seen no evidence
22   to indicate that Columbia's
23   distribution entity was provided daily
24   cash balance or cash flow information.

38 (Pages 149 to 152)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

153

1          So that -- to answer your
2     question, if that informed that point,
3     then I would be interested in seeing
4     it.  For the remaining points, as I sit
5     here now, I can't think of a reason to
6     see it.
7   Q   Okay.  So, other than the last point
8     that you cite on Page 3 of your report,
9     you don't believe that it would be
10    helpful for you to read the deposition
11    transcript of either defendant in this
12    case?
13  A   I would say that it would not inform
14    the opinions that I offer in this case
15    as I have them offered on my report.
16  Q   Well, given everything you've learned
17    just now, do you plan on asking counsel
18    after we get out of here if just as I
19    read Tambone or Hussey's deposition
20    transcript?
21        MR. GOLD:  Objection.
22  A   I don't know.  I haven't considered it.
23  Q   I think I asked you earlier about
24    speaking with people at Columbia at the

154

1     time of the activity.  I'm not sure if
2     I asked about the market timers
3     themselves.
4          But have you at any point
5     in time ever spoken to any of the
6     entities or people associated with the
7     eight market timers that are identified
8     in the Complaint?
9   A   No.
10  Q   Did you ever consider doing so?
11  A   In this matter?
12  Q   Yes.
13  A   No.
14  Q   Why not?
15  A   Well, in coming to my opinions I don't
16    think the opinion -- I need a
17    conversation with the eight market
18    timers, alleged market timers, in this
19    case to come to my opinions in this
20    case.
21  Q   I turn you back to that Exhibit 2
22    again.  I know we're flipping around a
23    lot.  I have another question I'd like
24    to ask you on Page 2 of Exhibit 2.

155

1     After the transcripts you identify the
2     Complaint, and then the next document
3     you identify is the SEC's Supplemental
4     Responses to Interrogatories Propounded
5     by James Tambone.
6          Do you see that?  So this
7     would be after the transcripts.
8   A   Right.  So I'm looking --
9   Q   The last item is the SEC's supplemental
10    responses?
11  A   Yes.
12  Q   Okay.  Why did you review that
13    document?
14  A   It was sent to me, and I read it.  I
15    will occasionally read things just to
16    read them in the same sense that I -- I
17    think -- remember I told you that some
18    legal documents were sent to me in
19    between meetings?  I think this was one
20    of them.
21  Q   Well, did you request this document or
22    just was it sent to you?
23  A   I -- I believe and I'm -- I can't
24    recall so I'm going to give you my best

156

1     recollection, but it's fuzzy because I
2     don't have a log of -- I don't know
3     right here as I sit here when each
4     document arrived.
5          As I sit here now my best
6     recollection is that it just arrived to
7     me before I was retained on the matter
8     and that I read it as part of coming --
9     because the attorney sent it to me.  I
10    was not yet retained, and they may have
11    asked me to take a look at that
12    document.
13  Q   Did they direct you to a portion of the
14    document or just say, here, read the
15    document?
16  A   I don't recall.  I note that the date
17    is July 1, 2001.  So that may help me
18    frame some of these.
19  Q   2011 just so you --
20  A   Oh, sorry.  Sorry.  Sorry.  2011.  That
21    might help me -- that might help me
22    with the timing on some of our earlier
23    things.
24          I think it was just sent to

39 (Pages 153 to 156)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

157

1    me to provide information, if this is
2    in fact that document. And, if it is
3    the document that was sent to me, I
4    don't recall being pointed to any
5    specific area. But, again, I can't as
6    I sit here now tell you which document
7    was provided when.
8    Q    Okay. Well, do you recall when you
9         reviewed the SEC's responses to
10        Tambone's interrogatories -- I think I
11        just got tongue-tied. Let me start
12        over.
13             Do you recall, when you
14        reviewed the SEC's responses to
15        Tambone's interrogatories reviewing any
16        information about the SEC's basis for
17        alleging that Tambone reviewed and
18        provided input into market timing
19        language in the prospectuses at
20        Columbia?
21             MR. GOLD: Objection.
22    A    Can you -- so, when I reviewed this
23        document here that's at the bottom, the
24        one that we've been talking about that

158

1    says Supplemental Responses to
2    Interrogatories Proposed by James
3    Tambone -- Propounded by James Tambone,
4    when I reviewed that --
5    Q    Do you recall reviewing information in
6         this document, in that document,
7         regarding the SEC's basis for alleging
8         that Tambone reviewed and provided
9         input into the market timing language
10        in the Columbia prospectuses?
11    A    No.
12             MR. GOLD: Objection.
13    A    No. I don't.
14    Q    Would it be helpful for you to review
15        that type of information, the SEC's
16        basis for its allegations?
17    A    I think I would, again, come back to my
18        opinions. And my opinions as listed in
19        Section III of my report would not seem
20        to me to rely or need that information
21        to come to the five opinions that are
22        laid out in my report.
23    Q    Let me ask you this. In the SEC's
24        responses to Tambone's interrogatories

159

1    do you recall reviewing materials about
2    the SEC's basis for alleging that
3    Tambone was aware of the harm caused by
4    market timing?
5    A    I don't recall that.
6    Q    Would that be helpful for you to
7        review?
8    A    Well, again, I apologize for always
9        answering the same way, but I'm looking
10        at the opinions that I offer. And
11        you're asking me if Mr. Tambone --
12        Mr. Tambone I think you said understood
13        the harm that would result from?
14    Q    Slightly different. Just so that it's
15        clear, what I'm asking is if it would
16        be helpful for you to review the
17        information that the SEC gave to the
18        defendants establishing the SEC's basis
19        for alleging that Tambone was aware of
20        the harm caused by the market timing?
21             MS. HAYES: Objection.
22    A    With respect to the opinions I offer in
23        this matter that doesn't bear on the
24        opinions that I offer in this matter.

160

1    Q    So it wouldn't be helpful for you to
2        review it, that's the answer; correct?
3    A    It wouldn't inform the opinions that I
4        offer in this matter.
5    Q    And, again, going back to the SEC's
6        responses to the interrogatories in the
7        document you cite, would it be helpful
8        for you at all to review the materials
9        regarding the SEC's basis for alleging
10        that Tambone entered into or approved
11        arrangements with market timers?
12             MS. HAYES: Objection.
13    A    Again, given the opinions that I offer
14        in Section III of my report, the SEC's
15        basis for what you just said would not
16        inform the opinions that I offer in
17        Section III. So no.
18    Q    In other words, it wouldn't be helpful;
19        correct?
20    A    It wouldn't be helpful for the five
21        opinions that I offer in Section 3 of
22        my report.
23    Q    Now, the document we've been referring
24        to that I've been discussing that the

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

161

1    SEC responded to Tambone's
2    interrogatories, you'll notice that's
3    called The Supplemental Responses, the
4    one that's dated July 1, 2011.
5         Are you aware that the SEC
6    provided initial responses to Tambone's
7    interrogatories?
8    A   Well, given the title supplemental I
9        guess, if I would have thought about
10       it, I could have reasoned that out, but
11       I have not -- so I would have to say,
12       no, I was not aware.  Though, looking
13       at the title I guess, if I wanted to
14       know, I could have figured it out.
15   Q   Well, knowing that now, my representing
16       to you there were initial responses,
17       would you be interested in reading the
18       SEC's initial responses to Tambone's
19       interrogatories?
20   A   I think my answers would mirror what I
21       said with respect to the supplemental
22       responses in that although I don't --
23       well, I should say I would need to know
24       what they are.  But, if they are

162

1    similar to what you told me about,
2    which is that they're the bases for the
3    SEC's allegations, then I would say
4    that with respect to the five opinions
5    I offer in Section III of my report I
6    would not need to review the bases for
7    the SEC's allegations to come to the
8    opinions that I cite.  No.
9    Q   Would the same be true for the SEC's
10       responses to Hussey's interrogatories?
11       MS. HAYES:  Objection.
12   Q   In other words, you've identified
13       responses to Tambone's interrogatories.
14       The other defendant, Hussey, the SEC
15       also responded to Hussey's
16       interrogatories.  I'll represent that
17       to you.  I can show you the document,
18       if you'd like.
19       My question is, do you
20       think it would be helpful to you to
21       review the SEC's responses to Hussey's
22       interrogatories?
23   A   No.  Based on my opinions in Section
24       III of the report I would not need to

163

1    know the bases for the SEC's
2    allegations against Mr. Hussey.
3         MR. LONDON:  Can we take a
4    break off the record?
5         THE VIDEOGRAPHER:  The time
6    is now 12:57, and we're going off the
7    record.
8         (A lunch recess was taken)
9
10        AFTERNOON SESSION
11
12        THE VIDEOGRAPHER:  The time
13   is now 1:51.  We are recording and back
14   on the record.
15   Q   Professor Sirri, if you'd take your
16       report that we marked as Exhibit 600
17       and turn to that Section III, Summary
18       of Opinions on Page 3 of your report?
19   A   Yes.
20   Q   The first bullet point hash mark that
21       you itemize there is that the SEC
22       provided limited guidance on market
23       timing or stale price arbitrage prior
24       to the fall of 2003.

164

1         Why is that item important
2    to you as part of your work in this
3    case?
4    A   There is a -- this case is about market
5        timing, and the term market timing is
6        used.  My opinion is relevant and
7        important to me with respect to this
8        case because it talks about and it
9        deals with the point that market timing
10       was both not uniquely defined and
11       guidance that came from the SEC about
12       this ill-defined activity was very
13       limited.  And so the opinion points out
14       that, unlike today, we're looking back,
15       people have a sense of what stale price
16       arbitrage is and how it's harmful to
17       people, that was not the case at the
18       time -- at the relevant period for this
19       matter from 1998 to 2003.
20   Q   What about the next item?  What about
21       market timing and mutual funds was an
22       industry-wide issue prior to the fall
23       of 2003, why did you opine on that?
24   A   Well, I opine because counsel asked me

41 (Pages 161 to 164)

ERIK R. SIRRI-1/13/12

165

1    an opinion what did I think about
2    market timing about in terms of its
3    prevalence before 2003, and we know
4    that market timing was an industry-wide
5    issue. There are a lot of settlements
6    that went on, and we know based on the
7    GAO report that it was prevalent. That
8    is, market timing was pretty broad
9    within the industry.
10   Q   I guess my question really is how is
11       that relevant to the Tambone and Hussey
12       case?
13   A   Oh, it's relevant because this matter,
14       that is, the activity in this
15       particular instance, is not unique. It
16       was going on broadly throughout the
17       industry.
18   Q   But there were a lot of fund companies
19       and individuals who were charged with
20       violating the law back in that time
21       frame; correct?
22   A   There were a lot. That's correct.
23   Q   The fourth hash mark down you discuss
24       the rule of the manager of the fund's

166

1    investments. You talk about the
2    portfolio manager. And I'd like to
3    direct you to the fourth line down, the
4    sentence that discusses -- the end of
5    it says, disruptive or harmful to the
6    fund. And then it says, a distributor
7    employee would not typically have
8    access to this information.
9        Do you see that --
10   A   I do.
11   Q   -- section?
12       Okay. Now, what
13       information are you saying the
14       distributor employee would not
15       typically have access to?
16   A   So, if you look at the beginning of
17       this hash mark paragraph, I say that
18       the portfolio manager and the advisor
19       have knowledge of the funds' day-to-day
20       cash balances and aggregate investor
21       cash flows. So this sentence below
22       that follows that, the distributor
23       employee would not typically have
24       access to the fund's day-to-day cash

167

1    balances or the aggregate investor cash
2    flows.
3    Q   And my question I think -- well, when I
4        hone in on it for you, you talk about
5        the daily cash balances and the
6        aggregate cash flow as a matter of
7        trying to determine whether something
8        is disruptive or harmful to the fund;
9        right? I mean, you're using the cash
10       flow and the cash balances to determine
11       if there's harm to the fund; is that
12       correct?
13   A   What it says is that knowledge of the
14       cash flow and knowledge of day-to-day
15       cash balances are pieces of information
16       that allow the portfolio manager to
17       determine if particular trading
18       activity is harmful to the fund.
19   Q   And in that next sentence you say, the
20       distributor employee would not
21       typically have access to that
22       information.
23       Now, my question is in our
24       case here, in the Columbia case, isn't

168

1    it correct that the distributor
2    employees did learn that there were
3    harm to the funds in the market timing
4    trades?
5        MS. HAYES: Objection.
6        MR. GOLD: Objection.
7    A   In this case I don't know what people
8        learned or didn't know so I don't have
9        an opinion about that nor do I know
10       what they knew so I can't respond to
11       that.
12   Q   And the reason you don't know is you
13       didn't review any e-mails where Tambone
14       or Hussey were informed of harm to
15       funds; correct?
16       MS. HAYES: Objection.
17   A   The reason I don't know is my opinions
18       don't cover that.
19   Q   But you also told me that you didn't
20       review e-mails that discussed, for
21       example, communications to Tambone that
22       there were harm to the Columbia funds
23       from market timing; correct?
24   A   Well, I don't know what the e-mails

42 (Pages 165 to 168)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

169

1    you're talking about said so I haven't
2    reviewed e-mails so I can't tell you --
3    I can't answer your question the way
4    it's posed precisely, but I reviewed
5    materials I needed to come to the
6    opinions I came to.
7    Q   Okay. But, would it matter to you if
8        you knew that there were e-mails that
9        showed that Tambone learned that there
10       were harm to the Columbia funds from
11       market timing?
12           MR. GOLD:  Objection.
13   A   So I have not reviewed the record, and
14       I did not need to review the part of
15       the record you're about to come
16       to my opinion.  I know there's a lot of
17       material in the record.  I would have
18       to review all of that, if I were to
19       come to some opinions about that, and I
20       haven't come to such opinions.
21   Q   So the bottom line is the fact that
22       there are e-mails produced in this
23       case, e-mails that show that Tambone
24       was made aware that there were harm to

170

1        the Columbia funds, that's not
2        something that you think it was
3        necessary to look at as part of your
4        work?
5            MR. GOLD:  Objection.
6    Q   Am I correct?
7    A   I don't know what the e-mails show.  I
8        don't know if they show what you
9        asserted they show or not.  What I said
10       and what I'll say again is that I
11       reviewed the kind of materials I needed
12       to come to the opinions in my case.  In
13       my report.  Excuse me.
14   Q   And the reason you don't know what the
15       e-mails said is because the only
16       e-mails or documents that you looked at
17       were the ones identified in Exhibit 2
18       to your report; correct?
19           MS. HAYES:  Objection.
20       Misstates his testimony.
21   A   The reason why I don't know what they
22       say is that I reviewed whatever
23       material I needed for my opinions, and
24       I didn't feel I needed to review

171

1        e-mails to come to my opinions.
2    Q   The next page, Page 4 of your report,
3        there's a hash mark where you discuss
4        the concept that daily fair value
5        pricing was the only method that would
6        eliminate both the incentives for and
7        the harmful effects of stale price
8        arbitrage trading.
9            Can you explain to me why
10       daily fair value pricing was the only
11       method?  In other words, there's other
12       potential methods.  There's redemption
13       fees.  There's sales loads.  Why do
14       those items, redemption fees, sales
15       loads, why don't they help to eliminate
16       incentives for the harmful effects of
17       arbitrage trading?
18           MR. GOLD:  Objection.
19   A   So what I say in this is that daily
20       fair value pricing is the only method
21       that would eliminate both the
22       incentives for and harmful effects of
23       stale price arbitrage.  In the example
24       that you gave you asked about

172

1        redemption fees.  A redemption fee,
2        depending on how it's structured, may
3        not help at all.
4            An example would be the
5        redemption fee is 1 percent and on a
6        particular day the stale price
7        arbitrage yields a profit of 3 percent,
8        thus there's still an incentive to
9        engage in stale price arbitrage.  It
10       may attenuate the amount of profit, if
11       any, that the stale price arbitrage
12       trader takes, but it wouldn't help that
13       person from engaging in stale price
14       arbitrage.  They would still have an
15       incentive to do so.
16           The second point is that
17       stale price arbitrage trading can exist
18       even without a round trip.  If all I do
19       ever is buy mutual funds, take the
20       example of me being someone who saves
21       money every month.  Hypothetically, I
22       save a thousand dollars a month and
23       that thousand dollars is available to
24       me on the first of the month.  I could

43 (Pages 169 to 172)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

**177**

1  Q  Who have you talked to?
2  A  I have talked to academics who've
3     gained -- who've done it. Just
4     professors who understood this and
5     figured it out. I've talked to
6     individuals who've done it who weren't
7     academics who were professionals in the
8     financial services community. Those
9     are the two that come to mind at the
10    moment.
11 Q  But in this case you didn't talk to any
12    of the timers that are identified in
13    the Complaint?
14 A  I did not.
15 Q  The folks that you did speak to who
16    have engaged in market timing, did you
17    discussed with them the concept of what
18    would eliminate their incentives?
19 A  Implicitly, yes. With the academics.
20 Q  And with the nonacademics?
21 A  I don't recall that I did. I can't
22    recall it coming up with the
23    nonacademics. With the academic folks
24    it was somewhat of an academic

**178**

1     conversation about why the opportunity
2     arises and how it can be fixed.
3  Q  With respect to nonacademics, how did
4     it come about that you spoke to those
5     people?
6  A  In a matter I was engaged in there were
7     allegations that -- so this is an
8     example of it. There were allegations
9     that employees of a fund complex
10    engaged in market timing of their own
11    mutual funds, and in the process of the
12    work I did there I talked to
13    individuals who were being questioned
14    about their trading activity. And I
15    later determined that their trading
16    activity was consistent with market
17    timing.
18 Q  Well, in that situation you talked to
19    individuals, but in our situation you
20    didn't talk to individuals.
21    Why not?
22    MS. HAYES: Objection.
23 A  In the case that I'm referring to I was
24    retained in part to determine if a

**179**

1     particular individual engaged in market
2     timing or not under a definition that I
3     developed. In this case that was not
4     part of my assignment.
5  Q  So your assignment was limited to the
6     specific items that appear on pages 2
7     to 3 of your report or I guess 2 to 4
8     of your report; is that correct?
9  A  Section II describes my assignment, and
10    Section III describes my opinions.
11 Q  So you didn't do any work in this case
12    that falls outside of either what is in
13    the assignment or the opinions section
14    of your report; correct?
15 A  That's correct.
16 Q  Could you turn to Page 9 of your
17    report, please. Paragraph 22. The
18    second sentence in your Paragraph 22
19    says that identifying whether an
20    investor is engaged in stale price
21    arbitrage requires empirical analysis
22    and absent confirmation from the
23    investor must be statistically inferred
24    from the investor's purchase and sale

**180**

1     activity.
2        Now, my question to you is,
3     in this case here, the Tambone and
4     Hussey case, wouldn't it be important
5     to you to review materials that could
6     potentially show confirmation from the
7     investor that they're engaging in that
8     activity?
9        MR. GOLD: Objection.
10 A  In the opinions I offer on this case,
11    which are in Section III of my report,
12    a review of investor's trading records
13    is not needed for me to come to the
14    opinions I offer in this matter.
15 Q  I'm not actually talking about trading
16    records, per se. I'm talking about
17    even talking to one of the investors,
18    one of the eight investors in the
19    Complaint.
20 A  I would -- again, as I look at the
21    opinions I offer in this report,
22    conversing with one of the eight
23    investors I don't feel is necessary in
24    coming to the opinions I come to in

45 (Pages 177 to 180)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

**181**

1    this report.
2    Q   So the investor's own words would not
3        be important to you as part of your
4        work in this case?
5            MS. HAYES:  Objection.
6        Asked and answered.
7    A   It would not -- I would not require a
8        conversation with one of the eight
9        investors to come to the opinions that
10       I offer in this report.
11   Q   I'm going to have you turn to Paragraph
12       31.  That's on Page 15 of your report.
13       I'd like to focus on the last sentence
14       of Paragraph 31.  The paragraph -- I'm
15       sorry, the sentence that says,
16       notwithstanding the limitations of the
17       portfolio manager to fully understand
18       the trading by individual accounts, the
19       portfolio managers were in a better
20       position than the distributor to
21       identify when an overall pattern of
22       short term or excessive trading was
23       occurring within their funds and to
24       determine whether such large or

**182**

1    correlated small trading was harmful or
2    disruptive.
3            Now in that sentence are
4        you speaking generally or are you also
5        speaking with respect to the portfolio
6        managers in the Columbia situation?
7    A   In this... in this paragraph I'm making
8        a general statement.  I'm saying that a
9        portfolio manager has responsibilities,
10       access to information, and professional
11       skills in making a particular judgment.
12   Q   Now, in the Columbia case does it
13       matter to you whether or not the
14       distributor people were actually
15       informed of timing arrangements?
16   A   Well, I think you have to look at my
17       opinion.  And with respect to my
18       opinion I'm pointing out that it's the
19       portfolio manager who's in a position
20       to judge whether particular timing
21       activity -- excuse me, or the
22       particular trading activity investor
23       flows are disruptive to the fund in
24       light of the portfolio manager's

**183**

1    responsibility and knowledge.
2    Q   And I understand that.  But
3        specifically in the sentence in
4        Paragraph 31 you say that the portfolio
5        managers were in a better position than
6        the distributor.
7            MS. HAYES:  Objection.
8    Q   I want to focus on the better position
9        aspect.
10   A   Sure.  You know what, let me just find
11       it.
12   Q   Sure.
13   A   Yeah, I found it.  Let me just...
14           Okay.
15   Q   So focusing on that aspect of portfolio
16       managers in a better position than the
17       distributor, my question to you is, in
18       our case here, in the Columbia case, do
19       you have an understanding that the
20       distributors were informed of the harm
21       to the funds from the market timing?
22           MS. HAYES:  Objection.
23   A   I don't know the facts about who was
24       informed about what in any level of

**184**

1    detail.  What I say here is that the
2    portfolio manager was in a better
3    position to identify -- than the
4    distributor to identify whether an
5    overall pattern of short-term excessive
6    trading was occurring and to determine
7    whether such large or correlated small
8    trading was harmful or disruptive.
9            So the statement that I
10       make here talks about identifying the
11       trading, short-term and excessive, and
12       determining whether that trading was
13       harmful or disruptive.  And I'm saying
14       that in coming to that determination
15       about whether the trading was harmful
16       or disruptive portfolio managers are in
17       better positions than distributors to
18       make that judgment.
19   Q   So it doesn't matter to you whether or
20       not there's e-mails that show portfolio
21       managers communicating to distributors
22       that there's harm to the funds --
23           MR. GOLD:  Objection.
24   Q   -- to Columbia?

46 (Pages 181 to 184)

ERIK R. SIRRI-1/13/12

185

1    MS. HAYES: Asked and
2    answered.
3    A    I think I've -- we've addressed that,
4    but what I would say is that I have
5    not -- this is a statement I'm making
6    about who's in a position to make the
7    judgment.
8    Q    So do you have any interest at all
9    having listened to my questions to you
10   today to review any of the e-mails in
11   this case that discuss portfolio
12   managers communicating to distributors
13   that there's harm in the funds?
14   A    I would say that -- I'm not sure about
15   the phrase interest, but what I would
16   say is I always want to have the best
17   information I can have to come to my
18   opinions. And I think I have the
19   information I need to come to the
20   opinions I offer.
21   Q    So even if I were to show you an e-mail
22   from a portfolio manager to a
23   distributor in Columbia, that wouldn't
24   change your opinion?

186

1    A    I can't -- it's hard for me to answer a
2    question about whether something I
3    haven't seen, it sounds like you're
4    citing something specific, would change
5    my opinion when I'm not sure what
6    opinion you're referring to when you
7    say my opinion.
8    Q    Well, you've obviously spent a lot of
9    time discussing this and I've
10   questioned you a lot about this, what
11   you reviewed as part of your work in
12   this case. And I just want to know if
13   there's any reason why you wouldn't
14   want to see e-mails from the portfolio
15   managers to the distributor in
16   Columbia.
17   A    And I think the reason that I don't
18   feel the need to see such e-mail is
19   that the opinions that I offer in this
20   matter are such that I feel like I have
21   all the information I need to come to
22   those opinions without reviewing the
23   e-mail you're discussing.
24   Q    Go to the next page in your report.

187

1    Paragraph 33 on Page 16. The paragraph
2    that begins, my understanding from
3    counsel.
4    What counsel are you
5    referring to?
6    A    Counsel would include attorneys who
7    work for Skadden, Arps and Greenberg
8    Traurig.
9    Q    So with respect to what you identify
10   here in Paragraph 33, what did counsel
11   tell you? You refer to your
12   understanding from counsel.
13   A    Just what the sentence says. I had
14   asked the question whether the actual
15   trading strategies of the people who
16   had these alleged arrangements, whether
17   those actual strategies were disclosed
18   to the defendants. I asked that
19   question. And counsel told me they
20   were not.
21   Q    Well, did you ask counsel to show you
22   the documents supporting what counsel
23   told you?
24   MS. HAYES: Objection.

188

1    A    I did not.
2    Q    Did you ask counsel to show you any
3    documents which discussed the trading
4    strategies of the market timers?
5    A    I did not.
6    Q    The other part of your sentence you say
7    that -- I think, if I'm correct,
8    counsel told you that the frequency of
9    trading activity and approximate dollar
10   amount was disclosed to the defendants.
11   Am I reading that correct?
12   A    I think it says that only the
13   approximate frequency of trading
14   activity and the approximate dollar
15   amount was disclosed to the defendants.
16   Q    And counsel told you that?
17   A    Counsel told me that.
18   Q    So you didn't ask counsel how they
19   understood that, did you?
20   MS. HAYES: Objection.
21   A    I'm -- who is they in your question?
22   I'm sorry.
23   Q    Sure.
24   In other words, counsel

47 (Pages 185 to 188)

KACZYNSKI REPORTING

ERIK R. SIRRI-1/13/12

---

**201**

1  market timers, and it talks about it
2  connects to short-term and excessive
3  trading. So it's about disclosure, but
4  it's also about understanding the
5  import behind the disclosure.
6  **Q  Let me ask you this. Would you turn to**
7  **Paragraph 43 on Page 21 of your report?**
8  **This is where you refer to finding no**
9  **SEC rule prior to the fall of 2003.**
10  **Do you see that section?**
11  A  (No response.)
12  **Q  Well, what about Rule 10b5? Wouldn't**
13  **that be an SEC rule that's applicable**
14  **to this situation?**
15  MR. GOLD: Objection.
16  MS. HAYES: Objection.
17  Calls for a legal conclusion.
18  A  I don't know that -- when I think about
19  market timing, short-term trading,
20  frequent trading, stale price arbitrage
21  within mutual funds, I was looking for
22  rules that addressed those practices as
23  I understand them. You've cited to an
24  antifraud rules, and I'm not sure I'm

---

**202**

1  in a position as a nonlawyer to say or
2  to opine on how that rule affects or
3  speaks to these practices.
4  **Q  But, I mean, you did work for the SEC**
5  **for a few years; correct?**
6  MS. HAYES: Objection.
7  **Q  And earlier in today's testimony you**
8  **did refer to the antifraud rules way**
9  **back earlier today; correct?**
10  MS. HAYES: Objection.
11  A  I did work for the SEC. And I have a
12  nonlawyer's understanding of why the
13  antifraud rules are important to the
14  Commission's policies and programs, but
15  I think that's different than opining
16  on how a particular rule in general
17  plays into activities that are not
18  precisely defined.
19  **Q  Well, do you have a nonlawyer's**
20  **understanding or opinion on the**
21  **implications of 10b5 as it applies to**
22  **disclosure violations?**
23  MR. GOLD: Objection.
24  A  Well, I would -- are you saying

---

**203**

1  disclosure violations, just generally
2  disclosure violations?
3  **Q  Well, we can relate it to our case**
4  **here. Allowing activity to happen as**
5  **alleged that goes in violation of the**
6  **prospectus disclosure.**
7  MR. GOLD: Objection.
8  A  Well, I would say that based on the
9  time I spent at the SEC I know that the
10  Commission uses 10b5, Section 10b and
11  10b5, when it alleges disclosure
12  violation issues. Beyond that, I'm not
13  sure I can talk very precisely about
14  when they do so and when they don't.
15  That's -- again, I'm not an attorney,
16  but I do understand that it's a
17  frequent tool that's used by the
18  Commission. Not always, but they do
19  use it when there are disclosure
20  violations.
21  **Q  Do you contemplate doing any additional**
22  **work at this point on the Tambone and**
23  **Hussey matter after you leave here**
24  **today?**

---

**204**

1  A  At this point I don't contemplate doing
2  any additional work unless new
3  materials are brought to me. But, no,
4  I do not contemplate doing additional
5  work.
6  **Q  So, for example, the materials I've**
7  **discussed with you today like the**
8  **depositions of Hussey and Tambone, you**
9  **don't contemplate going and reading**
10  **them after you leave here today?**
11  A  At this point I do not contemplate
12  going and reading them.
13  **Q  By way of background and to your**
14  **history, do you have any professional**
15  **licenses or affiliations?**
16  A  Licenses, no. Affiliations, I'm a
17  member of some academic societies. For
18  instance, if I subscribe to a journal,
19  I become a member automatically.
20  Anybody can become a member. So that's
21  an affiliation. But beyond that --
22  **Q  Do you have -- no professional -- for**
23  **example, a law degree would be a**
24  **professional license, for example.**

51 (Pages 201 to 204)